IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 13-cv-00573-RBJ-KMT
   (*Consolidated with* 13-cv-00574-RBJ-KMT, 13-cv-00576-RBJ-KMT,
   13-cv-00579-RBJ-KMT, 13-cv-00893-RBJ-KMT, and 13-cv-00892-RBJ)

DONALD THORNTON, individually and as Personal Representative of the ESTATE
OF JEAN THORNTON, and on behalf of all others similarly situated,

   Plaintiff,

v.

DAVITA HEALTHCARE PARTNERS, INC.,

   Defendant.

---

## FIRST AMENDED MASTER CONSOLIDATED COMPLAINT AND JURY DEMAND

---

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................1

II.    STATEMENT OF VENUE AND JURISDICTION ........................................................7

III.   PARTIES ....................................................................................................................7

IV.    COMMON FACTS....................................................................................................18

      A.     The Dialysis and Related Lab Services Business ...................................18

      B.     GranuFlo in Dialysis ...............................................................................19

            1.     GranuFlo and Dialysis Complications. ......................................19

      C.     How GranuFlo May Harm Dialysis Patients ...........................................20

      D.     DaVita Markets Itself as Superior Care ...................................................21

      E.     The Increased Use of GranuFlo Created Clear Indications of the
            Increased Risk of Cardiac Arrest Resulting from GranuFlo...................25

      F.     GranuFlo is Recalled...............................................................................28

      G.     Studies Show 941 Deaths........................................................................29

      H.     DaVita Knew or Should Have Known that use of GranuFlo was
            Contributing to High Dialysate Buffer Concentrations .........................30

V.     CLASS ACTION ALLEGATIONS ...........................................................................30

VI.    CHOICE OF LAW ALLEGATIONS...........................................................................32

VII.   CAUSES OF ACTION ..............................................................................................34

FIRST CAUSE OF ACTION  Failure to Warn (All Plaintiffs)...................................34

SECOND CAUSE OF ACTION  Breach of Implied Warranties (All Plaintiffs) ........36

THIRD CAUSE OF ACTION  Breach of Express Warranty (All Plaintiffs) ..............37

FOURTH CAUSE OF ACTION  Fraudulent Concealment (All Plaintiffs) ................38

FIFTH CAUSE OF ACTION  Negligence (All Plaintiffs) .........................................41

SIXTH CAUSE OF ACTION  Strict Products Liability (All Plaintiffs)......................44

003101-14 623226 V1

SEVENTH CAUSE OF ACTION  Wrongful Death (Allen, Harris, McAdams, Nunes and Thornton) ................................................................................................................46

EIGHTH CAUSE OF ACTION  Loss of Consortium (Harris, McAdams, Nunes, Minta and Perez) ........................................................................................................................46

NINTH CAUSE OF ACTION  Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq.* (All Plaintiffs) ...........................................................47

RELIEF REQUESTED.............................................................................................................50

DEMAND FOR JURY TRIAL ...............................................................................................51

003101-14  623226 V1

Plaintiffs, Suzette Allen, Tony Armstrong, Gaile Goosby, Sharon Harris, Helen McAdams, Armando Moreno, Doris Morris, Melvin Nunes, Emanuel and Louise Minta, Jose and Candida Perez, Donald Thornton, and Donald Young, by and through the undersigned counsel, bring this Master Consolidated Complaint in their individual capacities and on behalf of others similarly situated.  For their Complaint against Defendant DaVita Healthcare Partners, Inc. ("DaVita"), Plaintiffs allege as follows:

## I.    INTRODUCTION

1.    DaVita is one of the largest operators of dialysis centers in the United States, with a network of 1,954 outpatient dialysis centers in the U.S. throughout 44 states and the District of Columbia, serving a total of approximately 153,000 patients.  DaVita also operates acute inpatient dialysis centers in approximately 970 hospitals and provides related laboratory services throughout the U.S.  In operating these dialysis centers, DaVita engages physicians or groups of physicians as "medical directors" who refer patients to the DaVita clinic and provide dialysis services to the patients, while DaVita provides management and operations services, supplies the equipment for dialysis services, and supplies the products and drugs which are used in the dialysis process and sold to patients, including the GranuFlo and NaturaLyte products at issue in this lawsuit.

2.    Each of the Plaintiffs in this Master Consolidated Complaint, or the deceased loved-one the respective Plaintiff represents, received dialysis treatment in a clinic owned, managed, and operated by DaVita and each was administered dangerous levels of the acid concentrate known as GranuFlo and/or NaturaLyte (although the powdered bicarbonate concentrate product eventually came to be known by the name GranuFlo, there are indications that the NaturaLyte name may have been used interchangeably at times), which was supplied, distributed and sold to them by DaVita through its dialysis clinics.

- 1 -

3.     As described in detail below, DaVita knew or should have known that the GranuFlo product sold to Plaintiffs and administered during dialysis treatments could result in elevated bicarbonate levels leading to serious complications including cardiopulmonary arrest and death.  Nevertheless, DaVita continued selling the product and allowing it to be administered in its clinics to a large number of patients including the Plaintiffs herein or their loved-ones.  As a result, the Plaintiffs or their loved ones – as well as many similarly situated people around the country – suffered injuries or even death as a result of the GranuFlo that DaVita sold to them and that was administered to them at DaVita clinics.

4.     The FDA has made a finding that the GranuFlo and NaturaLyte products can lead to patient harm and serious or even fatal complications.  On March 29, 2012, the U.S. Food and Drug Administration ("FDA") issued a Class 1 recall of GranuFlo and NaturaLyte, dialysis products initially manufactured by Fresenius Medical Care ("Fresenius").  The use of either product can result in high bicarbonate levels that can cause metabolic alkalosis – a significant risk associated with low blood pressure, hypokalemia, hypoxemia, hypercapnia, and cardiac arrhythmia, which may culminate in cardiopulmonary arrest and death.

5.     Class 1 recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause adverse health consequences – or death.

6.     Medical research links GranuFlo and NaturaLyte to high bicarbonate levels that can cause a variety of health problems including:

- Cardiopulmonary arrest

- Heart problems

- Metabolic alkalosis

- 2 -

- Low blood pressure

- Sudden MI or heart attack

- Stroke, and

- Death

7.      Fresenius manufactures the GranuFlo and NaturaLyte products that DaVita mixes and sells to patients at its clinics.  The FDA recall states that Fresenius failed to disclose vital information to the FDA and health-care providers about the possible risk of high bicarbonate levels when administering these products.

8.      In response to the high rate of cardiac arrests that occurred in Fresenius Medical Care ("FMC") clinics in 2010, the company submitted an internal memo to its own dialysis clinics on November 4, 2011.

9.      After the FDA received an anonymous copy of the November 4th internal memo, company executives were forced to issue an urgent public product warning and recall to its customers that GranuFlo and NaturaLyte were associated with elevated bicarbonate levels and an increased risk for cardiopulmonary arrest and sudden cardiac death as well as stroke and other serious or even fatal complications.

10.      Fresenius conducted a case-control study that evaluated risk factors in hemodialysis patients who suffered from cardiopulmonary arrest in FMC facilities compared to other dialysis patients within the same facilities between January 1 and December 31, 2010. This study identified 941 patients in 667 FMC facilities who had cardiopulmonary (CP) arrests within the facilities.  Looking at the data for these 941 patients, the study found that the patients' risk of cardiopulmonary arrest was up to six times higher if they had an elevated pre-dialysis bicarbonate level.

- 3 -

11.     Cardiac death is recognized as the number one cause of death for dialysis patients, accounting for 59% of those deaths.  By 2010, the medical community had concluded that these cardiovascular-related deaths were not due primarily to atherosclerotic (plaques and arterial stiffening) disease, but rather uremic cardiomyopathy, characterized by left ventricular hypertrophy (LVH), LV dysfunction, and LV dilatation.  This conclusion caused many in the medical community, including FMC, to research the issue – too late to prevent GranuFlo and NaturaLyte related injuries.

12.     GranuFlo formulations are unique in that they use sodium diacetate (note the "di").  What was initially unnoticed by the prescribing physicians with the introduction of GranuFlo in 2003 is that it doubles the amount of acetate in dialysate compared to formulations made with acetic acid.  Instead of adding 4 mEq/L of acetate, it adds 8mEq/L.  This means that for dialysates made from GranuFlo, the total buffer level is 8 mEq/L higher than the bicarbonate level delivered from the bicarbonate concentrate.

13.     GranuFlo formulations are also unique in that they are delivered to the dialysis clinic in a powdered form, which then must be mixed with purified water in order to make a liquid concentrate that can be used in the dialysis process.  On information and belief, DaVita purchased the GranuFlo concentrate and the machines used to mix that concentrate with purified water, making the liquid concentrate that was sold to and then administered to patients in its clinics.  Thus, DaVita had control over the process of manufacturing and selling the end product – a liquid acid concentrate – to Plaintiffs that ultimately caused the injuries and deaths complained of herein.

14.     Lacking clinical knowledge, as well as a lack of effective product-related education from the original manufacturer or from DaVita, often exacerbates this situation.  If a

- 4 -

physician orders a bicarbonate level of 37 mEq/L for the patient, the clinic may set the dialysis machine to deliver 37 mEq/L from the bicarbonate concentrate alone.  If the clinic is using GranuFlo, the patient may receive a total buffer load of 45 mEq/L instead of the 37 mEq/L of bicarbonate normally prescribed by the physician.  Some DaVita clinics may have delivered, or may still be delivering, total buffer levels as high as 48 mEq/L, exposing patients to increased risk.

15.     The result is the delivery of higher bicarbonate levels than warranted, which can cause danger to patients.

16.     DaVita supplied and sold GranuFlo to patients receiving dialysis treatments in its clinics.  DaVita knew, or was negligent in not knowing, that its patients' pre-dialysis serum bicarbonate levels were gradually increasing and that patients were at an increased risk of cardiac arrest as a result.  DaVita physicians were not conducting prompt review of dialysate bicarbonate prescription levels in patients with a pre-dialysis Serum bicarbonate level of >24mEq/L.

17.     It is not credible that increased incidents of death and serious complications only occurred at Fresenius clinics and not at DaVita clinics that used the same products.

18.     There were several things DaVita could and should have done, but did not do, to protect its patients.  First, DaVita should have inspected and reviewed the composition of the concentrate and noticed changes.  Second, DaVita should have noticed that there was a significant upswing overall in the bicarbonate blood levels when their patients were returning for their dialysis treatments (which individually might not mean much because diet or dialysis sessions could account for it, but in the aggregate those explanations are unlikely to explain the uptick).  Third, they should be getting death and complication reports, so they should have noticed many more problems.  Each of these things would have alerted them on the front-end of

- 5 -

the problems and avoided many issues with pH imbalances and alkalosis.  DaVita failed to do

any of the above and thus exposed patients to problems caused by pH imbalance and alkalosis.

19.     The claims in this Master Consolidated Complaint arise out of deaths and injuries

caused by cardiac arrest or stroke following the use of defective NaturaLyte and/or GranuFlo

products.  As described further below, DaVita sold and administered the defective NaturaLyte

and/or GranuFlo products to each of the Plaintiffs (or their respective deceased loved-ones),

resulting in serious, painful and even fatal heart attacks or strokes.

20.     The injuries suffered by Mr. Armstrong, Ms. Goosby, Mr. Minta, Mr. Moreno,

Ms. Morris and Mr. Perez, Mr. Young, and the deaths of Ms. Gibson, Mr. Harris, Ms. McAdams,

Ms. Nunes, and Ms. Thornton, as with the death or injury of thousands of similarly situated

dialysis patients to whom GranuFlo products were supplied, sold and administered at DaVita

clinics all over the United States, were preventable.  These deaths and injuries occurred because

DaVita was negligent in recognizing that these products caused elevated levels of bicarbonate

resulting in an increased risk for cardiopulmonary arrest and sudden cardiac death, as well as

stroke and other serious or even fatal complications.  DaVita, which touts its programs for

evaluating patient outcomes and safety at the clinics for which it provides operational and

management including its use of its proprietary "DaVita Quality Index (DQI)" benchmarking

tool for tracking the performance of its clinics, failed to adequately investigate or study the

NaturaLyte and/or GranuFlo products prior to marketing it for use in dialysis.  Because of the

data regarding patient outcomes that DaVita tracked – both for purposes of its own DaVita

Quality Index or due to governmental regulations requiring DaVita to track and report adverse

patient outcomes, DaVita either knew – and failed to take remedial action – or should have

- 6 -

known of the dangerous propensities of the GranuFlo product it was mixing, distributing and

selling long before the Fresenius 2011 internal memorandum or the 2012 FDA recall notice.

## II.      STATEMENT OF VENUE AND JURISDICTION

21.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  There

is complete diversity of citizenship between Plaintiffs and Defendant, and the amount in

controversy exceeds $75,000.00.

22.      Venue is proper in this jurisdiction under 28 U.S.C. § 1391.  Defendant resides

and has its principal place of business in Colorado and is subject to personal jurisdiction in this

judicial district.

## III.      PARTIES

23.      Decedent, Sayoko Gibson, at all times relevant to this Master Consolidated

Complaint was a resident of the State of North Carolina.  Plaintiff Suzette Allen is over the age

of 18, is a resident of the State of North Carolina and is the daughter of the late Sayoko Gibson

and the personal representative of her estate.  Suzette Allen brings this complaint on behalf of the

estate of her deceased mother, Sayoko Gibson and on behalf of the members of the proposed

class.  On or about December 26, 2008, Sayoko Gibson went in for a dialysis treatment at DaVita

Waynesville Dialysis Center in Clyde, North Carolina.  On information and belief, DaVita

supplied and sold NaturaLyte and/or GranuFlo to Ms. Gibson, and those products were

administered to Ms. Gibson as part of that treatment.  While undergoing her dialysis treatment,

Ms. Gibson suddenly became unresponsive and lost consciousness. She was transported via

ambulance to Haywood Hospital in Clyde where despite emergency medical treatment she could

not be revived and remained unconscious.  Within a short time, she was transferred to Mission

Hospital in nearby Asheville, North Carolina, where the family learned she had suffered a heart

attack. The heart attack and resulting damage were so severe that Ms. Gibson never regained

- 7 -

consciousness and died on January 3, 2009.  Ms. Gibson ultimately died not from the renal
failure that required her to undergo dialysis, but rather from a heart attack which as is described
more fully below, was brought on by the defective NaturaLyte and/or GranuFlo products sold to
her by DaVita and administered to her in a DaVita clinic.

24.     Plaintiff Tony Armstrong is over the age of 18 and was at all times relevant to this
Master Consolidated Complaint a resident of the State of California.  Mr. Armstrong brings this
complaint on his own behalf and on behalf of the members of the proposed class.  On or about
August 15, 2011, Mr. Armstrong went in for a dialysis treatment at DaVita Oakland Dialysis
Center, in Oakland, California.  On information and belief, DaVita supplied and sold NaturaLyte
and/or GranuFlo to Mr. Armstrong, and those products were administered to Mr. Armstrong as
part of that treatment.  During his dialysis treatment, Mr. Armstrong began experiencing a
number of debilitating and frightening symptoms associated with a heart attack.  He developed a
rapid heartbeat, shortness of breath, left sided numbness, and confusion.  His condition
deteriorated so badly that his treatment was stopped and he was transported to directly to
Highland Hospital in Oakland, California.  Once at the hospital and after emergency treatment
began to stabilize his condition, Mr. Armstrong learned that he had suffered a heart attack and
was admitted to the hospital.  The heart attack was so severe that Mr. Armstrong still suffers
from its consequences. He still has numbness on his left side and continues to experience an
irregular heartbeat or palpitations.  Mr. Armstrong's heart attack was not the result of the renal
failure that required him to undergo dialysis, but rather as is described more fully below was
caused by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and
administered to him in a DaVita clinic.

25.     Plaintiff Gail Goosby is over the age of 18 and was at all times relevant to this Master Consolidated Complaint a resident of the State of California.  Ms. Goosby brings this complaint on her own behalf and on behalf of the members of the proposed class.  On or about November 17, 2010, Ms. Goosby went in for her regular dialysis treatment at DaVita Imperial Care Dialysis Center, located on East Imperial Highway in Lynwood, California.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Ms. Goosby, and those products were administered to Ms. Goosby as part of that treatment.  Shortly after returning home after completing her dialysis treatment, Ms. Goosby began experiencing a number of painful and frightening symptoms associated with a heart attack.  Ms. Goosby began to experience increasingly severe chest pain, which she initially thought might be heartburn or indigestion.  The pain waxed and waned, but worsened significantly that evening and began to spread into her back and shoulders, eventually becoming so intense that Ms. Goosby became nauseous and vomited multiple times.  Still thinking that the problem was indigestion, Ms. Goosby drove herself to the emergency room at Centinela Hospital Medical Center in Inglewood, California at around midnight and was admitted to the hospital early in the morning of November 18, where she was diagnosed having suffered a major heart attack.  The heart attack was so severe that Ms. Goosby was required to undergo multiple heart bypass procedures in the following weeks.  Even with the benefit of the life-saving emergency treatment she received, Ms. Goosby continues to suffer from the damage caused by her heart attack, and is still required to take cardiac medications.  Ms. Goosby's heart attack was not the result of the renal failure that required her to undergo dialysis, but rather as is described more fully below was caused by the defective NaturaLyte and/or GranuFlo products sold to her by DaVita and administered to her in a DaVita clinic.

- 9 -

26.     Decedent, John Harris, at all times relevant to this Master Consolidated Complaint was a resident of the State of Michigan.  Plaintiff Sharon Harris is over the age of 18, is a resident of the State of Michigan and is the wife of the late John Harris and the personal representative of his estate.  Mrs. Harris brings this complaint on behalf of the estate of her deceased husband, John Harris and on behalf of the members of the proposed class.  On or about July 1, 2008, John Harris went in for a dialysis treatment at DaVita Ionia Dialysis Center, in Ionia, Michigan.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Mr. Harris, and those products were administered to Mr. Harris as part of that treatment.  Approximately one hour after his typical four-hour dialysis treatment, Mr. Harris began experiencing a number of debilitating and frightening symptoms associated with a heart attack.  His face became flushed and he was in obvious distress, and then he suddenly lost consciousness.  His wife summoned emergency medical care and Mr. Harris was taken, via ambulance, to Butterworth Hospital in Grand Rapids, Michigan, where the family learned that Mr. Harris had suffered a heart attack.  He did not regain consciousness and remained comatose in the ICU for ten days before he died on July 10, 2008.  Mr. Harris ultimately died not from the renal failure that required him to undergo dialysis, but rather from a heart attack, which as is described more fully below, was brought on by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and administered to him in a DaVita clinic.

27.     Decedent, Elizabeth McAdams, at all times relevant to this Master Consolidated Complaint was a resident of the State of Arkansas.  Plaintiff Helen McAdams is over the age of 18, is a resident of the State of Arkansas and is the mother of the late Elizabeth McAdams and the personal representative of his estate.  Helen McAdams brings this complaint on behalf of the estate of her deceased daughter, Elizabeth McAdams, on behalf of Jeremiah McAdams, the

- 10 -

minor surviving son of Elizabeth McAdams, and on behalf of the members of the proposed class.

On or about November 20, 2012, Elizabeth McAdams went in for a dialysis treatment at DaVita

Independence County Dialysis in Batesville, Arkansas.  On information and belief, DaVita

supplied and sold NaturaLyte and/or GranuFlo to Ms. McAdams, and those products were

administered to Ms. McAdams as part of that treatment.  Within a few hours after completing her

typical four hour dialysis treatment, Ms. McAdams began to experience symptoms of weakness

and illness which progressively got worse over the next twenty-four hours.  On November 21,

Ms. McAdams became so weak that she could not walk and was in obvious distress.  While

preparations were being made to get her to the hospital, her condition deteriorated to the point

that she became unresponsive.  She was transported via ambulance to the emergency room at

White County Medical Center in Searcy, Arkansas, where, despite emergency medical treatment

and at the age of only thirty years, she was diagnosed as having suffered a heart attack and

pronounced dead.  Ms. McAdams ultimately died not from the renal failure that required her to

undergo dialysis, but rather from a heart attack, which as is described more fully below, was

brought on by the defective NaturaLyte and/or GranuFlo products sold to her by DaVita and

administered to her in a DaVita clinic.

28.     Plaintiffs Emanuel Minta and Louis Minta, husband and wife, at all times relevant

to this Master Consolidated Complaint were residents of the State of Georgia over eighteen years

of age.  Emanual & Louis Minta bring this complaint on their own behalf and on behalf of the

members of the proposed class.  On or about November 11, 2009, Mr. Minta went in for a

dialysis treatment at DaVita Fayetteville Dialysis in Fayetteville, Georgia.  On information and

belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Mr. Minta, and those products

were administered to Mr. Minta as part of that treatment.  Approximately one hour after

- 11 -

completing his typical four hour dialysis treatment, Mr. Minta began experiencing a number of painful, frightening and extreme symptoms associated with a stroke.  These symptoms began with dizziness, weakness, slowed walking, slurred speech, and extreme fatigue. Noticing Mr. Minta was unsteady on his feet, his wife, Louise Minta, took him to Fayetteville Community Hospital where emergency treatment was administered and he was diagnosed as having suffered a stroke. Even with the benefit of that life-saving emergency treatment, Mr. Minta continues to suffer from the damage caused by his stroke. Mr. Minta's stroke was not the result of the renal failure that required him to undergo dialysis, but rather was brought on by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and administered to him in a DaVita clinic, as described more fully below.

29.     Plaintiff Armando Moreno is over the age of 18 and was at all times relevant to this Master Consolidated Complaint a resident of the State of Arizona.  Mr. Moreno brings this complaint on his own behalf and on behalf of the members of the proposed class.  On September 8, 2011, Armando Moreno went in for a dialysis treatment at DaVita Tucson East Dialysis in Tucson, Arizona.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Mr. Moreno, and those products were administered to Mr. Moreno as part of that treatment.  At first, it appeared that everything had gone as normal during the dialysis session – Mr. Moreno left the clinic feeling tired and weak as usual, but he went to bed that night feeling otherwise normal.  However, between approximately 3:00 and 4:00 a.m. that night (September 9, 2011), Mr. Moreno awoke and found that he could not breathe. With extreme difficulty, he managed to dial 911 to summon emergency help and anxiously await their arrival.  He was transported by ambulance to Tucson Medical Center, where he was diagnosed as suffering from a heart attack.  He remained hospitalized for approximately one week, and required multiple

- 12 -

angioplasty surgeries.  Mr. Moreno's heart attack was not a result of the renal failure that required him to undergo dialysis, but rather was brought on by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and administered to him in a DaVita clinic, as described more fully below.

30.     Plaintiff Doris Morris is over the age of 18 and was at all times relevant to this Master Consolidated Complaint a resident of the State of Minnesota.  Doris Morris brings this complaint on her own behalf and on behalf of the members of the proposed class.  On or about April 17, 2012, Ms. Morris went in for a dialysis treatment at DaVita Robbinsdale Dialysis Clinic, in Minneapolis, Minnesota.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Ms. Morris, and those products were administered to Ms. Morris as part of that treatment.  Approximately twenty-four hours after her typical three-hour dialysis treatment, Ms. Morris began experiencing a number of debilitating and frightening symptoms associated with a heart attack.  She was in obvious distress and her son drove her to the Hennepin County Medical Center in Minneapolis where she received emergency treatment and was diagnosed as having suffered a heart attack.  The heart attack was so severe that Ms. Morris was admitted to the hospital where she remained for approximately one week before undergoing surgery to repair the damage to her heart.  Even with the benefit of that urgent course of treatment, Ms. Morris continues to suffer from the damage caused by her heart attack.  She still suffers from extreme fatigue and weakness, and cannot walk without the aid of a cane.  Ms. Morris's heart attack was not a result of the renal failure that required her to undergo dialysis, but rather was brought on by the defective NaturaLyte and/or GranuFlo products sold to her by DaVita and administered to her in a DaVita clinic, as described more fully below.

31.     Decedent, Stella Nunes, at all times relevant to this Master Consolidated Complaint was a resident of the State of California.  Plaintiff Melvin Nunes is over the age of 18, is a resident of the State of California and is the husband of the late Stella Nunes and the personal representative of her estate.  Melvin Nunes brings this complaint on behalf of the estate of his deceased wife, Stella Nunes and on behalf of the members of the proposed class.  On December 26, 2012, Stella Nunes went in for a dialysis treatment at DaVita Vacaville Dialysis Center in Vacaville, California.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Ms. Nunes, and those products were administered to Ms. Nunes as part of that treatment.  While undergoing her dialysis treatment, Ms. Nunes experienced shortness of breath and lost consciousness.  She was taken to the hospital, where she was diagnosed as suffering from a heart attack.  The damage, however, had already been done. Ms. Nunes died early in the morning on December 27, 2012.  Ms. Nunes ultimately died not from the renal failure that required her to undergo dialysis, but rather from a heart attack, which was brought on by the defective NaturaLyte and/or GranuFlo products sold to her by DaVita and administered to her in a DaVita clinic, as described more fully below.

32.     Plaintiffs Jose Perez and Candida Perez, husband and wife, at all times relevant to this Master Consolidated Complaint were residents of the State of Florida over eighteen years of age.  Mr. and Mrs. Perez bring this complaint on their own behalf and on behalf of the members of the proposed class.  On or about August 12, 2010, Mr. Perez went in for a dialysis treatment at DaVita Celebration Dialysis clinic in Celebration, Florida.  On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Mr. Perez, and those products were administered to Mr. Perez as part of that treatment.  Shortly after completing his typical four hour dialysis treatment, Mr. Perez began experiencing a number of painful, frightening and

- 14 -

extreme symptoms associated with a stroke, beginning with a severe and debilitating headache. Mr. Perez was in obvious distress, and was transported to Florida Hospital East Orlando in Orlando, Florida where he was diagnosed with having suffered a stroke. Mr. Perez remained hospitalized for eight days, several of which were spent in the ICU. Even with the benefit of that life-saving emergency treatment, Mr. Perez continues to suffer from the damage caused by his stroke. In addition to vision problems, Mr. Perez is unable to ambulate without assistance and must use a cane, a walker or a wheel chair to aid him when necessary. His wife, Candida Perez, is required to help him with his personal needs such as bathing. Mr. Perez's stroke was not the result of the renal failure that required him to undergo dialysis, but rather was brought on by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and administered to him in a DaVita clinic, as described more fully below.

33.     Decedent, Jean Thornton, at all times relevant to this Master Consolidated Complaint was a resident of the State of Wisconsin. Plaintiff Donald Thornton is over the age of 18, is a resident of the State of Wisconsin and the husband of the late Jean Thornton and the personal representative of her estate. Donald Thornton brings this complaint on behalf of the estate of his deceased mother, Jean Thornton and on behalf of the members of the proposed class. On November 3, 2011, Jean Thornton went in for a dialysis treatment at DaVita Harbor View Dialysis Clinic in Racine, Wisconsin. On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo to Ms. Thornton, and those products were administered to Ms. Thornton as part of that treatment. Approximately three hours after her treatment, after Ms. Thornton had returned to her home, she began to experience severe nausea and chest pains and informed her daughter that her entire body hurt. Ms. Thornton was in obvious pain and distress. After complaining to her daughter that she "did not feel right," Ms. Thornton took a deep breath,

started shaking uncontrollably and collapsed into her daughter's arms.  Emergency medical

services were immediately summoned, but their efforts to revive Ms. Thornton were

unsuccessful and she was declared dead that same day.  Ms. Thornton ultimately died not from

the renal failure that required her to undergo dialysis, but rather from a heart attack, which was

brought on by the defective NaturaLyte and/or GranuFlo products sold to her by DaVita and

administered to her in a DaVita clinic, as described more fully below.

34.      Plaintiff Donald Young is over the age of 18, and was at all times relevant to this

Master Consolidated Complaint a resident of the State of Pennsylvania. Mr. Young brings this

complaint on his own behalf and on behalf of the members of the proposed class.  On July 18,

2011, Donald Young went in for a dialysis treatment at DaVita Erie Dialysis in Erie,

Pennsylvania. On information and belief, DaVita supplied and sold NaturaLyte and/or GranuFlo

to Mr. Young, and those products were administered to Mr. Young as part of that treatment.

Approximately three hours into his dialysis treatment, Mr. Young began experiencing a number

of painful, frightening and extreme symptoms.  These symptoms began with severe stomach

pain, nausea, weakness and dizziness.  Mr. Young then began experiencing heavy chest pain and

noticed pain and tightness in his left arm as well as shortness of breath.  Mr. Young was in

obvious distress, and the clinic staff called 911.  While he was waiting for the emergency

responders to arrive, the pain became so severe that Mr. Young lost consciousness.  When he

next awoke, he was in the ambulance en route to the hospital, where he was diagnosed as having

experienced a massive heart attack.  The heart attack was so severe that Mr. Young was again

transported to a regional hospital in Pittsburgh, Pennsylvania, where he underwent emergency

heart surgery.  After that surgery, Mr. Young remained hospitalized for approximately three

weeks, part of which time he spent in a medically-induced coma.  Even with the benefit of that

- 16 -

life-saving emergency treatment, Mr. Young continues to suffer from the damage caused by his heart attack, and still has significant weakness and shortness of breath.  He requires the daily assistance of a home health nurse to care for his basic needs.  Mr. Young's heart attack was not the result of the renal failure that required him to undergo dialysis, but rather was brought on by the defective NaturaLyte and/or GranuFlo products sold to him by DaVita and administered to him in a DaVita clinic, as described more fully below.

35.     Defendant DaVita Healthcare Partners, Inc. ("DaVita") is a Delaware corporation with its principal place of business at 2000 16th Street, Denver, Colorado.  DaVita's U.S. dialysis and related lab services business is a leading provider of kidney dialysis services for patients suffering from chronic kidney failure or ESRD.  As of December 31, 2012, DaVita provided dialysis and administrative services through a network of 1,954 outpatient dialysis centers in the U.S. throughout 44 states and the District of Columbia, serving a total of approximately 153,000 patients.  DaVita also provides acute inpatient dialysis services in approximately 970 hospitals and related laboratory services throughout the U.S.

36.     As of December 31, 2012, DaVita operated or provided administrative services to a total of 1,954 U.S. outpatient dialysis centers.  A total of 1,929 such centers are consolidated in its financial statements.  The locations of the 1,929 U.S. outpatient dialysis centers consolidated in its financial statements on December 31, 2012, were as follows:

| **State** | **Centers** | **State** | **Centers** | **State** | **Centers** |
|---|---|---|---|---|---|
| California | 228 | New York | 41 | Nevada | 20 |
| Texas | 164 | Minnesota | 39 | Oregon | 20 |
| Florida | 149 | New Jersey | 38 | Nebraska | 15 |
| Georgia | 110 | Wisconsin | 37 | Massachusetts | 13 |
| Ohio | 89 | Colorado | 35 | Mississippi | 11 |
| Pennsylvania | 84 | Kentucky | 34 | District of Columbia | 10 |
| Illinois | 74 | Arkansas | 32 | Idaho | 9 |
| Michigan | 69 | Oklahoma | 32 | Utah | 4 |
| North Carolina | 65 | Louisiana | 27 | New Mexico | 4 |
| Virginia | 57 | South Carolina | 27 | West Virginia | 4 |
| Tennessee | 55 | Washington | 27 | Maine | 3 |

- 17 -

| State | Centers | State | Centers | State | Centers |
|-------|---------|-------|---------|-------|---------|
| Maryland | 54 | Arizona | 25 | South Dakota | 3 |
| Indiana | 50 | Kansas | 24 | New Hampshire | 2 |
| Missouri | 50 | Connecticut | 23 | North Dakota | 2 |
| Alabama | 47 | Iowa | 22 | Rhode Island | 1 |

## IV.    COMMON FACTS

### A.    The Dialysis and Related Lab Services Business

37.    The loss of kidney function is normally irreversible.  Kidney failure is typically caused by Type I and Type II diabetes, high blood pressure, polycystic kidney disease, long-term autoimmune attack on the kidney and prolonged urinary tract obstruction.  ESRD is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life.  Dialysis is the removal of toxins, fluids and salt from the blood of ESRD patients by artificial means.  Patients suffering from ESRD generally require dialysis at least three times a week for the rest of their lives.

38.    According to United States Renal Data System, there were approximately 415,000 ESRD dialysis patients in the U.S. in 2010 and the underlying ESRD dialysis patient population has grown at an approximate compound rate of 4.0% from 2000 to 2010, the latest period for which such data is available.  The growth rate is attributable to the aging of the population, increased incidence rates for diseases that cause kidney failure such as diabetes and hypertension, lower mortality rates for dialysis patients and growth rates of minority populations with higher than average incidence rates of ESRD.

39.    Hemodialysis, the most common form of ESRD treatment, is usually performed at a freestanding outpatient dialysis center, at a hospital-based outpatient center, or at the patient's home.  The hemodialysis machine uses an artificial kidney, called a dialyzer, to remove toxins, fluids and salt from the patient's blood.  The dialysis process occurs across a semipermeable membrane that divides the dialyzer into two distinct chambers.  While blood is circulated

- 18 -

through one chamber, a pre-mixed fluid is circulated through the other chamber.  The toxins, salt and excess fluids from the blood cross the membrane into the fluid, allowing cleansed blood to return into the patient's body.  Each hemodialysis treatment that occurs in the outpatient dialysis centers typically lasts approximately three and one-half hours and is usually performed three times per week.

40.     Hospital inpatient hemodialysis services are required for patients with acute kidney failure primarily resulting from trauma, patients in early stages of ESRD, and ESRD patients who require hospitalization for other reasons.  Hospital inpatient hemodialysis is generally performed at the patient's bedside or in a dedicated treatment room in the hospital, as needed.

41.     Some ESRD patients who are healthier and more independent may perform home-based hemodialysis in their home or residence through the use of a hemodialysis machine designed specifically for home therapy that is portable, smaller and easier to use.  Patients receive training, support and monitoring from registered nurses, usually in outpatient dialysis centers, in connection with their dialysis treatment.  Home-based hemodialysis is typically performed with greater frequency than dialysis treatments performed in outpatient dialysis centers and on varying schedules.

**B.      GranuFlo in Dialysis**

**1.      GranuFlo and Dialysis Complications.**

42.     Sudden cardiac arrest, also known as cardiopulmonary arrest, is the most dangerous complication of dialysis.  Unfortunately, the dialysis product GranuFlo, which DaVita mixed with purified water into a solution which it sold to its patients to be administered to them during the dialysis process in clinics it owned and operated, makes patients several times more susceptible to cardiac arrest.

- 19 -

43.     Dialysates such as GranuFlo are administered to patients to maintain the balance of acid and base in the blood.  This is because the kidneys of dialysis patients do not remove enough acid from the blood, which may consequently become too acidic, a serious condition known as acidosis.  To prevent acidosis, substances known as "dialysates" are administered during dialysis to neutralize acid in the blood.  A dialysate is a solution that includes both a bicarbonate and an acid.  A bicarbonate is an alkali, also known as a "base," and serves to neutralize or "buffer" some of the excess acid in the dialysis patient's blood.  The acid, or acetate, used in dialysates also serves to buffer some of the excess acid in the patient's blood. This is because the liver quickly converts acetate to bicarbonate.

44.     As a result, dialysis patients actually receive bicarbonate from two sources – from the bicarbonate concentrate used in the dialysate and, indirectly, from the acid concentrate used in the dialysate, which is then quickly converted into bicarbonate by the liver.  Taken together, the bicarbonate delivered to the patient through the bicarbonate concentrate and the bicarbonate converted by the liver from the acetate are known as the "total buffer."  These elements must be carefully balanced because both low pH levels ("acidosis") and high pH levels ("alkalosis") are extremely dangerous – and an excess total buffer can lead to alkalosis.

**C.     How GranuFlo May Harm Dialysis Patients**

45.     The acid concentrate traditionally used in dialysis has been a liquid acid. GranuFlo is a newer product composed of a dry acid powder which replaces the traditional liquid concentration.  The powder form is more concentrated than the liquid form leading to reduced shipping and storage costs compared to liquid formulations.  There is, however, an additional and crucial difference between the traditional acid concentrates and GranuFlo.  GranuFlo, unlike liquid acid concentrates, uses sodium diacetate, the powder form of acetic acid.  That powder must be mixed with purified water to create a liquid solution before it can be sold or distributed

- 20 -

to patients and then used in the dialysis process – that mixing is performed by the end-supplier, in this case, DaVita.

46.     The problem is that sodium diacetate – the material used in the GranuFlo product sold and distributed by DaVita – produces higher levels of bicarbonate in the body than more traditional dialysates.  When an acetate is combined with bicarbonate to make a dialysate, the combination results in no net increase in the amount of bicarbonate.  Stated simply, the acetate "consumes" an amount of bicarbonate equal to the amount that is produced by the liver as a result of the introduction of the acetate.  However, the introduction of sodium diacetate actually results in a net increase in the amount of bicarbonate being delivered by nearly twice that of any other product.

47.     The machines used to control the dialysis process track the levels of bicarbonate being introduced into the patient's body through a "bicarb value" displayed on the machine. This value, however, includes only the bicarbonate introduced via the bicarbonate concentrate – it does not include the bicarbonate being produced by the acetate.

48.     The result, as recognized in an internal Fresenius memo, is that the use of GranuFlo in the formulations given to dialysis patients can cause the blood of patients treated with GranuFlo to become not merely neutral but basic, a condition known as alkalosis which has been found to increase the risk of cardiac arrest several fold.  The FDA found this danger sufficient to issue a Class 1 FDA recall of GranuFlo, their most serious form of recall.

**D.      DaVita Markets Itself as Superior Care**

49.     DaVita promotes itself as providing superior care to patients:

Why Choose DaVita?

- 21 -



When it comes to choosing a dialysis provider, you want to know that you will receive superior care to maximize your quality of life.

**Discover Five Reasons to Choose DaVita**

- **Personalized Care Team** (http://www.davita.com/services/why-choose-davita/personalized-care-team)
- **Breadth of Care Options** (http://www.davita.com/services/why-choose-davita/breadth-of-care-options)
- **Clinical Leadership** (http://www.davita.com/services/why-choose-davita/clinical-leadership)
- **Accolades and Awards** (http://www.davita.com/services/why-choose-davita/accolades-and-awards)
- **Industry-Leading Education** (http://www.davita.com/services/why-choose-davita/industry-leading-education)

50.    DaVita represents that it has a team of specialists dedicated to patients:

Personalized Care Team



At DaVita®, our approach is to treat you, not just your kidney disease. Our dedicated and highly trained clinical care team works

- 22 -

closely with a broad range of specialists to address your physical, emotional and financial needs:

- **Nephrologists (kidney doctors)**: As physicians specializing in kidney care, nephrologists determine the treatment plan for their kidney care patients. DaVita's physician partners work closely with their clinical care team to identify the dialysis treatment option best suited to your unique health and lifestyle needs.
- **Nurses**: Nurses carry out the treatment plans outlined by the nephrologists and are integral members of the clinical care team. Nurses oversee each dialysis treatment from start to finish, checking vitals, reviewing any new lab results and supporting other members of the care team.
- **Dietitians**: Maintaining a kidney-friendly diet is a primary component of any dialysis treatment plan. DaVita's dietitians, who are specially trained in nutrition for people with chronic kidney disease, meet with patients to educate them about which foods to seek and which to avoid based on their unique dietary needs.
- **Social Workers**: DaVita's social workers actively support patients and their families during and after the transition to dialysis, helping manage the emotional, financial, career and lifestyle adjustments involved.
- **Care Technicians**: Dialysis care technicians facilitate the comfort and safety of patients in the dialysis center, monitoring the patients before, during and after treatment.
- **Insurance Specialists**: If you need help navigating your insurance options, DaVita has insurance specialists to help answer your questions.
- **Travel Planners**: DaVita has more than 1,600 dialysis centers nationwide, including ones located in virtually every popular vacation destination. Regardless of where you normally dialyze, let DaVita travel planners make arrangements for your next trip.
- **Facility Administrators**: DaVita's facility administrators manage the patient treatment schedule and all other aspects of dialysis centers' operations.
- **Emergency Services Providers**: When natural disasters or severe weather prevents dialysis centers from delivering care, DaVita's emergency services team responds so patients are accounted for and placed in alternate dialysis centers.
- **Call Center Support Specialists**: At DaVita, answers are just a phone call away — day or night. Support specialists are standing by to help you find the nearest dialysis center to your home or vacation destination, explain your treatment options, guide you through learning about kidney disease and more.

- 23 -

Your specialized clinical and support team works together to deliver personalized care.

**Learn more about DaVita:**

- Why Choose DaVita?  (http://www.davita.com/services/why-choose-davita)
- **Breadth of Care Options** (http://www.davita.com/services/why-choose-davita/breadth-of-care-options)
- **Clinical Leadership** (http://www.davita.com/services/why-choose-davita/clinical-leadership)
- **Accolades and Awards** (http://www.davita.com/services/why-choose-davita/accolades-and-awards)
- **Industry-Leading Education** (http://www.davita.com/services/why-choose-davita/industry-leading-education)

51.     DaVita represents itself as having "superior clinical research."

### CLINICAL LEADERSHIP



Superior care begins with superior clinical leadership. Led by some of the world's most acclaimed nephrologists, our Office of the Chief Medical Officer drives DaVita's clinical quality programs at our 1,600-plus dialysis centers around the country. Through continued innovation, DaVita® has produced 10 consecutive years of improvement in the DaVita Quality Index (DQI), a benchmarking tool created by our Physician Council to measure each dialysis center's outcomes against company-wide performance.

Through this dedication to providing high quality care, DaVita, our physician partners and our clinical care teams have achieved the following results for our patients:

- 24 -

- According to our annual patient satisfaction survey results, 96% of our patients would recommend DaVita for dialysis services
- Our clinical outcomes are the best or among the best in virtually every category, including 10 consecutive years of continued improvement
- In 2009, DaVita had the lowest day-90 catheter rates (the less preferred access method) among large dialysis providers, reducing the risk of hospitalization from infections and blood clots for its patients
- Since 2006, DaVita has exceeded other providers' influenza vaccination rates by as much as 40%, and vaccinations reduce hemodialysis patients' odds of hospitalization by 7%

52.    A reasonable consumer would have expected, based on the foregoing, that DaVita was carefully monitoring the safety and efficacy of GranuFlo.

**E.   The Increased Use of GranuFlo Created Clear Indications of the Increased Risk of Cardiac Arrest Resulting from GranuFlo**

53.    An internal memo from Fresenius dated November 4, 2011, indicated that Fresenius had knowledge that there was a significant increased risk of cardiac arrest and death during hemodialysis treatments associated with their GranuFlo dialysis concentrate product that contains sodium diacetate.

54.    Top Fresenius executives knew about the increased risk of cardiac arrest and death during hemodialysis treatments associated with their GranuFlo dialysis concentrate product since its introduction.

55.    The internal Fresenius memo which was circulated on November 4, 2011, specifically recommended action for patients with pre-dialysis bicarbonate levels of >28mEq/L and especially for those who also had pre-dialysis serum potassium levels of <4 mEq/L.  This 6-page internal FMC memo shows that for at least 15 months, Fresenius did not share this information with the thousands of non-Fresenius physicians and clinics that were using the GranuFlo product.

- 25 -

56.     The November internal Fresenius memo went on to state that, "[r]ecent analyses performed using FMCNA hemodialysis (HD) patient safety data confirms that alkalosis is a significant risk factor associated with cardiopulmonary (CP) arrest in the dialysis unit, independent of and additive to the risk of CP arrest associated with pre-dialysis hypokalemia. The major cause of metabolic alkalosis in dialysis patients is inappropriately high dialysate total buffer concentration.  As recommended in previous communications, physicians should individualize dialysate bicarbonate and total buffer prescriptions.  We further recommend that pre dialysis serum bicarbonate level of >24 mEq/L should prompt immediate review of dialysate bicarbonate prescription."

57.     The internal November memorandum went on to further state in its "summary of findings" that:  "The current analysis determined that:  *borderline elevated pre-dialysis bicarbonate levels and overt alkalosis are significantly associated with 6 to 8 fold greater increase of cardiopulmonary arrest and sudden cardiac death in the dialysis facility*."  (Italics in original.)  "In light of these troubling findings, we strongly recommend that physicians adjust dialysate bicarbonate prescriptions monthly for individual patients, with immediate attention to patients with serum pre-dialysis bicarbonate level of >24 mEq/L."  The memo further urges that this dangerous issue "needs to be addressed urgently."

58.     On March 27, 2012, Fresenius received an inquiry from the FDA specifically about GranuFlo-related products and alkalosis.  Only after the FDA inquiry did Fresenius provide a scientifically-ambiguous, 2-page memorandum, with far less actionable information, to its non-Fresenius customers.  This correspondence did not mention any patient blood levels and failed to discuss in any manner the most at-risk population of all, "acute" dialysis patients.

- 26 -

59.     The March 29th memo to non-Fresenius clinics and physicians contained only one of ten medical references that the FMC internal memo did.  The March 29th memo also bundled the risks of GranuFlo with another FMC acid concentrate product, NaturaLyte.

60.     In the internal November 4, 2011 Fresenius memo, GranuFlo use was associated with increased serum bicarbonate levels and alkalosis, as well as the increased possibility of cardiopulmonary arrests.

61.     Also in the internal November 4, 2011 Fresenius memo, the company noted that its own patients' serum pre-dialysis bicarbonate levels had gradually increased from 2004 to 2011.  Despite Fresenius' knowledge of this patient safety risk, more non-Fresenius clinics were actively being converted to the GranuFlo product even after knowledge of the risks that were made clear in the internal November 4, 2011 Fresenius memo.

62.     Through information and belief, during this same period of time, DaVita's purchase, distribution and sale of GranuFlo to its patients (after mixing with purified water to create a liquid acid concentrate used in the dialysis process and administered to patients in dialysis clinics it owned and operated) increased steadily, as did the serum pre-dialysis levels of its patients.  As a result of DaVita's gathering of statistics regarding patient outcomes both for its internal analysis of the performance of its dialysis clinics and as a result of governmental regulations and reporting requirements, DaVita had access to a steadily increasing pool of data which showed, or which DaVita should have realized showed, both a gradual increase in the serum pre-dialysis bicarbonate levels like that found by Fresenius, as well as an increased incidence of adverse events including cardiopulmonary arrest and sudden cardiac death associated with those increased levels.  In other words, even though Fresenius did not share its conclusions with DaVita, DaVita, as one of the largest dialysis companies in the United States,

- 27 -

had access to a similar pool of data.  Based on its own representations regarding its tracking of

patient outcomes and its analysis of data gathered from clinics its owns, manages and operates,

DaVita knew or should have known that patients to whom it was selling GranuFlo were

experiencing elevated bicarbonate levels and an associated increased risk of cardiopulmonary

arrest and sudden cardiac death.

63.     GranuFlo formulations are unique in the dialysis treatment world in that they use

sodium diacetate.  Through this formulation, GranuFlo doubles the amount of acetate in dialysate

compared to formulations made with acetic acid.  Instead of adding 4 mEq/L of acetate, it adds

8 mEq/L. This means that for dialysates made from GranuFlo, the total buffer level is 8 mEq/L

higher than the bicarbonate level delivered from the bicarbonate concentrate.

64.     This increased buffer level with GranuFlo products was never communicated by

DaVita to the physicians or nurses actually administering the products to the patients.  As a

result, the treating physicians and nurses could not account for the additional buffer in

formulating patient treatments, which could lead to significantly increased bicarbonate levels and

the associated risks of heart attack, cardio pulmonary arrest, and/or sudden cardiac death.

**F.     GranuFlo is Recalled**

65.     THE NEW YORK TIMES reported on June 14, 2012, that the Food and Drug

Administration was investigating whether the nation's largest operator of dialysis centers

violated federal regulations by failing to inform customers of a potentially lethal risk connected

to one of its products.

66.     The article quoted an FDA official:

> "Personally, I'm troubled by the fact that Fresenius on its own
> initiative didn't notify its entire customer base of this particular
> concern," Steven Silverman, director of compliance for the
> F.D.A.'s medical devices division, said in an interview this week.

- 28 -

> Mr. Silverman said the agency could issue a warning letter to Fresenius if it determined the company should have reported the safety concerns. But even if the company had no legal obligation, he said, "Candidly, I just think it's bad business and not in the interest of public health to sit on information about risks."

67.     The article also quoted:

> Dr. Thomas F. Parker III, chief medical officer at Renal Ventures, a dialysis chain that uses Fresenius products, agreed. "If the data was sufficient to warn their doctors, then all users of the product should have been made aware of it."

68.     On March 29, 2012, the FDA issued a Class 1 recall of GranuFlo and NaturaLyte, dialysis products. The use of either product can result in high bicarbonate levels that can cause metabolic alkalosis – a significant risk associated with low blood pressure, hypokalemia, hypoxemia, hypercapnia, and cardiac arrhythmia, which may culminate in cardiopulmonary arrest and death.

69.     Class 1 recalls are the most serious type of recall and involve situations in which there is a reasonable probability that use of these products will cause adverse health consequences – or death.

**G.     Studies Show 941 Deaths**

70.     Fresenius conducted a case-control study that evaluated risk factors in hemodialysis patients who suffered from cardiopulmonary arrest in Fresenius facilities compared to other dialysis patients within the same facilities between January 1 and December 31, 2010. This study identified 941 patients in 667 Fresenius facilities who had cardiopulmonary (CP) arrests within the facilities.  Looking at the data for these 941 patients, the study found that the patients' risk of cardiopulmonary arrest was up to <u>six times</u> higher if they had an elevated pre-dialysis bicarbonate level.

**H.     DaVita Knew or Should Have Known that use of GranuFlo was Contributing to High Dialysate Buffer Concentrations**

71.     Prior to use of GranuFlo as a key part of dialysis, DaVita should have understood the difference in how GranuFlo was made and what implications that might present to patient health.  DaVita should have inspected and reviewed the composition of the concentrate and noticed changes and investigated the potential impact of those changes.

72.     DaVita should have tested for and observed that there was a significant upswing overall in the bicarbonate blood levels when their patients were returning for their dialysis treatments and should have been analyzing aggregate data in this regard.

73.     DaVita should have been receiving death and complication reports so it should have observed a pattern of increased health problems associated with use of GranuFlo.

74.     To this day, DaVita has not alerted patients or doctors that heart attacks and other health issues following dialysis could have been caused by use of GranuFlo.  Clearly, the only credible conclusion is that DaVita clinics using the same product as Fresenius clinics must have produced the same or similar elevated risk of heart attacks and other health issues.

## V.     CLASS ACTION ALLEGATIONS

75.     Plaintiffs bring this action for damages on behalf of themselves individually or as personal representative of the estate of a deceased love one, and pursuant to Fed. R. Civ. P. 23(a), 23(b)(2) and 23(c)(4) on behalf of the Class identified below for injunctive relief and for the determination of certain issues of fact and law that apply generally to the Class.

76.     The Class is defined as:

> All patients treated with GranuFlo or NaturaLyte at a DaVita clinic.

77.     Class certification is warranted under Fed. R. Civ. P. 23 because the members of the Class are so numerous and geographically dispersed that joinder is impracticable; there are

- 30 -

questions of law and fact common to the members of the Class; Plaintiffs' claims are typical of the claims of the members of the Class that they represent; and Plaintiffs will fairly and adequately protect the interests of the Class.

78.     Plaintiffs have substantially the same interest in this matter as all other members of the Class, and Plaintiffs' claims arise out of the same facts and conduct as all other members of the Class.  All of the claims of Plaintiffs and Class members arise out of Defendant's sale and distribution of a product Defendant knew was dangerously defective and caused significant risk to patients, and from Defendant's failure to disclose this known safety risk and defect.

79.     Plaintiffs are committed to pursuing this action and have retained counsel experienced in complex products liability and class action litigation.  Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Class. Plaintiffs' claims are coincident with, and not antagonistic to, those of the other Class members they seek to represent.  Plaintiffs have no disabling conflicts with the members of the Class and will fairly and adequately represent the interests of the Class members.

80.     The elements for class certification under Rule 23 are met with respect to prerequisites for certification under Rule 23(a)(1) through (4).  Further, class certification is appropriate under Rule 23(b)(1) through (3) in that prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for Defendant; Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and questions of law and fact common to Class members predominate over questions affecting only individual members, and a class is superior to other methods for fairly and efficiently adjudicating the controversy.

81.     Plaintiffs seek class certification specifically under Rule 23(c)(4) to adjudicate

discrete questions of law and fact common to members of the Class.  Specifically, Plaintiffs seek

a determination of the following common questions of fact and law:

      a.     Whether GranuFlo and NaturaLyte is unreasonably
            dangerous and defective in its design and formulation in
            that it causes unsafe, rapid increases in bicarbonate levels
            and dangerously high levels of bicarbonate during dialysis
            treatment;

      b.     Whether GranuFlo and NaturaLyte is defective and
            unreasonably dangerous in design, formulation and
            distribution because it lacks adequate and appropriate
            instructions and warnings;

      c.     When DaVita knew or should have known that GranuFlo
            and NaturaLyte formulated with sodium diacetate in the
            concentration utilized from 2003 to date causes rapid
            increases in bicarbonate levels, elevated bicarbonate levels,
            and a 6 to 8 fold increased risk of CPA and sudden cardiac
            death; and

      d.     Whether DaVita concealed from clinics, clinicians, and
            patients that GranuFlo was dangerously defective in that it
            caused or contributed to dangerously high bicarbonate
            levels and the potential for CPA, sudden cardiac death, or
            other life-threatening conditions.

82.     Plaintiffs also seek to certify the Class for injunctive relief under Fed. R. Civ.

P. 23(b)(2) requiring that DaVita:  (1) disclose the identity of DaVita clinics and health care

providers which sold or otherwise distributed GranuFlo and NaturaLyte, and (2) notify members

of the Class, or permit the putative Class representative to notify members of the Class, pursuant

to Fed. R. Civ. P. 23(b)(2), of the information known to DaVita regarding GranuFlo and

NaturaLyte.

## VI.   CHOICE OF LAW ALLEGATIONS

83.     DaVita's principal place of business and corporate headquarters are located in

Denver, Colorado.  On information and belief, DaVita's corporate and executive leadership are

located in Colorado, as are its centralized offices and departments (including DaVita's Office of the Chief Medical Officer and Physician Council) for researching, gathering and analyzing data regarding clinical outcomes. According to DaVita's marketing materials, these departments – which comprise DaVita's "clinical quality programs" – and DaVita's management provide "superior clinical leadership" which guides the practices and policies for each of the dialysis clinics DaVita owns, manages and/or operates.

84.     DaVita personnel responsible for tracking clinical outcomes at DaVita clinics are also located at its headquarters in Denver, Colorado, as are the DaVita personnel responsible for formulating marketing materials and strategies, including those falsely touting DaVita's "superior clinical outcomes" and the safety and efficacy of the products it sold to dialysis patients in clinics it owned and managed. As a result, the statements, promises, and messages that form the express and implied warranties DaVita made to Plaintiffs and others similarly situated were originated in and made from Colorado. Moreover, the DaVita personnel responsible for communications with patients and with medical professionals in DaVita clinics are located in Colorado, thus, the core decision not to disclose and to fraudulently conceal the risks and dangers associated with GranuFlo was made and implemented from Colorado.

85.     Thus, the acts and omissions described herein related to DaVita's distribution and sale of GranuFlo: its failure to conduct sufficient investigations and studies before distributing and selling GranuFlo, its decision to market, sell, distribute and place GranuFlo into the stream of commerce, its failure to adequately monitor its clinical results in order to determine that its sale of GranuFlo was resulting in elevated incidents of cardiopulmonary arrest and sudden cardiac death associated with alkalosis or its failure to adequately inform and warn patients of those risks despite its knowledge of those risks through its internal programs and governmental

- 33 -

reporting requirements, among other things, all occurred in or emanated from DaVita's corporate

headquarters in Denver, Colorado.  Thus, the conduct and the failures to act that forms the basis

for each and every class member's claims against DaVita emanated from Colorado and is

properly governed by Colorado law.

## VII.   CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Failure to Warn (All Plaintiffs)

86.     Plaintiffs reallege and incorporate herein by reference each of the foregoing

paragraphs of this Master Consolidated Complaint as though fully set forth herein.

87.     DaVita distributed, manufactured and/or sold NaturaLyte and/or GranuFlo

products, which were used in treating Plaintiffs and they reached Plaintiffs without substantial

change in the condition in which they left the possession of the Defendant.  The products were

used and administered in the manner which had been contemplated.

88.     The NaturaLyte and GranuFlo supplied and sold by the Defendant was defective

due to inadequate warnings and/or instructions.  Defendant knew and/or should have known that

NaturaLyte and GranuFlo products had not been adequately tested prior to marketing and that

those products created significant risks of serious bodily harm and death to consumers – risks

which were reasonably foreseeable at the time of sale and/or could have been discovered by way

of reasonable testing prior to marketing the product.

89.     Defendant had a duty to, but failed to, adequately warn dialysis patients including

Plaintiffs, and the FDA, of such risks and/or provide adequate instructions that would allow its

products to be used without creating an unreasonable risk of harm to the consumer.  Had it issued

such warnings or instructions, the injuries and resulting death suffered by Plaintiffs as well as

thousands of similarly situated dialysis patients throughout the United States, could have been

- 34 -

reduced or avoided altogether.  Had DaVita provided adequate instructions or warnings, the physicians administering the dialysis treatments could have altered their prescription practices, adjusted their dialysis machines, or otherwise taken steps to ensure that they were accurately calculating the amount of bicarbonate being introduced into their patients' systems, thus preventing unintentional overdoses of bicarbonate.

90.    DaVita knew and/or should have known of the products' increased dangerous propensities as compared to other similar and comparable alternatives.  Those increased risks were known or discoverable through reasonable investigation to Defendant at the time of sale, yet DaVita failed to warn regarding these increased risks.

91.    DaVita, one of the world's largest users of dialysis concentrate products, is held to the level of knowledge of an expert in the field.  DaVita had or should have had specific actual knowledge of the dangerous risks and side effects of NaturaLyte and GranuFlo of which it failed to warn Plaintiffs, and/or protect them by providing adequate warnings or instructions regarding the use of those products.

92.    Plaintiffs did not have the same knowledge as Defendant and no adequate warning was communicated to them. The risks posed by these products were not obvious or generally known.

93.    DaVita had a continuing duty to warn consumers and the FDA of the risks and dangers associated with these products.  It negligently and/or wantonly breached its duty as follows:

a.    Failed to include adequate warnings with the hemodialysis products that would alert consumers to the dangerous risks and serious side effects of NaturaLyte and GranuFlo;

b.      Failed to include adequate instructions with the hemodialysis products that would allow these products to be used in a manner that would not create unreasonable risks to consumers;

c.      Failed to provide adequate warnings and instructions after the Defendant knew or should have known of the significant risks of heart attack, cardiac arrest, sudden cardiac death, and other adverse medical conditions from the use of NaturaLyte and GranuFlo; and

d.      Failed to inform Plaintiffs that NaturaLyte and GranuFlo had not been adequately and thoroughly tested for safety as a hemodialysis treatment.

94.     As a direct and proximate result of Defendant's failure to warn regarding the significant risks associated with its NaturaLyte and GranuFlo products that were sold, supplied, and introduced into the stream of commerce by Defendant or to provide adequate instructions for their use as set forth above, Plaintiffs sustained the injuries described herein.

## SECOND CAUSE OF ACTION

### Breach of Implied Warranties (All Plaintiffs)

95.     Plaintiffs reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

96.     When Defendant placed NaturaLyte and GranuFlo into the stream of commerce, it knew or should have known that the dialysis concentrates would be used for dialysis treatments just as Plaintiffs received.  Defendant impliedly warranted to the users of NaturaLyte and GranuFlo, as well as to other similarly situated dialysis patients and dialysis providers – that the products it used were safe and fit for their intended use in dialysis treatment.

97.     In fact, NaturaLyte and GranuFlo were not of merchantable quality and were not safe or fit for their intended use.  As described above, NaturaLyte and GranuFlo were unreasonably dangerous and unfit for the ordinary purposes for which they were used because

- 36 -

they created elevated levels of bicarbonate leading to significantly increased risks of serious or even fatal complications.  Moreover, as described above, Defendant failed to provide adequate instructions or warnings regarding these risks, which constitutes a further breach of its implied warranties.

98.     NaturaLyte and GranuFlo breached the warranties because they were unduly dangerous and not fit for their intended purpose as a result of defects in the design of the product and/or due to DaVita's failure to provide adequate instructions or warnings regarding its products.

99.     DaVita placed NaturaLyte and GranuFlo products into the stream of commerce in an unsafe, defective and inherently defective condition.  Those products were intended to and did reach users including Plaintiffs and other similarly situated dialysis patients without a substantial change in the condition in which DaVita sold the products.

100.     As a direct and proximate result of the breach of implied warranties by the Defendant, Plaintiffs sustained the injuries described herein.

## THIRD CAUSE OF ACTION

### Breach of Express Warranty (All Plaintiffs)

101.     Plaintiffs reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

102.     Defendant expressly warranted that NaturaLyte and GranuFlo were safe and fit for use in dialysis treatment, that they did not produce any dangerous side effects in excess of the risks associated with other acid concentrates used in dialysis treatments, that the products were adequately tested, and that the side effects they did produce were accurately reflected in the warnings accompanying the product.

- 37 -

103.     The NaturaLyte and GranuFlo manufactured, provided and sold by Defendant did not conform to these express representations because they were not safe and were unfit for the use for which they were intended.  As described more fully above, NaturaLyte and GranuFlo were defective in that their use in the manner and for the purposes intended creates an unreasonable risk of serious or even fatal complications and side effects in dialysis patients.  The products therefore are unsafe and unfit for use in dialysis treatment.  DaVita did not disclose or warn of these defects, complications or side effects, nor did it disclose that it had failed to adequately test its products prior to marketing them and warranting their fitness for use in dialysis treatments.

104.     Plaintiffs, as well as other similarly situated dialysis patients, reasonably relied upon the skill, judgment, representations and express warranties of DaVita as described above.

105.     DaVita knew or should have known that its warranties were false, misleading and untrue in that NaturaLyte and GranuFlo were not safe or fit for their intended purposes and in fact caused serious and even fatal complications and side effects that were not identified or included in warnings by DaVita.

106.     DaVita thus breached the express warranties described above because the products NaturaLyte and GranuFlo were defective and did not contain adequate warnings.

107.     As a direct and proximate result of the breach of express warranties by the Defendant, Plaintiffs sustained the injuries described herein.

## FOURTH CAUSE OF ACTION

### Fraudulent Concealment (All Plaintiffs)

108.     Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

- 38 -

109.     Defendant DaVita intentionally, willfully, wantonly or recklessly deceived Plaintiffs and other similarly situated dialysis patients, their prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and similarly situated dialysis patients and the public in general, by concealing from them the true and material facts concerning NaturaLyte and GranuFlo, which DaVita had a duty to disclose.

110.     DaVita knew or should have known that NaturaLyte and GranuFlo were not safe, fit, and effective for use in dialysis treatment.  Furthermore, Defendant was aware that the use of NaturaLyte and GranuFlo was hazardous to health, and that NaturaLyte and GranuFlo have a significant propensity to cause serious injuries to users, including, but not limited to, cardiac arrest, stroke and other serious and even fatal complications.

111.     DaVita was under an obligation to disclose the true facts regarding NaturaLyte and GranuFlo, including the increased risk of alkalosis and resulting increased risks of serious and fatal complications and side effects because the disclosure of those facts was necessary to keep its prior statements – including statements that its products were the "safest choice" and offered "superior clinical outcomes" as well as express warranties regarding the safety and efficacy of its products – from being misleading.  Moreover, the non-disclosed facts regarding the safety and fitness of NaturaLyte and GranuFlo for use in dialysis is basic to and goes to the very essence of the transaction.

112.     DaVita knew, but intentionally, willfully, wantonly or recklessly concealed and suppressed the true facts concerning NaturaLyte and GranuFlo with the intent to defraud Plaintiffs and other similarly situated dialysis patients, their prescribing physicians and

- 39 -

healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general.

113.     Specifically, DaVita fraudulently concealed or intentionally, willfully, wantonly or recklessly omitted the following facts:

a.     That NaturaLyte and GranuFlo were not as safe as other acid concentrates;

b.     That the risks of serious adverse side effects and complications associated with the use of NaturaLyte and/or GranuFlo were higher than those associated with the use of other acid concentrates in dialysis;

c.     That DaVita had not adequately tested risks of adverse side effects and complications associated with the use of NaturaLyte and/or GranuFlo prior to marketing and selling the products for use in dialysis;

d.     That the use of NaturaLyte and/or GranuFlo in connection with dialysis treatments resulted in elevated bicarbonate levels;

e.     That the use of NaturaLyte and/or GranuFlo in connection with dialysis treatments resulted in increased instances of alkalosis, a condition it knew could result in dangerous side effects and complications, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death;

f.     That NaturaLyte and/or GranuFlo were defective in that they caused dangerous side effects, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death at a much higher rate than other acid concentrates used in dialysis;

- 40 -

g.      That the administration of NaturaLyte and/or GranuFlo to dialysis patients resulted in dangerous side effects, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death;

h.      That physicians, dialysis providers, and/or health care facilities administering NaturaLyte and/or GranuFlo should monitor patients' bicarbonate levels more frequently than is common with other acid concentrates used in dialysis;

i.      That there existed procedures, adjustments and calculations that could render the use of NaturaLyte and/or GranuFlo for dialysis more safe and/or that could reduce or eliminate the increased risk of alkalosis and associated serious or even fatal side effects and complications;

j.      That NaturaLyte and/or GranuFlo were designed, manufactured, marketed, produced and distributed negligently.

114.    The foregoing facts were material, and indeed were central to the purpose of the underlying transaction – which was to receive effective and safe dialysis treatment.  Neither Plaintiffs nor any similarly situated dialysis patient would have chosen to use NaturaLyte and GranuFlo if adequately informed of the true facts concerning the dangers of NaturaLyte and GranuFlo.

115.    As a result of the foregoing fraudulent and deceitful conduct by Defendant as set forth above, Plaintiffs sustained the injuries described herein.

### FIFTH CAUSE OF ACTION

### Negligence (All Plaintiffs)

116.    Plaintiffs reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

- 41 -

117.    DaVita had a duty to exercise reasonable care in researching, supplying, selling and/or distributing NaturaLyte and/or GranuFlo and introducing such products into the stream of commerce.  This duty included the duty to ensure that the products would not cause users to suffer unreasonable, dangerous side effects.

118.    DaVita failed to exercise ordinary care in carrying out these duties and therefore breached them.  DaVita knew or should have known that NaturaLyte and/or GranuFlo, when used for their ordinary purpose and in the intended manner, caused elevated levels of bicarbonate in dialysis patients and created an unreasonable risk of dangerous and even lethal side effects including cardiac arrest, stroke, and other grave and serious conditions.  DaVita further knew or should have known that it had failed to adequately review, test and study the NaturaLyte and/or GranuFlo products to adequately ascertain their safety and efficacy prior to introducing them into the stream of commerce.

119.    DaVita had a duty to adequately warn, train, instruct and/or monitor treating physicians and dialysis treatment facilities to ensure that the NaturaLyte and/or GranuFlo products were being properly used and/or administered.

120.    Defendant failed to meet those duties and did not provide adequate warnings, training, instruction or monitoring to physicians and facilities administering the NaturaLyte and/or GranuFlo products.

121.    DaVita's negligence, including the wrongful acts and omissions of its agents, servants and/or employees, includes:

        a.      Selling NaturaLyte and/or GranuFlo without adequately or thoroughly testing them to determine whether and under what conditions they were safe for use despite knowing the significant dangers the products could pose to dialysis patients;

- 42 -

b.      Failing to provide adequate instructions regarding safety precautions and procedures to be observed in the administration and use of NaturaLyte and/or GranuFlo;

c.      Failing to adequately and accurately warn of the risks and dangers of NaturaLyte and/or GranuFlo;

d.      Advertising and recommending the use of NaturaLyte and/or GranuFlo without sufficient knowledge as to their dangerous propensities;

e.      Representing that NaturaLyte and/or GranuFlo were safe for use in dialysis treatment as intended, when in fact they were not safe;

f.      Negligently representing that NaturaLyte and/or GranuFlo were as or more safe and effective as other acid concentrates used in dialysis;

g.      Negligently designing, manufacturing, producing, or assembling NaturaLyte and/or GranuFlo in a manner that was dangerous to their users;

h.      Negligently communicating the dangers and risks associated with the use of NaturaLyte and/or GranuFlo to Plaintiffs, to the medical community, and to the general public, including other similarly situated dialysis patients;

i.      Concealing, misrepresenting or failing to reveal information to Plaintiffs, to the medical community, to the FDA and to the general public including other similarly situated dialysis patients suggesting that NaturaLyte and/or GranuFlo were unsafe, dangerous and/or did not conform to FDA regulations;

j.      Concealing, misrepresenting or failing to reveal information to Plaintiffs, to the medical community, to the FDA and to the general public including other similarly situated dialysis patients suggesting that NaturaLyte and/or GranuFlo presented more severe risks and dangers than other acid concentrates used in dialysis; and

- 43 -

k.      Under-reporting, underestimating and downplaying the serious and even lethal risks and dangers associated with the use of NaturaLyte and/or GranuFlo in dialysis.

122.    Despite the fact that DaVita knew or should have known that NaturaLyte and/or GranuFlo caused unreasonably dangerous side effects, including, but not limited to, cardiac arrest, stroke and even death among other serious conditions, Defendant continued to distribute NaturaLyte and/or GranuFlo to consumers, including Plaintiffs.

123.    Defendant's actions, by violating statutes, ordinances and/or other rules and regulations, constituted negligence *per se*.

124.    Defendant's negligence was the proximate cause of the injuries and damages alleged herein.

## SIXTH CAUSE OF ACTION

### Strict Products Liability (All Plaintiffs)

125.    Plaintiffs reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

126.    At all times herein mentioned, DaVita researched, advertised, promoted, marketed, sold, and/or distributed NaturaLyte and/or GranuFlo as described above, which was administered to and/or used by Plaintiffs.

127.    DaVita expected NaturaLyte and/or GranuFlo to, and those products did, reach the usual consumers, handlers, and persons coming into contact with said products without substantial change in the conditions in which they were sold, distributed, and marketed by DaVita.

128.    At all times relevant to this action, NaturaLyte and/or GranuFlo were in an unsafe, defective, and inherently dangerous condition, which were dangerous to users, and in particular, Plaintiffs.  Plaintiffs could not, by the exercise of reasonable care, have discovered the

- 44 -

defects described above or perceived their danger.  DaVita, on the other hand, knew or could have discovered through reasonable investigation that such products were defective and unsafe, particularly when used in the form and manner prescribed by Defendant.

129.   The acid concentrates, NaturaLyte and/or GranuFlo, promoted, sold and distributed by DaVita were defective in design or formulation in that, when they left the hands of DaVita, the foreseeable risks exceeded the benefits associated with the design or formulation of NaturaLyte and/or GranuFlo, were unreasonably dangerous, and were more dangerous than an ordinary consumer would expect.

130.   During the dialysis treatment provided to Plaintiffs, which ultimately led to their respective injuries and deaths, the NaturaLyte and/or GranuFlo products sold by DaVita to them were being used for the purposes and in the manner normally intended.

131.   Defendant had a duty to create products that were not unreasonably dangerous for their normal, intended use.  Instead, Defendant did create products, specifically NaturaLyte and/or GranuFlo, which were unreasonably dangerous when put to their normal intended uses.

132.   The acid concentrates, NaturaLyte and/or GranuFlo, researched, tested, promoted, marketed, sold and distributed by Defendant were manufactured defectively in that NaturaLyte and/or GranuFlo left the hands of Defendant in defective conditions and were unreasonably dangerous to their intended users.  They reached their intended users in the same defective and unreasonably dangerous conditions.

133.   Defendant researched, tested, promoted, sold and distributed defective products which created an unreasonable risk to the health of consumers and to Plaintiffs in particular, and Defendant is therefore strictly liable for the injuries and damages alleged herein.

## SEVENTH CAUSE OF ACTION

### Wrongful Death (Allen, Harris, McAdams, Nunes and Thornton)

134.    Plaintiffs Suzette Allen, Sharon Harris, Helen McAdams, Melvin Nunes, and Donald Thorton reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

135.    As a direct and proximate result of Defendant's negligence and otherwise culpable acts described herein, Sayoko Gibson, John Harris, Elizabeth McAdams, Stella Nunes, and Jean Thornton (the "decedents") received NaturaLyte and/or GranuFlo which caused them to sustain injuries that caused them to experience conscious suffering and caused their deaths.

136.    The injuries and death of the decedents as alleged more fully herein directly resulted from Defendant's negligent and otherwise culpable acts, omissions, and/or misrepresentations.

## EIGHTH CAUSE OF ACTION

### Loss of Consortium (Harris, McAdams, Nunes, Minta and Perez)

137.    Plaintiffs Sharon Harris, Helen McAdams, Melvin Nunes and Mrs. Minta and Candida Perez reallege and incorporate herein by reference each of the foregoing paragraphs of this Master Consolidated Complaint as though fully set forth herein.

138.    At all times relevant hereto, Sharon Harris, Melvin Nunes and Mrs. Minta and Candida Perez were lawfully married each to their respective spouses, now deceased.  At all times relevant hereto, Jeremiah McAdams, on whose behalf this action is brought, was minor son of his now deceased mother Elizabeth McAdams.

139.    As a direct and proximate result of the conduct of Defendants described herein, Plaintiffs have been deprived of the comfort, society, aid, services, consortium, and support of

- 46 -

their respective spouses or parent, and have otherwise suffered economic and other loss, the

extent of which will be more fully adduced at the trial of this matter.

## NINTH CAUSE OF ACTION

**Violation of the Colorado Consumer Protection Act, C.R.S. § 6-1-101 *et seq.* (All Plaintiffs)**

140.     Plaintiffs reallege and incorporate herein by reference the foregoing paragraphs of

this Master Consolidated Complaint as though fully set forth herein.

141.     Defendant DaVita engaged in an unfair or deceptive trade practice by

intentionally, willfully, wantonly or recklessly deceiving Plaintiffs and other similarly situated

dialysis patients, their prescribing physicians and healthcare providers, the medical, scientific,

pharmaceutical and healthcare communities, the FDA, and similarly situated dialysis patients

and the public in general, by concealing from them the true and material facts concerning

NaturaLyte and GranuFlo, which DaVita had a duty to disclose.

142.     DaVita knew that NaturaLyte and GranuFlo were not safe, fit, and effective for

use in dialysis treatment.  Furthermore, Defendant was aware that the use of NaturaLyte and

GranuFlo was hazardous to health, and that NaturaLyte and GranuFlo have a significant

propensity to cause serious injuries to users, including, but not limited to, cardiac arrest, stroke

and other serious and even fatal complications.

143.     DaVita was under an obligation to disclose the true facts regarding NaturaLyte

and GranuFlo, including the increased risk of alkalosis and resulting increased risks of serious

and fatal complications and side effects because the disclosure of those facts was necessary to

keep its prior statements – including statements that its products were the "safest choice" and

offered "superior clinical outcomes" as well as express warranties regarding the safety and

efficacy of its products – from being misleading.  Moreover, the non-disclosed facts regarding

- 47 -

the safety and fitness of NaturaLyte and GranuFlo for use in dialysis is basic to and goes to the very essence of the transaction.

144.   DaVita knew, but intentionally, willfully, wantonly or recklessly concealed and suppressed the true facts concerning NaturaLyte and GranuFlo with the intent to defraud Plaintiffs and other similarly situated dialysis patients, their prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general.

145.   Specifically, DaVita fraudulently concealed or intentionally, willfully, wantonly or recklessly omitted the following facts:

a.   That NaturaLyte and GranuFlo were not as safe as other acid concentrates;

b.   That the risks of serious adverse side effects and complications associated with the use of NaturaLyte and/or GranuFlo were higher than those associated with the use of other acid concentrates in dialysis;

c.   That DaVita had not adequately tested risks of adverse side effects and complications associated with the use of NaturaLyte and/or GranuFlo prior to marketing and selling the products for use in dialysis;

d.   That the use of NaturaLyte and/or GranuFlo in connection with dialysis treatments resulted in elevated bicarbonate levels;

e.   That the use of NaturaLyte and/or GranuFlo in connection with dialysis treatments resulted in increased instances of alkalosis, a condition it knew could result in dangerous side effects and complications, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death;

f.      That NaturaLyte and/or GranuFlo were defective in that they caused dangerous side effects, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death at a much higher rate than other acid concentrates used in dialysis;

g.      That the administration of NaturaLyte and/or GranuFlo to dialysis patients resulted in dangerous side effects, including, but not limited to, cardiopulmonary arrest, electrolyte imbalances, hypokalemia, hypoxemia, hypercapnia, cardiac arrhythmias, coma, stroke, hypotension and even death;

h.      That physicians, dialysis providers, and/or health care facilities administering NaturaLyte and/or GranuFlo should monitor patients' bicarbonate levels more frequently than is common with other acid concentrates used in dialysis;

i.      That there existed procedures, adjustments and calculations that could render the use of NaturaLyte and/or GranuFlo for dialysis more safe and/or that could reduce or eliminate the increased risk of alkalosis and associated serious or even fatal side effects and complications;

j.      That NaturaLyte and/or GranuFlo were designed, manufactured, marketed, produced and distributed negligently.

146.    The foregoing concealments and misrepresentations, which constitute unfair or deceptive trade practices under the Colorado Consumer Protection Act, occurred in the course of DaVita's business, and significantly impacted the public as actual or potential consumers of dialysis services.

147.    Each of the Plaintiffs or their respective decedents suffered actual injuries in the form of serious and even fatal heart attacks and strokes, resulting from DaVita's concealment of

the true dangerous nature of the products it sold and administered to Plaintiffs or their respective

decedents.  Neither Plaintiffs nor any similarly situated dialysis patient would have chosen to use

NaturaLyte and GranuFlo if adequately informed of the true facts concerning the dangers of

NaturaLyte and GranuFlo.

148.    As a result of the foregoing fraudulent and deceitful conduct in violation of the

Colorado Consumer Protection Act by DaVita as set forth above, Plaintiffs sustained the injuries

described herein.

### RELIEF REQUESTED

WHEREFORE, Plaintiffs pray for judgment against Defendant as appropriate to each

cause of action alleged as follows:

A.    Determining that this action is a proper class action and certifying Plaintiffs as

Class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.    Past and future general damages, the exact amount of which has yet to be

ascertained, in an amount which will conform to proof at time of trial;

C.    Past and future economic and special damages according to proof at the time of

trial;

D.    Loss of earnings and impaired earning capacity according to proof at the time of

trial;

E.    Medical expenses, past and future, according to proof at the time of trial;

F.    For past and future mental and emotional distress, according to proof;

G.    Punitive or exemplary damages according to proof at the time of trial;

H.    Restitution and other equitable relief;

I.    Injunctive relief;

J.    Attorney's fees;

- 50 -

K.      For costs of suit incurred herein;

L.      For pre-judgment interest as provided by law; and

M.      For such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, through undersigned counsel, hereby demand a jury trial on all counts in this

Complaint.


DATED:  July 8, 2013                    By:   */s/ Steve W. Berman*
                                            Steve W. Berman
                                        Garth D. Wojtanowicz
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 Eighth Avenue, Suite 3300
                                        Seattle, WA  98101
                                        Telephone:  (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        E-mail:  steve@hbsslaw.com
                                                garth@hbsslaw.com


                                        Leif Garrison
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        2301 E. Pikes Peak Avenue
                                        Colorado Springs, CO  80909
                                        Telephone:  (719) 327-5829
                                        Facsimile:  (719) 635-2920
                                        E-mail:  leifg@hbsslaw.com


                                        Robert B. Carey
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        11 West Jefferson Street, Suite 1000
                                        Phoenix, AZ  85003
                                        Telephone:  (602) 840-5900
                                        Facsimile:  (602) 840-3012
                                        E-mail: rob@hbsslaw.com

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 8th day of July, 2013, a true and correct copy of the

foregoing was filed with the Clerk of Court using the CM/ECF system, which will send

notification of such filing to the following:

- **Robert Bruce Carey**
  rob@hbsslaw.com,ecfphx@hbsslaw.com,clareb@hbsslaw.com
- **Leif Garrison**
  leifg@hbsslaw.com,clareb@hbsslaw.com,chrism@hbsslaw.com,mickim@hbsslaw.com
- **Joseph Edwin Hopkins**
  jhopkins@pattonboggs.com,sneafsey@pattonboggs.com,cscull@patonboggs.com,scarr@
  pattonboggs.com
- **Lisa Ann T. Ruggiero**
  lruggiero@pattonboggs.com,sneafsey@pattonboggs.com,cscull@pattonboggs.com,agran
  t@pattonboggs.com,scarr@pattonboggs.com
- **James Edward Tyrrell, Jr**
  jtyrrell@pattonboggs.com,sneafsey@pattonboggs.com,cscull@pattonboggs.com,scarr@p
  attonboggs.com,mmajor@pattonboggs.com
- **John Voorhees**
  voorhees@pattonboggs.com,sneafsey@pattonboggs.com,jwsmith@pattonboggs.com,csc
  ull@pattonboggs.com,scarr@pattonboggs.com
- **Garth Daniel Wojtanowicz**
  garthw@hbsslaw.com,carrie@hbsslaw.com


_/s/ Steve W. Berman_
Steve W. Berman