1       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLORADO
2

3    Civil Action No. 13-cv-00573-RBJ-KMT
     Member Cases:  13-cv-00574, 13-cv-00579, 13-cv-00893,

4    DORIS MORRIS; TONY ARMSTRONG; and MELVIN NUNES, as personal
     representative of the Estate of Stella Nunes,
5

6        Plaintiffs,

7    vs.

8    DAVITA HEALTHCARE PARTNERS, INC.,

9        Defendant.

10   _____

11                        REPORTER'S TRANSCRIPT
              Class-Certification and Daubert Hearing, Day 1

12   _____

13            Proceedings before the HONORABLE R. BROOKE

14   JACKSON, Judge, United States District Court for the District

15   of Colorado, commencing at 8:58 a.m., on the 29th day of April,

16   2015, in Courtroom A902, Alfred A. Arraj United States

17   Courthouse, Denver, Colorado.

18                           APPEARANCES

19        GARTH WOJTANOWICZ, CRAIG VALENTINE, Hagens Berman

20   Sobol Shapiro, LLP; STUART PAYNTER, for plaintiffs.

21        JOSEPH HOPKINS, JAMES TYRRELL, LISA RUGGIERO, and

22   PATRICK GILMARTIN, Edwards Wildman Palmer, LLP, for defendant.

23

24   Proceeding Reported by Mechanical Stenography, Transcription
            Produced via Computer by Kara Spitler, RMR, CRR,
25         901 19th Street, Denver, CO, 80294, (303) 623-3080

```
 1              P R O C E E D I N G S

 2        (In open court at 8:58 a.m.)

 3              THE COURT:  Good morning, folks.

 4              ALL:  Good morning.

 5              THE COURT:  Plaintiff is Morris now.  Doris Morris now

 6    your no. 1 lead plaintiff, vs. DaVita Healthcare Partners,

 7    13-cr-573.

 8                    Appearances.  Plaintiff.

 9              MR. PAYNTER:  Stuart Paynter for the plaintiff.

10              MR. VALENTINE:  Craig Valentine for the plaintiff.

11              MR. WOJTANOWICZ:  And Garth Wojtanowicz for the

12    plaintiff.

13              THE COURT:  Did you guys change seats?

14              MS. RUGGIERO:  Lisa Ruggiero for the defendant, DaVita

15    Healthcare Partners, Inc.

16              THE COURT:  Hold on.  Hold on.  We'll get there.  Not

17    to worry.

18              MS. RUGGIERO:  Okay.

19              THE COURT:  All right.

20              MS. RUGGIERO:  All right.  Lisa Ruggiero for

21    defendant, DaVita Healthcare Partners, Inc.

22              THE COURT:  Whoa, you're going to have to speak louder

23    than that, or we'll have a problem.

24              MS. RUGGIERO:  Lisa Ruggiero, Your Honor.

25              MR. HOPKINS:  Joseph Hopkins, Your Honor, for
```

1    defendant.

2                  THE COURT:  Two.

3                  MR. TYRRELL:  James Tyrrell for defendant, DaVita.

4                  THE COURT:  Three.

5                  MR. BELL:  Jonathan Bell with defendant, Your Honor.

6                  THE COURT:  Four.

7                  MR. GILMARTIN:  Patrick Gilmartin of Locke Lord also

8    for DaVita.

9                  THE COURT:  So it takes five to represent DaVita.

10                 MR. HOPKINS:  He's with the company, Your Honor, so

11   maybe he doesn't count.

12                 THE COURT:  Ah, the company man.

13                 Which one was it again?

14                 MR. BELL:  Jonathan Bell, Your Honor.

15                 THE COURT:  Are you the in-house lawyer, Mr. Bell?

16                 MR. BELL:  Yes, I am, Your Honor.

17                 THE COURT:  Okay.

18                 Anyone else, or is that all the lawyers that we are

19   going to have on this today?

20                 MR. PAYNTER:  That will be all for the plaintiffs,

21   Your Honor.  I just wanted to let the Court know that

22   Mr. Berman, who was going to be the lead attorney for this

23   hearing, had a health issue yesterday.  He was on a blood

24   thinner and it's not life-threatening or anything like that;

25   but he was unable -- his doctor forbid him from flying.  So he

1    was unable to come in.  We were taking over, so we would maybe

2    ask the Court to indulge us a little bit because we're catching

3    up on stuff that Mr. Berman was prepared to do.

4              THE COURT:  All right.

5              Speaking of that, where do you all come from?  Where

6    do the plaintiff lawyers come from?

7              MR. PAYNTER:  Washington, D.C., Your Honor.

8              THE COURT:  All three?

9              MR. VALENTINE:  I'm in Colorado Springs, Your Honor.

10             MR. WOJTANOWICZ:  And I'm from Seattle, Your Honor.

11             THE COURT:  So Mr. Wojtanowicz is from Seattle.

12             MR. WOJTANOWICZ:  Correct.

13             THE COURT:  Mr. Valentine from Colorado Springs,

14   Mr. Paynter from D.C.

15             I only ask because I would like to make sure that you

16   guys get your flight.

17             And how about the crowd for DaVita?

18             MR. TYRRELL:  Very simply, Your Honor, all from New

19   Jersey.  Except Mr. Bell.

20             THE COURT:  He's local.

21             MR. BELL:  From North Carolina, Your Honor.

22             THE COURT:  North Carolina.

23             MR. BELL:  Yes, Your Honor.

24             THE COURT:  And you folks probably have flights

25   tomorrow sometime.

1      MR. HOPKINS:  Our flights are on Friday, Your Honor.

2      MR. TYRRELL:  Friday morning, Your Honor.

3      THE COURT:  Well, I don't know if we'll finish this

4   today or not, but let's try to get it finished at least by

5   midday tomorrow, so who wants to go home can go home.  Also, it

6   shouldn't take more time than that.

7      All right.  Unless you want to stand for the next two

8   days, you might want to sit down.

9      Now, you proposed a method by which you wish to

10  proceed, and that's fine.  I really don't care, so go right

11  ahead.

12     MR. HOPKINS:  Your Honor, there are three motions on

13  for argument, Your Honor, and then a few remaining issues

14  regarding admissibility, and then we go straight to openings.

15  Per the email communication we had with the Court last week, we

16  indicated we'd be spending as little time as possible, but

17  arguing the Daubert motions first, Your Honor.

18     THE COURT:  Fine.  Go ahead.

19     You want to knock out their two experts.  Are they

20  their only two experts?

21     MR. HOPKINS:  Yes, Your Honor.

22     THE COURT:  And they want to knock out your expert.

23  Your only expert?

24     MR. HOPKINS:  They've asked to limit the testimony of

25  our expert in certain regards, and we're asking for both of

 1   their experts to be, their testimony to be excluded.

 2        THE COURT:  Right.

 3        In other words, the two sides just want, if they can

 4   possibly get the Court to do it, to knock out all the expert

 5   testimony or at least most of it.

 6        MR. HOPKINS:  Plaintiffs have, as I said, moved to

 7   exclude portions of Dr. Goldfarb's testimony, not what I would

 8   consider at least, Your Honor, half of it.

 9        THE COURT:  All right.  So you're Mr., what?

10        MR. HOPKINS:  Hopkins, Your Honor.

11        THE COURT:  Hopkins.

12        Mr. Hopkins, go ahead, try to convince me.

13        MR. HOPKINS:  Thank you.

14        Under Rule 702 and Daubert, Your Honor, we believe

15   that the law requires that plaintiffs' experts, Ms. Youngberg

16   and Dr. Borkan, be excluded.  Ms. Youngberg is neither

17   qualified or --

18        THE REPORTER:  Please slow down.

19        THE COURT:  I did read your papers.  It was not easy;

20   the way you folks briefed these issues did not make it easy at

21   all.  For one thing, you cited dozens upon dozens of cases from

22   all over.  My interest is in what the Tenth Circuit has to say.

23        And secondly, can you imagine, put yourself in the

24   position of a judge for a minute, how does a judge go about

25   reading your briefs with all the deposition excerpts that you

1    refer to?  Think about it.  I've got the motion or the brief

2    open on my computer screen, right?  And I come to a place where

3    you cite somebody's deposition, some page and line of

4    deposition.  I then have to close what I've got open, open that

5    as an attachment, right?  Read it, close that, go back to the

6    brief.  And on and on it goes.

7         I think lawyers sometimes ought to put themselves in

8    the position of a judge and just think about how a judge is

9    going to deal with this mass of stuff.

10        So the answer is I haven't read any of the deposition

11   excerpts at all.  But I did read your briefs.  Every one.  Even

12   the ones filed yesterday afternoon.

13        MR. HOPKINS:  Thank you, Your Honor.  In the future,

14   we can certainly submit hyperlinked briefs to the Court so that

15   in looking at the brief, you can click to the document without

16   clicking back.

17        THE COURT:  The other thing is please do not put your

18   citations in footnotes.  That may be a gimmick to try to fit

19   within the page limits, but it's really not helpful to me.

20        MR. HOPKINS:  Understood, Your Honor.

21        THE COURT:  Go ahead, Mr. Hopkins.

22        MR. HOPKINS:  Two points about Ms. Youngberg.  She's

23   neither qualified to opine on the matters that she does speak

24   to, and her opinions are unreliable.

25        THE REPORTER:  Please slow down.

1          MR. HOPKINS:   In the <u>Milne</u> case, the Tenth Circuit

2     noted that there was not a requisite foundation for an expert

3     to render an opinion where there's a lack of knowledge, skill,

4     experience, training, or education, which is precisely the

5     situation with Ms. Youngberg here regarding the dialysis

6     process and the science that underlies it.   She has no training

7     or education in nephrology or the treatment of dialysis

8     patients --

9          THE COURT:   She doesn't purport to.

10          MR. HOPKINS:   No, Your Honor, but she does purport to

11     be reviewing quality procedures and protocols that define

12     whether adequate quality care and adequate quality procedures

13     are being followed.   The one-size-fits-all approach that

14     plaintiffs assert should be relevant, that because she has some

15     experience in reviewing quality programs that's applicable

16     here, is incorrect.

17          As Ms. Youngberg herself testified, policies and

18     procedures in any health-care setting have to be tailored to

19     the risk factors inherent in the treatment and the clinical

20     measures that are appropriate; and in her testimony, she

21     acknowledges that she doesn't know the risk factors inherent in

22     the treatment and the clinical measures.   So just like the

23     bicycling expert in the <u>Milne</u> Tenth Circuit case, she does not

24     have the requisite training in this area to opine about the

25     quality matters that she speaks to.

 1          Moreover, her opinions are unreliable.  She's

 2   acknowledged that she failed to apply her own methodology that

 3   she ordinarily uses in her line of work.  And that she did not

 4   do any of those steps; by way of example, she did not conduct

 5   an on-site visit to any DaVita facility that she says is part

 6   of her methodology.  She did not review any data on patient

 7   safety or outcomes, nor did she conduct a complete or adequate

 8   review of DaVita's policies and procedures.

 9          THE COURT:  You're just repeating your brief.  That's

10   all you're doing.

11          MR. HOPKINS:  Well, Your Honor, those are our

12   arguments, and we think that they are telling in the nature

13   that she did not review and could not speak to a number of the

14   quality-assurance performance indicators, quality-assessment

15   performance improvement program, that she did not review any of

16   those thousands of pages that were produced.  Had she done so,

17   she would have realized the lack of basis for her own opinions.

18          THE COURT:  Seemed to me, reading your brief, that

19   your best argument was, whenever she was asked a question about

20   DaVita's procedures, she didn't seem to have a clue.

21          MR. HOPKINS:  There's that.  And the second point,

22   Your Honor, is that when asked to opine on the policies that

23   she did review, she said that they indicated a good

24   quality-improvement practice.  So that when asked about the

25   policies that she did review, they said they were good, they

1      were adequate.

2              THE COURT:  Look, Mr. Hopkins, I don't need a shotgun

3      argument, it doesn't help me.  What's your best argument?  When

4      you really put all this stuff that your associates came up with

5      in writing the brief aside, tell me, get right to the heart of

6      it, what's wrong with her?

7              MR. HOPKINS:  She's acknowledged that she doesn't have

8      the basis of qualification to speak to these issues, and when

9      asked about particular policies and specifics, she said that

10     they are good.  So that she's not qualified and she's not --

11     her opinions are unreliable.

12             THE COURT:  And why isn't it good enough for you to be

13     able to cross-examine her?  I thought your brief and the

14     questions that were asked in the depositions that you quoted in

15     the brief look like great, great stuff for cross-examination.

16     In fact, I frankly found myself wondering why would the

17     plaintiff want to put her on the stand if that's how she's

18     going to perform in front of a jury.

19             MR. HOPKINS:  And we look forward to addressing those

20     issues on cross-examination, but it goes to more than weight.

21     It goes to the fundamental issue of admissibility.  She's

22     simply not qualified.  The Milne case speaks to an individual

23     who had some expertise in accident reconstruction and vehicle

24     bike accidents but was not qualified to speak to mountain-bike

25     racing because that person had no experience in that area, no

1   training in that area, nothing that was applicable.  That's

2   precisely the case.

3           THE COURT:  Let me be the devil's advocate.  It

4   doesn't seem to me that qualifications is your best argument.

5           She purports to be a nurse who has made it her career

6   to evaluate quality-control practices in hospitals.  Or other

7   medical settings, right, that's what she says she does.

8           MR. HOPKINS:  Yes, Your Honor.

9           THE COURT:  She doesn't claim to be an expert in

10  dialysis.  She simply says, know how to set up a

11  quality-control program in a hospital or a clinic, and I know

12  how you're supposed to do it and it doesn't look to me as if

13  DaVita has done it right.  That's what she says.

14          MR. HOPKINS:  In sum, Your Honor, yes.

15          THE COURT:  It doesn't seem to me that the

16  qualifications are so much the issue as whether she really

17  knows what she's talking about when she criticizes DaVita.

18          According to your brief at least, DaVita has all these

19  things that she says they should have.

20          MR. HOPKINS:  That's exactly right.  We do think she's

21  not qualified.  In her own methodology, she says to be able to

22  evaluate, she needs to understand the risk factors.  She needs

23  to know what the health-care provider is trying to do and

24  whether they're achieving that; but she can't, because she

25  doesn't know about dialysis service providers and doesn't know

1    about dialysis.

2           THE COURT:  Let me ask a different question.  And that

3    is why do I even care at this point?  What the plaintiff wants

4    is for this Court to certify, by their request, three

5    questions, broad questions, for class determination.

6           What does she have to do with that?

7           MR. HOPKINS:  Well, if her testimony is inadmissible

8    because she's either unqualified or unreliable, it cuts away

9    one of the legs of plaintiffs' questions of why any question

10   should be certified.  It's not three questions, it's 13

11   different issues, that they attempt to boil down.

12           I'll move along.

13           Dr. Borkan, while qualified in his field, his opinions

14   are unreliable.  His opinions are a mere hypothesis, strung

15   together from individual puzzle pieces that he says he's the

16   only one that can put together; and a hypothesis is not a

17   sufficient, it's not a reliable opinion for admissibility under

18   Rule 702 and Daubert.  What Dr. Borkan hypothesizes is that

19   elevated serum bicarbonate levels in a dialysis patient are

20   caused by treatment with GranuFlo or NaturaLyte and that they

21   necessarily lead to a specific sequence of physiologic events

22   resulting in an increased risk of adverse outcome for patients.

23           THE COURT:  Well, he might have a pretty good point at

24   least on the first one, doesn't he?  He might have.

25           MR. HOPKINS:  I'm sorry?

13

```
1          THE COURT:  I said on the first of those two things,
2   he might be right.
3          MR. HOPKINS:  It's very possible.  It's certainly
4   axiomatic that the purpose of dialysis for the vast majority of
5   dialysis patients is to raise their serum bicarbonate level
6   from a predialysis level to a higher level, with any dialysate,
7   GranuFlo or not.  That's not a question that should be
8   certified for a class.  It's asking whether there's gravity or
9   the sun comes up.  The linkage has to do with whether there are
10  effects from that.  And his general-causation theory, of the
11  many theories advanced by plaintiffs, is that there is an
12  increase to a dangerous level, to an increased risk of a
13  dangerous outcome of elevated serum bicarbonate levels from
14  treatment with GranuFlo.
15         THE COURT:  Let me ask you a question, and that gets
16  way ahead.  It has nothing to do with what you're talking about
17  now.  I'm going to ask you this question because it's going to
18  come up later and perhaps you or your colleagues can be
19  thinking about it.
20         The plaintiffs are asking the Court to certify
21  questions.  They proposed some questions.  I'm not necessarily
22  blown away by the questions they posed.  I had a very difficult
23  time in this case convincing the plaintiff that they're not
24  arguing that DaVita is responsible for the defective or
25  dangerous condition of GranuFlo.  I've tried to make that as
```

1    clear as possible.  The first time I didn't get them off of

2    that, they came right back and tried to slide it in the second

3    time.

4              But we were valiant in our defense of how we see this

5    case.  So I'm not necessarily convinced that even if I do

6    certify a class, that three questions or 13 questions are what

7    I would pose.

8              But the defendant hasn't posed any questions.  That's

9    risky business.  When you try a damages case, the defendant's

10   side always has a strategic decision to make, right?  Do they

11   present evidence on damages.  When they argue to the jury in

12   closing argument, does the defense say anything like, well, if

13   you do find liability, we think the damages are too high and we

14   think this is a more reasonable number.  It's a decision the

15   defense lawyers have to make all the time.

16             I will tell you that if defendants completely ignore

17   damages, it's a risk because if they lose on liability, all the

18   jury has is what the plaintiff has told them, and you're

19   dealing with people that aren't usually aware of what's

20   reasonable.

21             If your side doesn't propose any questions and I

22   decide to certify, then all I've got is what they've proposed

23   or what I can come up with on my own.  So I would commend it to

24   your team to think about what questions would be appropriate if

25   the Court does decide to certify, and I assure you, I haven't

1    made that decision yet.

2         Okay.  That's an interruption.  I was probably

3    speaking to other members of your team on that.

4         Go ahead.

5         MR. HOPKINS:  And because Dr. Borkan's hypothesis is

6    not grounded in medical evidence, it should be found

7    unreliable.  There is not a single analysis or study that

8    Dr. Borkan can point to that demonstrates the sequence of

9    events that he postulates actually occurs.  And contrary to

10   plaintiffs' suggestion, the lack of support in the medical

11   literature for Dr. Borkan's opinions goes directly to

12   admissibility.  His general-causation theory is only admissible

13   if it's reliable, if each piece of this puzzle links together

14   in the way that he's outlining; and he's ignored contradictory

15   studies, ongoing medical debate, and causation issues for the

16   pieces he puts together to advance his theory.

17        Moreover, Dr. Borkan makes no attempt to relate his

18   theory to the facts before this Court.  There are three

19   plaintiffs with medical records, extensive documentation that's

20   been produced and obtained, and he indicates that it did not

21   occur to them to look to his theory and apply that to the

22   plaintiffs here and see whether his theory holds true.

23        THE COURT:  You say three plaintiffs.  I thought there

24   were like 20 or something.

25        MR. HOPKINS:  In this case, we are left with

1    Ms. Morris, Mr. Armstrong, and Miss Nunes.  All the other cases

2    have been dismissed.

3              THE COURT:  Morris, Armstrong.

4              MR. HOPKINS:  Nunes, N-U-N-E-S, Your Honor.

5              THE COURT:  Well, the original plaintiff was whom?

6              MR. HOPKINS:  There was Miss Thornton and then there

7    were a number of other cases, some of which were multi

8    plaintiffs, some of which were not, that were consolidated

9    together for the pretrial proceedings.

10             THE COURT:  And Ms. Thornton dropped out because it

11   turned out that she didn't -- she hadn't had GranuFlo or

12   whatever it was.

13             MR. HOPKINS:  She was not treated with GranuFlo or

14   NaturaLyte.

15             THE COURT:  That was kind of an oops on the

16   plaintiffs' side.

17             MR. HOPKINS:  I won't comment on that, Your Honor.

18             THE COURT:  And what happened to all of the other

19   plaintiffs?  There were one or two that I just tossed.

20             MR. HOPKINS:  I don't recall; I believe, Your Honor,

21   that looking at our records and information, we established

22   that the plaintiffs, that none of the other plaintiffs had

23   treated with GranuFlo or NaturaLyte as well, and then they

24   agreed to dismissals.

25             THE COURT:  Wow, I don't remember that, but you're

1   probably right.  So of all of all these consolidated cases, all

2   we have left is three people.

3          MR. HOPKINS:  That's correct, Your Honor.

4          THE COURT:  Out of 300,000, according to you.

5          MR. HOPKINS:  Three people out of the number of people

6   that brought this lawsuit in this particular court.

7          THE COURT:  But 300,000 who you say DaVita treated

8   with these products.

9          MR. HOPKINS:  That's the estimate over the time period

10  that plaintiffs have advanced, Your Honor.

11         To conclude, plaintiffs contend that Dr. Borkan did

12  not assert that every patient would experience the cascade of

13  physiological changes that he postulates.  But he did.

14  Dr. Borkan opined that patients' serum bicarbonate will exceed

15  the level intended by the nephrologist as written in the

16  dialysis prescription, and thereby, in this sequence,

17  increasing pH, lowering serum potassium, lowering ionized

18  calcium levels.

19         THE COURT:  And you're saying that doesn't happen?

20         MR. HOPKINS:  There's no proof of that happening in

21  the way that he outlines it.

22         THE COURT:  Well, does it happen or not, I'm asking?

23         MR. HOPKINS:  I don't believe that it does, Your

24  Honor, but I don't believe there's any proof for it.  I think

25  that's what's required by the plaintiffs with their burden.

1        For those reasons, Your Honor, we ask the Court to

2   exclude the testimony of plaintiffs' experts, Miss Youngberg

3   and Dr. Borkan.

4        THE COURT:  Okay.

5        All right.  Mr. Paynter.

6        MR. PAYNTER:  Good morning, Your Honor, I'll try to be

7   as brief as possible.

8        Let me start with Miss Youngberg.  And with respect to

9   her qualifications, I think the Court is exactly right.  She's

10  not purporting to be an expert in nephrology.  She's a

11  health-care risk expert.  In fact, it was her opinion that

12  being a specialist in the field actually undermines your

13  ability to objectively assess procedures in a specialty.  And I

14  will just quickly point out as well that of course at -- to the

15  extent that she does require specific information about the

16  dialysis process, she is entitled to rely on Dr. Borkan for his

17  expertise, will be entitled to do so at any trial.  And in

18  fact, that's exactly what she does in paragraphs 4 to 5 of her

19  declaration.

20       In response to the Court's concerns in defendant's

21  arguments regarding her reliability, again, Your Honor, they

22  have taken, I think Your Honor referred to as a shotgun

23  approach, simply seeking to exclude all of her opinions.  In

24  her deposition, there were some situations where she could not

25  remember the details of documents, and as Your Honor pointed

1   out --

2          THE COURT:  That's a nice spin on it.  The fact is, if

3   the excerpts from her deposition were quoted properly -- and I

4   have to assume they were -- she must have given one of the

5   worst depositions in your life as a plaintiff lawyer.

6          MR. PAYNTER:  Well, Your Honor, you may be surprised

7   about some of the depositions I've sat through.

8          But I will say that, look, assuming they're correct, I

9   think as Your Honor pointed out, this is perfect for

10   cross-examination.  I will also point out that, you know,

11   they've obviously cherry-picked what they believe are the worst

12   instances, and there's plenty in her, that she testified about,

13   and I think they don't even bring up.

14          For example, Miss Youngberg, relying on her 20 years

15   of experience, noticed right away that DaVita had an

16   adverse-event reporting system that was set up and geared

17   towards litigation.  It was geared towards essentially cloaking

18   findings about errors in work-product privilege and

19   attorney/client privilege and in her opinion was that was a

20   very antiquated approach, and that the modern approach is that

21   these adverse events need to be disseminated through the

22   company.  There's nothing unreliable in that type of opinion.

23          And I think this idea that simply because with regard

24   to specific questions in her deposition she may not have

25   remembered a document that she reviewed, that that mandates

 1    wholesale exclusion of her testimony.

 2         THE COURT:  Well, she kept saying, oh, that's not

 3    really within my area, that's really not within what I was

 4    asked to do.

 5         But the questions where she said that seemed pretty

 6    basic to me.  Do you know whether or not DaVita actually does

 7    this, whatever her testimony was the company should do this.

 8    Should do A.  Do you know whether or not DaVita does A.

 9         Well, actually, no.

10         I mean, after a while, you have to say, how is she

11    going to help the jury with anything.

12         MR. PAYNTER:  Well, again, Your Honor, I think they

13    cherry-picked the worst instances.  But beyond that, I think in

14    many of these instances, what she was talking is, you know, her

15    review at this stage, class-certification stage, before we have

16    full discovery, before we have a lot of depositions of most of

17    the witnesses, was really limited towards reviewing the

18    policies and procedures and not how they were necessarily

19    implemented at the company level.

20         THE COURT:  Let me ask you the same question I asked

21    Mr. Hopkins, and that is why do I care what she has to say or

22    whether she's an expert or not for purposes of class

23    certification?

24         MR. PAYNTER:  To a certain extent, Your Honor, I would

25    agree with that.  And this goes -- this is the certification

1    stage.  And I think the question here is not whether she

2    considered every conceivable document, you know, and had

3    adequate memory at her deposition.  The question really that

4    should be the focus of the Court's inquiry here is, and the

5    reason that we would have her testify, is is the subject of her

6    testimony capable of class-wide resolution, and so

7    Miss Youngberg will be testifying about corporate-wide,

8    company-wide proposals and their adequacy and what they should

9    have been, and so that's how it's relevant at this stage.

10              THE COURT:  So you're going to call her as a witness

11   here today.

12              MR. PAYNTER:  Correct, Your Honor.

13              THE COURT:  Good.  Because I don't want to make any

14   Daubert decision before I can eyeball a person and see how she

15   does and how she responds to cross-examination.

16              She'll have to do better than she did in the

17   deposition to get my attention.

18              MR. PAYNTER:  Understand.  And so unless the Court has

19   questions about Miss Youngberg, I'll turn to Dr., to

20   Dr. Borkan.

21              DaVita's motion here, Your Honor, is --

22              THE COURT:  Their motion is that my nephrologist is

23   better than yours; in fact, he's so much better than yours,

24   that yours can't talk.  You say, no, mine's better than yours,

25   and mine is so much better than yours, that, Judge, you

1     shouldn't let him talk very much.

2          MR. PAYNTER:  I think that's exactly right, Your

3     Honor.  And if I may just point out, Mr. Hopkins keeps

4     referring to this as a hypothesis.  I think what he neglected

5     to point out is when you look at what he cited, Dr. Borkan is

6     saying that this is a proven hypothesis is what he testified.

7     And so each one of these links, in Dr. Borkan's opinion,

8     there's no serious debate in the medical literature that

9     acetate breaks down in bicarbonate and so that more bicarbonate

10     is being delivered to the patient than the doctor prescribed if

11     GranuFlo is used, and he's going to testify that there's no

12     serious debate that increasing bicarbonate is going to raise

13     the pH, that in turn to going to lower breathing, it's going to

14     reduce the binding affinity of hemoglobin for oxygen.  It's

15     also going to lower serum potassium.  And ionized calcium, and

16     that all of these effects are recognized in the medical

17     literature as risk factors for adverse events, heart attacks,

18     et cetera.

19          And so, you know, this isn't, as they call in their

20     brief, a Rube Goldberg theory of causation.  If -- I think if I

21     was going to use an analogy --

22          THE COURT:  Well, that was lawyer's turn of phrase.

23          MR. PAYNTER:  Right.

24          THE COURT:  There was another one, I had to look up on

25     the Internet to even understand what it was.  I can't remember

1    just now what it was.  Bede, B-E-D-E.

2         MR. HOPKINS:  I'm responsible for the Rube Goldberg

3    comment.  Plaintiffs' was to buried lede.

4         THE COURT:  Buried lede, yes, yes.

5         MR. PAYNTER:  I'll confess, Your Honor, I did not

6    draft that brief, and when I reviewed it, I also had to look it

7    up on the Internet.  It's an archaic spelling of "lead" that

8    only exists now in the --

9         THE COURT:  He just couldn't resist.

10        MR. PAYNTER:  I won't name any names, but the

11   gentleman is sitting right here.

12        MR. VALENTINE:  I can explain that, Your Honor.

13        MR. PAYNTER:  And so, really, Your Honor, just to cut

14   through the briefing, what they're really saying is that

15   Dr. Borkan cannot point to a epidemiological peer-reviewed

16   study where patients were subjected to bicarbonate levels

17   exceeding 40 milliequivalents per milliliter and Dr. Borkan

18   explains that would be an unethical study.  Those are extremely

19   high levels and as he explained, that study was conducted.  It

20   was conducted by Fresenius, and that's Fresenius found the six-

21   to eightfold increase to cardiac pulmonary arrest.

22        THE COURT:  You know, if this case were to ever get to

23   a jury, the jurors would be thirsting to hear from

24   nephrologists.  On both sides.  The jurors wouldn't have a clue

25   about this stuff, unless they had been in dialysis themselves,

1   and I suppose if they had, they probably would have been

2   screened out by one side or the other.  I can't even imagine

3   how this case can proceed in a jury situation without

4   nephrologists.

5           MR. PAYNTER:  I think that's right, Your Honor.

6           THE COURT:  I'd be leaning towards allowing both

7   sides' nephrologists to have a go; as I probably suggested, I'm

8   more concerned about Ms. Youngberg.

9           MR. PAYNTER:  Sure, Your Honor.  Unless Your Honor has

10  further questions, that would be our response.

11          I don't know if Mr. Hopkins has a few words that he

12  wishes to state in rebuttal.

13          THE COURT:  Okay.  That's fine.

14          MR. PAYNTER:  And then I will come and argue our

15  motions after that.

16          MR. HOPKINS:  Ten or 15 seconds, Your Honor.

17          I would just correct Mr. Paynter that in fact,

18  Dr. Borkan testified at his deposition that his hypothesis has

19  not been proved and that there was not any single analysis or

20  study that showed the sequence of events as he laid them out in

21  the way that he postulated.

22          THE COURT:  Is he going to be here to testify?

23          MR. HOPKINS:  I believe so, Your Honor.

24          THE COURT:  Well, I'll bet somebody's going to ask

25  him, is your hypothesis proven or not.

```
 1              We'll see what he says.

 2              MR. HOPKINS:  Yes, Your Honor.

 3              And as to Miss Youngberg, I thought I heard

 4    Mr. Paynter say that her testimony was not really relevant to

 5    class, and so I would include that in my arguments as to why

 6    that should be excluded.

 7              Thank you, Your Honor.

 8              THE COURT:  You're welcome, sir.

 9              All right.  Now, you want to attack their expert.

10              MR. PAYNTER:  Yes, Your Honor, let me make very clear,

11    we have two separate motions to exclude portions of his

12    testimony.  And I'll start with the first motion that we filed.

13    And let me just stress that, you know, we have not taken a

14    categorical approach, we're not seeking to exclude most of his

15    testimony.  And we're not, certainly not challenging his

16    qualifications, very qualified.

17              What we are doing is there's a specific section of his

18    report entitled analysis of individual plaintiffs' medical

19    records in which he purports to draw conclusions about the

20    effect or the lack of effect of GranuFlo by analyzing their

21    predialysis serum bicarbonate levels.

22              But, Your Honor, he admits that he has no idea whether

23    these patients received GranuFlo.  He had no idea at the time

24    that he opined.  And he had no idea when they were switched to

25    GranuFlo.
```

1          And so --

2          THE COURT:  Didn't he express the same opinion even as

3    to somebody who, as it turns out, didn't get GranuFlo?

4          MR. PAYNTER:  That's exactly right, Your Honor.

5          THE COURT:  That might have been his oops moment.

6          MR. PAYNTER:  Well, I just think that the entire

7    process from the beginning is not scientific, and he admits it,

8    and we quote this, I believe we quoted this in full, not simply

9    cited it, but when I asked him in summary, I said:

10         Question:  Again, you have no idea whether the

11   patients were ever given anything other than GranuFlo, correct.

12         Answer:  Correct.

13         So you have no way by examining their individual

14   medical records of drawing conclusions about the effect of

15   GranuFlo on blood bicarbonate, blood potassium or blood ionized

16   calcium levels as opposed to some other dialysate, correct.

17         Dr. Goldfarb, I don't know, I could look back and see

18   if I could tease that out, I can't answer that right now.  I

19   don't know that.

20         THE COURT:  Well, you've got some good

21   cross-examination.  That's not even as good as the fact that he

22   expressed the same opinion about somebody who didn't even get

23   it.  That, to me, is one of those questions that sort of ends

24   the expert's credibility with the jury.

25         MR. PAYNTER:  Well, I think that's right, Your Honor,

 1    but what I would say is that especially in the interests of

 2    time and wrapping up this certification hearing early, that

 3    there's no need to wait for his testimony to provide Your Honor

 4    with more, a clearer record, because if you look at DaVita's

 5    brief in footnote 2, they admit, they admit that he assumed

 6    that they had GranuFlo, so that's not an issue; and it's simply

 7    unscientific, illogical to think that you could opine about the

 8    effects of GranuFlo if you didn't know when someone was on

 9    GranuFlo or if they were ever on GranuFlo.

10         THE COURT:  Of course you guys alleged that they all

11    were, and it turns out you were wrong.

12         MR. PAYNTER:  We were wrong, Your Honor.

13         THE COURT:  Maybe he relied on a good-faith belief

14    that when you said these people got GranuFlo, you knew what you

15    were talking about and you had a Rule 11 basis to say that,

16    maybe that's what he relied upon.  So maybe you put him off.

17         MR. PAYNTER:  He may have relied on that, I'm not

18    sure.  He may have relied on an assumption that his counsel

19    provided him.  Of course DaVita has all these records, but I

20    think the point is, Your Honor, it is not the -- a scientist

21    cannot simply rely on allegations, good-faith allegations in

22    any complaint.  A scientist in order to determine the effects

23    of GranuFlo needs to actually know, and whether or not, you

24    know, he was justified or he was relying on our, what we

25    stated, the fact is that he did rely on it and it's not

1    scientific to do so and in fact it was incorrect.

2            And I also would point out, Your Honor, that while we

3    did allege that they received GranuFlo, we did not allege when

4    they exactly were switched to GranuFlo, and again, that's a

5    critical piece of information that you would need to know.  So

6    he may have relied on our allegation that they at some point

7    had GranuFlo, but in order to opine on the effects of GranuFlo,

8    you need to know when they were switched.

9            THE COURT:  What would you think if the Court proposed

10   that these two experts get together and reach an agreement on a

11   third expert and that would become the Court's expert, although

12   you folks would pay for it.  And the only rule would be that

13   the lawyers have to keep their hands off the third expert.  No

14   preparing, no advising, no none of this stuff.

15           How would you feel about that?

16           MR. PAYNTER:  Your Honor, I think that would be

17   obviously the Court has discretion to do that.  We would not be

18   in favor of it.  Among other things, as you noted, it's an

19   additional expense that we would be bearing, and these experts

20   are obviously very highly qualified and very expensive.  And,

21   you know, I think you'll find today that there's actually a

22   large amount --

23           THE COURT:  Well, you can afford to have three lawyers

24   here.

25           MR. PAYNTER:  I'm not paying these guys.

1        But also, I would say I think you'll find today that
2   in fact there is a large amount of agreement between these two
3   experts and they are not -- and so there are areas in which, I
4   think, the Court will find for itself the areas of agreement.
5   And I think that --
6        THE COURT:  Maybe we ought to just put the two of them
7   in the room, without the lawyers, and let them hash it out
8   between them.
9        MR. PAYNTER:  Well, I've never seen that, seen that
10  happen, but it's certainly possible that they could --
11       THE COURT:  Just makes too much sense, doesn't it.
12       MR. PAYNTER:  Yeah.  Yeah.
13       And so, Your Honor, I think, you know, that's why we
14  do not support that.  Of course, that is an option that the
15  Court has.
16       And so I think with respect to that motion, to exclude
17  that discrete portion of Dr. Goldfarb's report, unless the
18  Court has any other questions, that's all I have, and I can
19  either -- Mr. Hopkins wants to respond or I can go ahead and
20  address our other motion on Dr. Goldfarb and he can respond.
21       MR. HOPKINS:  I can respond now.
22       THE COURT:  This one attacks what he has to say about
23  the specific three plaintiffs.
24       MR. PAYNTER:  Right.  He also reviewed Miss Thornton
25  as well, and she is the one who turned out to be --

1          THE COURT:  I can't remember.  What's your other

2    attack on him?

3          MR. PAYNTER:  So our other attack on him, and this is

4    not really a Daubert issue; but on Friday, Friday evening, we

5    got in the email a list of additional materials reviewed by

6    Dr. Borkan.

7          THE COURT:  Right, I remember.

8          MR. PAYNTER:  Right.  And, you know, Your Honor, some

9    of these materials were never -- there was a Fresenius memo

10   that we have never seen.  It was never produced.  They gave it

11   to us yesterday.

12         THE COURT:  And they said, wait a minute, that memo's

13   been out there and in fact, a part of your team is involved in

14   the Fresenius litigation and surely they must have that memo

15   already.

16         MR. PAYNTER:  Well, yes, of course I think that memo

17   probably has been produced there.  We of course can't use it in

18   this litigation.  It's subject to protective orders.

19         THE COURT:  I don't know if it is or not but whether

20   it is or not, if your team knows about it, they could certainly

21   go get it.

22         MR. PAYNTER:  Right, Your Honor, and we're not arguing

23   that it can't be, that that can't be used as, you know, if they

24   want to introduce that as an exhibit.  It's simply that they

25   can't have an expert testify about it because they never

1    disclosed that as a material that the expert reviewed.

2           THE COURT:  Now he has.  Although I think he said it

3    didn't affect his opinions.

4           MR. PAYNTER:  Yes or no, Your Honor, they disclosed

5    these additional materials, but Rule 26 requires you to

6    disclose the opinion and the materials, and there was no

7    disclosure of what effect these new materials have on his

8    opinion.  Have they altered his opinion, how did he analyze

9    them, none of this, we don't know any of this.  We're left

10   completely in the dark.  We never had a chance to cross

11   Dr. Goldfarb about these new materials.

12          THE COURT:  Is that what you want me to order, that

13   you can take his deposition again and cross him about the

14   additional materials?

15          MR. PAYNTER:  I think at this point -- let me put it

16   this way.  Of course we think Dr. Goldfarb can supplement his

17   report in the merits phase.  I guess the question is right now,

18   is it timely to supplement, to give us a whole new list of

19   additional materials reviewed five days before the

20   class-certification hearing when none of these materials are

21   things that are new.  Some of the articles date back to the

22   '60s.

23          And, sure, I mean I guess we could continue the

24   proceeding and we could depose him again --

25          THE COURT:  We're not even remotely close to a trial.

1        MR. PAYNTER:  Right.

2        THE COURT:  There's plenty of time.

3        MR. PAYNTER:  Yes.  So just so I'm clear, Your Honor,

4   we're not asking that these be excluded for trial or summary

5   judgment.  We're simply asking for purposes of this evidentiary

6   hearing, we would ask that those materials be excluded; and of

7   course, without any prejudice whatsoever to their ability, you

8   know, after certification to supplement his report with those

9   additional materials, with additional testimony, with, you

10  know, even more materials.

11       It's simply a matter of us getting this on Friday --

12       THE COURT:  Well, maybe he doesn't even need these

13  things for whatever testimony he's going to give here today.

14       MR. PAYNTER:  Again, Your Honor, I just don't know.  I

15  don't know what testimony he's going to give.

16       THE COURT:  We'll find out together.

17       MR. PAYNTER:  Okay.

18       THE COURT:  All right.  Mr. Hopkins.

19       MR. HOPKINS:  Taking plaintiffs' last argument first

20  and then going back to the motion to strike a portion of

21  Dr. Goldfarb's declaration.

22       Of the items on the updated list that was provided as

23  a supplement to discovery last Friday, all but ten have already

24  been in plaintiffs' hands.

25       THE COURT:  Yeah, I read that.  Why weren't they

1  produced way earlier than last Friday?

2          MR. HOPKINS:  The list was updated as of last week,

3  and then produced last week.

4          THE COURT:  Yeah, but these aren't brand-new

5  documents, a lot of these are old documents.  Why weren't

6  they --

7          MR. HOPKINS:  It was compiling a list of the items

8  that Dr. Goldfarb had reviewed and in discussions with him,

9  updating the list and providing it last Friday.

10         THE COURT:  So these are things that he reviewed after

11  he prepared his opinion.

12         MR. HOPKINS:  Exactly.  Because after his declaration

13  was submitted, Dr. Borkan had a reply declaration in which he

14  made various statements and cited various documents and some of

15  the documents on the list didn't exist until after

16  Dr. Goldfarb's declaration.

17         THE COURT:  So Goldfarb saw what Borkan had to say

18  about Goldfarb and decided he better go read all the things

19  that Borkan was talking about, and so he did.

20         MR. HOPKINS:  Well, an expert's base of knowledge is

21  not static, Your Honor, it doesn't freeze.  They continue to

22  look at issues regarding their opinions.  And this is, again,

23  as you've seen in the papers, so I won't repeat, an updated

24  list of things that he reviewed, which includes things produced

25  by DaVita months ago, medical records that plaintiffs have had

1    for some time and other records.

2          I would also note that the Fresenius document that's

3    referenced, and as Your Honor has seen in the briefing, none of

4    these articles or materials have changed Dr. Goldfarb's

5    opinion.

6          THE COURT:  What's the current state of the Fresenius

7    case?

8          MR. HOPKINS:  The Fresenius litigation, I don't have

9    the precise understanding of it, Your Honor; there was

10   preliminary discovery of a number of plaintiffs to select some

11   bellwether cases.  Those bellwether cases are now going through

12   more intense discovery, including expert discovery, leading up

13   to trials, which I think may be in the federal action, later in

14   this year in November.

15         MR. PAYNTER:  Yes, Your Honor, that's basically

16   correct, but the updated reports --

17         THE COURT:  Where is that case?

18         MR. PAYNTER:  That case, there's a MDL proceeding in

19   Boston and there's a state proceeding, state functional

20   proceeding, equivalent to MDL in Boston.

21         THE COURT:  And you're the plaintiffs' lawyers or one

22   of them.

23         MR. PAYNTER:  I'm one of the plaintiffs' attorneys for

24   two of the cases that have been selected as bellwether trial

25   cases in the main, in the MDL, federal MDL proceeding.  And we

```
 1    also have some plaintiffs in the state proceeding, but none who

 2    have been selected for bellwether treatment, and Dr. Borkan has

 3    recently submitted a report in the state proceeding and is

 4    about to submit a report in the MDL proceeding.

 5              THE COURT:  Which obviously DaVita has.

 6              MR. PAYNTER:  DaVita, we did not for purposes --

 7              THE COURT:  Or at least they can get it.

 8              MR. PAYNTER:  Yes.  I mean, we would, I think we would

 9    supplement, I mean, our report, our merits report is going to

10    be obviously based on the work done in Fresenius and we can, of

11    course, subject to any protective orders in that case, provide

12    copies of any reports that he presents in the MDL proceeding.

13              MR. HOPKINS:  Two points, Your Honor.  We were not

14    aware that Dr. Borkan had submitted a report until Monday when

15    I spoke with Mr. Paynter.

16              And number two, my re-review of the protective order

17    in the MDL would cover the disclosure of information in this

18    proceeding as well.  Because it's a GranuFlo-related proceeding

19    and we can get the protective order and submit it to the Court,

20    but the language is broad enough that it would encompass

21    information produced here.

22              I would also just note --

23              THE COURT:  What are you telling me?  What are you

24    saying here?

25              MR. HOPKINS:  There's not an obstacle to, if
```

1    plaintiffs obtain information, producing it to us.

2              THE COURT:  You mean Borkan's opinion there.

3              MR. HOPKINS:  Yes, Your Honor.

4              THE COURT:  They have to produce it to you.  He isn't

5    going to testify in this case if you don't get that

6    information, no way.

7              MR. HOPKINS:  Right.  Well, we haven't seen it yet.

8              THE COURT:  Well, you're going to see it.

9              MR. HOPKINS:  Thank you, Your Honor.  I would also

10   just note as a point of interest, of the approximately 12

11   bellwether cases selected in Fresenius MDL, six of them are

12   patients who treated at DaVita clinics, so we're dealing with

13   nonparty discovery in that action at the same time.  And I

14   think that goes to a class point that you'll be hearing from

15   Mr. Tyrrell at a later time.

16             As to the motion to strike the updated list, I think

17   I've covered the reasons why we would argue that it should be

18   struck and I would also note the tit-for-tat response of

19   plaintiffs and also providing us with an updated list of

20   Dr. Borkan that contained 105 new articles.

21             THE COURT:  Do you guys sort of enjoy this sort of

22   jousting with each other?

23             MR. HOPKINS:  Personally, Your Honor, I think things

24   would be done much more efficiently and smoothly and it's a

25   factor of perhaps how the system works and perhaps ruts people

1    get into.  I will tell you that we really are always striving

2    to make things quicker and easier.  We have had a good

3    relationship with plaintiffs' counsel and look forward to that

4    continuing.

5              THE COURT:  Okay.

6              MR. HOPKINS:  As to plaintiffs' motion to strike

7    portion of Dr. Goldfarb's testimony that relate to individual

8    plaintiffs, there was no oops moment.  We have to remember the

9    sifting sands of plaintiffs' general-causation theory.  First

10   they argue it's all about a trend.  Then they say, no, you're

11   not going to see the trend in individual people, it's all in

12   the aggregate.  Then they say, all patients, serum bicarbonate

13   levels will rise and create an increased risk of death.  Then

14   they say --

15             THE COURT:  It's kind of like politicians, they sort

16   of move with the tide.

17             MR. HOPKINS:  And then they say it's a transient spike

18   that comes postdialysis and an elevation in serum bicarbonate

19   level that you're not going to be able to see.  At the time

20   Dr. Goldfarb's declaration was submitted, plaintiffs were on

21   the trend theory, I would say.  And Dr. Goldfarb's testimony

22   about the five plaintiffs that existed at that point, including

23   Mr. Moreno, who we submitted his affidavit of merit, indicated

24   from his review of the laboratory records, irrespective of any

25   kind of dialysate use or when it began, he was looking for

1    patterns, he was looking for trends in serum bicarbonate levels

2    that Dr. Borkan has asserted would be higher and a lowering of

3    potassium, which Dr. Borkan asserted would be a consequence.

4    And a lowering of potassium that would be a consequence.

5              In looking at those laboratory values and the medical

6    histories of all of those plaintiffs, he said, there are no

7    patterns.  His language was, any use of GranuFlo and/or

8    NaturaLyte in the treatment of the plaintiffs did not

9    contribute to any of their cardiac events.  Therefore, it's not

10   an oops moment.  He looked at the laboratory values and spoke

11   to those.

12             His opinions are relevant as to class because they go

13   directly to plaintiffs' theories of general causation and they

14   demonstrate a lack of adequacy and typicality in this case,

15   because they show there are not the patterns and they show that

16   the three remaining purported class representatives are not

17   typical of the class that the plaintiffs are purporting to

18   establish.

19             Further --

20             THE COURT:  Well, they're trying for two different

21   classes, they are trying for a (b)(2) class and a (b)(3) class.

22             MR. HOPKINS:  Putting aside the (b)(2) class about the

23   notice, which we would also argue that the plaintiffs are not

24   representatives for because they certainly know what they took

25   when they brought this lawsuit.

1          THE COURT:  Yes, I think they have some difficulty

2     with their (b)(2) class.

3          MR. HOPKINS:  We agree, Your Honor.

4          And my final point as to Dr. Goldfarb, that he applied

5     sound methodology in looking through all of these laboratory

6     values, in examining the records for these patients to reach

7     his conclusions and we would ask that his portion of his

8     declarations speaking to the named plaintiffs not be struck.

9          THE COURT:  Okay.

10         MR. PAYNTER:  May I briefly respond, Your Honor?

11         First of all, whether or not we've made inconsistent

12    theories has nothing to do with whether Dr. Goldfarb's method

13    is scientific; it's not.  Because I think this will be helpful

14    by way of background, is important for the Court just to

15    understand going forward.  There is no inconsistency.  What

16    Dr. Borkan testified is that when you switch someone to

17    GranuFlo, you will see a step up in their predialysis average

18    serum bicarbonate levels.

19         THE COURT:  Yes, a spike.

20         MR. PAYNTER:  Yes.  And now that's what happens in an

21    individual patient.  In the patient population as a whole, Your

22    Honor, that will manifest itself as a trend upwards.  And the

23    reason, Your Honor, is because DaVita is switching different

24    patients to GranuFlo, different clinics are switching to

25    GranuFlo at different times.  So if you look at all the

1    places --

2              THE COURT:  DaVita doesn't switch them to GranuFlo,

3    does it?  They have to be prescribed by a doctor.

4              MR. PAYNTER:  No, Your Honor, that is a not part of

5    the prescription.

6              THE COURT:  I thought the doctors prescribed the

7    dialysate.

8              MR. PAYNTER:  They do not, Your Honor, and that's a

9    key fact.  It is the choice of the clinic.  The clinic is what

10   chooses the dialysate.  And so DaVita was switching clinics

11   over to GranuFlo at different times.  So as a result, you're

12   not going to see a step up in the patient population, you're

13   going to see a gradual trend as they switched over more and

14   more patients.

15             THE COURT:  DaVita wouldn't have any motive at all to

16   switch people to a product if the product was known to them to

17   be dangerous.  They would just be buying problems for

18   themselves, as well as being heartless.

19             MR. PAYNTER:  It does have a motive.  The motive is

20   it's much cheaper to ship a dry dialysate than the alternative,

21   which is a liquid dialysate that does not have the sodium

22   diacetate in it.

23             THE COURT:  And GranuFlo is the only dry one that is

24   available?

25             MR. PAYNTER:  That may exceed my knowledge.  I believe

1    at the time it may have been; I'm not sure.  But I do know that

2    Fresenius was obviously one of the biggest vendors for DaVita

3    and it was marketing the GranuFlo as a cheaper alternative to

4    the liquid dialysate.

5            THE COURT:  So you're going to try to convince the

6    jury that DaVita is such a heartless company that in order to

7    save some money on the price of the dialysate, they would

8    knowingly expose their patients to potentially extraordinarily

9    dangerous results?

10           MR. PAYNTER:  Your Honor, I think the fact is that

11   after they received the November 2011 memorandum from Fresenius

12   outlining a sixfold increase in cardiac pulmonary arrest, they

13   did nothing.  And I think that's what the record is going to

14   show, and they continued to use GranuFlo across their patient

15   population.

16           THE COURT:  Well, if you can prove that, then you're

17   going to get somebody's attention, of course.

18           MR. PAYNTER:  And we think that's what the evidence

19   will show.

20           Thank you, Your Honor.

21           THE COURT:  All right.

22           Now have you all had your say on these experts?

23           MR. PAYNTER:  Yes.

24           THE COURT:  And you want now to move into the

25   class-certification matter; is that right?

```
 1              MR. HOPKINS:  Yes, Your Honor.  There are some exhibit

 2    admissibility issues that we would ask to address first.

 3    Defendants do not have an objection to the admissibility of

 4    plaintiffs' exhibits.  Defendants would move our exhibits into

 5    evidence as well, but we understand plaintiffs have some

 6    objections to certain of defense exhibits.

 7              MR. PAYNTER:  And, Your Honor, the objections are

 8    largely ones that are related to the motion you just heard

 9    argument on.

10              THE COURT:  Okay.

11              Your objection is overruled.  This is a bench

12    proceeding.

13              MR. PAYNTER:  Sure.

14              THE COURT:  I'm not going to be unduly swayed by any

15    particular exhibit, whether it was produced months ago or last

16    week.

17              MR. PAYNTER:  Understood, Your Honor.  And so I think,

18    if that's the ruling --

19              THE COURT:  For today's purpose, your exhibits are

20    admitted.

21              MR. PAYNTER:  Thank you, Your Honor.

22              MR. HOPKINS:  Thank you, Your Honor.

23              THE COURT:  Before we launch into the class -- and how

24    do you plan to do that, are you going to make an argument first

25    or just start calling witnesses?
```

1              MR. PAYNTER:  Yes.  I can outline how we intend to

2    proceed.

3              My colleague Carl Wojtanowicz is going to begin with a

4    case summary, an overview, to highlight for the Court the key

5    documents that are relevant to class certification.  Then we

6    are going to have the expert testimony, expert testimony,

7    Dr. Borkan, Ms. Youngberg, and then a summation and further

8    review of some documents, and my colleague Craig Valentine in

9    particular is going to explain how whether a patient was

10   exposed to GranuFlo can be ascertained.  That will cover more

11   information on that during the summary.

12             MR. TYRRELL:  Your Honor, we would propose that there

13   be an opening and that we also open and then we go to the

14   witnesses, if that's acceptable to the Court.

15             THE COURT:  Fine.  Fine.  Any way you want to do it.

16             All right.  But before we launch into the class

17   issues, let's take a little ten-minute break here, and then we

18   can be fresh and change gears and be ready to go.

19        (Recess at 9:57 a.m.)

20        (Reconvened at 10:08 p.m.)

21             THE COURT:  Okay.

22             If you gentlemen would be more comfortable, you're

23   very welcome to slip your jackets off.  Any time you want.

24             MR. WOJTANOWICZ:  Thank you, Your Honor.

25             THE COURT:  Okay.  So now we're ready for class

1    certification.

2              MR. WOJTANOWICZ:  Yes, Your Honor.  If we could have

3    the screen turned on, we have some slides and a PowerPoint to

4    use during our presentation.

5              THE COURT:  Okay.  Could I ask you a question first.

6              MR. WOJTANOWICZ:  Of course.

7              THE COURT:  Why do you want a class certified?

8              MR. WOJTANOWICZ:  Well, we want a class certified for

9    several reasons.  First of all, this is an issue that's

10   impacting a large population of patients.  DaVita --

11             THE COURT:  Let's assume that for a minute.

12             MR. WOJTANOWICZ:  Sure.

13             THE COURT:  You try these issues, that's what you're

14   asking the Court to do, issue a (c)(4) type class.

15             So imagine for a minute that we don't certify a class

16   and you try these issues and win.  Get the right answers from

17   your standpoint on all the issues.

18             Wouldn't DaVita be collaterally estopped in any future

19   proceeding, if they've had a full and fair chance to litigate

20   the issues?  And if that is so, then why isn't it DaVita asking

21   us to certify a class, not you, because if you try your issues

22   and lose and it's not a class action, then DaVita can't use the

23   result in any other case.  But if it's a class action, all the

24   members of the class would be collaterally estopped or barred.

25             I'm curious as to why you want the class and why they

1   don't.  If it's a issue-only class.

2          MR. CAREY:  Well, Your Honor, we believe that the

3   resolution of the issues that we're seeking to certify will not

4   only benefit the entire class, because it will narrow the

5   issues that need to be proved later, and of course plaintiffs'

6   attorneys will argue or could argue in the future that DaVita

7   is collaterally estopped from --

8          THE COURT:  Well, they would be, wouldn't they?

9          MR. WOJTANOWICZ:  I believe so, but I'm not sure

10  that's an issue that we can resolve with certainty in advance.

11  I doubt DaVita would agree in any future case following an

12  individual lawsuit that they were bound by the result --

13         THE COURT:  Maybe they wouldn't, maybe they'd say, if

14  we lose, we're collaterally estopped.  Suppose they say that,

15  then where are you?

16         MR. WOJTANOWICZ:  Well, Your Honor, we believe also

17  that if you consider the combination between the issue classes

18  that we're seeking to have certified and the (b)(2) class that

19  would make sure that members of the class receive notice --

20         THE COURT:  I don't think you're going to get a (b)(2)

21  class out of me.  You can try.

22         MR. WOJTANOWICZ:  Well, Your Honor, as I think you'll

23  see during the course of our proceeding, and this is an issue

24  that you raised earlier regarding what you termed as the oops

25  moment, there really is an issue here with members of the class

1    and patients at DaVita clinics not knowing and not being told

2    that they're exposed to GranuFlo, and that is a really serious

3    and significant issue for this patient population.

4         THE COURT:  Might be, but that doesn't necessarily

5    convince me to certify a class.

6         Okay.  I want you and DaVita lawyers to be thinking

7    about my first question, why.  And if the real answer is,

8    because certifying a class has an *in terrorem* effect that will

9    lead to a settlement, that's not good enough.

10        Here's my second question.  Suppose the Court goes

11   along with you and certifies a class on one or more issues and

12   suppose you win.  What happens next?  They say there are

13   300,000 people out there that have gotten GranuFlo.  How in the

14   world are you going to manage the next phase of this case?

15        MR. WOJTANOWICZ:  Well, Your Honor, in that case, I --

16   the case becomes similar to other mass tort type, type cases.

17        THE COURT:  Nothing that I've ever seen comes even

18   close to 300,000 members.

19        Are you really thinking that you would have a

20   causation and damages mini trial on 300,000 people?

21        MR. CAREY:  Well, Your Honor --

22        THE COURT:  Not in my court you won't.

23        MR. WOJTANOWICZ:  It wouldn't necessarily be the case.

24   There are 300,000 members of the class.  That includes people

25   who received GranuFlo, had, of course, because of that, they

1    experienced the spike in their bicarbonate levels but they may

2    not have necessarily suffered a heart attack or stroke or some

3    other injury directly related to the administration of GranuFlo

4    by DaVita.  So the class includes 300,000 people that received

5    GranuFlo, and that would be the scope of the (b)(2) class.

6           The class of people who actually suffered physical

7    injuries, heart attacks, et cetera, and died, would be smaller,

8    so there wouldn't be 300,000 mini trials, there would be some

9    smaller number.

10          THE COURT:  How do you know?  How many do you think

11   there would be?

12          MR. WOJTANOWICZ:  At this point I don't have any way

13   of estimating that.

14          THE COURT:  Suppose we cut it by tenfold.  There are

15   30,000.  Cut it by a hundred.  There are 3,000.

16          How do you plan to proceed next?  Suppose you got

17   3,000 people.

18          MR. WOJTANOWICZ:  Well, Your Honor, there are --

19   certainly that becomes within the scope of a mass tort.  The

20   Fresenius case, for example, has, I believe, 3,000 claimants in

21   the MDL or in that neighborhood, and several thousand also in

22   the state action.  So this is not unprecedented in terms of

23   size.

24          THE COURT:  Has there ever been a class where 3,000

25   people or 30,000 or 300,000, you pick your number, where there

1    have been mini trials on causation and damages for that many?

2    How is it handled?  Tell me.  Because I don't have the time or

3    the staff to do that.

4           MR. WOJTANOWICZ:  And as I stand here right now, I'll

5    confess I don't have the answer to that question.  But I

6    believe both in terms of -- I think it's feasible because given

7    the reality of the situation, you're going to have likely some

8    of those cases settling out and you're going to have the

9    parties working to work through the caseload.  And you're

10   unlikely to have actual trials for all --

11          THE COURT:  Suppose DaVita doesn't roll over and play

12   dead, suppose they don't settle.  We here thought you guys were

13   going to settle this case before you certified a class.  We

14   thought so.  But you didn't.

15          Now, suppose DaVita says, okay, you wanted a class,

16   you got it.  Now, how do you propose to handle your class

17   because we're not going to settle with anybody.

18          MR. WOJTANOWICZ:  Well, Your Honor --

19          THE COURT:  You talked about the cost of a potential

20   third nephrologist.  That doesn't even begin to approach the

21   cost of trying to figure out a way to handle this many trials.

22   Does it?

23          MR. WOJTANOWICZ:  Well it certainly would be, wouldn't

24   be simple, Your Honor, but certifying the issues that we are

25   talking about would significantly narrow the issues that would

 1    have to be determined in the subsequent mini trials.

 2         THE COURT:  Well --

 3         MR. WOJTANOWICZ:  And it would make it significantly

 4    more likely that that's an administratively feasible way that

 5    these individual plaintiffs who, you know, in your, in the

 6    supposition that we're discussing, these are people with real

 7    injuries.  These are people who actually suffered heart attacks

 8    and strokes --

 9         THE COURT:  I get that.  And I'm hypothetically

10    assuming that.  I'm kind of giving you fair warning here, be

11    careful what you ask for, because once a class is certified,

12    you're stuck.  You can't decide, well, this wasn't a good idea,

13    I want out; I'm not going to let you out.

14         MR. WOJTANOWICZ:  Understood, Your Honor.

15         THE COURT:  All right.  You go ahead with your slide

16    show.

17         MR. WOJTANOWICZ:  Thank you.

18         And by way of opening, DaVita's proposed that they be

19    given an opportunity to open after we've discussed it.  So I'm

20    going to start with just an overview of what we're going to do

21    in our presentation and a summary of the key evidence and key

22    claims in this case.

23         So, Craig, if you'd skip to the fourth slide, please.

24         So just to give you an idea of the, the, the structure

25    of our presentation, I'm beginning with the case overview and

1    key evidence.  Then we're going to present the testimony of

2    Dr. Borkan who you've already discussed at length this morning.

3    We'll have some additional discussion of documentary evidence

4    that will be presented by Mr. Valentine.  Then Ms. Youngberg

5    will testify, and we'll end with a discussion of the

6    class-certification-specific factors and some of the evidence,

7    specifically the evidence relating to ascertaining the members

8    of the class.  And that will be handled, again, by

9    Mr. Valentine.

10         So one thing, moving on to the next slide, the

11   class-certification issues that are really guiding what we're

12   discussing here today, the evidence that we're going to be

13   presenting, that we should be keeping in mind while we're

14   thinking about this evidence, first of all, obviously the

15   class, the Rule 23(a) prerequisites:

16         Numerosity, is this an issue that affects a

17   significant number of people;

18         Commonality, are these issues that we've asked to be

19   certified common to the members of the entire class;

20         Typicality, are the claims of our class members

21   typical of those members of the class;

22         Adequacy, are the representatives that have brought

23   this case before you today and the law firms before you

24   adequately going to represent the interests of the class;

25         And finally, ascertainability;

1          And again, we've discussed it, that we are seeking to

2    issue certification under Rule 23(c)(4), and --

3          THE COURT:  Are you suggesting that you don't have to

4    meet both 23(a) and 23(b) if you just jump ahead to (c)(4)?

5          MR. CAREY:  No, Your Honor.  In order to, in order to

6    gain issue certification under 23(c)(4), we do recognize that

7    we have to show that it will materially advance the litigation

8    and show predominance and superiority regarding the individual

9    issues that we're seeking to have certified.

10         And finally, again, as we've raised this morning,

11   we're seeking a certification under 23(b)(2) for injunctive

12   relief to notify the members of the class that they were

13   actually treated with GranuFlo.

14         And this goes directly to a point we discussed

15   earlier --

16         THE COURT:  It's not injunctive relief.  It's more

17   mandatory relief.  An injunction is to preserve the status quo.

18   You're not trying to get an injunction to preserve the status

19   quo.  You're trying to get an injunction to change the status

20   quo.

21         MR. WOJTANOWICZ:  Well, Your Honor, we're seeking,

22   we're seeking equitable relief that would require DaVita to

23   provide notice to the members of the class so that they can

24   determine whether they were members of the class.

25         THE COURT:  Isn't that the plaintiffs' burden?  Are

1   you just trying to shift the burden of cost of giving notice to

2   them?

3           MR. WOJTANOWICZ:  Well, no.  I don't believe so.  In

4   this case, Your Honor, we believe that if, if you do interpret

5   that as a shifting of a burden, that it's certainly justified.

6   Because this, and again this goes to the point that you raised

7   earlier.  You said you thought it was a gotcha moment or oops

8   moment when certain plaintiffs had to be dismissed in this

9   case.  And that goes directly to our request for injunctive

10  relief in this case, because --

11          THE COURT:  Well, look, if I certify a class, then the

12  law is -- and I will follow it -- that the burden of giving

13  notice to the class falls on the plaintiff.  There are dozens

14  and dozens of cases that say that.  So take that into

15  consideration in your calculus as to whether you really want a

16  class.  If you've got 300,000 people out there, how much is it

17  going to cost you just to give notice to them?

18          MR. WOJTANOWICZ:  Okay, Your Honor.

19          And I guess I would just point out, the evidence is

20  going to show today that defendants, that DaVita, not only

21  doesn't keep track of who gets GranuFlo, this information is

22  not available to patients except through this litigation

23  process where -- and there will be a detailed explanation of

24  how you can determine who received GranuFlo, but it's not

25  something that's tracked separately by DaVita or that patients

1    could possibly know absent filing litigation or having that

2    information --

3            THE COURT:  It's got to be in the records.  They can't

4    put GranuFlo into somebody without keeping a record of it,

5    right?

6            MR. WOJTANOWICZ:  Well, Your Honor, the evidence shows

7    that they did not actually track that directly.  And the way

8    you determine whether the patient received GranuFlo has to do

9    with actually going down deeper into the purchasing records of

10   a particular clinic and comparing those purchasing records and

11   what was available with what was prescribed to the patient.

12           So it's not as simple as saying, this patient received

13   GranuFlo.

14           THE COURT:  So you're telling me that you can't go on

15   the computer and identify who got GranuFlo and who didn't?

16           MR. WOJTANOWICZ:  We're saying you can't -- DaVita is

17   actually arguing that you cannot do that.  We are saying that

18   you can do that, but it's not as simple as actually looking at

19   the patient's medical record and noting on the chart, this

20   patient was treated using GranuFlo.  It's not that

21   straightforward.

22           THE COURT:  I'm astonished that DaVita would put a

23   substance into a person without keeping a record of what went

24   into the person.  To me that is just shocking.

25           MR. WOJTANOWICZ:  We agree, Your Honor, but it's

1    accurate, and we believe that's what the evidence will show.

2         THE COURT:  So if that is accurate, then DaVita should

3    be ashamed of itself; but how are you going to figure out who

4    got it, then?  You say, by looking at records as to when they

5    bought GranuFlo, and then what?  Making a presumption that

6    after they bought two truckloads of GranuFlo, then the people

7    that got dialysis for the next two weeks must have gotten

8    GranuFlo?

9         MR. WOJTANOWICZ:  Your Honor, Mr. Valentine's going to

10   go into a detailed discussion of that later on in our

11   presentation.

12        But to put it briefly, you don't just purchase a jug

13   of GranuFlo, use that jug and then move.  Using GranuFlo

14   powdered acid concentrate requires some infrastructure.  It's

15   mixed in a central location using a machine.  It's a bigger

16   operation than just switching from one kind of a jug to another

17   kind of a jug.  And so that goes into part of the method for

18   how you can determine who received it.

19        But, again, the evidence is that they -- it's not

20   something they tracked in the patients' charts or noted.  It's

21   something that you have to do a little detective work, frankly,

22   to determine.

23        THE COURT:  Well, that's going to cost money.  Are

24   you, plaintiff, prepared to put up the money that it costs to

25   determine who's in your class so you can give notice to them?

1    MR. WOJTANOWICZ:  Well, Your Honor, again, we believe

2    that under the circumstances of this case, that that's a -- the

3    failure of DaVita to provide that information, to make that

4    information available to the class members, is an injury to the

5    plaintiffs.  It's, it's -- they have a right to accurate and

6    complete health-care records; they haven't been provided that,

7    and that's why it's an affirmative burden on DaVita.

8    THE COURT:  What if I disagree with you.  Are you

9    going to then jump ship?

10    MR. WOJTANOWICZ:  I don't believe so, Your Honor.

11    We -- but it's, obviously if you disagree with us, you're not

12    likely to certify the class for the injunctive relief that

13    we're seeking, but we --

14    THE COURT:  I already told you that.

15    MR. WOJTANOWICZ:  But we will do our best to identify

16    and notify members of the class.

17    So moving into briefly kind of the overview and

18    summary of the case.

19    Slide 6, thank you, this is a widespread issue.

20    DaVita treats, according to its own documents, over 150 (sic)

21    dialysis patients every single year.

22    THE COURT:  Where did you get this picture?

23    MR. WOJTANOWICZ:  That's a picture from the Internet,

24    frankly.  It's a picture of someone receiving dialysis

25    treatments.

1          THE COURT:  Do you know whether that person gave her

2     permission for people, lawyers, to use her picture?

3          MR. WOJTANOWICZ:  I do not know, Your Honor.

4          Because these patients receive multiple treatments per

5     week, as part of the normal dialysis treatments, that equals

6     roughly 20 million treatments per year that DaVita, that DaVita

7     gives, and it accounts for about a third of the dialysis

8     market.  And as you heard today in court, DaVita repeated its

9     estimate that during the period, the class period, it used

10    GranuFlo in treating approximately 300,000 patients at its

11    clinics.

12         And moving to the next slide.  The overall issue here

13    is really one of trust.  These are vulnerable patients,

14    dialysis patients, by their very nature.  They come in, they're

15    sick, they're sick by definition.  And most of them have, have

16    other problems and health issues that make them vulnerable to

17    changes in their blood chemistry and to other problems.  So

18    some common other problems that accompany end-stage renal

19    disease, which is what leads people to need dialysis, include

20    cardiovascular disease and other heart conditions; lung

21    disease; vascular disease, which is impaired circulation;

22    neurological problems; and hypertension.

23         So kind of an overview of the, of the dialysis

24    process, the prescription, and you'll hear this further

25    discussed by Dr. Borkan today, prescriptions for dialysis is

1    written by a nephrologist.  That prescription is then actually

2    filled or fulfilled by staff at DaVita, or whatever dialysis

3    clinic the patient happens to be at.  The nephrologist is not

4    there typically.  He's not located in the clinic.  He just

5    writes --

6              THE COURT:  He's right next door.

7              MR. WOJTANOWICZ:  Pardon me?

8              THE COURT:  Right next door.  I was sent out to a

9    nephrologist a couple of years ago by my family doctor, after

10   my annual physical.  Turned out there was nothing wrong with

11   me.  I was very pleased to find that out.  But I just happened

12   to notice when I went to the nephrologist office, that in the

13   very same building was DaVita.  It's a very close synergy, at

14   least in that office.

15             MR. WOJTANOWICZ:  Yes.  In some cases, they may be

16   closely located.  But the point is that the nephrologist is not

17   there in the clinic writing a prescription and then overseeing

18   the administration of the dialysis.  He or she writes the

19   prescription, it's filled by DaVita; and this was the point you

20   brought up earlier, Dr. Borkan will testify the nephrologist

21   does not specify what type of acid concentrate to be used.  He

22   doesn't say, please treat this patient --

23             THE COURT:  I was apparently mistaken.  I thought that

24   that was what happened.

25             MR. WOJTANOWICZ:  It is absolutely not the case, as

1    the evidence will show, and it's an important distinction.

2         THE COURT:  Can't the nephrologist at least specify,

3    we do not want GranuFlo?  Do not put GranuFlo in my patient.

4         MR. WOJTANOWICZ:  I suppose --

5         THE COURT:  He can do that.

6         MR. WOJTANOWICZ:  I suppose a nephrologist can do

7    that.  I don't know if that would be a common practice.  What

8    Dr. Borkan is going to testify about is that the nephrologist

9    specifies the values of bicarbonate that the patient should

10   receive and some key components like potassium and calcium, and

11   the staff at the dialysis clinic uses whatever product they

12   have on hand that will fulfill those requirements.

13        THE COURT:  So it's common knowledge that there have

14   been problems with GranuFlo, right?

15        MR. WOJTANOWICZ:  It became common -- or it became

16   known at a certain point, yes, Your Honor.

17        THE COURT:  In fact, the company that makes it had to

18   issue some sort of a warning or something, right?

19        MR. CAREY:  There was a, yeah, there was a Food and

20   Drug Administration recall in March 2012, Your Honor.

21        THE COURT:  And so any nephrologist worth his game

22   would know about that.  They have to make it their business to

23   know about things like that, right?

24        MR. WOJTANOWICZ:  You know, after a recall, I suppose

25   that nephrologists may be seen to have notice or that the word

1    is out there that there are problems associated with GranuFlo

2    or that it has certain effects.

3              Prior to that time, certainly --

4              THE COURT:  Prior to that time.  But once that became

5    well known, nephrologists wouldn't permit their patients to be

6    treated with it, if they thought it was really dangerous.

7              MR. WOJTANOWICZ:  Only if they, only if they were

8    aware it was being used and administered in the fulfillment of

9    their prescription in an improper way, which is what DaVita was

10   doing.

11             THE COURT:  Oh, so you're not complaining about the

12   GranuFlo, just the way DaVita administers it.

13             MR. WOJTANOWICZ:  You're right, Your Honor.  This

14   case, you know, and as you base, based on your rulings --

15             THE COURT:  This is going to cut against your

16   colleagues' interest in the Fresenius case, won't it, if you

17   say that?

18             MR. WOJTANOWICZ:  No, Your Honor, the facts are what

19   they are.  You know, DaVita had, had knowledge and knew that

20   the evidence is going to show that DaVita knew of the effects

21   of GranuFlo, knew it delivered extra bicarbonate, and either,

22   it either -- one of two things happened.  Either it failed to

23   investigate and dropped the ball and just didn't, it doesn't

24   ever learn about the effects it was having on its own patient

25   population, the way it was using it, or it did know and just

1    decided not to do anything about it because it was saving money

2    or for whatever other reason.

3            And so -- if you could go back to slide 3, Craig.

4            That brings up the issue, you know, why would DaVita

5    use GranuFlo in the first place.  It's a new product.  They had

6    been giving dialysis treatments successfully for years, so why

7    switch to this new product that changes the formulation.  The

8    answer is simple: it's a significant difference in cost.

9    Traditional acid concentrate in a liquid form costs about a

10   dollar 35 to a dollar 80 per gallon.  Switching to GranuFlo

11   acid concentrate, you're looking at somewhere around a dollar

12   nine a gallon.  And when you're extrapolating this over the

13   20 million treatments that are provided by DaVita in a given

14   year, you're talking about significant amounts of money that,

15   that are, that's being saved here.

16           THE COURT:  Assuming that those savings aren't passed

17   through in terms of the price to the patient or the insurance

18   company.

19           MR. WOJTANOWICZ:  Yes, Your Honor.

20           THE COURT:  Do you have somebody that's going to

21   testify that the reason they use GranuFlo is because of its

22   price?

23           MR. WOJTANOWICZ:  No, Your Honor, we believe that is

24   an acceptable inference, that they actually discuss the fact

25   that it is lighter, it takes up less room, that when they, they

1    make an effort in 2009 to push their clinics into using

2    powdered dialysate; and that initiative was, was prompted by

3    the desire to save costs and to use a product that was lighter,

4    took up less room, cheaper to ship, all those things.

5            So moving on to slide no. 9, please.

6            The differences between GranuFlo and liquid

7    dialysate -- this is going to be explained further by

8    Dr. Borkan and additional documentary evidence -- but the

9    graphic from on the slide there is taken from a presentation in

10   a 2004 DaVita meeting, national technical meeting, at which

11   Fresenius gave a presentation discussing, essentially a sales

12   pitch, discussing GranuFlo and highlighting the differences

13   between GranuFlo and liquid acid.

14           And what that shows is that GranuFlo, which contains

15   sodium diacetate, contains twice as much acetate as

16   traditional.  Therefore, it delivers 8 milliequivalents per

17   liter of metabolized bicarbonate to the patient, twice the

18   amount of traditional acid concentrate.  And below you see

19   traditional acid concentrate contains sodium acetate and

20   delivers at most 4 milliequivalents of metabolized bicarbonate

21   to the patient.

22           Moving on to the next slide, the typical dialysis

23   prescription is to prescribe to the patient 37 milliequivalents

24   of bicarbonate.  That's what a doctor's prescription would

25   indicate.  For the bicarbonate value.  And DaVita's job is to

 1    deliver the prescription consistent with that, or deliver the

 2    treatment consistent with that prescription.

 3           Now, because GranuFlo delivers the extra

 4    8 milliequivalents of acetate, which are converted into

 5    bicarbonate on one-to-one ratio, that actually, if that's not

 6    accounted for when you're administering the treatment, you're

 7    going to take patients, a patient with a 37 bicarbonate

 8    prescription up to 45.  And what we're going to hear is that

 9    serum bicarbonate between 35 and 40 is severely alkalotic, and

10    we'll hear more evidence, hear evidence about what alkalosis

11    results in and all the untoward effects that result from that.

12           And so the warning that DaVita issued and what

13    DaVita -- pardon me, what Fresenius concluded by reviewing its

14    own data was that if you're using GranuFlo, you should make

15    sure that you can only use it if the -- you don't want to

16    deliver a buffer greater than 39 to 40 milliequivalents per

17    liter because otherwise you're risking alkalosis and all the

18    bad effects that go along with that.

19           Now, in that same 2004 presentation, DaVita, or

20    Fresenius informed DaVita about the results that it saw when it

21    began using GranuFlo in its patient population.  And that's --

22    this is the chart that you're seeing here on the slide from

23    Exhibit 13.  And what that graph shows is that on this patient

24    population of about 47, 4800 patients, roughly, they saw that

25    switching to GranuFlo shifted everyone's bicarbonate to the

1    right.  Everyone became slightly more alkalotic, and it

2    increased the number of patients that were being subjected to

3    alkalosis concern, meaning they have a predialysis bicarbonate

4    level of greater than 30 milliequivalents per liter.  So that

5    after, through the dialysis process and being subjected to more

6    bicarbonate, they're in danger of becoming alkalotic.

7            Now, the next slide shows there's a -- Fresenius'

8    internal memorandum in November 2011.  That details sort of

9    what Fresenius was able to learn by viewing its own data after

10   it began using GranuFlo in its own patients.

11           Now, the evidence is going to show that DaVita was

12   aware of this memo at the time.  But it's, it's sort of

13   important for a couple different points, not only for what

14   DaVita knew, but for showing what Fresenius was able to learn

15   by examining its own patient data.

16           So, you know, this, this is a contrast to DaVita

17   because Fresenius was looking at its patient data at the very

18   least, even though it manufactured the product and shouldn't

19   have let it go out and be used in the manner that it was.  But

20   it was looking at its data, and the memo, which is a joint

21   Exhibit No. 2, warned some of the same risks that Fresenius

22   told DaVita about in 2004, this is seven years later.

23           Continuing on with that memo, on page 13 of the

24   presentation, Fresenius concluded that it reiterated that

25   powdered GranuFlo formulation has a total buffer equal to the

64

1    prescribed bicarbonate plus eight.  Because of the extra sodium

2    acetate in sodium bicarbonate.

3              And it also concluded that the use of GranuFlo exposed

4    patients to a higher buffer load than intended.  The buffer

5    load that the dialysis or that the nephrologist intends is the

6    prescribed level.  When you use GranuFlo to fill that

7    prescription, you're subjecting the patient to a higher level

8    than what is intended.

9              THE COURT:  So this is good evidence in your Fresenius

10   case.  What has it got to do with DaVita?

11             MR. WOJTANOWICZ:  Well, like I said, Your Honor,

12   DaVita was not only aware of this memo, but this shows what

13   DaVita could have learned, even if it, even if it wants to

14   claim, and it can't claim, that it didn't have this memo,

15   wasn't aware of it, this shows what DaVita could have learned

16   had it been adequately analyzing data that it was collecting

17   about its patients.  If it had been analyzing its patients,

18   doing an adequate patient-safety program that met the standard

19   of care, it could have learned these same things, because it

20   had the same type of data or should have had.

21             THE COURT:  And that's what your case is about, isn't

22   it?

23             MR. WOJTANOWICZ:  This is the, this is the

24   drop-the-ball portion.  If they didn't know, then they dropped

25   the ball.  Because Fresenius, who is of similar size, does the

1   same thing, looked at its own data and was able to reach these

2   conclusions.  If that's the case, why didn't DaVita reach the

3   same conclusions at the same time or earlier.

4           Moving on to slide 14 --

5           THE COURT:  Now, what that slide said was that there's

6   virtually an automatic increase of 8 in bicarbonate.

7           MR. WOJTANOWICZ:  Yes.

8           THE COURT:  If that is the case, and it happens every

9   time, why didn't every patient have the bad outcome?

10          MR. WOJTANOWICZ:  Your Honor, the -- what they -- what

11  the memorandum, what they found is that it increases the

12  chances, significantly increases the chances of a bad outcome.

13  Six- to eightfold increase in the risk of cardiac arrest.  That

14  doesn't mean that every single person is going to have a

15  cardiac arrest when they're subjected to excess bicarb.  But

16  you've got patients with other, with vulnerabilities due to not

17  only their end-stage renal disease but the other things that

18  bring that on or contribute to it.  And so you're taking a

19  vulnerable population, you're making them even more vulnerable

20  and you're significantly increasing their risk of sudden

21  cardiac death following -- during or following treatment at a

22  DaVita clinic using GranuFlo.

23          THE COURT:  Six- or eightfold, what is the percentage

24  of people that have cardiac arrest and then what is the

25  percentage of people that have cardiac arrest that had

66

1   GranuFlo?

2              MR. WOJTANOWICZ:  I don't know --

3              THE COURT:  I mean, an eightfold could be from

4   1 percent to 8 percent.  Right?

5              MR. WOJTANOWICZ:  Correct.

6              THE COURT:  How do you win your case, how do you prove

7   to a preponderance of the evidence that not monitoring the

8   GranuFlo caused injury to a particular person?

9              MR. WOJTANOWICZ:  Well, Your Honor, what we're hoping

10  to, to resolve through our -- the issues that we'd like to have

11  certified is the general-causation issue.  Is the

12  administration of -- is using GranuFlo in dialysis treatment

13  capable of producing untoward effects that include heart

14  attacks and strokes; DaVita seems to be contesting that.

15             The individual causation issues would need to be

16  determined later on a case-by-case basis.  But we believe that

17  you can show, at least on a, on a preponderance-of-the-evidence

18  standard, that any given patient, they go in, they've got a

19  high predialysis bicarbonate level, GranuFlo is used, you can

20  infer from that, based on the expert testimony and the science,

21  that they wound up being severely alkalotic, and then they

22  suffered a cardiac event or a stroke.

23             That the proximity in time is something that can be

24  considered when you're determining individual causation, and

25  we've got the science that shows that these, that GranuFlo

1    'leads to bicarbonate, leads to alkalosis, leads to heart

2    attack.

3              THE COURT:  Well, are the people that are going to be

4    in your class people that have actually had the cardiac arrest

5    or just everybody that's ever gotten the product?

6              MR. WOJTANOWICZ:  Well, Your Honor, for, for the

7    purposes of people who would be entitled to, people would have

8    to prove -- in order to be entitled to monetary compensation,

9    to damages, they would have to prove that they suffered an

10   untoward event or, you know, a heart attack or something like

11   that.

12             THE COURT:  So why isn't your class defined according

13   to people who have been administered GranuFlo and have suffered

14   a cardiac arrest, as opposed to 300,000 people who have gotten

15   GranuFlo?

16             MR. WOJTANOWICZ:  Because, Your Honor, part of the

17   issue is that DaVita doesn't track GranuFlo.  Part of the

18   relief we need to get in this case is notice to the class

19   members that they were subjected to this.  This might be people

20   who had a heart attack; and like we said, people are sick,

21   they're getting dialysis, they don't know that they were

22   receiving GranuFlo, their medical records don't show that they

23   were receiving GranuFlo; and the only way they're going to find

24   out is if this case proceeds on a class basis so that there's a

25   determination of who got that, who received that in their

68

1    treatment and it may have caused their heart attack or whatever

2    it was, or their loved one to die.

3            THE COURT:  Did you ever consider just putting an

4    advertisement in *The New York Times* and papers across the

5    country saying, if you or somebody, someone you know was on

6    dialysis and had a heart attack, you should find out whether

7    you got GranuFlo, and if you did, you might have a legal case.

8            MR. WOJTANOWICZ:  Well, Your Honor, those people

9    could, could, you know, there's a publicity about this case,

10   they could think, oh, I wonder if I got GranuFlo, hey, DaVita,

11   can I have a copy of my records so I can see whether I got

12   GranuFlo.  They're not going to find out because it's not in

13   there.

14           DaVita would have to say to that patient, here are the

15   research about records for our clinic, you know, here's --

16   Mr. Valentine's going to walk you through that process, but

17   it's not something a typical patient can just request their

18   record and say, hey, I got GranuFlo and I had a heart attack

19   and I'm a victim of your negligent conduct.  It's just not

20   possible.

21           THE COURT:  What if their nephrologist went next door

22   to DaVita and said I want to know, if you ever want my business

23   again and the rest of my partners, I want to know.

24           MR. WOJTANOWICZ:  That would help people going

25   forward.  It would not identify for the individuals who

1    received treatment what, you know, what was used in the past.

2    And that would, again, require DaVita to take some different

3    action in order to determine and sort out who received it and

4    who's a member of the class.

5            THE COURT:  So really what you're saying is, the

6    member of the class is people who have gotten GranuFlo and have

7    had a serious adverse effect as a result.  That's who's in your

8    class.

9            MR. WOJTANOWICZ:  Those are the members --

10           THE COURT:  You don't know who they are --

11           MR. WOJTANOWICZ:  They're ascertainable, but we don't

12   know, I don't have the list right now.  We've shown a, a

13   message for -- pardon me, we're going to show a method for how

14   you determine who's a member of the class.  You know, we've

15   also got in here the Colorado Consumer Protection Act claims,

16   which is another way we define who is in the class.  DaVita is

17   making representations about the quality of its care.  People

18   were relying on those representation, they were ubiquitous and

19   DaVita was delivering a different, less standard of care, and

20   that's part of the evidence.

21           THE COURT:  How do you even know that your class is

22   numerous?  If you don't know who they are, how do you know

23   there's numerosity?

24           You start off with 20 plaintiffs here, you're down to

25   three?  What if there are only a couple dozen people that have

1    ever had heart attacks while on dialysis because of GranuFlo?

2           MR. WOJTANOWICZ:  Your Honor, we've alleged damages to

3    the class that include -- there are multiple claims here.

4    We've got our negligence claim, Consumer Protection Act claim,

5    we've also got our claim for injunctive relief.  Every member

6    of the class, we believe, was harmed for purposes of the

7    Colorado Consumer Protection Act claim because of DaVita's

8    affirmative representation, and also it's our theory that they

9    knew about but did not reveal the danger that was posed to

10   patients by the way that it was using GranuFlo in giving the

11   patients treatments.

12          THE COURT:  You're saying now that people who got

13   GranuFlo were harmed even if they didn't have any adverse

14   reaction at all.

15          MR. WOJTANOWICZ:  Yes, Your Honor.

16          THE COURT:  So you really do want to give notice to

17   300,000 people.

18          MR. WOJTANOWICZ:  Yes, Your Honor.  We certainly want

19   the class to be certified under the Consumer Protection Act and

20   so there's harm for people --

21          THE COURT:  What's the harm if they didn't suffer any

22   adverse reaction at all?  Their dialysis just went fine.

23          MR. WOJTANOWICZ:  Well, Your Honor, they were, they

24   were subjected to an additional risk that they were, that they

25   were not aware of, based on representations of DaVita's, the

1   kind and quality of the services that DaVita was going to

2   provide.

3         THE COURT:  So what?  So what?  It didn't happen.

4   It's over.  If we were worrying about people who are going to

5   be subjected to additional risk in the future, that would be a

6   different matter.  But if they had the GranuFlo and they didn't

7   get sick or hurt --

8         MR. WOJTANOWICZ:  Well, Your Honor, in fact the

9   evidence is going to show that DaVita has not yet changed its

10  policies or how it uses GranuFlo.  Even after the recall

11  notice --

12        THE COURT:  Surely now nephrologists know all about

13  GranuFlo, and if they think it's a problem or if the patients

14  think it's a problem, they can elect not to have GranuFlo.

15  They could say, I will not allow you to put the GranuFlo into

16  me, period.  Now it's not a secret anymore.  People now go

17  forward with their eyes wide open, don't they?

18        MR. WOJTANOWICZ:  Your Honor, I mean dialysis patients

19  aren't putting themselves forward as providing the highest

20  quality of dialysis care.  They rely on the dialysis provider

21  to accurately fulfill the doctor's prescription and to

22  administer their care in a safe and effective way, and that's

23  not what's happening because of the way that DaVita has, has

24  used GranuFlo and continues to use it.

25        THE COURT:  Well, you could paper the airwaves, if you

1   really cared about these people, you could paper the airwaves

2   with advertisements, notices, warnings: people out there, if

3   you are on dialysis or if you or your loved ones ever go on

4   dialysis, do not let them use GranuFlo, no matter what.

5   Nephrologists know, you can go to the nephrologists'

6   convention, do not let people use GranuFlo.  I mean, if your

7   goal here was just to make sure that people don't get it in the

8   future, you could do that without a lawsuit, right?

9          MR. WOJTANOWICZ:  Well, Your Honor, we can, we can and

10  do put that message out there.  But we're not the only people

11  talking.  Fresenius is out there continuing to fight and

12  claiming that its product is safe.  They're defending their

13  lawsuit.  DaVita is defending its behavior and claiming that it

14  didn't do anything wrong.  So there's a lot of other noise out

15  there.

16         A lawsuit that actually affirmatively protects

17  consumers and compensates them for the wrongs and the harms

18  that they have suffered is a way to enforce that mechanism and

19  actually to make the message that we're sending stand out above

20  all the other noise.

21         So, you know, I understand that there are different

22  ways than lawsuits to accomplish safety objectives, but part of

23  the reason that we have class, class mechanisms is because you

24  can't always get that message through effectively and not

25  everyone is going to be informed.  And so we have mechanisms

1   for that.

2          THE COURT:  Well, I come back, and I'm maybe taking

3   too much of your argument from you; but if your case really is

4   that everybody that ever had GranuFlo was harmed, then you are

5   talking potentially about 300,000 in a class.  And there's no

6   way you can manage or any court can manage that.  If you're

7   talking about people that actually suffered a real injury, then

8   you're talking about a much smaller population, I assume.  And

9   maybe then it's manageable.

10          MR. WOJTANOWICZ:  Well, I think it's --

11          THE COURT:  But I've got to find that a class action

12   is superior.  And if you're talking about 300,000 mini trials,

13   because you've told me everybody that ever got it was harmed,

14   then right now, I'll tell you, it's not manageable.  No.  It

15   isn't.

16          MR. WOJTANOWICZ:  We're not talking about 300,000 mini

17   trials.  We're talking about members of the class, 300,000

18   people that were, that were -- that were exposed to additional

19   bicarbonate.  So they're harmed in that they have, they have

20   not received adequate and complete medical records.  They're

21   harmed in the Colorado Consumer Protection Act which provides

22   for statutory damages.  Only a subset of those people, of that

23   group, a small subset will have actually suffered physical harm

24   and need a mini trial to determine individual causation and

25   their individual damages.

1      THE COURT:  Oh, you don't think you need to prove

2  causation for the people that were damaged just by the risk?

3      MR. WOJTANOWICZ:  We believe under the Colorado

4  Consumer Protection Act that we can prove the causation and

5  their, the availability of damages on a class-wide basis.  We

6  don't think individual trials will be necessary to determine

7  whether individuals -- whether DaVita violated the Colorado

8  Consumer Protection Act and as a result people are entitled to

9  statutory damages.

10      THE COURT:  So how do they get the damages?

11      MR. WOJTANOWICZ:  How do they get their damages?

12      THE COURT:  Yeah.

13      MR. WOJTANOWICZ:  Part of the relief would be, we

14  would identify who was a member of the class, and they would be

15  entitled to their statutory damages --

16      THE COURT:  300,000 of them, how are those 300,000

17  people, or the 290,000, whatever it is, that didn't have an

18  adverse reaction, how are they going to get their damages?  You

19  say they're entitled to damages.  How are they going to prove

20  it?

21      MR. WOJTANOWICZ:  Your Honor, we're going to prove the

22  availability of class-wide statutory damages with evidence that

23  is common to the entire class.

24      THE COURT:  Statutory damages, but how do the

25  individuals get their little piece of it?

75

1        MR. WOJTANOWICZ:  How do they get the check?

2        THE COURT:  Yeah.

3        MR. WOJTANOWICZ:  The same as they do in any other

4  case, it would be a determination of who was a member of the

5  class, who was exposed to GranuFlo and the distribution of

6  those funds.

7        THE COURT:  Oh, so, they have to prove that they're in

8  the class.  Right?

9        MR. WOJTANOWICZ:  Right, Your Honor.  And in that

10  case --

11        THE COURT:  How do they prove it?

12        MR. WOJTANOWICZ:  We will -- Mr. Valentine will show

13  later how you ascertain who received GranuFlo, and that's

14  something that we can show.

15        THE COURT:  So once we've ascertained that they've

16  received it, if we can, then your theory is that everybody's

17  going to get a check in the mail?

18        MR. WOJTANOWICZ:  Yes, Your Honor.  And that's, that's

19  completely feasible.  In the Toyota case, we had over

20  20 million class members and, you know, millions of those

21  people got checks in the mail for the damages that they, they

22  got through the settlement.  So that's not a barrier to

23  proceeding --

24        THE COURT:  Settlement.  But you're just hoping,

25  hoping against hope, that there will be a settlement.

1          MR. WOJTANOWICZ:  No, Your Honor, I'm just saying that

2     it's not -- distributing checks to 300,000 people is not a

3     problem.  We're going to display and show you how we can

4     determine who's a member of the class.  If statutory damages

5     are awarded, we can determine who is a member of the class, who

6     is entitled to them --

7          THE COURT:  But what if DaVita doesn't roll over and

8     play dead, what if they say you prove it?

9          MR. WOJTANOWICZ:  Then we'll get a judgment against

10    them for the statutory damages and proceed in the same way.

11         THE COURT:  Okay.

12         MR. WOJTANOWICZ:  So turning to the presentation,

13    slide 15.  This is a continuation of discussion of the 2011

14    Fresenius memo.  Where Fresenius looking at its own patient

15    data for using GranuFlo prior to that time found the six- to

16    eightfold increase --

17         THE COURT:  By the way, you keep referring to the

18    Colorado Consumer Protection Act.  Does that even apply?  To

19    people that aren't Colorado people?

20         MR. WOJTANOWICZ:  Yes, Your Honor.

21         THE COURT:  You've got people all over the country

22    you're representing, supposedly.  You've got potentially 46 or

23    50 different state tort laws.  Colorado has the CCPA, but no

24    one else does.  How does that work?

25         MR. WOJTANOWICZ:  Well, Your Honor, that's, of course,

1  there will be, there needs to be a choice-of-law decision.  We

2  think that in this case application of the Colorado Consumer

3  Protection Act is appropriate because all of the acts we're

4  complaining of have to do with DaVita's corporate central

5  management.  It's based here.  All of the acts that we're

6  complaining of were, were failures to act or actions that

7  occurred here in Colorado.  And so based on that, we think that

8  in this circumstance, everyone should be entitled to the

9  protection of the Colorado Consumer Protection Act.

10         THE COURT:  What if I disagree with you on choice of

11 law?  Then where are you?

12         MR. WOJTANOWICZ:  If you disagree with us on choice of

13 law, then we would be looking at subclasses based on individual

14 state laws.  That does, of course -- that's more complicated,

15 but it's not, it's certainly not unprecedented.  It's been done

16 by many courts in, in other class-action cases, and you can

17 group cases together based on similarities between their laws.

18 There aren't -- there are 50 states, but there aren't 50

19 entirely disparate kind of consumer-protection laws, and they

20 can be grouped together in ways that make sense.

21         THE COURT:  So I come back to my question that I

22 started with.  You've got three plaintiffs that you represent

23 for sure.  You know for sure that they got GranuFlo.  You know

24 for sure that they had this horrible outcome, right?

25         MR. WOJTANOWICZ:  Yes.

1             THE COURT:  Why wouldn't you want to just try your

2    issues for those three people and rely on collateral estoppel

3    against DaVita?  That would be -- you wouldn't have to worry

4    about choice of law, or at least not much.  I don't know where

5    your three come from, actually.  You wouldn't have to worry

6    about notice, all these expensive things.  You have a simple,

7    straightforward case.  You bring in seven people, you present

8    your evidence; and if they agree with you, you've got rulings

9    on however many issues the Court were to pick.  And then you

10   can say, DaVita, you're stuck with it.

11            MR. WOJTANOWICZ:  Well, Your Honor, would that it were

12   that simple, you know, it certainly is something that could be

13   attempted to be used; but individual lawyers around the country

14   trying to bring those cases later would wind up arguing, and

15   re-arguing and re-arguing, the issue of whether DaVita was in

16   fact collaterally estopped, whether the issues were identical.

17   You know, it would create --

18            THE COURT:  Lawyers argue everything.  I've seen that

19   in this case.  There isn't a single thing you guys haven't

20   argued about.

21            But so far as I know, the law everywhere is if you've

22   had a full opportunity to have your day in court and present

23   your evidence and so forth and you lose on an issue, you're

24   collaterally estopped, you can't relitigate it again and again.

25   Plaintiffs can.  If you don't certify a class, you've got three

1    plaintiffs, and if they lose the case, well, okay.  You've got

2    300,000 more out there.  That's why I just don't understand why

3    you want a class and DaVita doesn't.  Unless this is all about

4    getting a class certified that is so terrible looking that it

5    will bring DaVita to its knees.

6         MR. WOJTANOWICZ:  Well, Your Honor, pardon my -- as

7    we've argued, we simply believe that the class mechanism in

8    this case, considering, you know, the expense of bringing a

9    case like this, it's going to provide significant benefit to

10   members of the class.  And also the significant factor is

11   letting people know that they may have been harmed, that's not

12   something that's going to happen without a class action,

13   because in an individual case, it's not relevant whether John

14   Doe in Maine received GranuFlo, that's not going to be a part

15   of the discovery that occurs in an individual case against

16   DaVita.  It's only discovery that can occur if we're proceeding

17   on a class-wide basis so we can determine who got this.  Did

18   Mr. Doe up in Maine actually receive it because he's never

19   going to know that that heart attack he had three years ago was

20   caused by the fact that he was being administered GranuFlo.

21        THE COURT:  Okay.

22        MR. WOJTANOWICZ:  So to quickly wrap up, the 2011

23   memo, by Fresenius, shows two things.  One, the evidence is

24   going to show that it actually, that knowledge can be imputed

25   to, to DaVita because they were given a copy of the memo.  And

1    it also shows what could have been done had they had adequate

2    patient-safety and risk-management procedures and had they been

3    analyzing their data, there's no reason they couldn't have

4    reached the same conclusion like DaVita reached in slide 15

5    that, that elevated predialysis bicarbonate levels and overt

6    alkalosis or significantly associated six- to eightfold risk of

7    CP, cardiopulmonary arrest and sudden cardiac death in the

8    dialysis facility.

9         And in this study as well, DaVita has, has talked

10   about that there's a debate in the community, what the, what

11   the impact of elevated bicarbonate is.  Fresenius here

12   confirmed that, that you'll hear about the DOPPS study, and it

13   was a study that was published in the early 2000s that

14   associated elevated bicarbonate with untoward events.  And that

15   was there in that memo confirmed by Fresenius.

16        THE COURT:  Well, does anybody argue that elevated

17   bicarbonate doesn't carry a risk?

18        MR. WOJTANOWICZ:  Well, Your Honor, it seemed that

19   Mr. Hopkins was alluding to that earlier.  We don't believe

20   that there is any reasonable scientific debate over that.  I'm

21   certainly not going to make that argument for DaVita.  It

22   sounded to me like that they were thinking about making that

23   kind of an argument.  We don't think it's a subject of a

24   realistic debate.

25        And this is, this is part, part of the proof of that.

1    And again, from, on page 16 of the presentation, the Fresenius

2    memo concluded that elevated bicarbonate increases the risk of

3    death and that it's an actionable and preventable risk factor

4    as long as proper steps are taken when you use it.

5            Now, if you look at page 17, this is actually an

6    excerpt from Plaintiffs' Exhibit No. 2, which is a copy of the

7    FDA recall notice in March of 2012.  And again, just to show

8    consistency, in that recall notice, the FDA recognized GranuFlo

9    leads to elevated bicarbonate levels and that, and that

10   elevated bicarbonate levels leads to alkalosis and

11   cardiopulmonary arrest in other --

12           THE COURT:  But the FDA didn't tell them to take it

13   off the market.

14           MR. WOJTANOWICZ:  Well, Your Honor, it was a labeling

15   issue.  You know, a medical --

16           THE COURT:  And the labeling goes to the doctor.

17           MR. WOJTANOWICZ:  No, the label is on the product,

18   which is in the clinic.

19           THE COURT:  Oh --

20           MR. WOJTANOWICZ:  So the conclusion ultimately was

21   that it's not that GranuFlo is, is dangerous under every

22   possible circumstance.  It's dangerous the way it was labeled

23   and it needs to be used properly by the people administering

24   the treatment.

25           THE COURT:  Well, the label doesn't make it dangerous.

82

1          MR. WOJTANOWICZ:  Actually, when you're talking about

2    medical devices, the label is part of the device.  The label

3    and the device are, are approved together.  Because you can't

4    have -- it's sort of like instructions are for use for a

5    prescription medicine.  They are, they're things that go hand

6    in hand.

7          THE COURT:  So now they've labeled it right.

8          MR. WOJTANOWICZ:  There are issues, there are ongoing

9    issues about labeling; Fresenius continues to fight that.

10         THE COURT:  Did the FDA say, well, I don't care what

11   you want to fight about, this is what's got to go on the label,

12   do it?

13         MR. WOJTANOWICZ:  Your Honor, I believe that the FDA,

14   that there were changes to the label.  But again, there is --

15   Fresenius is continuing to work with the FDA over labeling

16   issues.

17         Going on to no. 18, this goes to some of the testimony

18   that Dr. Borkan will provide regarding the effects of excess

19   delivery of bicarbonate.  As he's going to describe it, the

20   process of dialysis has to do with a balancing a number of

21   factors.  Okay.  The primary purpose is to balance the pH of

22   the patient because a person with ESRD, their -- they become

23   too acidic, but you are affecting several other factors that

24   have been considered to the patients' health and safety.

25         So excess delivered bicarbonate, as Dr. Borkan will

1    testify, lowers potassium and what's the effect of a low

2    potassium level, it can affect heart and muscle dysfunction.

3    Long QT.  Low ionized calcium.  Again, he'll testify that's a

4    result of excess delivered bicarbonate.  Again, can result in

5    heart and muscle dysfunction, a long QT interval and

6    arrhythmias and increased metabolic alkalosis, can result in

7    less oxygen delivery to, to organs.  And then associated with

8    the fall in calcium and potassium levels and causes

9    arrhythmias.

10        They can also, moving on to the next slide, contribute

11   to, and this is kind of a graphic representation of how all of

12   these factors work together.

13        And actually, I think you might need to . . . .

14        There we go.  So we'll just reveal it all.

15        He'll testify about how all these factors work

16   together, contribute to reduced tissue oxygenation and how

17   those things lead to cardiopulmonary arrest, myocardial

18   infarction, and stroke.

19        So to kind of, you know, sum up what we're going to

20   show here on slide 20, we're going to -- we have common proof

21   that's applicable to all class members to resolve all the class

22   issues that we seek to have certified.  DaVita didn't have any

23   written policies to account for the extra bicarbonate in

24   GranuFlo.  It had staff training materials that failed to cover

25   GranuFlo, alkalosis or metabolized bicarbonate, so its staff

1    wasn't prepared to fill, accurately fill prescriptions that

2    were coming in for dialysis treatments in facilities that were

3    using GranuFlo.

4            DaVita executives and clinical leadership didn't

5    understand total buffer.  You're going to see evidence that

6    they were disseminating wrong information and then after the

7    recall, at very high levels, they didn't know what was

8    happening with the patient bicarbonate levels.  Despite this,

9    in 2009, they had initiated an aggressive initiative to convert

10   their clinics to the use of GranuFlo and powdered, powdered

11   acid concentrate, even though they didn't have any of these,

12   these safety checks in place.

13           So, and, and, and one of the ways that you can see

14   what DaVita did over time in the fact that they, they never --

15   is the fact that they never changed their, their behavior.

16   There's no proof that they ever changed the way that they were

17   filling dialysis prescriptions.

18           And when you look at the prescriptions that were given

19   to our three plaintiffs and proposed class representatives,

20   they didn't change over time.  They stayed even before, before

21   the memo in November 2011, when the FDA recalled GranuFlo, and

22   after the fact, not only has DaVita, there's no evidence that

23   DaVita has changed the way it's filling the prescription, and

24   there's no evidence that the doctors were changing their

25   prescriptions.  So that just shows that DaVita has never taken

 1     into account the problem with GranuFlo and extra dialysate.

 2              THE COURT:  Well, if that's the case, then the FDA

 3     label change didn't have any impact, did it?

 4              MR. WOJTANOWICZ:  Well, it certainly didn't have any

 5     impact on DaVita's behavior, Your Honor.

 6              THE COURT:  So now you're talking punitive damages is

 7     what you're doing, really.

 8              MR. WOJTANOWICZ:  Well, it's certainly a possibility.

 9     You know, I think we have a --

10              THE COURT:  You're claiming that DaVita started using

11     GranuFlo because it was cheaper, and they knew that elevated

12     bicarbonate levels were risky.  And they knew from Fresenius --

13              MR. WOJTANOWICZ:  Fresenius.

14              THE COURT:  -- Fresenius that elevated bicarbonate

15     levels and risks of heart attacks, et cetera, were shown to be

16     associated with the product.  And they knew that the label had

17     to be changed; and according to you, they just kept on doing

18     the same old same old, keep saving money.

19              Now, if that's what happened, you're talking punitive

20     damages, seems to me.

21              MR. WOJTANOWICZ:  Your Honor, we, we, we think that

22     the, the evidence, the way that it's showing so far, and we

23     have a long way to go, is, does create a set of circumstances

24     that are, that are shocking and that you wouldn't think that a

25     health-care company treating such vulnerable people would

1   engage in.  You know, that's an argument for another day.  I

2   don't know that we, we need to establish that for class

3   certification.  And, you know, it's not something that we're

4   relying on at this point, but, yeah, we think the evidence is

5   pretty dire.

6        And moving to the next slide, slide no. 22, you know,

7   this is one of the pieces of evidence that, that is sort of

8   shocking.  And that is that in 2009, David Van Wyck, M.D., who

9   is a member of, a manager at DaVita and having to do with

10  patient safety was responding to an inquiry by one of the

11  individual clinics or medical directors, asking about, asking

12  for a comment on, you know, what's with the extra acetate

13  that's in GranuFlo, how does that affect us, 'cause we're

14  thinking of switching to that.

15       And this is in Exhibit 14.  What he tells this,

16  Mr. Tseng, Dr. Tseng is that there's no intradialytic advantage

17  or disadvantage, this is to GranuFlo, could not change your

18  bicarb prescription, whatever it is you've chosen.  So this is

19  DaVita specifically telling a doctor, who wants to know, if I

20  use GranuFlo, how is this going to affect what I do.  And

21  they're told, no advantage or disadvantage, you don't change

22  your prescription.

23       And this is in stark contrast to ultimately what the

24  FDA used when there was the recall in 2012, which is what that

25  using, using GranuFlo results in a reasonable probability that

1    it will cause serious adverse health consequences or death.

2              THE COURT:  You have your three plaintiffs, Morris,

3    Armstrong, and Nunes.

4              MR. WOJTANOWICZ:  Uh-huh.

5              THE COURT:  I can't remember what their particular

6    adverse consequence was.  Did they die?

7              MR. WOJTANOWICZ:  If I'm remembering correctly, two

8    out of the three, sorry, one out of the three died.  The other

9    two actually -- and so it's being brought on behalf of their --

10             THE COURT:  The estate, I take it.

11             MR. WOJTANOWICZ:  The estate.

12             THE COURT:  Or the survivors, whatever.

13             MR. WOJTANOWICZ:  Yeah.

14             THE COURT:  And the other had two heart attacks, but

15   survived.

16             MR. WOJTANOWICZ:  Yes.

17             THE COURT:  But have permanent disabilities or

18   something?

19             MR. WOJTANOWICZ:  They're receiving ongoing treatment

20   and, yeah, they were, you know, they suffered, you know,

21   obviously suffering a heart attack is a serious injury.

22             THE COURT:  Oh, I agree with that.

23             Let's say you could prove that this was because of the

24   GranuFlo and to the point of this case, it was because DaVita

25   didn't properly monitor.  And let's say you could even prove

 1    all these horribles that you're accusing DaVita of, that they

 2    knew all about the problem, they didn't do anything about it,

 3    they had the money motive, all those things.

 4         If you could prove all of that, then you're talking

 5    about potentially some fairly significant compensatory and

 6    punitive damages for these three people, right?

 7         MR. WOJTANOWICZ:  Potentially, Your Honor, yes.

 8         THE COURT:  Now, one of the original thoughts when

 9    they created class actions was there are cases where a lot of

10    individuals have suffered such a small injury that if they had

11    to proceed alone, they couldn't, they couldn't afford to.

12    Couldn't even get a lawyer to represent them.  But these three

13    people potentially have big cases.  Potentially have

14    seven-figure cases, each of them.  Right?

15         MR. WOJTANOWICZ:  Yes, Your Honor.

16         THE COURT:  There's enough at stake here that you

17    don't need a class action.  They don't need a class action.

18    You've got a potentially big case just for three guys.

19         MR. WOJTANOWICZ:  Well, Your Honor, I think that, you

20    know, what we've got here is several different issues coming

21    together.  You've got the potential for people having been very

22    seriously injured and, yes, that might mean that some members

23    of the class would be entitled to very large damages, and

24    you've also got that overlapped with the issue, with the fact

25    that DaVita doesn't track or tell people that they've received

1    GranuFlo.  So people don't have adequate or accurate medical

2    records and can't determine whether they --

3              THE COURT:  But these three know.  These three you've

4    got buttoned down.

5              MR. WOJTANOWICZ:  After a year of discovery, yes, we

6    were finally able to determine that they did get it, Your

7    Honor.

8              Slide no. 23 shows, this is an excerpt from Exhibit

9    No., Plaintiffs' Exhibit No. 11.  And, Your Honor, the point of

10   these slides coming up is showing that DaVita, of course it's

11   training its staff.  It's providing them with information about

12   how to provide dialysis treatments.  During the period of time

13   in question, though, even after DaVita had that 2004

14   presentation telling them what, what GranuFlo does, delivers

15   extra bicarbonate, despite that knowledge, it's training its

16   staff and completely omitting any specific instruction about,

17   if you're using GranuFlo, you need to make sure the patient is

18   protected and that that extra bicarb is taken into account.

19             So the next couple of slides show that DaVita was

20   talking about the factors affecting lab values.  One of those

21   is the dialysis prescription, including the type of dialysate.

22   So they're acknowledging that the type of dialysate matters,

23   but they're not telling the staff, this is how it matters, and

24   they're not saying, you need to pay attention to what brand of

25   dialysate is being used, because knowing the brand and

1    specifically if you're comparing the brand of GranuFlo to some

2    other liquid dialysate, that's what tells you, this brand is

3    delivering extra bicarb.

4         And again, the next slide, when they're talking about

5    steps interpreting the labs.  They're telling people, check the

6    type of dialysate.  But they're not specifying, check the brand

7    of dialysate, so you know how about bicarbs are being delivered

8    through the metabolism process.

9         Moving on to the next slide, and this is, this is

10   perhaps, at least in my opinion, one of the most critical and

11   kind of shocking pieces of evidence.  These are excerpts from

12   Exhibit No., Plaintiffs' Exhibit No. 16.  In which GranuFlo --

13   pardon me, DaVita's chief medical officer, Mr. Nissenson, asks,

14   do we have a distribution curve of predialysis bicarbonate, any

15   recent month.

16        And the person to whom he directed this request says,

17   it's not something I've ever seen.  Are we -- he asks some

18   clarifying questions and says, I can look that up, but it might

19   take some time.  This is in May 2012.  And the recall, the FDA

20   recall was in March 2012.

21        So two months after the recall, you've got their chief

22   medical officer, ostensibly the highest ranked person in charge

23   of medical safety in the organization, asking for information

24   that should have been tracked all along and being told, I don't

25   even know if we have that, never seen it.

1          So what all this evidence adds up to, and what

2    Ms. Youngberg, what Ms. Youngberg's testimony, testimony

3    establishes is just an across-the-board disregard for patient

4    safety.  DaVita showed a lack of institutional response

5    regarding GranuFlo, the information that it received about

6    GranuFlo.  And that lack of institutional response breached a

7    standard of care for patient safety.  Its patient safety

8    programs, they were poorly designed because they were overly

9    concerned with lawsuit defense and compartmentalized critical

10   information.  The people that were finding out what was going

11   wrong were keeping it secret for defense purposes, and they

12   weren't using it constructively to keep people more safe.  And

13   had they implemented proper tracking analysis and patient

14   safety systems, even if you assume they didn't know before,

15   they would have learned that their own patients were becoming

16   alkalotic and that that was significantly increasing the risk

17   to them.  They could have learned as, at the same time or

18   before Fresenius, based on their own data.  They're same size,

19   they're doing the same thing.

20          So our claims, DaVita's negligence, DaVita failed to

21   connect the dots.  That's the bottom line of that theory.  They

22   didn't look at the right things.  They didn't analyze the data

23   that they had available, and they didn't implement changes.

24   They systemically overdelivered buffer to their patients,

25   because they weren't accounting for the extra bicarb, and they

1    were exposing patients to more bicarb than what the doctor

2    prescribed; and as a result, patients, that leads to alkalosis

3    and a six- to eightfold increase in the risk of cardiac arrest

4    and other complications.

5              THE COURT:  Right.  I'm not trying the merits today.

6              MR. WOJTANOWICZ:  Okay.

7              THE COURT:  We're on the class-certification issue

8    today.

9              MR. WOJTANOWICZ:  Certainly, and I'm just, we're

10   briefly laying out what are our claims and how does the

11   evidence we're presenting fit in.

12             THE COURT:  Is this the only lawsuit against DaVita

13   like this?

14             MR. WOJTANOWICZ:  I believe so.  I think there are

15   other individual lawsuits that I don't know that any other one

16   has sought class certification.

17             MR. HOPKINS:  It is the only class action, Your Honor.

18   However, one of the defense exhibits goes to a list of cases

19   that are currently pending against DaVita, relating to GranuFlo

20   as well as a number of cases that were dismissed regarding

21   GranuFlo.  It's quite extensive.

22             MR. TYRRELL:  Hundreds.

23             THE COURT:  So there's no other class action that's

24   been requested.

25             MR. WOJTANOWICZ:  As far as I know, Your Honor, yes.

1       THE COURT:  So no judge has said yes or no yet.

2       MR. WOJTANOWICZ:  Correct.

3       So sort of the flip side of that coin, either DaVita

4    dropped the ball or failed to connect the dots.  But if it did

5    connect the dots -- and there is evidence that it did in fact

6    connect the dots -- then it concealed that information, and

7    that information, of course, would be material to a person

8    receiving dialysis treatment.  They would want to know a

9    product being used in their treatment was, wasn't being used

10   properly and that as a result they were being exposed to a six-

11   to eightfold increase of their risk of cardiac arrest and other

12   adverse complications.

13      So that, that concealment and the evidence of

14   concealment supports our claims for deceptive trade practices

15   because it knowingly concealed what it did.  It represented its

16   goods as being of a certain type, and as a result the class,

17   the members of the class are entitled to equitable relief and

18   statutory damages.

19      And finally --

20      THE COURT:  Is that a Tenth Circuit case?

21      MR. WOJTANOWICZ:  Well, the availability, we believe

22   that it's under Shady Grove, that's the Shady Grove analysis.

23   But the statute itself provides for the availability of

24   statutory damages.

25      Finally, we just want to point out that the DaVita

1    records point out the three plaintiffs each received GranuFlo,

2    and we're going to demonstrate for you the method by which we

3    can determine who else that received treatments at DaVita got

4    GranuFlo as well.

5            So with that, I would wrap up kind of the introductory

6    part of our presentation, Your Honor.

7            And turn it over, I suppose, to DaVita for their

8    opening.

9            THE COURT:  Kara, do you want another break before we

10   go to the next one?

11           THE REPORTER:  Yes.  Yes.

12           THE COURT:  Ten minutes.

13           All right.  Take ten.

14       (Recess at 11:24 a.m.)

15       (Reconvened at 11:36 a.m.)

16           THE COURT:  Okay.

17           Mr. Tyrrell.

18           MR. TYRRELL:  Yes, Your Honor.

19           May it please the Court.

20           For the record, my name is James Tyrrell.  I'm a

21   member of the firm Locke Lord, and I represent DaVita today.

22           Before turning to the issues as to whether this case

23   should be certified, I suggest to the Court that there are

24   three lodestars that need to be kept in mind.

25           First, is GranuFlo really a dangerous product.  An

1    awful lot of assumptions seem to have been made, and this is

2    our first real chance to discuss this with Your Honor in

3    detail; but I suggest, and you'll hear obviously from the

4    nephrologists and you can take their word more than mine, but

5    let's remember what happened here.  The GranuFlo product has

6    never, as Your Honor observed, been taken off of the market.

7         Now, when somebody says a product is recalled, you

8    think, oh my God, it must be bad, it must be doing damage to

9    people.  It was recalled for a label change.  And the documents

10   that counsel this morning urged Your Honor that they're now

11   going to be reviewed by Your Honor to keep out, are the

12   documents that show that the label has now effectively been

13   changed back.  In other words, it's like Alice in the looking

14   glass.  The label change that was, the FDA was concerned about

15   and ordered to take place, subsequent submissions by Fresenius

16   to the FDA has caused the FDA to allow Fresenius to go back to

17   what is essentially the original label.  No harm, no foul.

18        So if there was no, nothing wrong with this product,

19   if the FDA was concerned that there be knowledge out there that

20   a typical dialysate increases the bicarbonate by about 4, the

21   GranuFlo product, it was concluded, increases the bicarbonate

22   by about 8, the FDA was concerned that the treating

23   nephrologist know about that.  Hence the change in label, and

24   whatever other publicity was ordered.

25        Now, for reasons I will discuss and the nephrologists

1    will discuss, it's been concluded that the results of total

2    buffer, add on the 4, are really misplaced.

3          Why, because in the multi-hour process of dialysis,

4    itself, when that patient sits there hooked up to the dialysis

5    machine, there is a dialyzer, and substances passed back and

6    forth, in essence the function that the kidneys should be

7    performing are now being performed by the dialyzer; but it's a

8    two-way street, so if too much bicarbonate goes through the

9    dialyzer -- I'll call it the filter -- and into the patient,

10   during those hours that the patient sits there, because the

11   filter seeks equilibrium, some of it flows back again.

12         So the great concerns of Dr. Hakim and the concern

13   that the FDA had about making sure people knew about this is

14   now entirely reversed, and Fresenius has now come out with the

15   FDA's approval and notified 5,000 practitioners out there and

16   clients that you don't have to worry about anymore.  So now we

17   have, so we're in the bizarre world that during a finite time

18   period when counsel says we knew things that we should have

19   been monitoring and, boy, they hurt the patient, now with

20   further study, the FDA, who only asked for a label change, not

21   a withdrawal of the product, is now back allowing fundamentally

22   the original label.

23         THE COURT:  How does this relate to the issue that

24   we're here for, and today that is class certification?

25         MR. TYRRELL:  It relates to class certification as a

1    lodestar because there shouldn't be any case at all.

2              THE COURT:  That's the merits of the case.

3              MR. TYRRELL:  Correct, Your Honor.

4              THE COURT:  The question is, are these three people

5    going to try to prove that you're wrong, or are they going to

6    represent some number of other people.  And I asked him right

7    off the bat, why do you want a class, and I'll ask you, why

8    don't you want a class.  If you're so convinced that you're

9    right, why wouldn't you be all over the idea of an issue class

10   so you can bind all those people, not just three of them.

11             MR. TYRRELL:  And I will answer that, Your Honor.

12             40 years ago, I clerked for a judge on the Third

13   Circuit.  He said the first thing before you make your

14   argument, answer the Court's questions.

15             Why don't we want a class, we don't want notice going

16   out to 300,000 of our patients implying that there was a

17   problem with GranuFlo.  That's why I suggested to you, Your

18   Honor, the lodestar observation.  There wasn't a problem here.

19   And if there was a problem, it was constrained to a very small

20   group; and as you observed, they're never going to be able to

21   identify and prove numerosity as to that group.

22             Secondly, you asked a question about, about collateral

23   estoppel.  I've spent my career arguing class issues and the

24   World Trade Center litigation, the Agent Orange litigation.

25   We're not going to concede that there is collateral estoppel,

 1    why.  Because the fundamental question in a negligence case is

 2    proximate causation and general causation are completely

 3    interrelated.  Most courts find that in those kinds of cases,

 4    depending upon what kinds of questions the Court chooses to put

 5    to the jury, there is rarely collateral estoppel, or if there

 6    is, it's on very specifically defined questions.

 7            So we don't think we're at risk if Your Honor agrees

 8    not to have a class here.  But we are at terrible peril if

 9    300,000 of our patients are excited about nothing.  And so we

10    don't want a class.

11            THE COURT:  How much would it cost to send out notices

12    to 300,000 people?

13            MR. TYRRELL:  The real question is how to identify the

14    300,000 people.

15            THE COURT:  Let's assume you can.

16            MR. TYRRELL:  But there's a tremendous cost in doing

17    it.  Counsel observed, he's right, that we did not track which,

18    the brand of the acetate that went into each patient's --

19            THE COURT:  Well, that's potentially DaVita's problem.

20            MR. TYRRELL:  I'm going to suggest to you, it isn't,

21    okay, when I get to that part of the argument.  But the answer

22    is you would have to do, if you could identify the people who

23    got GranuFlo, you would have to send them direct mail notice,

24    you would also have to probably do publication notice for the

25    people that you -- I don't know exactly in the past, it's

1   millions of dollars, when I've had to do it before.

2          THE COURT:  Well, for 300,000 people, how much is it

3   going to cost?

4          MR. TYRRELL:  Assuming you can identify them and you

5   send it by some kind of certified mail, it's going to cost a

6   couple dollars for each person plus the processing and

7   administrative costs.

8          THE COURT:  So you're talking about anywhere from 300

9   to 600,000 or more.

10          MR. TYRRELL:  Just for the mailing, and what it would

11   cost to do the research necessary to decide who is part of that

12   300,000 group.

13          THE COURT:  Well, I have real concerns as to whether

14   these very able plaintiffs' lawyers are willing to put out that

15   kind of money.  Maybe they will tell me they are.

16          MR. TYRRELL:  The second question here --

17          THE COURT:  They're on a tight budget and maybe if I

18   ordered a third nephrologist, it would be a financial issue.

19   If that's the case, then I really question whether they want to

20   put out five or $600,000 just in postage.

21          MR. TYRRELL:  And I will say, on your proposal about a

22   third nephrologist.  From DaVita's perspective, assuming it's

23   somebody who is truly neutral and academically qualified, we

24   have no objection.  Because they're going to get the same

25   answer I referred to, that the alleged dangers of GranuFlo are

1    much ado about nothing.

2           Your Honor asked a second question, and I wrote it

3    down, because the judge told me to make sure I answer Your

4    Honor's questions.

5           You said, counsel, if you win, what happens next, have

6    you thought about that.

7           I suggest to you that what happens next is a God awful

8    mess, because the class they're asking you to certify is

9    300,000 people.  Your Honor said maybe there could be a smaller

10   class, and we'll get to that.  But what they're asking for, and

11   they have to stand by what they're asking for, is 300,000 mini

12   trials.  Your Honor knows that that's not going to happen and

13   absent a wing and a prayer that DaVita is going to somehow

14   capitulate because of the burden, it's going to go on and on.

15   I was counsel in the World Trade Center case, we have 11,000

16   patients, not 300,000.  They all filed separate actions, why,

17   Judge Hellerstein said you've got to be kidding, there's no way

18   in a mass court case, I'm not going to certify, and we had

19   7,000 separate cases, there was a settlement there.  But there

20   is still, for those who haven't settled, dealing with

21   bellwether trials.  It's just not manageable.

22          One other point Your Honor made, it wasn't a question,

23   but let me answer it and turn to my argument, with Your Honor's

24   permission.

25          THE COURT:  By the way, as you probably know, you

1  wouldn't know what my experience has been, but you would know

2  about class-action litigation, my experience has been that in

3  every case -- I don't mean most cases, every case -- whether in

4  state court or federal court, that I've ever been asked to

5  certify a class, the defendant said it's not manageable because

6  we have to have all these mini trials.  It loses credibility

7  'cause it comes up every time.  But this might be the case

8  where it's right.

9       MR. TYRRELL:  That's why when I get to the specific

10  argument, I'm going to try to focus on the unique features of

11  this case, why I suggest it is right, because I don't want to

12  argue labels.  I want to argue what you're really going to have

13  to face here, in terms of manageability.

14       Your Honor also asked a question or implied, well,

15  DaVita must keep a record of GranuFlo that it puts into

16  patients.  Respectfully, it doesn't put GranuFlo into patients.

17  GranuFlo is the dialysate that passes on the other side of the

18  filter, I'll call it the filter.  Acids and bicarb pass through

19  and other things pass through with each other.  But you do not

20  keep, just like, for example, if Your Honor went, God forbid,

21  to the hospital and got saline, the hospital doesn't keep track

22  of the brand of saline.  It may keep in your medical records

23  that you got saline.

24       THE COURT:  You think that's a good analogy, saline

25  versus a product like GranuFlo?

1          MR. TYRRELL:  I do.

2          THE COURT:  Why doesn't DaVita keep track of what

3     dialysate it was using for the patient?  That would not have

4     been difficult.

5          MR. TYRRELL:  It uses multiple dialysates, it's not

6     part of the prescription; and as long as it delivers what the

7     doctor wants for the prescription, I suggest to you that at a

8     minimum, at least until the Hakim memo and things came out in

9     2011, it didn't matter.  It didn't matter.

10          THE COURT:  It seems to me that if I got to the point

11     where I was going to certify a class and someone had to

12     identify who got the GranuFlo, that's going to fall on you, not

13     on them.

14          Because you could have kept records that would make it

15     very easy.

16          MR. TYRRELL:  There are many things we could have kept

17     records about, and obviously there are regulatory issues that

18     we fully comply with, but there is nothing that required you to

19     keep track of the brand of dialysate that you used; and until

20     these issues with Hakim came in and the labeling change, no one

21     was concerned about it.  There were multiple different brands.

22          Your Honor asked with respect to counsel's argument,

23     well, it's cheaper and aren't there other powdered competitive

24     products, there are.  There are.  Counsel's not going to be

25     able to show you this was done because of, because of cost

1    issues.  Rockwell manufactures a dry powdered product that's a

2    competitor to GranuFlo.

3              In any event, let me finish my other two lodestars.

4              Number one was GranuFlo is not inherently dangerous,

5    still on the market.

6              Number two, Your Honor, let's remember that this is a

7    medical malpractice case at its core.  Standing between the

8    patient and DaVita is a fully trained nephrologist.  It is the

9    nephrologist who has responsibility, as Your Honor observed,

10   and they're often, many of the nephrologists are our medical

11   directors, it's their responsibility to set the prescription.

12   Now, if you take to its logical conclusion what counsel argues,

13   they're suggesting that the technician that sits there at the

14   dialysis machine should change the prescription by plus or

15   minusing --

16             THE COURT:  No, they suggest that it's the technician

17   that you employ that decides whether to use GranuFlo or not.

18             MR. TYRRELL:  It is the technician that we employ that

19   delivers the prescription.  That's correct.  And the whole --

20   and the technician, maybe the facility, the technician has no

21   control over it, it's what the facility uses, but it's the

22   same --

23             THE COURT:  The prescription doesn't say GranuFlo

24   versus some other type.  It just says this is the level of

25   bicarbonate that I want for this patient.  And they say and you

1   haven't denied, that then DaVita decides to dialysate to use.

2        MR. TYRRELL:  DaVita decides what dialysate to use,

3   and we now know they get what the prescription provided,

4   because of the principles of diffusion.  So they didn't get the

5   wrong thing.  And therefore, I suggest to you, it didn't matter

6   whether it used a liquid dialysate, whether it used Rockwell's

7   dialysate, or whether it used GranuFlo.

8        THE COURT:  Then you win the case on the merits.

9   That's not why we're here.  You also win your Fresenius case on

10  the merits.

11       MR. TYRRELL:  They're not even paying me, Your Honor,

12  but maybe it's *quantum meruit*, I don't know.

13       Last point.  Your Honor has in two opinions defined

14  what we're here for, okay?  We're here for two issues,

15  negligence and fraud.  You said, the issue is whether or not

16  DaVita failed to, it was negligent in failing to connect the

17  dots.  Or if it knew about it and failed to disclose it, is it

18  guilty of fraud.

19       THE COURT:  That's right.

20       MR. TYRRELL:  So for purposes of analyzing class

21  certification, as I now turn to those prongs, I'm going to

22  focus on negligence and fraud because that's what we're about.

23       THE COURT:  That's one reason I suggested you might

24  consider what questions the Court would ask if the Court

25  certifies any kind of a class.

1          MR. TYRRELL:  I do want to consider that, Your Honor.

2     I've never had a court put that to me.  I usually stand up and

3     say, here are all the issues that you shouldn't certify.  But

4     it's a thoughtful issue and I wanted to talk to my client about

5     it.

6          THE COURT:  Okay.

7          MR. TYRRELL:  I prefer not to analyze this according

8     to the rules because I think it's confusing.  So I'm going to

9     start with the issue, which I think is particularly important

10    here, of what I would call standing.

11         The putative class members must allege an injury to

12    have standing.  The putative class should not be certified if,

13    as defined, and it's up to the plaintiffs to define their

14    class, they set the table, we do not.  And I'm going to suggest

15    it's not up to the Court to rescue them if they set the table

16    wrong.  The class as defined must include only members who are

17    harmed.

18         Indeed, that is grounded in Article III of the

19    Constitution.  If you're not harmed, you do not have a presence

20    in the case or controversy.

21         THE COURT:  The Tenth Circuit has been known to say,

22    and other circuits have said that the Tenth Circuit is one that

23    says, that standing is something you only have to establish as

24    to the named plaintiffs, not every member of the class.

25         So I wouldn't spend a lot of time on that.

106

```
 1            MR. TYRRELL:  Let me address the issue with respect to

 2   the definition of the class and the issue of standing as it

 3   turns on ascertainability and identifiability of the class.

 4            THE COURT:  That's a different issue than standing.

 5            MR. TYRRELL:  Plaintiffs propose to define the class

 6   as follows: all patients treated with GranuFlo or NaturaLyte at

 7   a DaVita clinic.  All patients.

 8            THE COURT:  I know.

 9            MR. TYRRELL:  They do not tailor that definition to

10   say all patients who were injured or had a cardiac event as a

11   result of that.

12            THE COURT:  It's been obvious from my questions that

13   I'm concerned about a class of the proportion that they're

14   talking about.

15            MR. TYRRELL:  Plaintiffs cannot appear to claim that

16   they couldn't -- and I suggest in good faith that they

17   couldn't.  That all patients receiving GranuFlo in dialysis

18   treatment have suffered an acute medical complication or a

19   necessary event.  As the scientific literature that will be

20   addressed by both Dr. Goldfarb and his testimony will show, his

21   examination of the plaintiffs' medical records will show that

22   it is likely that the vast majority of putative class members

23   suffered no acute medical complication and many may not have

24   even experienced elevated bicarbonate levels.

25            THE COURT:  How does he know that?  How does he know
```

 1    the vast majority either did or didn't have bad consequences?

 2              MR. TYRRELL:  I will let him answer that question

 3    better than I, but based on the science involving GranuFlo and

 4    the fact that as plaintiffs argue themselves, they say that

 5    there's no trend, that it's a spike.  If somebody did not

 6    suffer an acute cardiac event during that spike period,

 7    basically there's no problem with GranuFlo, even as they

 8    construct it.

 9              THE COURT:  Do you concede or not concede that these

10    three plaintiffs at least suffered a adverse consequence?

11              MR. TYRRELL:  If I understand their medical records

12    correctly, they have an adverse, they have an adverse

13    consequence of cardiac event, but not attributable to GranuFlo.

14    One of the great risks of dialysis is cardiac risks.  These are

15    sick people that come in.  There is a high level of strokes

16    that are caused for any number of reasons in dialysis patients.

17    Their burden is to show proximate causation that it occurred

18    because of GranuFlo, and the way they've chosen to do it,

19    they're choosing to do it is because of this spike analysis

20    which means there's a temporal limitation on it.

21              So if they cannot show that within that temporal time

22    period enough people suffered, even if you assume, through all

23    of the other problems of class certification, they're not, we

24    suggest, going to be able to show that.  And I don't know if

25    they're going to be able to show that the three people who are

1    left in this case, out of the hundreds that sued, sued DaVita

2    and then dropped their cases, they're not going to be able

3    to -- it remains to be seen whether in that spike period is in

4    the time that these people suffered their cardiac event.  We

5    don't know that.

6              THE COURT:  Well, that's ultimately the merits, isn't

7    it, for these three people.

8              MR. TYRRELL:  It goes to the issue of typicality.

9              THE COURT:  It's not really the merits for these

10   people anyway, because even if they did, even if their heart

11   attacks were caused by GranuFlo, still the merits are, should

12   DaVita have been alert to that and done something about it in

13   their super-duper monitoring that they brag about.

14             MR. TYRRELL:  It's a dual burden of proof for them to

15   lay that liability on DaVita, we agree.

16             So let me just briefly mention Dr. Borkan who in his

17   deposition testimony, he explicitly testified -- he tried to

18   resuscitate this later, and I'll be interested to see how he

19   handles it on the stand -- but he testified that not everyone

20   who receives GranuFlo was injured or is injured.

21             Now --

22             THE COURT:  I hope not, or we have 300,000 very

23   seriously injured people out there and the situation would

24   probably be worse than what's going on in Baltimore right now.

25   I assume that there's only a percentage of these people that

1    have had heart attacks, whether they're caused by GranuFlo or

2    not.

3              MR. TYRRELL:  Correct.  A very small percentage, thank

4    God, Your Honor, yes.

5              THE COURT:  And at least DaVita ought to know who

6    those people are, right?  I can't even conceive --

7              MR. TYRRELL:  DaVita tracks cardiac events, yes.

8              THE COURT:  Yeah, and they keep records of that,

9    right?

10             MR. TYRRELL:  What I do not know as I stand here

11   today, is whether DaVita knows that the cardiac event occurred

12   in Dr. Borkan's narrow time window.  It could have occurred in

13   the chair, it could have occurred two weeks later, it could

14   have occurred after dialysis concluded.  We track cardiac

15   events, but I'm not sure we pin it down to the so-called spike

16   period.

17             THE COURT:  You would pin it down to whether it

18   happened, I would hope.

19             MR. TYRRELL:  Yes, yes, I would imagine that would be

20   the case.

21             Now, Your Honor's already observed, and I'll pick it

22   up in a different prong, but the people who had serious

23   injuries have a great incentive to bring the case on their own

24   behalf; and I suggest to you, don't have very much of an

25   incentive, and all of these three allegedly had serious

1    injuries, to bring these Colorado consumer fraud act cases for

2    people who are looking for a $500 statutory recovery.  So I'm

3    going to argue later about typicality and whether there's

4    adequate representation here.

5              THE COURT:  What states are these three survivors

6    from?

7              MR. TYRRELL:  I believe two from California.

8              MR. HOPKINS:  Arizona and California and Minnesota.

9              MR. VALENTINE:  That's not quite accurate.  There's

10   two in California and one in Wisconsin.

11             MR. TYRRELL:  The one in Minnesota fell out.

12             MR. VALENTINE:  Mr. Moreno was in Arizona, he's the

13   one that got tossed out.

14             THE COURT:  The point of my question was did any of

15   these people get their dialysis and have their problems in

16   Colorado, and the answer is no.

17             MR. TYRRELL:  Right.

18             Lumped in this class definition, Your Honor, are the

19   people we just discussed who allegedly had serious injuries.

20   Also lumped in that class definition are the people who claim

21   that they were injured simply because they -- GranuFlo was used

22   as a dialysate in connection with them.  It is well-established

23   in the law that exposure, even to a toxic substance, does not

24   cause injury, does not give you claim to bring an injury

25   assertion if you were not affected by it.  And Your Honor made

1    the observation that most of these people were not affected by

2    it.  And as a consequence, this class is grossly overly broadly

3    defined and should not be certified as they ask.

4         THE COURT:  You said that the Court can't come to

5    their rescue.  Do you have law to that effect?

6         MR. TYRRELL:  I said shouldn't come to their rescue.

7    I don't have law to that effect, no.

8         THE COURT:  They haven't suggested any other class;

9    they've only suggested the one.

10        MR. TYRRELL:  That's right.

11        THE COURT:  And I'm not sure it's up to the Court to

12   figure out a class that works for them.

13        MR. TYRRELL:  That was my only point, Your Honor.

14        Your Honor has asked me to focus on specifics.  Why

15   specifically with respect to GranuFlo is it the case that those

16   who had it used in their treatment were not necessarily

17   injured.  I mentioned the principle of diffusion across the

18   dialyzer and I won't repeat that, but the nephrologists will

19   speak to the question -- let's hear what their issues are -- of

20   the fact that if you got too much bicarbonate and your liver --

21   too much bicarbonate from the GranuFlo and your liver -- your

22   kidneys are now working or your liver is functioning during the

23   course of the treatment, which takes hours and it therefore

24   creates more bicarbonate than you want, it flows back, it flows

25   back.

1           THE COURT:  Right about one thing for sure.  I'm more

2    interested in what the nephrologists have to say about that

3    than what the lawyers have to say about that.

4           MR. TYRRELL:  I'll move on.  But I have some better

5    familiarity to things on which -- I have better familiarity

6    which are the prongs for finding or not finding class

7    certification.

8           THE COURT:  We're after noon already.

9           What do you want to do?  We need to take an hour break

10   for the reporter, for all of us, probably, for lunch.

11          MR. TYRRELL:  I would leave it up to Your Honor and

12   reporter.  I can continue later.

13          THE COURT:  How much more do you have?

14          MR. TYRRELL:  I think counsel went about an hour and

15   20 minutes, and I have about an hour altogether.

16          THE COURT:  And you've only been going for 20 minutes.

17          Let's take our lunch break and everybody can relax,

18   have their lunch break, talk to their clients, and we can come

19   back and you can finish your opening statement.

20          MR. TYRRELL:  Okay.

21          THE COURT:  So let's say one o'clock.

22      (Recess at 12:03 p.m.)

23      (Reconvened at 12:59 p.m.)

24          THE COURT:  All right, Mr. Tyrrell.

25          MR. TYRRELL:  Thank you, Your Honor.

113

1          To complete where we were briefly on the issue of

2    ascertainability.  That essentially goes to the question of

3    administrative feasibility.  A party seeking to certify a class

4    under Rule 23(b)(3) must establish that the class, using the

5    decision of Supreme Court decision in <u>Warnick</u>, precise,

6    objective and presently ascertainable.  The class members must

7    be ascertainable, is an implicit requirement of Rule 23 and is

8    important because it eliminates serious administrative burdens.

9          Plaintiffs must demonstrate that the class is defined

10   with reference to objective criteria and that there is a

11   reasonable and administrative object for determining whether

12   putative class members fall within or without the class

13   definition.  I suggest to you they have offered no way to do

14   that as to 300,000 or so.

15          THE COURT:  We haven't heard from Mr. Paynter yet.

16          MR. TYRRELL:  We haven't.

17          THE COURT:  He's got the magic bullet.

18          MR. TYRRELL:  I'll move from ascertainability to

19   predominance, awaiting the magic bullet.

20          Predominance issues is one of the major ones that we

21   think makes this class, no matter how they attempt to

22   restructure it, and they haven't so far, not feasible.

23          What are the principles that we're talking about, and

24   against that, let's measure the specifics of this case.

25          With respect to predominance, Rule 23(b)(3) provides

1    that certification is appropriate if the Court finds that the

2    questions of law or fact common to class members predominate

3    over any questions affecting only individual members and that a

4    class action is superior to other available methods of fairly

5    and efficiently adjudicating the controversy.

6              As this Court has said in the past, to show

7    predominance, quote, Plaintiffs must prove that the proposed

8    classes are sufficiently cohesive to warrant adjudication by

9    representation, referencing this Court's decision in Helmer in

10   March of 2014.

11             THE COURT:  But they're asking for a different kind of

12   class here.  They're asking for a (c)(4) class, as they call

13   it.

14             MR. TYRRELL:  Correct.

15             THE COURT:  And they cited and I think you've cited

16   perhaps cases that say, with that type of a class, it almost

17   follows by definition that there are common issues.  There's

18   typicality that the common issues predominate.  It's kind of

19   the nature of the beast.

20             MR. TYRRELL:  I would respectfully disagree with that,

21   Your Honor.  There is a debate among the circuits, which is

22   what Your Honor is alluding to, and the Tenth Circuit has not

23   spoken to it.

24             The Fifth Circuit says you must show all of these

25   things as to the issues.  Certain other circuits have said, you

1   only have to show the criteria as to the specific issue.

2   Another circuit has said you don't have to show the 23(a)(3)

3   criteria at all.  And what I'm going to show or try to show

4   Your Honor is that even as to the specific issues, common

5   questions are dwarfed by the individual consideration that

6   would have to be reviewed.  Again, our touchstone being

7   negligence and fraud.

8          So let's take a look at those specific issues, okay?

9          It is quite clear --

10         THE COURT:  Are you looking at the three or at the 13?

11         MR. TYRRELL:  What I'm going to look at is, frankly,

12  the issues as to whether, no matter how they break it down, I'm

13  going to talk about individual questions.  Because particularly

14  on the choice-of-law issues, which I'm about to address, they

15  are simply never going to be able to and they can't solve it

16  with subclasses, demonstrate the common issues under any of the

17  13 questions predominate over individual questions.

18         THE COURT:  Well, take their first question of their

19  original three.  Whether GranuFlo and NaturaLyte is

20  unreasonably dangerous and defective in its design and

21  formulation in that it causes unsafe, rapid increases in

22  bicarbonate levels and dangerously high levels of bicarbonate

23  during dialysis treatment.

24         Now, if that were an issue, that would be common to

25  everybody that got it.

116

1          MR. TYRRELL:  I don't think so, Your Honor.  It

2    depends on a number of factors.

3          THE COURT:  Okay.

4          MR. TYRRELL:  For example, let's start by saying that

5    the question was poorly framed.  Question no. 1 asks whether

6    GranuFlo, when administered in the manner as directed by

7    DaVita's company-wide policies and procedures, leads to

8    elevated bicarbonate levels and alkalosis.

9          In the first place, they have two entirely different

10   things lumped together in the same question.  Every acetate,

11   every dialysis solution elevates bicarbonate levels.  That's

12   what its purpose is.  I suggest that an individualized inquiry

13   is required to determine if GranuFlo triggered alkalosis, which

14   is a physiologic process, which caused alkali accumulation or

15   acid loss and serum bicarbonate level in each individual

16   patient.  This cannot be proven on a class-wide basis.

17         THE COURT:  Sure it can.  You can convince the finder

18   of fact that it doesn't, it doesn't happen.  And the answer to

19   that first question would be no.  And then you're happy.

20         MR. TYRRELL:  And if you answered that question no,

21   where would it get you.  Because it proves nothing without all

22   of the individual questions of proximate causation that are

23   inextricably intertwined with it.

24         THE COURT:  Well, that's obviously one of the concerns

25   I have.  I think you can frame questions -- I don't know that

1    the plaintiffs have done it -- but I think you can frame

2    questions that are common to all members of the so-called

3    class.  But I'm not sure what happens if the jury says yes.

4              MR. TYRRELL:  And, Your Honor, while I don't want to

5    jump from predominance to superiority, the answer we give you

6    is even if you could do that, is this class procedure the

7    superior mechanism for handling these cases.

8              It's rather odd to me that the same firm has got

9    hundreds of nonclass cases before the district court of

10   Massachusetts, a good number of which the bellwether cases are

11   treatments performed at our clinics.  And yet here, they're

12   trying to somehow formulate common questions.  It sort of

13   stands the logic on its head.  Presumably they have the same

14   duty to all of their plaintiffs, and if they thought class

15   treatment would work, why weren't they trying to do that in

16   either the state or district courts of Massachusetts.

17             THE COURT:  Neither you nor I can answer that

18   question, and I don't have to answer that question.

19             MR. TYRRELL:  You only have to answer the question as

20   to whether the common questions predominate over the individual

21   questions, so I turn to my first point, which is choice of law.

22             As a threshold issue, this Court must determine

23   whether to apply Colorado law or the law of each plaintiff's

24   individual home state where they lived and were treated.  In

25   light of the expansive, nationwide class definition, this

 1    latter possibility, each state's law applying, would result in

 2    the application of at least 46 different states' laws,

 3    including potentially 46 different statutory laws as to

 4    fraudulent concealment, comparable, if they have it, to the

 5    CCPA.

 6          The forum state's choice-of-law rule is controlling in

 7    diversity action, and this of course is a diversity action.

 8    Colorado follows the *Restatement* for purposes of analyzing

 9    choice of law.  We have a tort and we have potentially, though

10    they don't argue it that way, a contract.

11          For choice of law, without going through all the

12    citations, the predominant consideration is the state that has

13    the greatest contact, common nexus with the events that

14    occurred.  That cannot be anything but where these people were

15    treated.  They went to the clinic at that state.  They lived in

16    that state.  They entered into a contract with each DaVita

17    facility in that state.  And these facilities are separately

18    incorporated.

19          How can we possibly suggest, but they do, that the law

20    of Colorado should apply.  Look at the question Your Honor

21    asked, where are the three people, who are all we've got left,

22    from.  None of them are from Colorado.

23          THE COURT:  Well, there's a fourth person in the room

24    that's from Colorado, isn't there?

25          MR. TYRRELL:  I think Your Honor is --

1          THE COURT:  DaVita.

2          MR. TYRRELL:  Yes, and I'm going to address why we

3     believe the courts hold that is not the test that is the

4     corporate headquarters of DaVita.

5          Let's assume Your Honor would be inclined to go that

6     way.

7          THE COURT:  A little odd wouldn't want its own state's

8     law applied.

9          MR. TYRRELL:  DaVita doesn't want a class action.

10         THE COURT:  I'm getting that impression.

11         MR. TYRRELL:  The reason that all of these states' law

12    would have to apply is a good reason.  DaVita is proud to

13    defend three individual actions by these three people.  We'd

14    have to apply the law from their home state in doing it.

15         THE COURT:  Right.

16         MR. TYRRELL:  So for torts, I told you what it is.

17    But for contract, even if they've somehow --

18         THE COURT:  It's not a contract, it's a tort case,

19    either negligence or fraud.

20         MR. TYRRELL:  Under the *Restatement*, if it's fraud,

21    the same would apply.

22         Let's turn to negligence.  Your Honor said this case

23    is about negligence.  How do they get around the fact that the

24    laws about negligence are materially different in every state.

25    The answer is they deny that.  They say in their papers that,

1    you know, it really reduces itself to the same thing, they're

2    all kind of the same.

3              We believe that it is clearly not the case or else

4    numerous mass-disaster cases and other cases that are not

5    certified as classes because of wide differences in the law

6    would be certified as classes.

7              THE COURT:  Well, I don't have to worry about those

8    cases.  Your best argument is, I think, that it's really a

9    medical-device case and the laws of different states are

10   different.  And we've already addressed that.

11             MR. TYRRELL:  Did Your Honor read my outline?

12             The next point is this is a professional negligence

13   claim which can vary widely by state by state, but as this

14   Court has already recognized, this case involves a claim of

15   negligence against a medical provider, not standard negligence.

16   Therefore, what Your Honor has already done, applying the

17   affidavit of merit rules of certain states is indicative of the

18   fact that Your Honor has already recognized the need to

19   confront the variability of those state laws.

20             So without pushing it any further, I would suggest to

21   you that this notion that you can decide negligence as a matter

22   of law on some common basis simply doesn't wash.  It doesn't

23   make sense.

24             Moving on from negligence.  I've already covered the

25   issue 1 in response to Your Honor's question.

1           Let's focus on their issue 2, just as an example,

2    'cause I can't cover all 13.  Their issue no. 2, which they say

3    Your Honor can decide on a common basis, is -- it asks whether

4    DaVita's use of GranuFlo resulted in bicarbonate levels above

5    that prescribed or intended.  Inherent in the question of

6    whether administration of GranuFlo resulted in levels above

7    that prescribed or intended is the question of what an

8    individual's physician intended in prescribing a particular

9    level of bicarbonate.  Intent requires a multilayered analysis,

10   which by definition is, has to be determined on an individual

11   basis.

12          Here's the question.  It's just the sum of them,

13   whether the physician knew that GranuFlo was the dialysate

14   being administered.  And that it might result in an additional

15   level of bicarbonate proportionately being delivered to the

16   patient.  The amount of the bicarbonate the physician intended

17   to deliver.  Serum bicarbonate level the physician intended to

18   achieve.  Intended, intended, intended.  How can issues of

19   intent in a, in a medical malpractice case be determined on a

20   common basis.

21          The doctrine of causation varies in negligence cases,

22   varies markedly between the states.  And without going into

23   great detail, I'll just give one example.  There is a doctrine

24   called the loss-of-chance doctrine.  The so-called

25   loss-of-chance doctrine says that an alternative theory of

122

1   liability in medical malpractice actions permitting the claim

2   weren't a 50 percent or less chance of survival to nevertheless

3   recover damages has been adopted to varying degrees in Arizona

4   and Wisconsin, but has been rejected in Minnesota and

5   California.  How are you to figure out, unless you do it state

6   by state, the application of that doctrine.  It's another

7   individualized question.

8          What about standard of care.  I suggest to you that

9   the very issue, central issue, is did DaVita breach its duty,

10  did it deviate from acceptable standards of care for providers

11  of dialysis.  The standard of care that is demanded every day

12  of a dialysis provider or any professional again varies state

13  by state.

14         Excuse me.

15         Special consideration has to be given to the time when

16  the plaintiffs were treated.  This is a class that asks you to

17  certify for a nine-year period.  But look at what evidence they

18  placed in front of you even in their opening.  Dr. Hakim's

19  memo, which is a Fresenius memo, which was sent to Fresenius

20  clinics, wasn't sent to DaVita's clinics, 2011.  The recall,

21  2012.  But they would have you apply some standard for years

22  before that when Fresenius itself wasn't even circulating

23  information about this?  How do you have a nine-year class and

24  apply the appropriate standards.

25         Again, individualized questions determined by temporal

1    issues.

2              Excuse me.

3              The bottom line is that we suggest that with respect

4    to negligence issues, the questions of general and specific

5    causation are so inherently woven together as to be

6    inextricable.  It would be completely wrong to try to frame a

7    general-causation question and leave open for a second jury to

8    determine proximate causation; I will argue in a moment that it

9    raises serious Seventh Amendment issues of subjecting DaVita to

10   inconsistent determinations of what is essentially the same

11   issue by two different juries.

12             Cover the issue of standard of care.  I'd like to talk

13   for a moment about the issue of fraud.  Which is the other

14   prong of what Your Honor said is left in this case.

15             Individual questions predominate again with respect to

16   fraud because fraud is viewed differently by each state.

17   Particularly so with respect to what I would call statutory

18   fraud, and don't forget, that's the lever that plaintiffs are

19   attempting to use to say everybody's the same, 'cause they can

20   all get $500 worth of damages under the Colorado Consumer

21   Protection Act.  Focusing on the issue of fraud.

22             The issue of materiality, very relevant in a fraud

23   case, varies state by state.  Even under Colorado law, you

24   cannot prove materiality on a common basis.  Focusing on the

25   Colorado cases in question.  Colorado has an informed-consent

1    standard which takes into account subjective testimony as

2    probative.

3           THE COURT:  So, Mr. Tyrrell, I know you've got a list

4    of about a hundred reasons why I would be totally wrong to even

5    consider their class.  And I'm not sure we'll go through all

6    100.

7           MR. TYRRELL:  I'm going to try to keep it to many less

8    than that.

9           THE COURT:  But what they're contending is that DaVita

10   was supposed to be monitoring its patients and even bragged

11   about what a wonderful monitoring company and procedure they

12   had; and if they had been monitoring, they would have seen that

13   there were these spikes in bicarbonate levels and so forth.

14   They're saying that either they just missed it, which would be

15   negligence, or they knew it was there but for whatever reason,

16   they just kept it to themselves.

17           Now, those are the merits and we're a long ways from

18   ever deciding the right and the wrong of this case.  But if in

19   fact they could convince a jury that DaVita knew that this

20   product carried a significant risk of causing substantial harm

21   to patients but just kept it to themselves, are you telling me

22   that the discrepancies among the states in the fraud laws would

23   mean anything at all?

24           MR. TYRRELL:  Absolutely.

25           THE COURT:  That's going to be fraud anywhere.

1      MR. TYRRELL:  Absolutely.  What are we talking about?

2    We're talking about the informed-consent doctrine.  What did

3    DaVita have to disclose to patients.

4      THE COURT:  Well, if they knew of a risk and didn't

5    disclose it, they're going to be in big trouble under any

6    state's law.

7      MR. TYRRELL:  But the standard that you would have to

8    apply, the informed-patient standard is true in one state, the

9    informed-physician standard is true in other states.

10      THE COURT:  You didn't hear my hypothetical.  I said

11    they knew about the risk and they didn't disclose it.

12      MR. TYRRELL:  Right.

13      THE COURT:  Period.

14      MR. TYRRELL:  Okay.  So they committed fraud, in other

15    words.

16      THE COURT:  They committed fraud and they're looking

17    down the barrel of a punitive-damages gun, if they could prove

18    that.  And I don't care what the law of different states say,

19    there isn't any state that is going to say that's fine.

20      MR. TYRRELL:  Let's assume that's right.  They're

21    still going to have to prove damages as a result of the fraud.

22    They're still going to have to prove reliance, that they were

23    misled, that it would have made a difference to their

24    physician, hence why I say there's a informed-consent doctrine.

25      THE COURT:  The point I'm trying to make to you, sir,

 1    is it's much more effective to cull through the wheat and the

 2    chaff and give me the wheat.  I'm much more interested in your

 3    best arguments than I am in how many you could dream up, you

 4    and your team.

 5            MR. TYRRELL:  So let me try to focus on the core

 6    arguments.  What we've said to you, and Your Honor has gleaned

 7    already --

 8            THE COURT:  Good thinking.

 9            MR. TYRRELL:  -- is that there are a large variety of

10    individual requests and therefore they don't meet the

11    predominance standard.  I don't need to say any more.

12            THE COURT:  It's inevitable, isn't it -- I know you'll

13    say, of course, Your Honor, you're so smart -- it's inevitable

14    that if I define the class the way they want and we get these

15    questions answered to their benefit and DaVita says, fine,

16    we're going to defend to the last day on causation, that we're

17    looking at some sort of a procedure that I can't even conceive

18    of, right?

19            I don't even know how many people are in the class,

20    and of course they don't know, either.  Well, they know how

21    many are in the class.  They just don't know how many of them

22    actually got hurt.

23            So we're looking at some sort of a management problem.

24    That's your best issue, isn't it?

25            MR. TYRRELL:  It's certainly one of my good issues,

1    Your Honor.  And I don't think I need to say more than I've

2    already said about that issue other than to perhaps pigeonhole

3    it under the issue of superiority and contrast it with what

4    essentially, as I alluded before, would normally be done.  The

5    plaintiffs with serious injuries have, as you said,

6    potentially -- I'm not admitting that -- seven-figure cases and

7    a great incentive to bring those actions on their own behalf.

8                THE COURT:  Sure they do.

9                MR. TYRRELL:  But to lump in with them, assuming that

10   there are such, 300,000 other people who simply had GranuFlo

11   run through a machine and never experienced any incident makes

12   no sense whatsoever.  And when I came here today to address the

13   appropriateness of class certification, that is the definition

14   that confronted me.  And glad Your Honor asked them, would you

15   back off of it and make a narrower and tailored definition; if

16   I heard correctly, counsel refused to do so.

17               There are a lot more I can say, though I wish I said

18   most in my brief --

19               THE COURT:  This wasn't when you were heading up the

20   team at the World Trade Center.

21               MR. TYRRELL:  This was before that.

22               THE COURT:  I'm teasing you now; smile.  You've made

23   it your point to tell me that twice.  Good on you, but it's

24   really not too relevant to this case.

25               MR. TYRRELL:  When I was a first-year associate at

1    Sullivan and Cromwell, we were all sent down to part 1 of the

2    New York Manhattan courts, and nobody told you what to expect,

3    and I had a summary judgment motion and I was passionate, I was

4    going to argue it my first time for my client and I get down

5    there, and the judge isn't even on the bench, the late

6    afternoon, there are all kinds of code words and there's a

7    thousand cases for the same day.  I stay, stay, only three

8    fools like me stayed till the late afternoon and then the judge

9    took the bench.  Then it went right there.  The person right in

10   front of me.

11           Why aren't you submitting your case.

12           And he said, well, I have things to argue.

13           Why isn't it in your brief.  And if it isn't in your

14   brief, I'll give you more time to supplement your brief; if it

15   is in your brief, why do you need to argue.

16           I guess it is in my brief, Your Honor, and I better

17   submit.

18           So I stayed all day, because I got the clue that this

19   isn't the case to argue.  And I said, I think we're going to

20   submit.

21           He said, extremely smart, counsel.

22           So I spent the entire day.

23           THE COURT:  You're making up for that today, aren't

24   you.

25           MR. TYRRELL:  Thank you, Your Honor.  Of course I do

1    get paid by the hour.

2           We don't think the class action here as defined would

3    be superior.  I do want to focus your attention on two

4    arguments which are somewhat unique here as to whether or not

5    there is adequacy of representation.  And I want to talk about

6    and finish there with respect to both the plaintiffs and the --

7           THE COURT:  Are you going to bash these poor guys now?

8           MR. TYRRELL:  To the contrary, I am going to say that

9    they are excellent lawyers, they wouldn't have the reputation

10   that they do, but they have placed themselves in a fundamental

11   conflict of interest.

12          THE COURT:  Really?

13          MR. TYRRELL:  They have taken positions, and I will

14   read Your Honor an example, in the Fresenius litigation, in the

15   district of Massachusetts, which are completely inconsistent

16   with the positions that they are taking here before Your Honor.

17          Let me read to you exactly what positions they took.

18          THE COURT:  Is this all three of them?  Or are you

19   picking on one?

20          MR. TYRRELL:  I'm speaking of the Hagens Berman firm,

21   who made these representations.

22          THE COURT:  Which one of these gentlemen are from that

23   firm?

24          MR. WOJTANOWICZ:  Two of us.

25          THE COURT:  The two whose haircuts I like much more.

1            MR. VALENTINE:  We did this just for you, Judge.

2            MR. TYRRELL:  In the MDL against Fresenius, plaintiffs

3    represented by Hagens firm alleged as follows.  That Fresenius

4    actively and fraudulently, there is a quote, concealed

5    information in the Fresenius defendants' exclusive possession

6    regarding the hazards associated with NaturaLyte and GranuFlo

7    with the purpose of presenting -- preventing physicians and

8    patients such as plaintiffs from discovering these hazards.

9            However, in the current action against DaVita, the

10   named plaintiffs represented by Hagens Berman assert that,

11   quote, DaVita knew the true facts concerning NaturaLyte and

12   GranuFlo with the intent to defraud plaintiffs and other

13   similarly situated dialysis patients, their prescribing

14   physicians and health-care providers, medical, scientific, and

15   pharmaceutical communities and the public in general.

16           These contradictory allegations cannot both be true.

17           THE COURT:  Why not?

18           MR. TYRRELL:  It cannot be true that Fresenius was in

19   exclusive control of this information and that DaVita

20   simultaneously knew it.

21           THE COURT:  Maybe in the Fresenius case they're saying

22   Fresenius concealed it from the doctors and the patients.

23           MR. TYRRELL:  It says they had exclusive control of

24   it.

25           THE COURT:  Well, okay.  I don't know what that means.

1          MR. TYRRELL:  And my last point, Your Honor, is with

2    respect to the class plaintiffs themselves.  Are they really

3    going to adequately represent those who are not injured when

4    their interests, all three of them, three is all that we've got

5    left, claim to have serious injuries.

6          In short, Your Honor, I hope we've covered everything

7    else in the brief.  You've been very generous --

8          THE COURT:  That's a rhetorical question.  What's the

9    answer?

10         MR. TYRRELL:  The answer is they're not going to

11   adequately represent these plaintiffs.

12         THE COURT:  Why?

13         MR. TYRRELL:  Because the damages that they can

14   receive, if they can prove that they received -- the cardiac

15   event was caused to them so it qualifies the $500 that they say

16   all the other people that didn't have events are going to get,

17   that they have no incentive to fight for $500; indeed, the $500

18   is probably merged in their damages award.  Now, if they had a

19   class representative who claims he wasn't injured, but there is

20   no class representatives.  All three are allegedly seriously

21   injured people.

22         In short, Your Honor, you asked the question of what

23   happens.  I suggest to you, if you certify, it is indeed the

24   mess I referred to at the beginning, and thank you.

25         THE COURT:  What happens, if I certify it, you'll

1    apply to the Tenth Circuit for immediate review, and one way or

2    the other, we'll be sitting around here dormant for the next

3    several months.

4            MR. TYRRELL:  Thank you, Your Honor.

5            THE COURT:  But that doesn't mean I shouldn't do it.

6            Okay.  Now what?  Evidence?

7            MR. WOJTANOWICZ:  Yes, Your Honor.  Compared to the --

8    what we told you earlier, we need to switch it up a little bit,

9    due to travel schedules, and this is taking a little bit longer

10   than we had anticipated so far, so at this time, we'd like to

11   call Barbara Youngberg, please.

12           THE COURT:  Your experts have been sitting here

13   watching the show, have they?

14           MR. WOJTANOWICZ:  They have been, Your Honor.

15           THE COURT:  All right.  Good afternoon, ma'am.

16           Youngberg, right?

17           MR. WOJTANOWICZ:  Correct, Youngberg.

18           (**BARBARA YOUNGBERG, PLAINTIFFS' WITNESS, SWORN**)

19           THE COURT:  Thank you.

20           Where are you from, ma'am?

21           THE WITNESS:  Chicago, Illinois.

22           THE COURT:  Chicago.  Welcome to Denver.

23           THE WITNESS:  Thank you.

24           THE COURT:  So this is both for me to assess the

25   Daubert issue and to the extent that I think it's appropriate,

Barbara Youngberg — Direct

1    the class issue.

2              MR. WOJTANOWICZ:  Yes.

3              THE COURT:  Okay.

4              MR. WOJTANOWICZ:  And, Your Honor, just to let you

5    know, we're not attempting to completely recover all the

6    material that's contained in her report.  The report, you know,

7    we think speaks for itself.  So in the interests of time and

8    efficiency, we're not intending to regurgitate everything that

9    we've already put before the Court.

10             THE COURT:  Good.

11             MR. WOJTANOWICZ:  We want to address some of the

12   pending Daubert issues through this testimony today.

**DIRECT EXAMINATION**

14   BY MR. WOJTANOWICZ:

15   Q   So good morning, Ms. Youngberg.  Would you please state

16   your name for the record.

17   A   Barbara J. Youngberg.

18   Q   And I would like to just go into some of your background,

19   so would you describe for us your educational background?

20   A   Yes.  I graduated in 1975 with a bachelor's degree in

21   nursing.  Then I went on to get a master's degree in social

22   work and a law degree.

23   Q   And currently, you work in an academic setting; is that

24   right?

25   A   I do.  Work as a visiting professor at the University -- at

Barbara Youngberg – Direct

1    Loyola University in Chicago.

2    Q    And what kinds of classes do you teach there?

3    A    I teach a class in risk management to lawyers, I teach risk

4    management and patient safety class to people in our master's

5    of jurisprudence program which are physicians, nurses, and

6    hospital executives, and I teach in the graduate school of

7    business a class in risk management and patient safety.

8    Q    In addition to your teaching responsibilities -- pardon

9    me -- do you also do consulting work in the field of, of

10   patient safety or risk management and health care?

11   A    I do.  From time to time, especially in the summer when

12   it's not academic year, I do jobs for physicians and

13   organizations that are in the health-care field.

14   Q    And do you participate in any professional organizations

15   that relate to patient safety or risk management in the

16   health-care setting?

17   A    I do.  I sit on the board, the governing board, of the

18   National Patient Safety Foundation.  I'm a member of the

19   American Society of Risk Management.  And I also teach in the

20   American Hospital Association, in their patient-safety

21   leadership fellowship program.

22   Q    And you're also a registered nurse; is that correct?

23   A    I am.

24   Q    And did you practice for a period of time as a registered

25   nurse in health-care facilities?

Barbara Youngberg - Direct

1  A   I did.  I practiced for five years full-time at Rush

2  University in Chicago.  Always in critical -- I started in the

3  orthopedic unit to get trained for critical-care nursing, and

4  then worked the remainder of my full-time career in the

5  intensive care unit.

6  Q   And at some point, did you transition from working as a

7  sort of front-line nurse, if you will, to working in the

8  health-care field in more of a risk-management patient-safety

9  type capacities?

10  A   I did.  I should say that while I was at Rush, I actually

11  participated on the quality-assurance committees for nurses and

12  became very interested in the quality aspects of health care.

13  So after law school, I actually went on to work for a medical

14  malpractice insurance company that was known at the time for

15  their progressive approach to risk management and patient

16  safety.

17  Q   And when approximately did you begin that part of your

18  career?

19  A   You know, I don't have my resumé in front of me, but I

20  think it was about 1984.  At MMI.

21  Q   And what did you -- can you describe generally what you did

22  there?

23  A   Yeah, I was hired as a western litigation manager of the

24  claims.  So I handled the medical malpractice claims asserted

25  against physicians and hospitals.  But also because of my

Barbara Youngberg - Direct

1   clinical knowledge, I worked in what they called their

2   proactive risk-management program, which was to try to identify

3   system and process problems in the high-risk specialties for

4   that company that were giving rise to claims.

5   Q   And after you, you left that position, what was your next

6   position?

7   A   Next I went to the university health system consortium,

8   which is an alliance of academic medical centers, throughout

9   the country.  They have about a hundred of the main teaching

10  hospitals for the United States.  And I started in my role

11  there as the director of insurance.

12  Q   And how long were you with UHC?

13  A   21 years.

14  Q   Okay.

15       You said you began as director of insurance.

16  Eventually you took a different position there?

17  A   I did.  I was promoted.  I started just to start the group

18  medical malpractice program, but as part of that, I realized

19  that the underwriters were wanting to see that organizations

20  were doing things to prepare themselves to be good candidates

21  for insurance.  So I developed a lot of the risk-management

22  programs for or in conjunction with the memberships.  And then

23  I was promoted to the vice president of insurance risk quality

24  and legal services for UHC.

25  Q   Can you describe for us some of the specific tasks that you

Barbara Youngberg - Direct

1   undertook while you were at UHC?

2   A   UHC, for people that don't know the organization, is a very

3   data-driven organization, so they collected clinical outcomes

4   data.  We spent a lot of our time analyzing the organization's

5   ability to both understand their data and react to it.  And

6   then in that role, I helped identify, through benchmarking

7   processes, the better performers and the performers that

8   perhaps weren't, weren't performing as well.

9          I did a lot of individual work at the member

10  organizations, helping them identify systems and structures

11  within their organization that were impeding their ability to

12  deliver optimal care.  So we were able to show them what the

13  best-practice performers were doing and where they were falling

14  short and essentially help them bridge the gap.

15  Q   While you were at UHC, were you also researching or

16  publishing papers?

17  A   I did.  Early on in my career, I realized there really

18  weren't any textbooks or any materials available for

19  health-care providers.  In 1990, I actually wrote the first

20  book in risk management called *The Essentials of Healthcare*

21  *Risk Management*; and then during the time I was at UHC, I wrote

22  two additional books, kind of moving the field forward.  There

23  was a big change in health care, patient safety and quality,

24  after 1998 and my most recent books really reflect the

25  responsibility to integrate quality risk and safety in a more

Barbara Youngberg – Direct

1   meaningful way.

2   Q   You mentioned your most recent books.  What are those, what

3   are those books?

4   A   The most recent one is called *The Patient Safety Handbook*.

5   And that was published in 2013.  And prior to that is a book

6   called *The Principles of Risk Management and Patient Safety*

7   that was published in 2011.

8   Q   The first one, *The Patient Safety Handbook*, can you just

9   describe for the Court, you know, what that book is and what

10  the purpose of it is.

11  A   Yeah, it's a compilation.  I actually really was the editor

12  and author of some chapters.  But it is a compilation of

13  materials written by some of the leading people in the world

14  really on patient safety about hospitals, how hospital systems

15  need to redesign the way they, they look at care and the

16  systems and structures that are in place to support that care.

17  Q   And do you know what's the intended purpose of the book?

18  What is it used for in the field?

19  A   A lot of people that are health-care providers have the

20  book and use it as a kind of day-to-day manual as they're doing

21  their work.  But it's also used as a textbook in many of the

22  academic programs that are now teaching patient-safety and

23  risk-management courses.

24  Q   And I believe that you referenced your other more recent

25  publication.  Was that principles of risk management, or did I

Barbara Youngberg – Direct                139

```
 1    just conflate them?

 2    A    That, that's Principles of Risk Management and Patient

 3    Safety.

 4    Q    Okay.

 5    A    And that was published in 2011.

 6              The same kind of description would apply, that is used

 7    as a desk reference for practicing risk managers but also is

 8    used as a textbook in many courses taught on risk management.

 9    Q    Okay.

10              And did you bring to bear on the problems posed to you

11    in this case your experience in the fields that you described

12    today?

13    A    Absolutely.  I spent a lot of time, as I mentioned, going

14    into hospitals and actually helping them understand where their

15    systemic problems were, and everything in my book really

16    supports the need to develop systems and structures to hold

17    people accountable for the care that they provide.

18    Q    And you said these books, you didn't develop the principles

19    that you set forth in these books for the purpose of this

20    litigation, did you?

21    A    No, I did not.

22    Q    What -- when did you develop them or how did you develop

23    them?

24    A    Actually, as far back as 1990, I started looking at the

25    need to integrate or incorporate quality and risk management
```

Barbara Youngberg - Direct                                    140

1    more closely.  I was seeing in academic medical centers was

2    that many organizations kept the information from those two

3    disciplines separate and they were missing things that were

4    happening in their organizations, so as early as 1990, I spoke

5    about the need of integrating.

6              I think I mentioned 1998 as a kind of bellwether year.

7    That was the year that the Institute of Medicine report was

8    released.  And that report really focused on systems and

9    structures to support care, and so my more recent books have

10   evolved to look at the systems and structures that are

11   necessary to have in place so that you can assure that patients

12   receive the outcomes that you would hope that they would

13   receive.

14   Q    And those principles that are in those books, are they the

15   same principles that you applied to the work that you did in

16   this case?

17   A    Yes, they are.

18   Q    Okay.

19             Now, you were here in the courtroom early and heard

20   some of the discussions about your, your qualifications.  And,

21   and you're not a nephrologist, right?

22   A    That's correct.

23   Q    So can you explain for the Court why it is that lacking

24   specific training in nephrology or dialysis, you believe you

25   are still qualified to render an opinion about the adequacy of

Barbara Youngberg - Direct                              141

1    DaVita's policies and procedures as they relate to patient

2    safety?

3    A    Sure.  I mean, I think I was retained with a very specific

4    purpose in mind.  And that was to look at the systems and the

5    structures and the processes that were in place at DaVita to

6    support the quality, risk-management, and patient-safety

7    efforts as it related to the deployment and use of GranuFlo.

8    Q    Now, is the process that you followed for the narrow task

9    that you just described, is it the same kind of process that

10   you would apply if you were doing the same task in another

11   context?

12   A    It's the process I used all the time.  Whether I was

13   looking at an intensive care unit or an emergency department, a

14   pediatric unit, or a renal transplant program, the systems for

15   quality should not change.  It's the outcomes and the way, the

16   things that you measure that might change.

17   Q    Has DaVita hired you to fix their system or to tell them

18   exactly how they should be formulating their patient-safety or

19   risk-management systems?

20   A    No.

21   Q    Might your analysis look a little bit different if you were

22   actually working for DaVita in helping them fix their systems?

23   A    Right.  I think when I described the process that I used,

24   it was how I went to organizations and helped them redesign

25   their systems of care.  So it was a very different focus than

Barbara Youngberg - Direct                          142

1   what I believe I am asked to testify here about, which is are

2   the systems in place, do they seem to be working, and are they

3   consistent with best practices as they exist today.

4   Q    Now, you tendered a written opinion or declaration in this

5   case, correct?

6   A    Correct.

7   Q    And I think is it also true, you provided a supplemental

8   declaration in connection with this class-certification

9   hearing?

10  A    Correct.

11  Q    And as you sit here today, do you stand by the opinions

12  that you expressed in those declarations?

13  A    I do.

14  Q    Okay.

15       I know, I'd like you to describe earlier, you heard

16  earlier that one of the criticisms that DaVita has leveled at

17  the review that you conducted was that you, you, you didn't

18  adequately understand or review their policies.

19       So let me ask you generally, would you just describe

20  the review that you did undertake and what you looked at in

21  trying to perform the tasks that you were asked to do here?

22  A    Okay.

23       I started with somewhere between eight and 10,000

24  documents that were produced.  And looked at all of those.

25  Then I went through the literature to try to find -- and this

Barbara Youngberg - Direct

143

1   is again consistent with what I would do as a part of my own

2   process -- I tried to find evidence-based practice or academic

3   support for a certain type of manner in which organizations

4   might respond to a problem associated with GranuFlo.

5        I looked at job descriptions of employees at DaVita.

6   I looked at policies and procedures, the manual for risk

7   management reporting, the occurrence report that you use.  I

8   also recently read the deposition of Miss Skoygan, who is the

9   VP of quality or VP of clinical quality for DaVita.

10  Q   Was that Goykhman?

11  A   Goykhman, sorry.

12  Q   Now, was there any information, based on your professional

13  experience, your experience in the industry, in order to

14  conduct the review that you were asked to do here and to render

15  the opinions that you rendered, was there any information that

16  you lacked, that you needed in order to be able to do that?

17  A   No.

18  Q   Now, did you look to see -- in your review of the documents

19  and the evidence in this case, did you attempt to determine

20  whether DaVita appeared to be tracking bicarbonate levels in

21  its patient population?

22  A   I did consider that.  Because one of the principles of

23  quality improvement is if you introduce a new practice into

24  your organization or a new product, you change the way you

25  treat patients, that you would want to monitor how the patients

Barbara Youngberg - Direct

1   respond to that change.  So I knew that GranuFlo had been

2   introduced in 2006 and was looking at whether they were

3   tracking that information for that purpose.

4   Q    And did you see any information suggesting that they either

5   were or were not tracking that information?

6   A    I saw that the information was available, according to the

7   quality-control index, there was a article written that cited

8   to that index that mentioned that predialysis bicarb levels

9   were taken, but I saw no evidence that anyone at DaVita was

10  looking at that information or understanding what it might mean

11  for the patient population.

12  Q    And based on that evidence, did you reach a conclusion

13  about whether DaVita's system for tracking and analyzing data

14  was sufficient in the context of the issues that we're talking

15  about in this case?

16  A    I did.

17  Q    And what, what did you conclude?

18  A    It appeared that they were collecting a lot of data, but

19  they didn't really have a reason for collecting it.  That, that

20  speak to quality improvement.  They might have had a lot of

21  regulatory reasons or there might have been other reasons that

22  they had for collecting it, but it didn't seem to be driving

23  their decision-making and their quality program.

24  Q    In your, in your written report, you discuss various

25  aspects of quality control and risk management as they apply to

Barbara Youngberg – Direct

1   health-care organizations.  Can you describe, you know, the

2   broad sort of parameters or arms of how that applies in a

3   health-care setting?

4   A    Okay.

5        I think there's three general areas where quality and

6   outcomes are viewed, and the first one is quality improvement.

7   I think quality improvement primarily looks at clinical

8   outcomes.  And a good quality program will say, what is the

9   outcome we expect, what is the outcome we are observing, and

10  why isn't what we expect what we're observing.  So they're

11  trying to look at how they put together a treatment plan to, to

12  deliver to the patient the optimal outcome.  It's really

13  focused on clinical outcomes.

14       The second area -- I should say with quality, you can

15  have surveillance activities where you're just looking at large

16  data sets and trying to understand what they mean.  Or you can

17  have regulatory or mandatory reporting requirements that are

18  things that you have to report because some federal program or

19  someone else is demanding that you report that.  So you can

20  look at it as collecting data to learn or collecting data to be

21  in compliance with regulatory bodies.

22       The second area is patient safety.  And patient safety

23  is really oriented more around the systems and the processes

24  that contribute to allowing the patient to receive the intended

25  outcomes.  So you look at how people are trained, you look at

Barbara Youngberg - Direct

1    how they use information, how they hand off or communicate

2    perhaps with the nephrologist or the treating physician.  But

3    it's looking at all the systemic factors that have to come

4    together in order for you to deliver an optimal result.

5              And then finally, patient safety -- or risk

6    management, which is an area that has evolved.  Used to be kind

7    of closing the barn door after the horse has left, so it's

8    waiting for someone to get hurt and then figuring out how you

9    handle that.  Do you end up worrying about whether they're

10   going to sue you and try to protect that.  Or do you go to them

11   and say, we think something might be wrong, we want to talk to

12   you about it.

13             So it went from a very litigation-management type of

14   orientation to now, which is more integrated function with

15   quality and safety and much more focused, I think, on helping

16   the organization and the patient move forward after an injury

17   in a positive way.

18   Q   So you say that the concept of risk management changed over

19   time; is that correct?

20   A   It is.

21   Q   Okay.

22             Now, what do you mean -- it changed in whose minds?

23   Is this an industry standard, or is this just an academic sort

24   of change in the way that people think about things?

25   A   No, it changed really in 1998, after the Institute of

Barbara Youngberg - Direct                              147

1    Medicine report that I already alluded to.  In that report, one

2    of the biggest criticisms was that we, we hide information from

3    each other, so that we can't learn from it.  After that report

4    came out, it was -- and they actually also blamed the legal

5    system and said that the legal system is so punitive that

6    people don't want to come forward and talk about the things

7    that happen in their organizations.

8              After that, ASHRM, which is the professional society

9    for health-care risk management, actually moved towards risk

10   management being more proactive, being a discipline that

11   doesn't wait for events to happen but tries to seek them out

12   and understand where the system vulnerabilities might be.  So

13   really more towards patient assistance.

14   Q    Is that really a standard of care for patient care in the

15   health-care industry?

16   A    Yes, it is.

17   Q    Did you examine documents and information from DaVita

18   about, regarding its quality-improvement systems or policies,

19   its patient-safety systems, and its risk-management policies?

20   A    I did.

21   Q    Okay.

22             And is one of the -- did you consider the interplay

23   between those three different functions of an overall

24   health-care, risk management system?

25   A    I did.

Barbara Youngberg - Direct

1    Q    And in DaVita's case, or in this case, what did you find?

2    A    There seemed to be limited interaction between those

3    functions, and in fact in some instances, particularly from my

4    review of the risk management, there was specific directives

5    about that information gathered from the occurrence reports to

6    be kept separate from anything else.  I should also say that

7    Ms. Goykhman's deposition also clarified that there was very

8    little interaction or very little sharing of that information.

9    Q    Okay.

10        And then in your opinion, based on your experience,

11   the interaction that you observed between these different

12   functions of an overall system of patient safety and risk

13   management at DaVita, did that meet the standard of care for

14   the health-care industry?

15   A    Not the current standard of care, no.

16   Q    Okay.

17        And in -- what do you mean, why do you say not the

18   current standard of care?

19   A    Well, again, I think the current standard of care -- and

20   this is really an opportunity that I think DaVita had but

21   failed to capitalize on -- is, you know, one of the principles

22   of quality and patient safety is that you learn more and you

23   learn quicker if you look at a lot of data.  So having one

24   death in one clinic may not be all that informative, but having

25   30 deaths might tell you something.

Barbara Youngberg - Direct                         149

1    And so the ability to aggregate data and share data

2    doesn't seem to have been done in a way that was useful to the

3    folks at DaVita.

4    Q   Is gathering large amounts of data enough to satisfy a

5    health-care organization's obligations to meet standards of

6    care for patient safety?

7    A   No.   It's not the gathering of data that really meets the

8    standard of care, it's how you use the data to create change

9    and how you measure the impacts of what you've done after

10   you've reviewed that data phenomenon that you've solved

11   problems or created a more learning or supportive environment

12   for the caregivers.

13   Q   And based on your review of the information and DaVita's

14   policies in this case, were you able to reach a conclusion

15   about whether DaVita adequately analyzed data as it related to

16   the use of GranuFlo?

17   A   I was able to reach that opinion.   And I don't believe that

18   they were there using the data to help inform them in the way

19   that they should.

20   Q   Now, what is -- do you know what a patient-safety

21   organization is?

22   A   I do.

23   Q   Can you just briefly describe what that is?

24   A   A patient-safety organization is actually a federal

25   certification that is given to an entity that is really a

Barbara Youngberg - Direct

150

1   repository of patient-safety work product which is data that's

2   submitted by any health-care organization for the purpose of

3   advancing learning and promoting best practices.

4   Q    And do you know, does DaVita participate in a

5   patient-safety organization?

6   A    They do.

7   Q    So does that mean that by participating in that

8   organization, they've satisfied their obligations to collect

9   and analyze data?

10  A    No.  Again, it doesn't -- just submitting data or saying

11  you're a member of the patient-safety organization really isn't

12  what makes you a top-performing organization.  You have to use

13  the data or get reports back from that data that enables you to

14  change the practices in your organization.

15          So it's -- a lot of people use PSOs to try to shield

16  information from discovery, but the real purpose of a PSO is to

17  accelerate learning.

18  Q    And did you, in reviewing the information in this case, did

19  you reach any impressions or conclusions about whether DaVita's

20  policies were properly geared toward patient safety or whether

21  they were more geared toward shielding?

22  A    Well, there was, again, some information that I reviewed

23  that suggested that Ms. Goykhman wasn't aware of any

24  information that was reported back to her from the

25  patient-safety organization.  So at least the limiting from

Barbara Youngberg – Direct

151

1    that PSO to the quality department did not seem to be present.

2            There was also some clear verbiage in the

3    risk-management manual that information that was collected

4    around sentinel events that are things like death or stroke or

5    serious events to patient, should be kept in the

6    risk-management department.  And she affirmed the fact that

7    those were not things that were routinely shared with the

8    quality department.

9    Q    Now, you testified earlier that you, as part of your work

10   here, you reviewed, I think you said thousands of pages of

11   documents, right?

12   A    Eight to 10,000, I think.

13   Q    All right.

14           Now, in order to reach the opinions that you reached

15   in this case, did you need to specifically analyze every

16   different provision of, for example, their risk-management

17   policies?

18   A    I needed to review them all to get a sense of how the

19   organization was structured to address the problems that were

20   identified in the literature.  Particularly as I mentioned,

21   since my scope was to look at how the organization responded

22   once GranuFlo was introduced to the organization, to really

23   look at how they would have done that if they were doing it in

24   an optimal way.

25   Q    Okay.

Barbara Youngberg - Direct
152

1      There was -- now, one of the things DaVita has raised

2   was that during your deposition testimony, one of, one thing

3   that occurred on a number of occasions was you were presented

4   with documents and asked whether you reviewed them.  Do you

5   recall that?

6   A   I do.

7   Q   Okay.

8      And at that time it's true that you gave answers that

9   you didn't remember some of the documents, right?

10  A   Yes, that's true.

11  Q   Okay.

12      Can you just kind of explain why that's the case and

13  how that, despite your lack of memory of these specific

14  documents or policies, are you still able to give an opinion in

15  this case?

16  A   I am.  I mean, what I tried to characterize in my

17  deposition is that a lot of the documents had very similar

18  names and purposes.  And very often the question was, is this

19  indicative of a good program.  And I kept saying, I don't know,

20  because the document, in my experience, does not indicate that

21  the program is robust enough to do what it's supposed to do.

22  It just means you've got a good binder full of nicely written

23  policies.  So I kept trying to push back on that.

24      But I certainly got a sense of what the organization

25  was doing relative to quality improvement and relative to risk

Barbara Youngberg – Direct                               153

1    management.   And I saw some of the marketing materials that

2    they purported to use to advise their patients what they do for

3    their patients; and through all of that review, I was able to

4    determine that the information available to the general public

5    about GranuFlo didn't seem to be part of their quality process.

6    Q   And –– now, even though you're not trained as a

7    nephrologist or in dialysis, you did a little bit of, of just

8    background research to try to determine what role, what factors

9    were related to GranuFlo; is that right?

10   A   That's correct.

11   Q   Okay.

12        So, so what kind of, you know, what was kinds of the

13   information that you were relying on in trying to assess that?

14   A   I mean, there were a couple of really interesting things to

15   me as a quality professional and as someone who looks at a lot

16   of data.   It was interesting in 2004, the article didn't say

17   that there was a problem associated with cardiac disease.   They

18   just said that there was a difference in the outcome patients

19   were experiencing.   So there was a higher acid level in

20   patients that were receiving GranuFlo.   So that's a different

21   outcome than what you would expect, that in my mind would

22   advise me to, to talk to someone I was working with.   If you're

23   seeing something different, you need to measure that and see if

24   it impacts the patient.

25        Then I looked at another study that was a Fresenius

Barbara Youngberg - Direct

1   study, and it was done on patients that were seen in Fresenius

2   clinic in 2010.  And it was throughout the year, the 12 months

3   of 2010.  And in that report, they did at least describe an

4   association that they were seeing with higher levels of acid in

5   patient and with sudden cardiac death; and I think they said it

6   was 6 to 8 percent higher in patients, and they showed the

7   curve of the higher, the way the acid levels were going up over

8   time.

9        So it struck me that that was evidence that if you had

10  the data and you were looking at the data, you could actually

11  reach some conclusions about it.  And, you know, honestly, as,

12  again, somebody who is trained in quality, you don't

13  necessarily always reach the right conclusion; but you know

14  that something is wrong, something is different.  You

15  introduced a product, you get different outcomes.  I need to

16  understand why that was done.

17       So my first thinking was if Fresenius could have that

18  information, DaVita, which has a very robust quality index,

19  which captures a lot of great information, had they been

20  looking, could have seen that same information.

21       Another article I reviewed actually thanked DaVita for

22  the use of their quality index.  So they were looking at the

23  data that DaVita was collecting on its own patients and

24  reaching conclusions about higher levels of acid.  And so I

25  don't -- I wasn't necessarily looking at the science in that

Barbara Youngberg – Direct                    155

1    article, because that isn't what I am trained to do.  But I was

2    saying, here's somebody that is using data that is obviously

3    telling researchers -- and this was researchers at Duke

4    University -- that something was amiss.  But it didn't seem to

5    be that the people at DaVita were looking at that same data.

6    Q   Did you see any other evidence or information that you

7    considered significant that reflected whether data -- pardon

8    me -- whether DaVita was, was tracking patient bicarbonate

9    levels?

10   A    Yeah, I mean, there's two things.  One you alluded to when

11   Your Honor was talking at the beginning of today.  There was a

12   memo from the physician who was, I think, the chief, I don't

13   know what his title, chief medical officer, asking for a

14   distribution curve which would have showed the potential rise

15   in alkalosis or acidosis in patients.  And he, he was told by

16   the person that was in biomedical that it wasn't something that

17   was normally tracked and he didn't know -- he said it might

18   take a while to get the information.

19            But that was months after the recall happened where

20   people at DaVita, in my opinion, would have been, or should

21   have been on notice that this was something that should be

22   tracked.

23   Q   So you referenced the 2004, the information in 2004 about,

24   and was that information that related to additional bicarb that

25   was delivered by GranuFlo?

Barbara Youngberg - Direct

156

1    A    It was.   It was related to the increased acid.   But really

2    not saying what the concern was.   Just saying that this is

3    something we noticed.   And there might be a positive to it,

4    there might be a negative to it.   But it's something that we

5    see different in patients getting this, this product.

6    Q    And based on your experience and your knowledge, would an

7    organization with a properly constituted patient-safety and

8    risk-management program initiate a system to track that data

9    when confronted with information that this product did

10   something different?

11   A    It certainly would be.   I mean, if your outcome is to

12   produce a high-quality outcome for dialysis patient, you would

13   look at all the literature that is out there that suggests

14   where there might be problems and dedicate some, some activity

15   around monitoring those patients that are receiving that

16   product.

17   Q    Okay.

18             And you also referred to Fresenius memo?

19   A    A 2011 Fresenius, it was an article that I referred to.

20   Q    Okay.

21             Let me refer you to an exhibit, if I can.   One second.

22             In one of your notebooks there, you might have Joint

23   Exhibit 2.

24   A    Volume 1 or volume 2?

25   Q    Volume 1 will be Joint Exhibit 2.

Barbara Youngberg – Direct                    157

1    A    Yes.

2    Q    And is that one of the documents that you reviewed?

3    A    It is.

4    Q    And I just want to clarify.  Is this what you were just

5    referring to as an article, or was it something different?

6    A    No, this is definitely a document I reviewed, but there was

7    also the article that was written by Fresenius on the patients

8    in 2010 that had the, with the 6 to 8 percent increase in

9    deaths.

10   Q    Okay.

11         Now, in your, in your opinion, the health-care

12   organization that has quality, quality-control or

13   patient-safety program meeting the standard of care, confronted

14   with that information, would such an organization track

15   bicarbonate levels in its patient population?

16   A    I believe they would.  I mean, again, not necessarily

17   knowing why they were tracking them at this point, but the role

18   of a quality organization or quality department is to try to

19   better understand what is contributing to the outcomes that

20   patients are receiving.

21   Q    Okay.

22         And you're aware, one of the things that you -- were

23   you aware that there was a recall related to GranuFlo, a recall

24   notice in 2012?

25   A    I was.

Barbara Youngberg – Direct

1  Q    Okay.

2         Faced with information like that, with an FDA recall

3  relating to a product being used in a health-care facility,

4  would a health-care facility with a properly constituted

5  patient-safety program do something in reaction to that?

6  A   Well, again, I think they would do a couple things in

7  reaction to that.  One is the recall, as has already been

8  established, was not to pull the product out of the market, but

9  to understand that the product as it was being used was

10 different than dialysates that were being used before that

11 product was introduced.

12        So I think if you're talking about what would a

13 quality organization or a patient-safety organization do, they

14 probably would start with education and saying to their staff,

15 there is a difference in how you administer this, this product,

16 and this is what you need to know.

17        They would also, I think, focus on, you know, looking

18 at the quality activities, they had separate quality project,

19 they called them, but the director, VP of quality, didn't know

20 or wasn't aware of any projects associated with monitoring

21 bicarbonate level and didn't think any of those existed in the

22 organization.

23        I think finally, I would say after this memo came out,

24 there was an FDA guidance document that came out that also

25 called for, and it said that, in partnership with the Safe

Barbara Youngberg - Direct

1    Medical Devices Act, which is a law that does govern this

2    product, they encouraged people to report events that were

3    associated with elevated bicarbonates so that both the

4    manufacturer and the health-care professionals could learn more

5    about what was going on and what was contributing to that, that

6    unusual occurrence.

7    Q    Now, one of the other aspects of your opinion in this case

8    related to what's known as look-back programs; is that correct?

9    A    That's correct.

10   Q    Can you describe basically what a look-back program is?

11   A    Look-back programs really started around the blood industry

12   where people were given blood that might have been contaminated

13   with HIV or hepatitis.  The principle was that patients or

14   their physicians have an obligation to be told or providers

15   have an obligation to tell them that something might have

16   happened during the course of their treatment that might impact

17   future treatment, might have an impact on their health.  And

18   those programs started in the early '70s, around HIV

19   notification, anything that was stuck with a needle or maybe

20   used, had care provided to them that might have been used on a

21   patient that was HIV positive were advised, were told by an

22   organization that this was a potential risk.

23         And the look-back program just means an organization

24   has to go back and look at the number of people that they

25   treated that might have gotten something that might have

Barbara Youngberg - Direct                                         160

1    influenced their health care or might influence it in the

2    future and to just send them a letter and notify them.

3              So those programs are pretty common in health care

4    when large groups of people are advised of potential hazards to

5    their health.

6    Q   Is that, is having adequate look-back programs part of the

7    standard of care for large health-care organizations?

8    A   It is increasingly part of the standard of care.  It really

9    speaks to this notion of transparency, which is part of both

10   National Patient Safety Foundation and ASHRM and the Institute

11   of Medicine, call for change, that we have to be more open,

12   both with patients and within our own organizations, so that we

13   can really understand and capitalize the learning on events

14   that are occurring.  So it is the current standard, in my

15   belief.

16   Q   So does that, does that standard, does that obligation

17   apply only when a patient exposed to a hazard is known to have

18   actually suffered physical injury as a result of the hazard?

19   A   No.  I mean, it's actually, if they already had suffered

20   the injury, it would be pretty obvious to them that that, that

21   something might have happened.  It was really designed to

22   enable people to seek care that they might need or to sometimes

23   hospitals would order them to come in and get a free test to

24   make sure that they hadn't contracted what they had been

25   exposed to.  So it's really to assure that the patient's

Barbara Youngberg – Direct

161

1   treatment in the future is not jeopardized by what might have

2   happened to them in the past.

3   Q   And based on your review in this case; do you have an

4   opinion about whether DaVita has met its obligations with

5   respect to look-back programs as they apply to GranuFlo?

6   A   I do have an opinion.

7   Q   And what is that?

8   A   I don't think they've advised patients yet that they might

9   have been exposed to some risk by these increased acid levels.

10  Q   And do you believe that a health-care organization

11  complying with the standard of care would actually take that

12  step and do that?

13  A   I do.

14          MR. WOJTANOWICZ:  I have nothing further at this time,

15  Your Honor.

16          MR. HOPKINS:  If I might approach, Your Honor.

17          Defendant's exhibits, Your Honor.  We'll give one to

18  the witness.  Deposition transcripts, and this is a electronic

19  set.

20          THE COURT:  Well, that's a lot of paper.

21                        **CROSS-EXAMINATION**

22  BY MS. RUGGIERO:

23  Q   Good afternoon, Miss Youngberg.  We've met before, I think.

24  In a deposition?

25  A   In the worst deposition ever, apparently.

Barbara Youngberg – Cross

1          THE COURT:  That might have been a little hyperbole on

2    my part.

3          I didn't know you were sitting there.  I probably

4    wouldn't have said it quite that way, because I wouldn't want

5    to be rude to somebody.

6          THE WITNESS:  No.  That's fine, it felt like the worst

7    deposition ever.

8    BY MS. RUGGIERO:

9    Q   I want to direct your attention to your reply declaration

10   in this case, and that's Exhibit P in defendant's book.

11         THE COURT:  Exhibit P.

12   BY MS. RUGGIERO:

13   Q   Do you have that?

14   A   Yes, I do.

15   Q   In paragraph 3 of your reply declaration, you state that

16   DaVita actually knew that GranuFlo was increasing bicarbonate

17   levels across the patient population and thereby dramatically

18   increasing the percentage of patients identified as a, quote,

19   alkalosis concern, quote.  See that?

20   A   I do.

21   Q   And as support of that, you point to a PowerPoint

22   provided --

23         THE REPORTER:  Please slow down.

24         THE COURT:  I can't keep up with you, either.

25         MS. RUGGIERO:  I'm going too quickly?

Barbara Youngberg – Cross

1      THE COURT:  Well, it depends on what you're trying to

2   accomplish.  If you're trying to accomplish communication with

3   me, yes.

4      MS. RUGGIERO:  Okay.  Well, why don't we start again.

5   BY MS. RUGGIERO:

6   Q    So in paragraph 3 of the reply declaration, you made a

7   statement that DaVita actually knew that GranuFlo was

8   increasing bicarbonate levels across the patient population and

9   thereby dramatically increasing percentage of patients with an

10   alkalosis concern.  Do you see that?

11   A    Yes, I see that.

12   Q    And cite to a PowerPoint that you note a footnote, and the

13   PowerPoint you describe is the one that was provided by

14   Fresenius to DaVita as part of Fresenius GranuFlo marketing

15   efforts; is that correct?

16   A    That's correct.

17   Q    Can you turn to Exhibit R in the binder, which is that

18   PowerPoint that you cite to.

19   A    I'm there.

20   Q    Okay.

21      And the first page of that PowerPoint, it says,

22   talking points, and it lists several topics that Fresenius

23   covers; is that correct?

24   A    That's correct.

25   Q    And one of those points is metabolic acidosis effects?

Barbara Youngberg - Cross

164

1   A    That's correct.

2   Q    And the last point on that sheet is increased serum bicarb

3   levels; is that correct?

4   A    That is correct.

5   Q    And on page 2 of that PowerPoint, Fresenius lists the

6   effects of acidosis, and one of those effects that it

7   identifies is increased mortality among dialysis patients; is

8   that correct?

9   A    That's correct.

10  Q    And then starting on page 9 of that PowerPoint and going

11  through the last page of that PowerPoint, Fresenius provided

12  its customer DaVita with that clinical data that it collected

13  from the 2004 retrospective study that it conducted on

14  GranuFlo; is that correct?

15  A    That's correct.

16  Q    And according to page 10 of this PowerPoint, the study

17  reviewed the bicarbonate levels of 4,793 Fresenius patients,

18  using GranuFlo during a several-month period; is that correct?

19  A    That is correct.

20  Q    And when you use the phrase "alkalosis concern" in your

21  declaration, are you referring to Fresenius' use of that phrase

22  in this PowerPoint, specifically on page 17?

23  A    I mean, honestly, I can't say whether I took it from this

24  paragraph or I was just generalizing, saying, there were

25  concerns about changes in acid/base balance with the inception

Barbara Youngberg - Cross

165

1    of the use of GranuFlo.

2    Q    Okay.

3              And Fresenius uses this phrase in the PowerPoint to

4    describe in patients' bicarb levels of greater than 30; is that

5    correct?

6    A    That's correct.

7    Q    Is that what you mean when you use this phrase in

8    paragraph 3?

9    A    I just mean from a quality, from a quality perspective,

10   different than what was expected or different than what is

11   acceptable in a range for alkalosis for a patient.

12   Q    So do you know what "alkalosis" means?

13   A    Yes, I do.

14   Q    And does it mean a certain level of bicarb?

15   A    Yes, it does.

16   Q    And do you have a number of what starts the alkalosis

17   range?

18   A    Again, I didn't feel like that was my scope of my opinion.

19   Q    On page 18 of the PowerPoint, Fresenius reports that

20   there's an increase from .9 percent to 1.5 percent of the

21   Fresenius patients whose bicarb levels rose above 30 during the

22   study; is that correct?

23   A    That's what this slide shows.

24   Q    And if we do the math, 1.5 percent minus 0.9 percent equals

25   .6 percent, right?

Barbara Youngberg - Cross

1    A    It does.

2    Q    And if we do some further math, if you take .6 percent of

3    4,793 patients of this study, that equates to 28 Fresenius

4    patients, correct?

5    A    You know, I think that was really beyond what I was asked

6    to do in my testimony.

7    Q    Okay.

8    A    This is really Dr. Borkan's area, and I was just -- my

9    opinion was whether you see a change that is outside the

10   expected outcome, would that trigger the need to do some kind

11   of additional review or analysis of the data.

12   Q    Okay, but in your reply declaration, statement --

13            THE REPORTER:  I can't keep up with you.

14   BY MS. RUGGIERO:

15   Q    You make an affirmative statement in your declaration that

16   DaVita actually knew that GranuFlo was increasing the bicarb

17   levels of its patients and dramatically increasing the

18   percentage of patients with a alkalosis concern, correct?

19   A    Correct.

20   Q    So when you said that, you were basing it on this

21   PowerPoint, correct, this is how DaVita knew that there was an

22   increase in GranuFlo patients experiencing an increase in

23   patients increasing high bicarb levels, correct?

24   A    I was basing it both on the review of this PowerPoint and

25   articles that said patients receiving GranuFlo, there was a

Barbara Youngberg - Cross

1   shift to the alkalotic, to acidosis after prolonged use.

2   Q    Okay.

3            And this PowerPoint that you rely on in your

4   declaration indicates that .6 percent of the 4,793 patients,

5   which equates to 28 patients, are in the alkalosis concern

6   range; is that correct?

7   A    That is what the PowerPoint shows, yes.

8   Q    And you'd agree that in this PowerPoint that Fresenius gave

9   to its customer DaVita, on page, the last page of the

10  PowerPoint, Fresenius indicates that this .6 percentage

11  increase, which equates to 28 patients, was a slight increase.

12  They said that the prevalence of alkalosis rose only slightly;

13  is that correct?

14  A    That's what it says.

15  Q    And on that same page, Fresenius informs its customer that

16  by using GranuFlo, there's actually a positive clinical impact

17  of 33 percent reduction in acidosis in the study patient

18  population; is that correct?

19  A    That's what Fresenius asserts, yes.

20  Q    And according to this study, the mean serum bicarbonate

21  level in the Fresenius patients rose from 22.9 before GranuFlo

22  conversion to 23.7 after the GranuFlo conversion; is that

23  correct, on page 18?

24  A    It is correct.

25  Q    Okay.

Barbara Youngberg - Cross

168

1      And that's an increase of 0.8; is that correct?

2   A   That's correct.

3   Q   And according to the chart or the graph that Fresenius

4   provides DaVita on page 17, bicarbonate levels of 23 and 24 are

5   both within what they call the desired range; is that correct?

6   A   In this PowerPoint, yes.

7   Q   Okay.

8   A   But again, this is information coming from the manufacturer

9   of this product.

10  Q   Right.

11      And it's also the PowerPoint that you cite to in your

12  reply declaration as support to your statement in paragraph 3.

13  Correct?

14  A   Correct.

15  Q   Okay.

16      At the time of your deposition, soon after you

17  executed your first declaration in this case, you testified

18  that you did not know who wrote prescriptions for dialysis

19  patients; is that correct?

20  A   That is correct.

21  Q   Since your deposition, have you come to understand that the

22  treating nephrologist orders the dialysis prescription for the

23  dialysis patient?

24  A   I know that to be true.

25  Q   And since your deposition, have you come to understand that

Barbara Youngberg - Cross

1   only the treating nephrologist can make changes to that

2   prescription?

3   A   I don't know that.

4   Q   Okay.

5        Do you understand that by way of a dialysis

6   prescription, the nephrologist orders the amount of bicarbonate

7   and the amount of electrolytes that will be streamed into the

8   dialysate that the hemodialysis patient will receive?

9   A   I don't know that.

10  Q   Do you know that a nephrologist considers many factors when

11  determining the specific dialysis prescription that he will

12  order for each patient?

13  A   I don't know that.  I would certainly hope that to be true.

14  Q   Do you have an understanding that the treating nephrologist

15  will individualize a dialysis patient's prescription based on

16  the patient's many individual lab values and the specific

17  medical needs of that patient?

18  A   I would say the nephrologist would base that not only on

19  the things you said but also on the product that is going to be

20  delivered to that patient and how that product might interact

21  with that patient once he or she gets it.

22  Q   So there are many factors that a treating nephrologist will

23  look at when determining what the precise prescription for

24  dialysis is for his patient; is that correct?

25  A   You would hope.  Again, I couldn't say that that's

Barbara Youngberg - Cross

1   universally true, but I think most nephrologists would take

2   those factors into consideration.

3   Q   At the time of your deposition, you testified that you did

4   not know or understand that there are reasons that a

5   nephrologist might want a dialysis patient to be alkalotic.  Do

6   you recall that?

7   A   I do not recall that.

8   Q   Have you come to understand today there may be reasons that

9   a nephrologist wants its patient, his or her patient, to be

10  alkalotic?

11  A   I mean, I have to say I haven't thought about it any

12  further because I really felt that testimony was outside what I

13  was asked to comment on.

14  Q   In paragraph 5 of your reply declaration, when you opined

15  that the standard of care requires DaVita to immediately take

16  steps to reduce bicarbonate in patients with levels that

17  Fresenius' own study identified in the range of alkalosis

18  concern, you understand, don't you, that DaVita could not usurp

19  the role of the treating nephrologist by requiring all doctors

20  to reduce the bicarbonate prescription of every single DaVita

21  patient who may have had a serum bicarbonate level of greater

22  than 30?

23  A   I think it required, though, that the nephrologist know

24  what the conversion problem is with GranuFlo, and I understand

25  that they didn't all know that information.  So they were

Barbara Youngberg - Cross

1    ordering based on their past assumptions of how dialysate

2    converted to bicarbonate.

3    Q    In reaching this opinion about DaVita's standard of care,

4    did you consider that nephrologists understand from their own

5    medical training and education that all dialysates in

6    hemodialysis contain an acid component that converts to bicarb

7    in the liver?

8    A    I'd have to say I really didn't think about that.

9    Q    And you cited no evidence that demonstrated that DaVita

10   concealed which acid products it used or the ingredients of

11   those acid products from the nephrologists who were treating at

12   their clinics; isn't that correct?

13   A    Could you restate that question.

14   Q    Of course.

15            THE COURT:  What's an acid product?

16            MS. RUGGIERO:  GranuFlo is the acid product.  The acid

17   component contains the electrolytes.  So GranuFlo is one piece

18   of the product that ends up going into the dialyzer which is

19   called the dialysate.

20            THE COURT:  So you're saying that nephrologists

21   didn't, what, didn't know what acid products were being used,

22   and then you're asking her --

23            MS. RUGGIERO:  No.  Miss Youngberg made a statement

24   that DaVita should have immediately taken steps to reduce the

25   bicarb in the patients with levels in the alkalosis concern.

Barbara Youngberg - Cross

1    So my question to her was, does she understand why that

2    statement, that she was asking DaVita to usurp the role of the

3    treating physician who was the only person who can actually

4    prescribe the dialysate and the dialysis prescription and the

5    only person who can change that prescription.

6         MR. WOJTANOWICZ:  Your Honor, if I may, I'm not quite

7    sure to what extent, obviously this is not trial.  And whether

8    you want objections to these questions, but I would argue this

9    is outside the scope and is assuming a lot of facts not in

10   evidence.

11        MS. RUGGIERO:  Your Honor, I would suggest that

12   Miss Youngberg made a lot of very bold statements in both of

13   her declarations about what DaVita's policies did and how

14   DaVita executed on those policies.  And the statements that she

15   made are based on incorrect information, inadequate

16   information, lack of knowledge as to many things, and that

17   impacts the Daubert motion being made and whether or not she's

18   qualified, whether or not her opinion is reliable, and it also

19   does go to the weight of the opinion.

20        So I'd ask that you indulge me in allowing us to

21   explore her opinions and understand how she made those

22   statements, because I think it reflects her knowledge or lack

23   of knowledge about what it is that she's saying and how it is

24   she's saying that DaVita didn't meet the standard of care.

25        THE COURT:  Oh, that's a lot for me to even understand

Barbara Youngberg - Cross

173

1    what you said.  I'll indulge you, don't worry about that; but

2    what you're doing is kind of a lawyer trick, and that is you

3    say, did you understand A, B, C.  I guess you're assuming that

4    A, B, C is just obvious or at least it's obvious to you.

5              MS. RUGGIERO:  Given somebody that's made the

6    statements that she's made --

7              THE COURT:  Why don't you ask her about the statements

8    she made, not did you understand all this stuff about medicine.

9    Why don't you ask her about the statements she made and the

10   opinions she has.

11             MS. RUGGIERO:  Well, thank you, Your Honor.  The

12   opinions she's made are based on these facts that are

13   inaccurate.  And by --

14             THE COURT:  Let's look at the opinion and see what the

15   opinion is and then talk, talk about what it's based on.  And

16   if it's inaccurate and you can prove that, fine.

17   BY MS. RUGGIERO:

18   Q   Miss Youngberg, do you allege in your declarations that

19   DaVita concealed what acid products it was using from the

20   nephrologists?

21   A   I was led to believe that DaVita didn't know what acid

22   products they were giving to patients, so they couldn't advise

23   them as to what products were being used.

24   Q   Do you know or do you understand that in the DaVita clinic,

25   that the labels of the products, the acid products that are

Barbara Youngberg - Cross

174

1   used, are actually posted in the clinic, for all to see?

2   A    Again, I just don't -- I know I saw a label, but I also

3   know that I was told through some of the discovery documents

4   that you had no way of knowing which patients got GranuFlo.  So

5   if you didn't have a way of knowing, then I'm not sure how you

6   would have or where you would have posted the label.

7   Q    I think if you're referring to declarations that were put

8   forward in support of this case, I think those declarations

9   indicated that DaVita could figure it out, but it would take

10  quite a bit of effort and time and money to figure it out.

11          THE COURT:  Well, weren't your partners just trying to

12  tell me earlier today that DaVita doesn't really know who got

13  the GranuFlo and who didn't?

14          MS. RUGGIERO:  You think what was said was it would

15  be, and that one of the gentleman on this side of the table

16  would explain that there is a process in place for figuring

17  out, but it takes quite a bit of effort.  And thus the --

18          THE COURT:  And DaVita hasn't done that effort yet.

19          MS. RUGGIERO:  Well, DaVita obviously did it for the

20  several plaintiffs that ended up being voluntarily dismissed,

21  because they figured out for the plaintiffs that those patients

22  did not take GranuFlo.

23          THE COURT:  Right.  But they, DaVita has or hasn't

24  done it for the rest of this so-called class.

25          MS. RUGGIERO:  As to the ten or 13 people, we have

Barbara Youngberg - Cross

1    done it for the 13 people.  To do it for individual people, you

2    have a name, you have a clinic, you have a date of service, it

3    can be done.  It takes quite a bit of effort.  It took several

4    months for us to uncover that the individuals that the

5    plaintiffs purported were given GranuFlo did not.  It's a

6    matter of matching up what's in the medical --

7            THE COURT:  Your answer to my question is no.

8            MS. RUGGIERO:  Yes, we've done it with 13 people over

9    the course of this litigation.

10           THE COURT:  Right.  Because you got sued, you've done

11   it for 13 people; but you haven't done it for all these other

12   people, so you don't know at this point who got GranuFlo or

13   not, so --

14           MS. RUGGIERO:  Not unless we have the names and we can

15   connect with the medical records.

16           THE COURT:  Okay.  So it follows if you don't know who

17   got it, you can't inform the physicians who got it.  Right?

18           What are you trying to ask her here?

19           MS. RUGGIERO:  That there's an allegation that DaVita

20   concealed information from nephrologists.  They did not share

21   that there was extra buffer or extra acetate in the product.

22   My question to Miss Youngberg is, she's making these

23   statements.  Does she understand that in a DaVita clinic, a

24   doctor need only look at the machinery where the label is

25   posted that indicates that a GranuFlo product is being used, a

Barbara Youngberg - Cross

176

1    Rockwell product is being used, and the ingredients that are in

2    that product.

3            THE COURT:  Okay.  Let me give you a hypothetical

4    here.

5            Ms. Jones goes to the nephrologists and he gives her

6    the bad news your kidneys is bad, you need dialysis.  Go next

7    door to DaVita.  And here's your prescription, take it over.

8            She goes over and hands the prescription to the DaVita

9    people and they put her in a machine.

10           Now, they know at the time, don't they --

11           MS. RUGGIERO:  Yes.

12           THE COURT:  -- what product they're using?

13           MS. RUGGIERO:  Yes.

14           THE COURT:  They don't know it now, 'cause they didn't

15   keep records of it.  But they knew it at the time they did it.

16           MS. RUGGIERO:  There are records that will indicate

17   that she was given a prescription of a certain amount of

18   bicarbonate and a certain amount of electrolytes.  They also

19   have records of what it is they purchased at that point.  They

20   can then match up that, that formula of her prescription with

21   the product that they had at the time that had that same

22   formula.

23           THE COURT:  Yeah, if they want to do it, they can do

24   it and come up with a pretty good idea of what she got.

25           MS. RUGGIERO:  Correct.

Barbara Youngberg - Cross

177

1            THE COURT:  But the day that she got it, they knew

2    exactly.

3            MS. RUGGIERO:  Exactly, exactly.

4            THE COURT:  DaVita didn't tell the doctor what she

5    got.

6            MS. RUGGIERO:  If the doctor decided they wanted a

7    specific product, they could have told DaVita.

8            THE COURT:  Of course.  The point is DaVita didn't

9    make it its business to tell the doctor, you know, today, we

10   use GranuFlo with Ms. Jones, they just didn't do that, right?

11           MS. RUGGIERO:  If the doctor was a medical director, a

12   medical director of the facility would know what the medical

13   facility was using and the nephrologist had every ability to

14   know.

15           THE COURT:  The answer is they didn't.  I'm not saying

16   they should or shouldn't have, that's a different matter.

17           MS. RUGGIERO:  Okay.

18           THE COURT:  The fact is they didn't tell the doc, the

19   nephrologist, what they just put in the machine that treated

20   Mrs. Jones today.

21           MS. RUGGIERO:  The doctor was just told that acid

22   product was being used and would assume that it was on a list

23   of products that contained acid and would take it from there.

24           THE COURT:  So this witness used the word "concealed"

25   and maybe that's a little strong, maybe it isn't; but she's

Barbara Youngberg - Cross

1    right, they didn't tell the doctor.  Concealed maybe has the

2    stigma of they did it on purpose.  And maybe they just didn't

3    do it because they didn't think it was important.  But they

4    didn't do it.  So she's sort of right, isn't she?

5              MS. RUGGIERO:  Well, again, I guess to me, the fact

6    that the labels are posted in the clinic where the

7    nephrologists' patient is being dialyzed makes it pretty much

8    on notice of what the product that was being used on the

9    patient.

10             THE COURT:  Okay.

11             THE WITNESS:  I just have to say that unless the

12   nephrologist is walking around, they're not going to see that

13   label.  So if the label --

14   BY MS. RUGGIERO:

15   Q    The nephrologist should be walking around, checking --

16   A    If the label is on the machine, why isn't is it on the

17   patient's record?

18   Q    There isn't a question pending.

19             THE COURT:  Be polite.  I know you think she's a bozo

20   expert.

21             MS. RUGGIERO:  I didn't say that.

22             We had a nice rapport during the deposition.

23             THE REPORTER:  Could we take a break, please.

24             THE COURT:  Yeah, the reporter wants a break now.

25             MS. RUGGIERO:  Sure.

Barbara Youngberg - Cross

179

1        THE COURT:  Let's take ten minutes.

2        (Recess at 2:32 p.m.)

3        (Reconvened at 2:46 p.m.)

4        THE COURT:  Okay.  Fire away.

5   BY MS. RUGGIERO:

6   Q   One last question, Miss Youngberg, as to where we left off.

7   Making, providing your opinions in this case, did you take into

8   consideration that nephrologists have privileges at the DaVita

9   clinics and perform rounds?

10  A   I did not.

11  Q   In paragraph 4 of your reply declaration, you opined that

12  the standard of care required DaVita to take steps to examine

13  whether the switch to GranuFlo caused an increase in adverse

14  outcomes; is that correct?

15  A   That is correct.

16  Q   Okay.

17        Did you come across any, any evidence that shows

18  DaVita was aware before the recall that Fresenius may have seen

19  a relationship between GranuFlo and increased cardiac events or

20  deaths in their patients?

21  A   Could you please restate the question.

22  Q   Sure.  In coming up with your opinions here, did you come

23  across any evidence that showed that DaVita was aware before

24  the recall that Fresenius may have seen a relationship between

25  GranuFlo and increased cardiac events and deaths in their

Barbara Youngberg - Cross

1   patients?

2   A   I know there was evidence that there was an increase or a

3   change in the level of bicarb, they were aware of that.  They

4   might not have associated it yet with cardiac death.

5   Q   Okay.

6        And did you see any evidence that shows that DaVita

7   was aware before the recall that any other dialysis provider

8   was seeing a direct relationship between GranuFlo and increased

9   cardiac events and deaths in their patients?

10  A   Again, could you restate that question.

11  Q   Sure.

12       Before the recall, did you see any evidence that

13  DaVita was aware before the recall that dialysis providers were

14  seeing a direct relationship between GranuFlo and increased

15  cardiac events and deaths in their patients?

16  A   There were articles before 2012 that made that suggestion.

17  Q   About GranuFlo?

18  A   About rising, they didn't associate it with the dialysate,

19  but changes in patients' bicarb levels following dialysis.  Not

20  associating with a specific product, but noting that

21  difference.

22  Q   Did you review any actual DaVita actual patient-safety

23  data, yourself, did you actually review any, yourself, before

24  coming to your opinions in this case?

25  A   DaVita patient-safety data?

Barbara Youngberg - Cross

181

1    Q    Correct.

2    A    I looked at the data from the data quality index, if you

3    would call that DaVita patient-safety data, that was in the

4    articles.  But I didn't look at specific patient-safety data

5    from DaVita.

6    Q    Okay.

7         So any data that you think you looked at came from

8    studies that reported on that data, correct?

9    A    Correct.  I know data was requested, but we never were

10   given any data.

11   Q    Is that your understanding, that data was actually

12   requested in this case?

13   A    Uh-huh.

14   Q    In your declaration, you stated that you reviewed all the

15   documents that DaVita produced during discovery in this case;

16   is that correct?

17   A    I reviewed all the documents that were sent to me by, by

18   Garth and the team.

19   Q    If you can turn to what's Defendant's Exhibit L, please?

20   A    L?

21   Q    L.  L like Lisa.

22   A    Yes.

23   Q    And it's entitled DaVita Healthcare Partners continuous

24   quality improvement program, policies and procedures, correct?

25   A    That's correct.

Barbara Youngberg - Cross                    182

1   Q   Did you review this document in reaching your opinions in

2   this case?

3   A   I believe I did.

4   Q   But you don't reference this document anywhere in your

5   declarations, do you?

6   A   Again, I reviewed eight to 10,000 pages of material; I

7   didn't reference all of them.

8   Q   Did you reference this document, DaVita's policy and

9   procedure on continuous quality improvement?

10  A   This would have been a document that it would have been

11  important for me to review, so, yes, I would say that I

12  reviewed it.

13  Q   Did you reference it in any of your declarations?

14  A   I don't recall.

15  Q   And in reaching your opinions, would you have reviewed the

16  various DaVita monthly minute meeting templates and related

17  materials, dating as far back as 2004?

18  A   Yes.

19  Q   But you don't reference any of those quality-

20  improvement-related documents in any of your declarations, do

21  you?

22  A   I don't remember.

23  Q   You testified at your deposition that you know what a

24  quality assessment and performance improvement program is.

25  Otherwise known as QAPI, Q-A-P-I?

Barbara Youngberg - Cross

1    A    Uh-huh.

2    Q    But at the time of your deposition, you were unfamiliar

3    with the name by which DaVita, the name that DaVita uses for

4    its QAPI program; is that correct?

5    A    I don't recall.  I know that the name changed.  But I

6    didn't know what the name was before or after.

7    Q    Okay.

8         Have you come to understand now what DaVita calls its

9    QAPI program?

10   A    I do.

11   Q    And what's that?

12   A    That it's -- I mean, again, what it, how it's described and

13   how it's actually working are two different things, so the

14   quality-improvement program --

15   Q    My question is only do you know the name that DaVita uses

16   for its QAPI program?

17   A    I don't know the name that they use, I'm sorry.

18   Q    Would you agree that DaVita had policies and procedures in

19   place defining adverse occurrences to include death and cardiac

20   arrest?

21   A    I would agree that they had them in place, yes.

22   Q    Okay.

23        And isn't it true that DaVita had policies and

24   procedures in place directing that adverse occurrences be

25   reviewed and trended monthly?

Barbara Youngberg - Cross

184

1    A    I don't recall that.

2    Q    Okay.

3         Do you see that CQI policy that's in front of you,

4    Exhibit L?

5    A    Okay.

6    Q    And when reciting the topics that are to be reviewed at the

7    monthly QAPI meeting, doesn't this list trend of adverse

8    patient occurrences as a item that's to be reviewed at the

9    monthly QAPI meeting at DaVita?

10   A    The policy states that those are things to be reviewed.

11   Q    Okay.

12        And if you turn to Joint Exhibit 3.  This is Joint

13   Exhibit 3.

14   A    Okay.

15   Q    And would you agree that this is DaVita's adverse

16   occurrence reporting manual?

17   A    Yes, it is.

18   Q    And if you turn to page 17179.

19   A    Yes, I'm there.

20   Q    Okay.

21        And if you look at (b)(2).

22   A    Yes.

23   Q    The second-to-last sentence says AORs, which I'll say is

24   adverse occurrence reports, as defined in this manual, are to

25   be trended and reviewed during the facility health meeting.

Barbara Youngberg - Cross

185

1    Any negative trend should result in a plan of action.

2            Do you see that?

3    A   I do.

4    Q   Okay.

5            Wouldn't you agree that policies that direct the

6    review of adverse events at a monthly QAPI meeting that's

7    attended by many different health-care professionals would seek

8    to foster transparency and manage adverse outcomes?

9    A   I can only state that what's in the manual isn't what was

10   the testimony of your VP of quality.

11   Q   My question is solely would you agree that policies that

12   direct the review of adverse events at a monthly QAPI meeting

13   where many health professionals are in attendance, would that

14   actually foster transparency?

15   A   The policy wouldn't necessarily foster transparency.  The

16   act of doing it would foster transparency, but not the policy.

17   Q   In that same policy that we just looked at, same page,

18   17179 (b)(2), it says, If adverse occurrences involve a

19   patient, the facility administrator slash manager or designee

20   will notify, in a reasonably timely manner, the patient's

21   attending physician or nephrologist and the facility's medical

22   director as applicable.  Do you see that?

23   A   I do.

24   Q   Do you dispute that directing a policy that directs that

25   the facility administrator notify the patient's treating

Barbara Youngberg - Cross

1    nephrologist if an adverse occurrence occurs fosters

2    transparency?

3    A    Again, if it's actually done, it fosters transparency.

4    Q    Yes, assuming it's done, does it foster transparency?

5    A    Assuming it's done.

6    Q    And does a policy and procedure in place that directs the

7    facility administrator to notify the facility's medical

8    director if an adverse occurrence transpires that involves a

9    patient, does that foster transparency; does that seek to

10   foster transparency?

11   A    Same answer, assuming it's done.

12   Q    Do you have any evidence that DaVita and its clinics did

13   not comply with the policies and procedures in this manual,

14   regarding reporting adverse occurrences to nephrologists and

15   medical directors?

16   A    That really wasn't -- I have no evidence that it happened.

17   I'll just say that.

18   Q    And you have no evidence that it didn't happen; is that

19   correct?

20   A    Correct.

21   Q    Do you have any evidence that DaVita did not actually trend

22   adverse occurrences at its clinics during the time that DaVita

23   patients may have been taking GranuFlo?

24   A    I think DaVita trended many adverse occurrences.  What I

25   don't think they did that's relative to GranuFlo is that they

Barbara Youngberg - Cross

1   acted on them.

2   Q    What evidence do you have of that?

3   A    That the patients continued to get GranuFlo.

4   Q    Is it your understanding that GranuFlo is no longer a

5   product that can be used in the nephrology community?

6   A    No, it can be used; but it's just that the way it's used

7   has to be understood differently, the ordering practices have

8   to be different.

9   Q    Do you have any evidence that suggests that ordering

10  practices changed or didn't change at DaVita after the recall?

11  A    I have no evidence that ordering practices changed.

12  Q    And do you understand that the FDA has since the recall

13  taken a different position and has changed what needs to be on

14  the label and what the order and prescription should be?

15  A    I am not aware of that.

16  Q    You are?  I'm sorry, you are, or you aren't?

17  A    I am not.

18  Q    Let's look at Joint Exhibit 4.

19  A    Okay.  I'm there.

20  Q    Okay.

21        Joint Exhibit 4 is a large document.  I don't think

22  it's the one that's on the screen, though.

23        It should be this.

24        Okay.  Scroll down to -- there are several documents

25  in this exhibit.  And one of them is entitled conditions for

Barbara Youngberg - Cross

188

1    coverage.

2    A    Uh-huh.

3    Q    And orientation for medical directors on the new ESRD

4    regulations?

5    A    Uh-huh.

6    Q    Can you get to that, please.

7         And could you turn to page 17 within that particular

8    PowerPoint.

9         It says what do you do if, dot dot dot?

10   A    I see that on the screen.

11   Q    Page 17.

12        Can you just leave that page.

13   A    I mean, I can see it on the screen.

14   Q    Okay.

15        It says, and I'm going to read it verbatim.  If a

16   facility identifies a cluster of adverse patient outcomes or

17   single sentinel event.  The interdisciplinary response, it

18   says, will be initiated to provide the resources needed to

19   address, correct, and report the event properly.

20        Do you see that?

21   A    Yes.

22   Q    Do you have any evidence that demonstrates that DaVita did

23   not follow this practice during the time that its patients may

24   have been treating with GranuFlo?

25   A    I have no evidence one way or another that it happened or

Barbara Youngberg - Cross

1    not.

2    Q    Since your deposition, have you come to understand that

3    DaVita's risk-management department are comprised of risk

4    managers who are nurses like you?

5    A    I wasn't aware of that.  But that's not unusual.

6    Q    'Cause you testified at your deposition that in your

7    experience, most professionals are nurses, correct?

8    A    Many of them are.

9    Q    And did you, do you dispute that every adverse-occurrence

10   report at DaVita is reviewed by a risk manager?

11   A    I don't know that.

12   Q    And isn't it correct that DaVita's policies and procedures

13   direct that if an adverse occurrence involves a hospitalization

14   or death, the clinic facility administrator will notify the

15   regional operations director or another supervisor and the

16   facility administrator will also meet a call risk manager, will

17   notify other departments of the adverse occurrence?

18   A    Again, I think what is in the policy isn't what I saw when

19   I looked at how this information was actually played out in the

20   organization.  So it might be in the policy, but I don't see

21   evidence that it's happening.

22   Q    And my first question is, do you dispute that the policies

23   and procedures direct those activities to occur.

24   A    I don't dispute that.

25   Q    All right.

Barbara Youngberg - Cross

190

1    And did you go on-site to see how DaVita implements

2    this policy and procedure?

3    A   No, but I did read the deposition of Miss Goykhman.

4    Q   And other than that, did you look at any patient-safety

5    data or any minutes as evidence for what DaVita does or doesn't

6    do?

7    A   I was not provided those documents to review.

8    Q   So the answer is no.

9    A   The answer is no.

10   Q   Isn't it true that you've written and lectured that

11   risk-management programs serve both a quality-improvement

12   function and a litigation and claims-handling function?

13   A   Yes.  Often.

14   Q   Okay.

15        And in fact, you've written that litigation and claims

16   handling are significant part of risk management in the

17   health-care setting; isn't that true?

18   A   That's correct.

19   Q   And in one of your books, *Principles of Risk Management and*

20   *Patient Safety*, you actually say that legal considerations are

21   very important in assessing an organization's risk; is that

22   correct?

23   A   Of course.

24   Q   And your CV lists numerous articles and lectures where you

25   explicitly recognize that claims-handling and litigation

Barbara Youngberg - Cross
191

1    concerns are part of risk management; is that correct?

2    A    That's correct.

3    Q    And during your deposition, when I asked about the

4    health-care risk-management course that you teach, you

5    testified that you tell your students that the elements of risk

6    management are, quote, risk financing, claims management, and

7    probably most heavily emphasizing loss control, looking at the

8    legal and regulatory issues, but also just how you design

9    systems and structures to support safe care; is that correct?

10   A    That's correct.

11   Q    And you wouldn't have spent so much time writing and

12   lecturing on this subject of claims management and litigation

13   in risk management if it wasn't an important consideration in

14   the discipline of risk management; isn't that correct?

15   A    That is correct.

16   Q    And therefore, you would agree, as you say in your book,

17   that it's appropriate for a health-care provider to focus on

18   appropriate quality-improvement standards while at the same

19   time considering legitimate litigation issues in their

20   risk-management programs; is that correct?

21   A    My books all say there needs to be a balance in protecting

22   the patient over protecting the paper.

23   Q    Right.

24        So considering both, correct?

25   A    Considering both.

Barbara Youngberg - Cross                    192

1    Q    And DaVita has policies and procedures in place directing

2    that mortality be specifically reviewed and trended monthly;

3    isn't that correct?

4    A    That's required.

5    Q    And DaVita has policies and procedures in place that direct

6    that mortality be specifically reviewed and trended monthly; is

7    that correct?

8    A    That is correct.

9    Q    Okay.

10        And if you look at Exhibit L, which is the CQI policy.

11        The bottom of the first page, spilling over to the

12   second page, it indicates the facilities, what the facility

13   will measure and analyze and track at their quality, monthly

14   quality-improvement meeting.

15        And on the second page, do you disagree that when it

16   recites the topics that are to be reviewed at the QAPI meeting,

17   DaVita lists mortality, review of deaths?

18   A    I see that on the policy, yes.

19   Q    Okay.

20        If you turn to Exhibit M, which is a 2004 template of

21   DaVita's QAPI meeting minutes?

22   A    Yes.

23   Q    If you look at no. 1B, it says all patients' deaths were

24   reviewed for the month of.  And then at D, it says mortality

25   review forms attached.

Barbara Youngberg - Cross

1    And then it says no mortality problems were

2    identified.  And then it says the following prior and/or

3    current concerns were reviewed.  See attached action plans.

4    A    I see this form.

5    Q    Do you disagree that as part of this form DaVita is

6    instructing that mortality be reviewed at the monthly QAPI

7    meeting?

8    A    I can honestly say I don't know if it's instructing people

9    to do that.

10   Q    This is a policy and procedure about the quality and

11   improvement meeting; is that correct?

12   A    It is.

13   Q    And minutes are, exist to record what is to be set forth at

14   the meeting, correct?

15   A    That is correct.

16   Q    And we looked at the CQI program, which is the policy and

17   procedure 1-1406, correct?

18   A    That is correct.

19   Q    And that directs clinics to have a QAPI meeting, correct?

20   A    That's correct.

21   Q    And then it also directs the facility as to what metrics

22   and quality indicators it should track at that meeting; is that

23   correct?

24   A    That it should track, that is correct.

25   Q    Okay.

194

Barbara Youngberg - Cross

1          And if you look at Exhibit FF?

2     A    FF.

3     Q    Double F, yes.

4     A    Okay.

5     Q    And those are the QAPI minute templates from 2006, and

6     there are several documents.  And I direct your attention to

7     the document entitled quality improvement and facility

8     management meeting minutes.

9          The fourth one, which indicates it's tracking metrics

10    from Q3.

11         If you look at, in the box, it will say Q1, Q2, Q3.

12    This one will say Q3.

13    A    I'm sorry, I'm in FF, but what page am I supposed to be --

14    Q    This is a native document, so there are no pages.  So,

15    again, it will say, there are, it will get document that's

16    entitled quality improvement and facility management meeting

17    minutes.

18    A    Okay.

19    Q    And in the box, keep going down, keep going.  It's like the

20    document that's on the screen, but it will say Q3.  In the

21    first box.

22         It has Q1.  So now you need to get to Q3.

23    A    Okay.

24    Q    Keep going.

25    A    Q3.

Barbara Youngberg - Cross

1    Q    And it's on the screen now as well.

2              Do you disagree that on this form, DaVita is

3    instructing that as part of the monthly meeting, 20 or so

4    possible causes of death in their patients should be tracked.

5              If you look at the box entitled "mortality."

6    A    I mean, I know your question; but I have to say, in

7    reviewing the deposition, there was the suggestion that the

8    DaVita clinics could do things at their discretion.

9    Q    Okay.

10   A    So I think that what's being sent out from somebody, but I

11   don't know, given the fact that all I see here is zeros,

12   whether it's actually been done.

13   Q    And we've said that this is a template, a meeting minute

14   template, correct?

15   A    Yes.

16   Q    So therefore it should be empty, it's a template.  And with

17   regard to the mandate of the clinic, we go back to the CQI

18   program policy.  Exhibit L.  And I think we've established that

19   there's a directive in there that the facility have to conduct

20   a QAPI meeting.  And there are certain measures that the

21   facility has to track, and one of those metrics was mortality,

22   correct?

23   A    That's what the policy says, yes.

24   Q    So on this minutes template form, DaVita has a box,

25   correct, and it lists 20 or so different types of causes of

Barbara Youngberg - Cross

1    deaths that the facility needs to examine; is that correct?

2    A    Yes.

3    Q    Okay.

4         And it also lists in B the documents that must be

5    reviewed as part of this mortality assessment; is that correct?

6    A    That is correct.

7    Q    And it indicates the snapshot report, clinical outcome

8    slash SMR, correct?

9    A    Correct.

10   Q    The CQI trend analysis.  Slash cause of death form.  Is

11   that correct?

12   A    That's correct.

13   Q    And the mortality review forms.  Is that correct?

14   A    That is correct.

15   Q    Regarding any patients who have died during the month.

16        Correct?

17   A    That's correct.

18   Q    Did you review any of those documents in coming to your

19   opinion that the DaVita failed to meet the standard of care in

20   this case?

21   A    These completed documents?

22   Q    Yes, any of these documents?

23   A    No.

24   Q    Have you seen any of those documents otherwise?

25   A    No.

Barbara Youngberg - Cross
197

1    Q    And you testified at your deposition, didn't you, that it's

2    important to quality improvement and patient safety to have in

3    place a mechanism by which to track monthly dialysis patients

4    mortalities, and suspected causes of deaths, correct?

5    A    Yes.  Important to have an effective mechanism.

6    Q    And in your first declaration, you said a robust QI program

7    should track the number of patients suffering from myocardial

8    infarction, stroke, or death while on treatment, correct?

9    A    Correct.

10   Q    And you've put forth no evidence that DaVita and its

11   clinics did not comply with the policies and procedures during

12   the time that some DaVita patients may have been treated with

13   GranuFlo, correct?

14   A    The deposition I read suggested they weren't being tracked.

15   Q    Is that what the deposition said?

16   A    Uh-huh.

17   Q    Do you remember specifically what it said?

18   A    Not specifically, no.

19        That she didn't have access to that information.  Miss

20   Goykhman.

21   Q    About monthly tracking?

22   A    Uh-huh.

23   Q    She didn't testify that that's something that's actually

24   required at DaVita clinics?

25   A    No, I don't recall.

Barbara Youngberg - Cross                    198

1   Q    And isn't it correct that DaVita has policies and

2   procedures in place directing that hospitalizations be reviewed

3   monthly and trended monthly?

4   A    That hospitalization, I don't know about that.

5   Q    Okay.

6        Well, let's look at the CQI form again, the Exhibit L,

7   the CQI policy and procedure at DaVita.

8        And again, we said that this policy directs that

9   clinics have a monthly QAPI meeting.  And it also sets forth

10  the mandatory quality indicators that they must track at that

11  monthly meeting.

12       And if you look at 7 which follows from page 1 to

13  page 2, one of the things that, under the negative quality

14  indicators that must be tracked, hospitalizations and emergency

15  ambulance transfers.  Do you see that?

16  A    I do.

17  Q    And if you look at, back at the 2004 minutes template,

18  which is Exhibit M, do you disagree that this form has a, has a

19  place for the memorialization of the hospitalization review

20  that is going to take place at the QIFMM meeting in accordance

21  with the policy on page 2?

22  A    Looking at the minutes template has a place for it didn't

23  tell me that it's done.  I see that it's here.

24  Q    My question is not whether it's done or not.  Because we

25  know you didn't go on site and you didn't look at patient data.

Barbara Youngberg - Cross

1    So my question to you only asks that the forms and the policies

2    direct that the clinics take a review of this particular

3    metric, the hospitalization?

4    A    The policy states that, yes.

5    Q    And if you look back at Exhibit FF, the same document with

6    the Q3 on it.  And it's on the screen as well.

7    A    Okay.

8    Q    And if you go to the second page of that document.

9    A    Okay.

10   Q    The next page.

11          Okay.  Scroll down.

12          Do you disagree that on this form, DaVita is setting

13   forth an area where 20 or so possible causes of hospitalization

14   in their patients can be tracked during the QIFMM meeting?

15   A    I don't disagree with that.

16   Q    Okay.

17          And one of the types of, one of the types of

18   hospitalization causes that can be tracked is whether there was

19   a circulatory, cardiovascular system issue; is that correct?

20   A    That's correct.

21          THE COURT:  Miss Ruggiero.

22          MS. RUGGIERO:  Yes.

23          THE COURT:  What points are you making?  You're just

24   asking all these questions.

25          MS. RUGGIERO:  The points I'm making, Your Honor --

Barbara Youngberg – Cross

1          THE COURT:  Yeah, what are you trying to prove?

2          MS. RUGGIERO:  Miss Youngberg is opining about the

3     adequacy of the policies and procedures, both on their face and

4     in practice.  As you saw in the Daubert motion, she was unaware

5     of a lot of things associated with policies and procedures

6     which they said were inadequate.  She did not go on site,

7     review any patient-safety data.

8          I'm here to do a few things.  One of which is

9     substantiate our brief in support of the Daubert exclusion and

10    also because of this is Mr. Wojtanowicz did have Miss Youngberg

11    on the stand opine as to the merits as to whether the policies

12    are adequate, whether we executed them appropriately; I'm

13    setting forth the information that sets forth whether or not

14    that opinion is valid.  And whether or not she has reviewed

15    this material appropriately to put forth the opinion she has

16    put forth.

17         THE COURT:  Well, there isn't any question but that

18    DaVita had had all kinds of policies, right?

19         MS. RUGGIERO:  Right.

20         THE COURT:  I mean, you've got books and books of

21    policies.  They're pretty good-looking policies.  They're good

22    policies.  So one thing this witness is doing is saying, I'm

23    not so sure that DaVita actually implemented its policies.

24         MS. RUGGIERO:  Correct.

25         THE COURT:  Setting that aside, let me ask you some

Barbara Youngberg - Cross
201

1   questions.  Did or did not DaVita track bicarbonate level

2   increases?

3           MS. RUGGIERO:  DaVita tracks outlier lab data.  So

4   every month, bicarb --

5           THE COURT:  Maybe they did, but that isn't my

6   question.  I don't even know what that --

7           MS. RUGGIERO:  Okay, let me finish --

8           THE COURT:  Did DaVita track increases or trends in

9   increases in bicarbonate levels in patients who got GranuFlo,

10  yes or no.

11          MS. RUGGIERO:  DaVita trended and tracked lab data.

12  One of the pieces of lab information that it would look at

13  every month, if not more, are the bicarb levels.

14          THE COURT:  Okay.  So your answer is no.  Because I

15  said in patients who got GranuFlo.

16          MS. RUGGIERO:  In all patients.

17          THE COURT:  Do they have -- did they track how

18  GranuFlo recipients' bicarb levels went --

19          MS. RUGGIERO:  I can tell you, Judge, that based -- at

20  this time I haven't seen evidence of that.  But we haven't

21  looked at all the evidence yet.  And that's that the premise

22  underlying that question is unfortunately faulty insofar as --

23          THE COURT:  Well, it may be faulty, but I'm asking the

24  questions.

25          MS. RUGGIERO:  Okay.

Barbara Youngberg - Cross

1          THE COURT:  Did DaVita track adverse outcomes for

2    people who got GranuFlo, as compared to other people.

3          MS. RUGGIERO:  DaVita tracks adverse outcomes as to

4    all of the different types of events that take place, whether

5    it's cardiac event, a death, there's a whole list in the

6    adverse occurrence manual.

7          THE COURT:  All right.  So I'll take that as a answer

8    no to my question.

9          MS. RUGGIERO:  And that's if there was an adverse

10   occurrence that was related to GranuFlo, it would be reported

11   and it would be looked at.

12         THE COURT:  But did they keep track of whether in fact

13   the adverse occurrence did in fact relate to when the patient

14   got GranuFlo.

15         See, I'm hearing the evidence saying, sometimes people

16   got GranuFlo, and sometimes they didn't.  DaVita didn't keep

17   records of who got GranuFlo and who didn't.  They can go back

18   now in a very cumbersome procedure, and you wanted to say it's

19   a very cumbersome procedure when you're arguing against

20   certification of the class.  But the fact is through this very

21   cumbersome procedure, they can now figure out more or less

22   which patients got GranuFlo.

23         But it is a fact that, is it not, that they didn't

24   keep track of who got GranuFlo at the time, they didn't try to

25   correlate who got GranuFlo with their adverse outcomes, they

Barbara Youngberg - Cross                    203

1    didn't try to correlate who got the GranuFlo with these

2    increases in bicarbonate levels, and they didn't do that after

3    the 2004 information, and they didn't do it after the recall.

4    They haven't done it at all.

5        MS. RUGGIERO:  Right, the 2004 information, which was

6    what I was trying to get at earlier, did not indicate there was

7    any problem with GranuFlo.  It did not put anybody on notice

8    that there was anything but a positive clinical impact

9    associated with GranuFlo.

10       THE COURT:  Okay.  And that might be, and you might

11   certainly win the case on the merits.  But those are facts,

12   aren't they?  And what this witness seems to be saying is not

13   DaVita didn't have a lot of very good policies but that when

14   you get right down to what's involved in this case, in her

15   opinion, they didn't have the right policies or if they did,

16   they didn't implement them.  That's what I think she's trying

17   to say here.

18       MS. RUGGIERO:  Right.  And unfortunately what I was

19   trying to do at the start of this questioning is to get

20   underneath her opinion of why she thinks that that should have

21   been done.  Because, number one, we have the 2004

22   retrospective --

23       THE COURT:  Well, why don't you ask her about that,

24   because you haven't gotten to that yet.

25       MS. RUGGIERO:  I tried, but I was cut off.

Barbara Youngberg - Cross                                  204

1   BY MS. RUGGIERO:

2   Q   We talked about the 2004 retrospective study, and as I

3   started before to say, that study which is the PowerPoint that

4   we were looking at and you could pull it back up again.

5           And that PowerPoint, Fresenius tells DaVita that out

6   of 4,793 patients, that 28 patients have a bicarb level greater

7   than 30, correct?

8   A   Correct.

9   Q   Okay.

10          And that 33 percent of the patients had improved

11  bicarb levels that are no longer acidotic; is that correct?

12  A   That's correct.

13  Q   And they talk about the dangers of acidosis, isn't that

14  correct, in the beginning, and that it's a risk of mortality

15  associated with that.

16          And in this PowerPoint, they also indicate that one of

17  the purposes of their GranuFlo initiative is to reduce acidosis

18  in their patients; is that correct?

19  A   That's correct.

20  Q   So this PowerPoint is given to DaVita and there's nothing

21  in this PowerPoint that tells DaVita that there's a danger of

22  cardiac arrest or increased death in patients who use GranuFlo,

23  correct?

24  A   That is correct, but I would say a quality-improvement

25  program doesn't just wait for a death to happen.

Barbara Youngberg - Cross

1    Q    Okay.

2    A    They look for change.

3    Q    At this point, this PowerPoint that they got in 2004, if

4    you look at that, it indicates that GranuFlo has a positive

5    clinical impact on the majority of patients, correct?

6    A    On the majority of patients.

7    Q    Right.   And 28 patients fall within the alkalosis concern

8    which is greater than 30, correct?

9    A    Correct.

10   Q    And nephrologists dispute whether greater than 30 is a

11   problem, correct?

12   A    Again, I think you're taking me into a clinical area and

13   it's not the quality review I would do if I saw data that

14   showed a disparity in what was expected versus what was

15   observed; as a quality professional, I'd want to see the group

16   that got the new product, is see the group that were on the old

17   dialysate and see what the outcomes looked like one compared to

18   the other.   That's what I would do as a quality person.   The

19   clinicians decide at what number they need to be concerned.

20   Q    Right.

21         THE COURT:   Let me ask you a question, ma'am, so that

22   I can understand what you're trying to say to us here.

23         Because you're put through a whole bunch of leading

24   questions by the plaintiff, and then you're put through all

25   this, I think largely irrelevant cross-examination.

Barbara Youngberg - Cross

1          Tell me, what are you saying DaVita did wrong?

2          THE WITNESS:  They failed to appreciate that in all

3    the data they collected, there were signals that would have,

4    would have caused them to believe that there might be a problem

5    with the dosing of GranuFlo.

6          THE COURT:  All right.  That's your opinion.

7          MS. RUGGIERO:  Okay.

8          THE COURT:  Your opinion is that from all the data

9    that they had at their disposal, they should have figured out,

10   but didn't figure out, that they had a problem and then they

11   should have done something about it.

12         THE WITNESS:  That's part of my opinion.  The other is

13   that by the, the documents I reviewed, there is evidence that

14   even when they identified problems, they kind of kicked them

15   over to the clinics and they didn't have an accountability

16   structure, which is a really important part of quality program,

17   to say to people, this is something you have to do.  So if we

18   notice a problem in how you're doing your dialysis, this is

19   what you have to do, or there will be some consequences for it.

20         THE COURT:  So break those opinions down.  What is it

21   that they had in their data that they were blind to, that they

22   didn't properly interpret?

23         THE WITNESS:  They saw an elevated level of

24   bicarbonate in predialysis blood draws in their patients.

25   BY MS. RUGGIERO:

Barbara Youngberg - Cross

207

1    Q    And where was that.  Could you direct our attention to

2    that?

3    A    Well, it was reported %in the DQI data set in the article,

4    in the Pun article.

5    Q    Okay.  Let's look at the Pun article.  And by the Pun

6    article, I assume you mean the 2011 Pun article, 'cause he has

7    written before, and that's what's identified as no. 3 in your

8    materials review list.  And maybe to make it easier for you,

9    you can look at your materials review list is Exhibit . . .

10   Exhibit Q is your exhibits review list.

11   A    Okay.

12   Q    Okay.

13        And the 2011 Pun study is identified as no. 3, is that

14   correct, is that the article?

15   A    That is correct.

16   Q    Okay.

17        And that's the, the name of the article is modifiable

18   risk factors associated with sudden cardiac arrest within

19   hemodialysis clinics; that is correct?

20   A    That's correct.

21   Q    And you just told the judge that you think --

22        THE COURT:  She didn't tell me that, she told you

23   that.  I haven't -- you popped in before I had a chance to

24   finish my questions.

25        MS. RUGGIERO:  I'm sorry, Judge, would you like to

Barbara Youngberg - Cross

208

 1   finish?

 2          THE COURT:  Oh, you know, I thought it was kind of a

 3   good idea.

 4          MS. RUGGIERO:  My apologies.

 5          THE COURT:  I want to come back to your opinions.

 6   That's what I was trying to get to the bottom of.

 7          Your opinions, you said now that you've got two

 8   opinions.  Is that what you said?

 9          THE WITNESS:  Well, I have an opinion that they had

10   data that they weren't looking at to discern problems.

11          THE COURT:  All right.  There's one.  I'm going to

12   write it down.  They had data they weren't looking at.

13          THE WITNESS:  Or if they looked at it, they weren't

14   seeing what the data was telling them.

15          THE COURT:  They looked but did not see.

16          THE WITNESS:  Uh-huh.

17          THE COURT:  All right.  So that's an opinion.  In all

18   this data that they had, there was some important data that was

19   right there in front of their eyes but they either didn't look

20   or if they looked, they didn't get it.

21          THE WITNESS:  Uh-huh.

22          THE COURT:  All right.  I'll come back to that one.

23          What's your second opinion?

24          THE WITNESS:  That they didn't have an accountability

25   structure in place where even though --

Barbara Youngberg - Cross                        209

 1          THE COURT:  I don't even know what that means.

 2          THE WITNESS:  That means when a problem is identified

 3   at one of the clinics, that their mortality is higher than the

 4   other clinic, they would direct them to understand why their

 5   mortality was higher and to fix the problem.  So a system for

 6   remediation, really.

 7          THE COURT:  Remediation of what?

 8          THE WITNESS:  Of the system problems in the clinic.

 9          THE COURT:  Well, that's way too spongy for me.  We're

10   not trying DaVita based on whether they had great policies and

11   procedures.  We're trying DaVita based on whether they had

12   something wrong that affected GranuFlo patients.

13          THE WITNESS:  Well, what's wrong with the

14   accountability system is if you see a problem but you don't

15   have a way to enforce the solution, then patients continue to

16   get something that could be harmful to them.

17          THE COURT:  All right.  Let's go back to that first

18   opinion.

19          They had data that they weren't looking at or they

20   looked at but did not see.

21          THE WITNESS:  Right.

22          THE COURT:  What data?

23          THE WITNESS:  From the DaVita quality index.  Which

24   is --

25          THE COURT:  No, what data?  What was the data about?

Barbara Youngberg - Cross

1    THE WITNESS:  They had lab data, they had predialysis

2  bicarbonate data, they had lots of data in the data quality

3  index that was --

4    THE COURT:  I'm asking you specifically now.  Don't

5  weasel on me here.  What type of data did they have that they

6  weren't looking at?  What was this data, what did it say to

7  them?

8    THE WITNESS:  The predialysis bicarbonate levels of

9  patients.

10    THE COURT:  Predialysis bicarbonate levels.

11    Just as a curiosity, this will show, now you can tell

12  on my part, probably, predialysis means before they got

13  dialysis.

14    THE WITNESS:  Correct.

15    THE COURT:  So why would they be interested in data

16  before they even got the dialysis?

17    THE WITNESS:  Because the articles that were reporting

18  the problems showed that patients had that level creep up month

19  after month.

20    THE COURT:  Okay.

21    THE WITNESS:  And when it reached a certain level, it

22  became serious.

23    THE COURT:  All right.

24    THE WITNESS:  It posed a potential health risk.

25    THE COURT:  So it wasn't predialysis, it was during

Barbara Youngberg - Cross                      211

1    dialysis, it was time to time to time, these people come back

2    two to three times a week.

3              THE WITNESS:  But drawn before the treatment starts.

4              THE COURT:  You're saying that -- the first day that

5    Ms. Jones comes in, they do a blood draw.

6              THE WITNESS:  Uh-huh.

7              THE COURT:  But her bicarbonate levels aren't elevated

8    yet.

9              THE WITNESS:  Correct.

10             THE COURT:  Right?

11             THE WITNESS:  Correct.

12             THE COURT:  Or if they are, it's certainly not

13   DaVita's fault.

14             THE WITNESS:  Right.

15             THE COURT:  But what you're saying is she comes back

16   time and again; each time, before they hook her up to the

17   machine, they take another blood draw, and it would show the

18   bicarbonate level.

19             THE WITNESS:  Correct.

20             THE COURT:  And in fact, they've got that data.

21             THE WITNESS:  They do have that data.

22             THE COURT:  You say.

23             And if they were looking at it, you say, it would have

24   shown a trending upward.

25             THE WITNESS:  Correct.

Barbara Youngberg - Cross

212

 1          THE COURT:  For Mrs. Jones.

 2          THE WITNESS:  Correct.

 3          THE COURT:  And for other patients that got GranuFlo.

 4          THE WITNESS:  Well, it would show it for all

 5   patients --

 6          THE COURT:  With or without the GranuFlo.

 7          THE WITNESS:  Can't distinguish who that is.

 8          THE COURT:  You're saying they didn't even pay

 9   attention to the trend of bicarbonate patients generally.

10          THE WITNESS:  Correct.

11          THE COURT:  Okay.  But we're here about this GranuFlo

12   problem.

13          Are you trying to relate your opinion to GranuFlo?

14          THE WITNESS:  Well, again, I don't think the data

15   really tells the story unless you know what the product was

16   that the patient was receiving.  That might have impacted that

17   bicarbonate to go up.  So having the bicarbonate level is

18   important, but it's only part of the puzzle.  The rest of it is

19   was that patient getting GranuFlo or not.

20          THE COURT:  Okay.  So let me put it my way.

21          If they'd have been paying attention, they would have

22   seen that the bicarb level of their patients was going up.

23          THE WITNESS:  Uh-huh.

24          THE COURT:  Then I take it you're saying they should

25   have then figured out which of the patients were going up and

Barbara Youngberg - Cross

1   was it related to a particular acetate.

2         THE WITNESS:  Right.

3         THE COURT:  And you're saying if they had done that,

4   they would have found out there's a problem with GranuFlo.

5         THE WITNESS:  They might have found out.  I mean,

6   that's the way you find out if there's problem, by comparing a

7   group that's getting it and a group that's not getting it.

8         THE COURT:  So maybe that gets really to the

9   nut-cutting of what your expertise and your opinions are.  Your

10   opinion is that as a quality-control outfit, they had a duty to

11   keep, not only keep track of the numbers, but to interpret the

12   numbers.

13         THE WITNESS:  Of course.

14         THE COURT:  And if they'd have done that, they would

15   have seen there's a problem.

16         And then you leave it to somebody else to decide if

17   the problem was related to GranuFlo or not.

18         THE WITNESS:  Correct.

19         THE COURT:  That's not your -- that's the nephrologist

20   or somebody, not you.

21         THE WITNESS:  Well, I think the nephrologist would

22   say, at what point does it become a problem.  The quality

23   person in me would say you have to know what are the possible

24   contributors to that problem.

25         So a defect in a system that is looking at patient

Barbara Youngberg - Cross                    214

1    quality is that they're not capturing all the elements that

2    they need to understand the real cause of the problem.

3                THE COURT:  So really the root of your whole opinion

4    is they didn't have a proper quality control because's if they

5    had, they would have noticed this alarming trend.

6                THE WITNESS:  Correct.

7                THE COURT:  And then your second opinion is, if they

8    noticed it, then they should have done something about it, but

9    they didn't have what you call an accountability system which

10   is a fancy way of saying they didn't have any policy to do

11   anything about it.

12               THE WITNESS:  They didn't have consequences.  They had

13   policies, but they didn't have any consequences if you didn't

14   adhere to the policies.

15               THE COURT:  All right.  Is that what your opinions

16   are?

17               Do you have any other opinions, or are those your

18   opinions?

19               THE WITNESS:  Well, I mean I think relative to -- I

20   don't want to introduce any new concepts, but I think relative

21   to the current, present-day standard of care, they look for

22   what people look for.  They look for education of staff, what

23   people use to create data.  Transparency which we've already

24   discussed, the sharing of information for the purpose of

25   learning and understanding, and then this form is

Barbara Youngberg - Cross                    215

1   accountability so that everyone knows what are the specific

2   guidelines that they need to follow.

3             THE COURT:  Right.  But for your opinion to really

4   have any importance to this case, it has to relate to something

5   having to do with bicarb levels.  And adverse consequences.

6             THE WITNESS:  Right.

7             THE COURT:  Right?

8             I imagine that Ms. Ruggiero can find a policy

9   somewhere in the books that deals with practically everything

10  you're talking about.  But what we're here is about this trend

11  of bicarbonate --

12            THE WITNESS:  There's no policy for trending bicarb

13  levels, and there was no quality work group to look at rising

14  bicarb levels.  According to the VP of quality.

15            THE COURT:  You're saying there should have been

16  because it should be known to people in that business that

17  rising bicarbonate levels are bad, or are you saying that's up

18  to the nephrologist to tell us.  But assuming the nephrologist

19  says that's a bad thing, then they should have been paying

20  attention to it.

21            THE WITNESS:  Right.

22            THE COURT:  And then when they came across the bad

23  data, they should have done something about it.

24            THE WITNESS:  Correct.

25            THE COURT:  That's kind of where you fit into this

Barbara Youngberg - Cross

 1    case.

 2              THE WITNESS:  Uh-huh.

 3              THE COURT:  Okay.

 4         That's what I think she's trying to say.  That's what

 5    I'm getting, anyway.

 6              MS. RUGGIERO:  Understood.

 7              THE COURT:  Do you think she's trying to say something

 8    different than that?

 9              MS. RUGGIERO:  Nope, I'm sure that's what she's trying

10    to say.

11              THE COURT:  So your point, really, at bottom, is,

12    what, that they were looking and trending these bicarbonate

13    levels?

14              MS. RUGGIERO:  Miss Youngberg premises her opinions on

15    what DaVita should or shouldn't have done and how it should

16    have executed its quality-improvement programs by assuming many

17    things that are untrue.  Number one, that there was some spike

18    in the data at DaVita, that bicarb levels were indeed

19    increasing to some dangerous levels.

20              THE COURT:  Well, obviously the plaintiff has to prove

21    that with something.  I think she's just assuming that.

22              MS. RUGGIERO:  Right.

23              THE COURT:  She's not a nephrologist.  For all she

24    knows, increase in bicarbonate level might sound pretty good.

25              MS. RUGGIERO:  She's also assuming that there was a

Barbara Youngberg - Cross

1    reason in the nephrology community prerecall that would have

2    alerted DaVita to the fact that this is something that they

3    should have been looking at.  She's saying that --

4            THE COURT:  But -- yes, but that again is going to be

5    your nephrologist.  The nephrologist is going to be the one

6    that will say, look, high bicarbonate levels are bad.  Not for

7    everybody, but for a lot of people, they're bad things.  And

8    he's going to say that DaVita, who is the ultimate expert in

9    the United States, maybe the world, on dialysis, of all people,

10   should know this.  And he's going to say, that it's very

11   important for DaVita to know that these levels are steady or

12   increasing because it's bad for patients.  That I assume is

13   what the expert's going to say, and then this expert's going to

14   say, well, you know, that's news to me, I didn't know all of

15   that was important.  But apparently it is, and assuming that it

16   is, these people didn't do it.  And that's a violation of the

17   quality-control standard of care.

18           MS. RUGGIERO:  And there are policies and procedures

19   in place that I would have gotten to that indicate that DaVita

20   tracks lab data for all values, including bicarb, and there are

21   procedures in place for tracking what they call outlier data,

22   so if data is seen that -- in a range that is unusual or

23   troublesome, those values will be looked at more deeply.

24           THE COURT:  I got it.

25           So basically what you're saying is, this expert is

Barbara Youngberg - Cross

218

1    wrong because she says that they didn't have this procedure in

2    place to track bicarb levels, but they did in fact.  They not

3    only had the procedure, but they tracked them, and they watched

4    them and they took appropriate action, based on what they saw.

5             MS. RUGGIERO:  And in fact, when the document is

6    referred to that shows that DaVita did look at what the values

7    were in 2009, 2010, 2011, and 2012, the values were well within

8    the desirable range of what bicarb values should be, 23, 24.

9             THE COURT:  So there's a fact dispute here, obviously.

10   That's why we have a lawsuit.

11            MS. RUGGIERO:  So I'll just see what else I have to

12   cover so we can move on.

13   BY MS. RUGGIERO:

14   Q    Based on the testimony you just gave, are you suggesting

15   that DaVita does not have in place, when you said there was no

16   system in place that if a problem is found, that it's looked

17   at, reviewed, plan of action is put in place, it's looked at

18   again to see if that problem has been resolved; is that your

19   testimony?

20   A    That's not my testimony.  I didn't testify either way to

21   that.

22   Q    You've never served as an expert in a case involving

23   nephrology or dialysis before, have you?

24   A    No, I have not.

25   Q    And at your deposition, you testified that before reaching

Barbara Youngberg - Cross

1   your opinion regarding DaVita's quality-improvement programs,

2   that you did not review any publicly available articles about

3   any commendations and awards that DaVita had received in the

4   area of quality improvement and patient safety; isn't that

5   right?

6   A   I did not review them.

7             MS. RUGGIERO:  I have no further questions.

8             THE COURT:  Redirect.

9             MR. WOJTANOWICZ:  Yes, thank you, Your Honor.

10                     **REDIRECT EXAMINATION**

11  BY MR. WOJTANOWICZ:

12  Q   Ms. Youngberg, you were looking earlier at Joint Exhibit

13  no. 4.

14            And just if the Court would like to follow along, but

15  it's a brief passage that I would read to you on the third page

16  there.  There's a quote from Goethe saying, Knowing is not

17  enough.  We must apply.  Willing is not enough.  We must do.

18            From your perspective as a professional in the

19  patient-safety and risk-management profession, you agree with

20  that concept that's imposed in this DaVita training material?

21  A   I think that is the essence of a good quality program.

22  Q   So having reviewed with my counterpart all of these

23  policies and blank meeting minutes that were not completed,

24  that didn't demonstrate what was actually on them, do any of

25  those policies or having reviewed those, does that change your

Barbara Youngberg - Redirect

1   opinions about whether DaVita's patient-safety and

2   risk-management programs met the standard of care for a

3   health-care organization?

4   A    It does not change my opinion.

5   Q    Now, you testified about kind of what makes a robust

6   quality-improvement program.  In reviewing these documents, did

7   you get a sense, and in particular some of the meeting minutes

8   that Ms. Ruggiero reviewed with you, did you develop an

9   understanding of whether these reviews were done at a

10  clinic-by-clinic basis or at a whole sort of DaVita-wide basis?

11  A    I got the sense that they were done clinic by clinic.

12  Again, because of my review of Miss Goykhman's -- I'm sorry, I

13  always forget her name -- deposition, she said that DaVita did

14  not share information from clinic to clinic because that would

15  be a HIPAA violation, so I surmised that to be that that was

16  information shared at the local level or the individual clinic.

17  Q    So do you have an opinion whether robust

18  quality-improvement program for a company like DaVita, should

19  that be done on a clinic-by-clinic basis or company-wide?

20  A    The real value is to do it company-wide, because even there

21  they have a larger number of data points to look at.

22         MR. WOJTANOWICZ:  I have no further -- oh, I do have

23  one further question, I'm sorry.

24  BY MR. WOJTANOWICZ:

25  Q    When His Honor was questioning you earlier, he was asking

Barbara Youngberg - Redirect                      221

1    you about your opinions; and you, you gave him a couple that he

2    wrote down.  But you do have one other opinion that you left

3    out, don't you, that stated, regarding look-back procedures, I

4    wanted to clarify that that is still your opinion.

5    A    Yes, it is my opinion.

6    Q    Okay.  Thank you.

7              MR. WOJTANOWICZ:  Nothing further, Your Honor.

8              THE COURT:  All right.  Thank you for putting up with

9    all of this, including my own questions.

10             THE WITNESS:  No, thank you.

11             THE COURT:  All right.  Now, are you going to call

12   your other witness?

13             MR. PAYNTER:  That's correct, Your Honor.  At this

14   point we call Dr. Borkan.

15             THE COURTROOM DEPUTY:  I do want to ask you guys to

16   put cellphones under the table.  You hear the feedback.  It's

17   usually from the cellphones.

18             Thank you.

19             (**STEVEN BORKAN, PLAINTIFFS' WITNESS, SWORN**)

20                       **DIRECT EXAMINATION**

21   BY MR. PAYNTER:

22   Q    Good morning.  Sorry, good afternoon, Dr. Borkan.

23   A    Good afternoon.

24             MR. PAYNTER:  And, Your Honor, unless the Court wants

25   me to delve into his qualifications in detail, I'm going to,

Steven Borkan - Direct

1    because they're already in the record, I'm going to try to save

2    some time and just skip most of that.

3             THE COURT:  Well, he's a qualified nephrologist, I

4    assume.

5             MR. PAYNTER:  Yes.

6             MR. HOPKINS:  Your Honor, I don't mean to interrupt.

7    I apologize.  We were going to ask if the Court wanted to

8    perhaps view as just sort of a reference point or a grounding

9    the short video that we had submitted to the Court previously

10   about dialysis in terms of the system of it.  I didn't know if

11   that was useful to see prior to the testimony of a

12   nephrologist.

13            THE COURT:  I looked at it.

14            MR. HOPKINS:  You looked at it already, okay.

15            THE COURT:  Yeah, I thought it was interesting.  I

16   learned from it.  Thank you.

17            MR. HOPKINS:  Just wanted to give an opportunity.

18            THE COURT:  I didn't have any idea before I looked at

19   that how this worked, really.

20            MR. HOPKINS:  Understood, Your Honor.

21            Sorry.

22            MR. PAYNTER:  No problem.

23   BY MR. PAYNTER:

24   Q    Dr. Borkan, you are currently an attending physician at

25   Boston Medical Center, correct?

Steven Borkan - Direct

223

1   A    That's correct.

2   Q    And you are an associate professor of medicine at Boston

3   University?

4   A    Yes, I am.

5   Q    And do you have any clinical experience with dialysis?

6   A    Yes, I do.  Since I have become board-eligible in

7   nephrology, after becoming board-eligible in internal medicine,

8   I've practiced with approximately 11 or 12 outpatient dialysis

9   units and have privileges at those units, and have continued to

10  practice extensively in the inpatient unit and to cover the

11  outpatient unit with end-stage renal disease patients with

12  hemodialysis.  And I've been doing this since 1986.

13  Q    And do you have privileges at any DaVita clinic?

14  A    Yes, I do.  The DaVita Boston clinic.

15  Q    And how long have you had privileges at that clinic?

16  A    I believe since DaVita first took over the clinic, which

17  would be in the early 1990s.

18  Q    And in your capacity as a treating nephrologist at that

19  clinic, were you ever provided by DaVita with Fresenius'

20  November 4, 2011 memo that has been admitted as Joint

21  Exhibit 2?

22  A    No, sir, I was not.

23  Q    And in your capacity as a treating nephrologist at the

24  Boston DaVita clinic, were you ever informed by DaVita of the

25  March 2012 FDA recall?

Steven Borkan - Direct                                     224

1    A    No, I was not.

2    Q    As a treating nephrologist at the Boston DaVita clinic,

3    were you ever provided with any information by DaVita about the

4    acetate content of GranuFlo?

5    A    No, I was not.

6    Q    And finally, as a treating nephrologist at the Boston

7    DaVita clinic, were you ever provided any information about the

8    use of GranuFlo in your patients?

9    A    No, I was not informed of the use of GranuFlo.

10   Q    And just so the record's clear, what has been previously

11   admitted as Defense Exhibit D represents the list of materials

12   that you reviewed in creating your original report, correct?

13   A    Yes, that's correct.

14   Q    And together with the documents cited in that report and

15   the documents cited in your reply, that represent the complete

16   universe of documents that you reviewed prior to submitting

17   your report, correct?

18   A    That's correct.

19   Q    And previously admitted Plaintiffs' Exhibit 35 is a list of

20   the additional medical literature that you have reviewed

21   following your reply declaration, correct?

22   A    That is correct.

23   Q    And did your review of the literature listed in exhibit,

24   Plaintiffs' Exhibit 35, cause you to alter any of the

25   conclusions in your original or reply declarations?

Steven Borkan - Direct

225

 1    A    No, nothing in the supplemental information or articles

 2    cited caused me to change my opinion.

 3    Q    Did this additional literature cited in Plaintiffs'

 4    Exhibit 35 support the medical opinions contained in your

 5    original and reply declarations?

 6    A    Yes, it did.

 7              THE COURT:  Is 35 the original list or the updated

 8    list?

 9              MR. PAYNTER:  Yes.  35 is the updated list.  It's the

10    additional -- I shouldn't say updated, 'cause it doesn't

11    include the original materials --

12              THE COURT:  So why does Exhibit D say "updated list of

13    materials reviewed by Dr. Steven Borkan in addition to those

14    cited in his report"?

15              MR. PAYNTER:  This is Defense Exhibit D.

16              THE COURT:  Yes, that's what you referred to, Exhibit

17    D.

18              MR. PAYNTER:  I think, yes, so I think this is an

19    older supplement.  This is not the, as Mr. Valentine has

20    explained to me, that's the reason it says "updated."  But the

21    most recent list of the materials that he reviewed after his

22    reply declaration is Plaintiffs' Exhibit 35.

23              THE COURT:  Okay.  So the original list of what he

24    reviewed was what?  Where do we find that?

25              MR. PAYNTER:  That would have been, I believe, simply

Steven Borkan - Direct

226

 1    the materials that were cited in his declaration and then we

 2    provided an updated list of materials that he reviewed but did

 3    not actually cite.

 4              THE COURT:  So it's the 35 list that is the one that's

 5    in controversy here.

 6              MR. PAYNTER:  That is correct.  And that is the one

 7    that, you know, assuming their updated list is excluded, we

 8    would of course voluntarily withdraw that as well.

 9              THE COURT:  And that's the one that you gave the

10    defendants only a week ago.

11              MR. PAYNTER:  That is correct.  And again, we, we

12    weren't intending to use it.  What we intended was that neither

13    side would refer to new materials that weren't part of the

14    class-certification record.

15              MR. HOPKINS:  Your Honor, could I clear up a

16    misunderstanding, that I think is just becoming evident?

17              We provided an updated list for Dr. Goldfarb last

18    Friday.  They made a motion about it.  We opposed.  We argued

19    it this morning.  They then provided to us, I guess yesterday,

20    a further supplemental list for Dr. Borkan.  That's the list

21    that Mr. Paynter is referring to as Exhibit 35.

22              THE COURT:  Oh.

23              So you're both guilty of updating at the last minute.

24              MR. HOPKINS:  I don't find myself guilty, but I would

25    think getting it yesterday is more guilty.

Steven Borkan - Direct

1    MR. PAYNTER:  We don't think it's proper at all, but I

2  guess our point is if they're permitted to do it, then we also

3  should be permitted to do it.

4    THE COURT:  What's the list of --

5    MR. PAYNTER:  For Dr. Borkan, it's additional medical

6  literature.  For Dr. Goldfarb, it also includes DaVita

7  documents, medical records.

8    THE COURT:  So you don't think yours is proper or

9  theirs?

10    MR. PAYNTER:  We think they should both be excluded.

11  It was just too soon before the hearing.

12    THE COURT:  And that's Exhibit 35 on your side.

13    MR. PAYNTER:  Correct.

14    THE COURT:  And it's your exhibit, Plaintiffs' Exhibit

15  35.

16    MR. PAYNTER:  Correct.

17    THE COURT:  But having marked as plaintiffs' exhibit,

18  you don't want anybody to look at it.

19    MR. PAYNTER:  My understanding is that Your Honor has

20  rejected the motion in *limine* to exclude their additional

21  evidence, so that being the case, we do --

22    THE COURT:  But it's all a tempest in a teapot, right,

23  because he said it didn't make any difference to him.

24    MR. PAYNTER:  For our doctor, I think that's correct.

25  I don't know what Dr. Goldfarb is going to say.

Steven Borkan - Direct                          228

 1                MR. HOPKINS:   It's in our brief.

 2                THE COURT:   I'm thirsting to know something about

 3     nephrology here.   I'm so tired of this debate between the

 4     lawyers about when they produced the documents and all that.   I

 5     want to know about the substance.

 6                Do you have anything to say about that?

 7                THE WITNESS:   Yes, sir, I do.   I'm delighted that

 8     you're such a curious individual, and I hope that I can clarify

 9     this confusing situation.

10                THE COURT:   Okay.   Well, I hope you can, too.

11                MR. PAYNTER:   And, Your Honor, I would like to now

12     move into the discussion of the dialysis procedure.

13                THE COURT:   I think so.

14     BY MR. PAYNTER:

15     Q   Dr. Borkan, you are aware that the parties stipulated to

16     show a short video, to present to the Court a short video on

17     the dialysis procedure?

18     A   Yes, I am.

19     Q   And you have viewed that video, correct?

20     A   Yes, I have.

21     Q   And the video, in your opinion, is accurate, correct?

22     A   Yes, the video is accurate.

23     Q   And how often is the hemodialysis outlined in the video

24     typically performed?

25     A   Usually three times per week, either on a Monday,

Steven Borkan - Direct                                      229

1    Wednesday, Friday schedule, or Tuesday, Thursday, Saturday.

2    Q    And does hemodialysis completely replace kidney function?

3    A    No, it does not.  Even effectively dialysis only reproduces

4    about 10 to 15 percent of the kidney function.

5    Q    And do you recall in the video, there was a description of

6    the diffusion of waste products and electrolytes out of the

7    blood and into the dialysate?

8    A    Yes, I am aware of that direction of diffusion.

9    Q    And can electrolytes also diffuse into the blood from the

10   dialysate?

11   A    Absolutely.

12   Q    And specifically focusing on the electrolytes of

13   bicarbonate, potassium, and calcium, would those diffuse into

14   the blood in a dialysis patient?

15   A    The potential to diffuse in or out of the patient's

16   bloodstream depends completely on which compartment the

17   concentration is higher.  If the concentration is higher in the

18   dialysate, the diffusion will go downhill into the patient's

19   bloodstream.

20        In contrast, if the concentration is higher for a

21   substance in the patient's bloodstream, in your example, toxic

22   wastes, then the diffuse would go downstream in the other

23   direction from the patient's blood into the dialysate where it

24   would be removed and disposed of.

25   Q    Focusing specifically on bicarbonate, in the typical

Steven Borkan - Direct

230

1  dialysis patient, does bicarbonate diffuse into the blood?

2  A    Yes.   In the typical patient, the concentration of

3  bicarbonate is far higher than the patient's bloodstream.

4  Therefore, the concentration gradient would go downhill into

5  the patient.

6  Q    And can you describe for the Court in general terms what

7  the role of the bicarbonate component in the dialysate?

8  A    Yes, I can.   The bicarbonate is intended to provide a

9  buffer against very wide swings in pH.   Which represents the

10  numeric equivalent of the concentration of acid.   So the small

11  addition of acid to this cup of water, even one drop, would

12  dramatically lower the pH to a very, very dangerous level.

13        And I've actually done this experiment in my lab with

14  one drop of acid in a cup of water.   And the pH fell from

15  seven, which is the pH of normal water, to two, which would

16  cause immediate death in a human being, who can't survive at a

17  pH of two.

18        In contrast, if I added buffer, bicarbonate, to this

19  cup of water and added the same drop of acid, the pH would

20  barely change.   So the purpose of adding bicarbonate to the

21  patient's bloodstream is to prevent wide swings in pH that

22  would otherwise occur without the buffer being present.

23  Q    And can you maybe explain to the Court how the buffer

24  removed some of the --

25        THE COURT:   How does the drop of acid get into the

Steven Borkan - Direct                                          231

 1   water in the first place?

 2          THE WITNESS:  That's an excellent question.  It's an

 3   analogy.  Acid is added to the body through physical activity,

 4   movement, and through the ingestion of dietary protein in the

 5   form of fish, poultry, meat, and dairy products.  The human

 6   body breaks down these substances in the diet to acid.  The

 7   acid, if left unabated, would cause very severe acidosis which

 8   would be fatal.

 9          In patients with normal kidneys, that acid is excreted

10   every day in the exact same amount as the human being ingests.

11          In end-stage kidney failure, the patients are

12   completely dependent upon the addition of buffer into their

13   body by the dialysis procedure --

14          THE COURT:  Because the kidneys aren't able to do it

15   anymore.

16          THE WITNESS:  Touché.

17          THE COURT:  So you eat -- I'll go home tonight for

18   dinner, let's say, and have a nice piece of salmon.  Actually,

19   we had it last night.  I'll probably have something else

20   tonight.

21          THE WITNESS:  I hope you have leftovers, Your Honor;

22   I'll be there.

23          THE COURT:  And you say that as I'm eating that

24   salmon, acid is going into my body.

25          THE WITNESS:  That's absolutely correct.  As your body

Steven Borkan - Direct                                  232

1    is breaking down the salmon, you are generating acid as a

2    consequence.  So the presence of buffer inside the human body

3    prevents the untoward effects of the acid buildup.

4          THE COURT:  And that buffer in the human body is in

5    the kidneys.

6          THE WITNESS:  No, sir.  It's generated partly by the

7    kidneys.

8          THE COURT:  Oh, I see.

9          THE WITNESS:  And the kidneys eliminate acid which is

10   the biochemical equivalent of generating bicarb.

11         During dialysis, the process is more direct, when that

12   addition of bicarb consumes the acid that has built up from the

13   salmon and the meat and the poultry.

14         THE COURT:  Ah.  So the normal person just eliminates

15   it, but if their kidneys are not working right, then you need

16   that bicarb to in effect destroy it.

17         THE WITNESS:  That's absolutely correct.  You need

18   that bicarb to destroy the buildup of acid which occurs

19   naturally as a result of physical activity which generates acid

20   and the ingestion of food.

21         THE COURT:  So it sounds like the more bicarb you've

22   got, the better off you are; but somebody is saying, that isn't

23   correct.

24         THE WITNESS:  Up to a certain point, sir, that is

25   correct.

Steven Borkan - Direct

233

1      That is that the level of target bicarbonate is known

2  to be about 20 to 22, which is slightly lower than the

3  24 milliequivalents per liter that you and I would have.

4      So that --

5      THE COURT:  Oh, the kidneys are at 24?

6      THE WITNESS:  24 is where our maker has set the ideal

7  level of buffer.

8      THE COURT:  It's 24 something, but I don't need to

9  know what the something is; it's just to say units.

10     THE WITNESS:  Units.  It's fair to say that units of

11  milliequivalents per liter, but units are fine.

12     THE COURT:  And dialysis aims to get it up to 22,

13  which is pretty close.

14     THE WITNESS:  It's not completely correct what you

15  said.  Dialysis has to overshoot that 20 to 22 in order to

16  guarantee that over the next few days, when the patient is

17  physically active, is continuing to eat, that as they lowered

18  their bicarbonate, due to the generation of acid, that when

19  they come back for the next session, they will still be around

20  20 to 22.

21     THE COURT:  Ah.

22     THE WITNESS:  The ideal target before dialysis.

23     The price of trying to achieve that 20 to 22 is that

24  during dialysis, bicarbonate has to go above the target so that

25  it can then swing downward.  And that process of bicarbonate

Steven Borkan - Direct

234

1   going up and down between dialysis is like a roller coaster.

2          MR. PAYNTER:  If we can see the next slide, which I

3   think will illustrate this for the Court.

4   BY MR. PAYNTER:

5   Q   Dr. Borkan, can you explain what this slide illustrates?

6   A   Yes.  This slide shows here the serum bicarbonate level, as

7   His Honor said, in units.  And you can see that if there were

8   an infinite number of bicarbonate measurements, before and

9   after dialysis, bicarbonate levels would come up to a peak, top

10  of the roller coaster, and then begin to fall between the two

11  to three days of dialysis; and then when dialysis starts, it

12  would come up the roller coaster again.

13          The difference between the bicarbonate levels is the

14  period of time when the patients are physically active, eating

15  and drinking.

16          In this particular example, 40 milliequivalents of

17  bicarbonate in dialysate is prescribed, the patient presents,

18  in this example with 24, and could go in theory as high as 40,

19  if there was 40 milliequivalents of bicarbonate in the

20  dialysate.

21          THE COURT:  I thought you said the 24 is what we all

22  were given when they were born.

23          THE WITNESS:  Yes, I did.  The example could have 20

24  or 22.  Instead of 24.  Either would be adequate.

25          THE COURT:  I guess if a person had the 24, they

Steven Borkan - Direct

1    wouldn't be needing dialysis, right?

2            THE WITNESS:  That's not completely true.

3            THE COURT:  Oh.

4            THE WITNESS:  In other words, there's many factors

5    that determine what the predialysis bicarbonate is.  But what

6    really determines the peak level of bicarbonate is the dialysis

7    procedure itself.

8            THE COURT:  So in this example, at the peak, they're

9    up to 40.

10           THE WITNESS:  In this example of the peak, that's

11   exactly correct.  They could be as high as 40.

12           THE COURT:  And so would you prescribe 40?

13           THE WITNESS:  I personally have never prescribed 40.

14   I've only prescribed up to 35 milliequivalents per liter

15   because one of the consequences of trying to keep patients no

16   lower than 20 to 22 is that they spike upward.

17           So if patients have low serum bicarbonates

18   predialysis, that could be a potential problem because of acid

19   buildup.

20           But if I overprescribe or deliver excess bicarbonate,

21   then during the procedure or thereafter, within the few hours

22   when dialysis is complete, there could be an untoward spike of

23   bicarbonate that causes the pH to go to the opposite extreme.

24   So instead of having acidosis, the patients have alkalosis.

25   Instead of having a low bicarb, they have a high bicarb.

Steven Borkan - Direct                                        236

1    Either extreme is known to have consequences.

2              THE COURT:  So your job as a nephrologist is to try to

3    figure out for this particular patient what level to prescribe

4    that will be just right.

5              THE WITNESS:  That's beautifully said, and I refer to

6    that as the Goldilocks effect, that you don't want your

7    porridge to be too hot or too cold, you want it to be just

8    right.  And you also threw in that the prescription should be

9    individualized to the patient, depending upon their level of

10   physical activity, how much residual kidney function they have,

11   and what they have in their diet.

12             THE COURT:  So you might prescribe 25 for one person

13   and 30 for the next person and 35 for the next one?

14             THE WITNESS:  The typical prescription that I write

15   varies between 30 and 35.  The absolute maximum that can be

16   delivered is 40.  I have never ordered 40 milliequivalents per

17   liter knowingly.  And the minimum --

18             THE COURT:  That's the maximum according to whom?

19             THE WITNESS:  That's a very good question.

20   Biochemical limits determine how much bicarbonate can be mixed

21   into the solution without accidentally precipitating calcium

22   carbonate.  So if I exceed a prescription of 40 by adding

23   straight bicarbonate, I can actually accidentally precipitate

24   other substances out of the dialysate, making the delivery of

25   substance very inaccurate.  So 40 is a technical limit.

Steven Borkan - Direct

237

1    And if I ask my dialysis nurses or technicians, what's

2    the lowest number they can achieve, it would probably be a

3    20 milliequivalents per liter, but the typical prescription is

4    30 to 40.  And in the United States, the average is around

5    37 milliequivalents per liter.

6    THE COURT:  All right.  And just to clear up one other

7    thing that's been hanging out there all day.  I take it from

8    what they've been telling me, that you, the nephrologist, don't

9    tell DaVita or any other clinic how to do it.  You just tell

10   them, this is what I want.  I want 35, but you don't tell them

11   what brand of dialysate they're supposed to use.

12   THE WITNESS:  No, sir, I do not.

13   THE COURT:  You don't even know what they use.

14   THE WITNESS:  I do not.  And I do not prescribe, nor

15   does any other nephrologist I know, prescribe acetate in the

16   dialysate prescription.

17   THE COURT:  What's acetate?

18   THE WITNESS:  Acetate is one of the key components --

19   THE COURT:  That's the GranuFlo.

20   THE WITNESS:  -- of GranuFlo.

21   So the way to get around the limitation of bicarbonate

22   is to begin to add acetate to the solution.  And a typical

23   solution, such as NaturaLyte, another brand name, would contain

24   4 milliequivalent of acetate.  The GranuFlo, in contrast,

25   contains 8 milliequivalents of acetate.  And when you ask why

Steven Borkan - Direct

238

1  would anyone add acetate, it would be to enhance the delivery

2  of bicarbonate without directly exceeding the 40

3  milliequivalent maximum.

4          So the acetate doesn't cause precipitation of anything

5  in the dialysis solution.  So they can give acetate, it

6  diffuses downward into the patient, because the patient has

7  very, very low acetate levels, the GranuFlo has much, much

8  higher acetate levels.

9          THE COURT:  Is acetate the same as acid?

10          THE WITNESS:  No, it can be converted to acid.  It's

11  the salt of the acid.  It's related to acetic acid.  So some of

12  the component of acetate can be converted to acid, and some can

13  be converted to bicarbonate.

14          THE COURT:  But your whole point in the dialysis is to

15  help eliminate the acid, so you're putting acetate in there to

16  eliminate acid.  It doesn't seem logical.

17          THE WITNESS:  It doesn't seem logical until we

18  appreciate that the acetate is very efficiently converted in

19  the patient's liver to bicarbonate.

20          THE COURT:  Oh.

21          THE WITNESS:  So it actually enhances the delivery of

22  bicarbonate above the prescription that I would provide.

23          THE COURT:  So if you know, for example, that the

24  acetate is 8, then you're going to probably prescribe a lower

25  bicarbonate so that it will balance?

Steven Borkan - Direct

1    THE WITNESS:  I might do that, sir, particularly since
2    all patients are not created equal in the sense that some
3    present with higher bicarbonates.  So if I apply GranuFlo to an
4    entire population, what I'm basically doing is if you look at
5    the population as heights, if we were to measure all the
6    heights in this room, the heights would be from the shortest
7    person in the room to the tallest, and it would be a
8    bell-shaped curve.

9        That bell-shaped curve exactly represents the
10   predialysis serum bicarbonates.  Some folks are very short.
11   They have very low bicarbonates and are dangerously acidotic
12   when they present to the dialysis unit.  Other patients are
13   dead center in the middle.  They're the average height, they
14   have the average target bicarbonate.  Other patients go to the
15   other extreme.  They're very tall.  They have high
16   bicarbonates.  Higher than 24.  When they first come to the
17   dialysis unit.

18       It's the ones that are very tall that I worry about.
19   Because if I add high bicarbonate to their body, their serum
20   bicarbonates can spike to dangerous levels.  And that's exactly
21   what Fresenius noted is that when they applied GranuFlo to an
22   entire population, they shifted the bicarbonate average to a
23   higher level, which is exactly what they intended.  But in
24   doing that, the price they paid is that they made alkalotic
25   patients with high bicarbs even higher.  That is potentially

Steven Borkan - Direct

240

1    dangerous because of the known consequences of acute, severe

2    metabolic alkalosis.

3          And if you look at dialysis and you compare it to

4    every other maneuver on God's earth, I can't think of a single

5    clinical situation that can more dramatically change the

6    patient's pH and change their bicarb than dialysis.  It would

7    win in terms of the rate of change of bicarbonate and the

8    magnitude of the change.  And that's what makes dialysis so

9    touchy for the patients and why it's so critical when a new

10   medical device is introduced, to study its impact on the entire

11   population, not simply the population that are short, with the

12   low bicarbonate values.

13         For them this product could be helpful.  But it could

14   be dangerous to people at the other extreme.

15         THE COURT:  So now that you know all of that, why is

16   it that you don't pay close attention to whether your patient

17   is going to get GranuFlo?

18         THE WITNESS:  That's exactly why I'm here, Your Honor.

19   Because I'm very concerned about the lack of communication

20   within my dialysis unit, which is a DaVita unit, that I didn't

21   know that there was acetate in the dialysate.  I didn't know

22   that my patients were switched to GranuFlo.  I couldn't explain

23   to my patients who got sick, whose serum bicarbonates exceeded

24   my prescription, how that would be possible.  And some of them

25   had untoward effects as a result.  And as a doctor, I felt

Steven Borkan - Direct                    241

1   completely in the dark about the association between exposure

2   to GranuFlo, high bicarbonates, low potassiums, falling ionized

3   calcium, and the other untoward effects on the heart.

4           THE COURT:  So you just said you didn't know that

5   there was acetate in the dialysate?

6           THE WITNESS:  That's correct, sir.  Not until I became

7   involved in this particular process did I truly understand that

8   acetate is part of the dialysis process.  And that GranuFlo has

9   more acetate than the standard solutions that my patients had

10  been exposed to for years.

11          THE COURT:  Well, now you know.

12          THE WITNESS:  Yes, sir, I do.

13          THE COURT:  So what have you done about it?

14          THE WITNESS:  I'm here to try to educate the Court and

15  also to make a case for why I think Fresenius observed that so

16  many of their patients, 1.1 percent of their 80,516 patients,

17  and that is 941 patients, died in the dialysis chair from

18  cardiac arrest.  After exposures to GranuFlo.

19          I think there needs to be major educational issues.

20  My colleagues need to know about this.  My own DaVita medical

21  director, when I approached him, did not have for me a data

22  analysis of the average bicarbonate in our unit.  Before,

23  during, or after GranuFlo exposure.

24          I think there's a major problem in introducing a

25  product that has potential dire consequences and I don't even

Steven Borkan - Direct                     242

 1  know as a doctor, as a nephrologist, that it's being used, and

 2  that it's being used in all my patients.  I've never received

 3  education one until I started to read, myself, as part of this

 4  process, about the exposure and the potential risks of high

 5  bicarbonate.

 6          THE COURT:  So have you told these clinics, don't use

 7  GranuFlo on my people anymore?

 8          THE WITNESS:  I wish I had that power.  But I think

 9  it's becoming more clear to me that there are patients who are

10  at the highest risk for adverse consequences, and as I read the

11  medical literature, in looking back, I would predict that the

12  patients who died in the dialysis chair, as reported by

13  Fresenius' internal investigation, would be exactly the

14  patients I'd be most worried about.

15          THE COURT:  Well, thank you for those explanations.

16  BY MR. PAYNTER:

17  Q   So, Dr. Borkan, let's look at the next slide here.  The

18  Court was asking you about the dialysis prescription.  And can

19  we see all the elements of that?

20          THE COURT:  You can make those marks go away.

21          THE COURTROOM DEPUTY:  Bottom right-hand corner.

22          THE WITNESS:  Thank you.

23  BY MR. PAYNTER:

24  Q   So, very quickly, Dr. Borkan, you were being asked whether

25  the dialysis prescription contains acetate.  Is this slide in

Steven Borkan - Direct

1    front of you a summary of a standard nephrologist prescription?

2    A    Yes, this is a standard nephrology prescription for the

3    dialysis procedure.

4    Q    And just very quickly -- we don't have tons of time --

5    could you please walk the Court through the elements here that

6    are listed as the elements of the dialysis prescription.

7    A    Yes.  The first element of the prescription is the size of

8    the artificial kidney.  In general, the larger the surface area

9    of the kidney, the more rapid the diffusion of substances

10   between the body and the dialysate or in the opposite

11   direction.

12         The duration of the procedure itself is specified in

13   hours, typically three to four.

14         The blood flow rate is the rate at which the patient's

15   blood flows through the dialysis machine and is measured in

16   milliliters per minute.  The faster the blood flows, the more

17   rapid the washing of the blood, the cleaning of the blood

18   process.

19         The dialysate flow is also determined by a pump.  And

20   the dialysate flow rate also is ordered in milliliters per

21   minute.  In general, the faster the dialysate flow rate, the

22   more rapid substances are added or removed from the body.

23         Next, the nephrologist would target how much salt

24   water to be removed from the patient.  That's because patients

25   eat and drink between dialysis sessions, and gain weight.  The

Steven Borkan - Direct

1    nephrologist's goal is to remove enough fluid to return the

2    patient to their ideal body weight by the end of the procedure.

3              Finally, the dialysis prescription includes the

4    electrolyte composition of the dialysate, particularly

5    potassium, which is abbreviated K; calcium, abbreviated CA;

6    sodium, NA; and finally bicarbonate, $HCO_3$.  Of note, there is

7    no acetate.

8    Q   And these substances in the dialysate, the electrolytes, is

9    it the standard of care to test these predialysis?

10   A   Yes, it is the standard of care to test at least once a

11   month.  Usually on the same day or date each month, to provide

12   consistency.  Electrolytes are generally checked more often, if

13   there's a problem.

14   Q   And focusing on bicarbonate.  Do monthly predialysis

15   bicarbonate serum levels accurately reflect postdialysis

16   bicarbonate levels?  In other words, the levels that would

17   exist during or immediately after dialysis?

18   A   No, they would not.  Predialysis bicarbonate levels are one

19   of the factors that predict how high the patient's bicarb will

20   go, but the major factor that determines the peak level, surge,

21   or spike, as it's referred to, is the combination of

22   bicarbonate, and in the case of GranuFlo, the amount of acetate

23   in that solution.

24   Q   And if you look at the next slide, if we can flip to the

25   next slide.

Steven Borkan - Direct

245

1   Do you recognize this slide as summarizing what you

2   just testified that the postdialysis bicarbonate levels will

3   exceed the predialysis bicarbonate levels?

4   A   Yes, it does.  I first became aware of this article by Noh

5   *et al.* --

6   Q   So is the source of the data on the slide?

7   A   It's a article published by Noh, N-O-H, *et al.* in 2007, in

8   which 53 hemodialysis patients were studied to determine what

9   the effect was of changing the dialysate bicarbonate content on

10  pre- versus postdialysis bicarbonate levels.

11  They've looked at two parameters, pH, shown here, and

12  the arterial bicarbonate level, shown circled in green.  And

13  they studied three different dialysis bicarbonate

14  concentration, including 25 milliequivalents per liter, 30, and

15  35.

16  And what's important to notice here is that the

17  bicarbonate level predialysis, which is the standard of care,

18  rose from 21, as the bicarbonate concentration was increased,

19  actually the average in these 53 patients fell slightly; and as

20  the bicarbonate concentration was jacked up to 35, the

21  predialysis bicarbonate went up to 22.9 from 21.6.  A very

22  modest increase in predialysis bicarbonate levels.  This is

23  exactly what we would expect.

24  But if you look in contrast at the post- or after

25  dialysis, you can see that the bicarbonate levels are uniformly

Steven Borkan - Direct

246

1    and significantly higher than the predialysis levels.  What

2    this tells us is that the more bicarbonate delivered to the

3    patient, the higher the surge or spike in bicarbonate post- or

4    after dialysis.  And the effect of increasing dialysis

5    bicarbonate is far greater on the bicarbonate levels after

6    dialysis than it is on the bicarbonate levels before dialysis.

7            Importantly, Noh did not study dialysis levels of 40,

8    nor did he study bicarbonate levels of 40 plus the 8 of

9    acetate.  As a nephrologist, I would predict that if he had,

10   the levels of postdialysis bicarbonate would be even higher

11   than reported here.

12           THE COURT:  Postdialysis is how far, how long after

13   dialysis?

14           THE WITNESS:  In this study, sir, it was immediately

15   when the dialysis procedure was completed.

16   BY MR. PAYNTER:

17   Q   And so, Dr. Borkan, in a patient population you observed an

18   increase in predialysis bicarbonate levels, would that indicate

19   to you as a nephrologist that the postdialysis bicarbonate

20   levels had increased by a larger magnitude?

21   A   Yes, it would.

22   Q   Now, let's talk specifically about the, talk about the

23   acetate in the GranuFlo.  And let's just start with the basics.

24   Does the acetates in the GranuFlo diffuse across the dialysis

25   membrane into the patient's blood?

Steven Borkan - Direct

1    A    Yes, the acetate in GranuFlo would diffuse into the

2    patient's blood because the 8 milliequivalents per liter is

3    significantly higher than the exceedingly low level in the

4    patient's bloodstream.  So the concentration gradient would

5    heavily favor the rapid uptake of dialysate, of acetate from

6    the dialysate into the patient's blood.

7    Q    And this would occur in all patients, correct?

8    A    Yes, it would.

9    Q    And once --

10              THE COURT:  Can you -- do you have any explanation as

11   to why GranuFlo or Fresenius would put acetate in there?

12              THE WITNESS:  Yes, I do, sir.

13         I think there are four reasons.  And since you are a

14   person who wants to know which ones are the most important,

15   I'll cover those.

16              THE COURT:  You've been listening.

17              THE WITNESS:  I have.

18         The most important reason would be to more effectively

19   treat those patients who have severe acidosis.  Because, as I

20   mentioned, there's limits to how much bicarbonate the patient

21   can be exposed to without causing a technical problem in the

22   dialysate.

23         The acetate does an end-around this limitation of

24   bicarbonate by supplying additional bicarbonate equivalents.

25   So the acetate goes into the patient's body, gets converted to

Steven Borkan - Direct
248

1   bicarbonate, and then adds to the delivered bicarbonate in the

2   procedure.

3          THE COURT:  So for somebody that is short.

4          THE WITNESS:  Yes.

5          THE COURT:  Meaning low bicarbonate level, it makes

6   perfect sense for there to be acetate in the solution.

7          THE WITNESS:  Absolutely well said.

8          That GranuFlo would have one medical advantage for

9   patients who are refractory to bicarbonate alone.  But it could

10  be potentially dangerous to lift up the tall people.

11         THE COURT:  Right.

12         THE WITNESS:  Because they're going to be banging

13  their heads on the door.

14         THE COURT:  So suppose in your practice, now that you

15  know all this, you've got somebody who has a naturally low

16  bicarbonate level, would you be inclined to say to the clinic

17  when, when Mr. Smith comes over, I want GranuFlo for him

18  because he needs the extra acetate?

19         THE WITNESS:  Yes, sir, that would be reasonable.  As

20  long as I understand the complexities of how that acetate is

21  handled in my patients.

22         In the old days, in the 1980s, as I was becoming a

23  fellow -- which is the term used to train doctors like me in

24  nephrology -- there was a conversion from acetate-only dialysis

25  solutions to bicarbonate-only dialysis solutions.  And the

Steven Borkan - Direct

1   reason that the acetate was abandoned was because about

2   10 percent of the patients couldn't tolerate acetate.  They got

3   sick during dialysis.

4          THE COURT:  Because their bicarbonate levels got too

5   high.

6          THE WITNESS:  Because the acetate levels got too high.

7          THE COURT:  Well, it converts to bicarbonate.

8          THE WITNESS:  But it was shown that the patients who

9   got sick, from acetate alone, predominantly had too high of an

10  acetate level.

11         And those who got sick turned out not to metabolize

12  the acetate quite as rapidly as they should have.  It turns out

13  that as the dialysis population has gotten sicker and older and

14  more fragile, many comorbidities slow the rate of acetate

15  metabolism and cause it to build up in the bloodstream.  So

16  it's now somewhat more challenging now that acetate has been

17  reintroduced at a higher level than the NaturaLyte, we've gone

18  from 4 to 8 with the GranuFlo, now patients can potentially get

19  sick from the acetate and can potentially get sick from the

20  additional bicarbonate if they came to the clinic with a high

21  level.

22         THE COURT:  You say 4.  Are you saying that all of

23  these solutions, no matter who makes them, have at least 4

24  acetate?

25         THE WITNESS:  From my reading, it could be as low as

Steven Borkan - Direct                    250

```
 1   2.5.  But the range is 2.5 to 5 milliequivalents or units of

 2   citrate or acetate or other acid.

 3            THE COURT:  So no matter where you send them, whether

 4   it's to DaVita or some other clinic, no matter what dialysate

 5   that clinic happens to use, they're going to get some acetate

 6   in the solution.

 7            THE WITNESS:  Yes.  Or something like it.  Like

 8   citrate.  But at a lower level.

 9            THE COURT:  And the problem you're having with

10   GranuFlo is that it, maybe uniquely, I don't know, has 8 levels

11   of acetate and because it's got so much acetate in it, that for

12   a certain part of the population that's in dialysis, it's

13   potentially dangerous.

14            THE WITNESS:  Yes, sir, that's correct.  And the

15   company DaVita or Fresenius made the decision to convert

16   patients to GranuFlo with the specific purpose of raising the

17   average bicarbonate level in the population.  And the Fresenius

18   memo documents their success in achieving that goal.

19            THE COURT:  And I think the, the DaVita lawyer was

20   pointing out that they'd been successful in doing that.

21            THE WITNESS:  Absolutely.

22            THE COURT:  And that's a good thing.

23            THE WITNESS:  That's a good thing for the left half.

24   For the short people, that's a good thing.

25            For the tall people, it can be potentially deadly.
```

Steven Borkan - Direct

251

 1              THE COURT:  See, I always thought that there was an

 2    advantage to be tall.

 3              THE WITNESS:  Most of the time there is, sir.

 4              THE COURT:  Okay.

 5    BY MR. PAYNTER:

 6    Q   Let's transition, then, to the next slide.  So, Dr. Borkan,

 7    you're talking about the metabolization of acetate in the

 8    liver.  Focusing on a person with normal, healthy liver

 9    function, can you describe for the Court how acetate would be

10    metabolized and the rate of that metabolization in that person?

11    A   Yes.  This curve that we see on the left-hand side, the

12    serum bicarbonate level.  We see that bicarbonate level rise as

13    a result of dialysis and reach a peak.  The peak,

14    interestingly, could be as high or higher than

15    48 milliequivalents per liter.  Assuming that the nephrologist

16    has actually prescribed 8, I'm sorry, 40 milliequivalents per

17    liter of bicarbonate.

18              The difference between 40 and 48 could be the addition

19    of 8 milliequivalents of acetate.  To the patient's

20    bloodstream.

21              In theory, patients who rapidly metabolize acetate

22    would experience the peak bicarbonate level during or near the

23    end of dialysis.  That's because they have healthy livers that

24    have normal perfusion, they have normal hearts, normal blood

25    pressure, normal hematocrits, blood counts.  And they very

Steven Borkan - Direct

1    quickly convert that acetate to bicarbonate.

2    Q    And so can you explain how, in the slide here, it says that

3    the, the serum bicarbonate level would exceed 48.  Could you

4    explain how it could go above the 40 plus 8 in a patient with

5    healthy liver function?

6    A    Yes.  It's possible to exceed the nephrologist's

7    prescription of 40 because the acetate is converted to

8    bicarbonate and the bicarbonate that's generated inside the

9    patient's bloodstream, by the liver, and then released, would

10   not go out of the patient's body until the patient's bicarb

11   level actually exceeded the content in the dialysis solution.

12        So if the nephrologist has prescribed 40 and all

13   8 milliequivalents of acetate get converted to bicarbonate,

14   it's technically possible to spike the bicarb level above 40

15   and only be limited by the rate of acetate conversion to

16   bicarbonate.

17        And the reason you can spike above the level of 40 is

18   because the excess bicarbonate is not instantaneously removed

19   by the dialyzer.  It would only be removed if the bicarbonate

20   levels spiked above 40, causing the concentration gradient to

21   go from the patient's bloodstream back into the dialysis

22   solution.

23        And if the rate is very quick, for acetate to

24   bicarbonate generation, then the spike could be up to or more

25   than 8 milliequivalents per liter.

Steven Borkan - Direct
253

1      The truth is, we don't know exactly how high it could

2   spike.  But it is not true what Mr. Tyrrell said, that the

3   bicarbonate level would never exceed 40.

4   Q   And let's look at the next slide --

5          THE COURT:  Are you saying that the people who are in

6   danger of these spikes are actually the people who otherwise

7   are the healthiest?

8          THE WITNESS:  Yes, sir, it's part of the population

9   that would be at risk.  But unfortunately, some people can get

10  sick after they leave dialysis, as is shown in the next slide.

11  Because they metabolize the acetate more slowly to bicarbonate.

12  And the difference between them and healthy patients is not how

13  high they spike but when they spike.  So they can actually

14  spike after the procedure is done and they're taken off and

15  they're let to go home.  And released from the dialysis clinic.

16         THE COURT:  Are you reciting some statistics earlier

17  about 1 percent something of people die?

18         THE WITNESS:  That's what Fresenius reported when they

19  put their aggregate data together in 667 facilities.

20         THE COURT:  1 percent died during dialysis?

21         THE WITNESS:  During dialysis.

22         THE COURT:  So those must be the healthy people.

23         THE WITNESS:  Those are the ones that probably

24  metabolized the acetate most quickly.  In their analysis, which

25  I think is the tip of the iceberg, they missed strokes and they

Steven Borkan - Direct

1    missed heart attacks.  They only got patients who had

2    cardiopulmonary arrest.  And they only captured the patients

3    who died in their facility.

4            Because patients vary in their ability to metabolize

5    the acetate to bicarbonate, some patients actually experienced

6    the peak shown here in a delayed fashion after the dialysis

7    procedure is over.  So they would be at the most risk for

8    untoward events of severe alkalosis, after they leave the

9    clinic.

10   BY MR. PAYNTER:

11   Q    And so just to clarify, Dr. Borkan, those patients would

12   not have been picked up by the Fresenius study that you were

13   referring to, correct?

14   A    No, sir, they would not.

15   Q    And can you think of a circumstance where a patient

16   administered a GranuFlo would not experience the bicarbonate

17   spike we see here described in these slides, either before or

18   after dialysis?

19   A    It would be very rare for a patient not to experience a

20   spike of some sort.  What would differ is the magnitude of the

21   spike and when the spike occurred.

22   Q    And would the magnitude of this spike, would it be detected

23   with predialysis bicarbonate testing?

24   A    Absolutely not.

25   Q    And why not?

Steven Borkan - Direct

255

1    A    Predialysis bicarbonate, as shown by Noh, which fits with

2    many other clinical studies and my years of experience as a

3    nephrologist, would underestimate the peak rise in bicarbonate

4    during or after dialysis.  So I would expect that the

5    introduction of GranuFlo would cause a modest but measurable

6    increase in predialysis bicarbonate, but a potentially much

7    larger spike in bicarbonate content in the patient's

8    bloodstream during or after the procedure.

9    Q    And in your clinical practice, have you ever personally

10   observed bicarbonate levels postdialysis spike above your

11   prescription?

12   A    Yes, I have.  And I'm still troubled by those patients I've

13   seen.  One in particular had had crushing chest pain during the

14   dialysis procedure, at the DaVita clinic.

15        The nurse dialyzing the patient became concerned

16   enough that the patient's chest pain represented angina, which

17   is a term for ischemia or decreased or inadequate blood flow to

18   the heart.  She stopped the dialysis procedure, called me

19   immediately, and we agreed to transfer the patient from the

20   outpatient clinic, around the corner, to our inpatient

21   emergency department.

22        In the emergency department, the emergency room

23   doctors ordered a set of chemistries in a patient who had

24   reached almost the end of his dialysis.  And in that patient,

25   they called me and said that the bicarbonate levels was 38 or

Steven Borkan - Direct

256

1    39 milliequivalents per liter.

2         I said, I don't understand how that can happen.  I

3    prescribed 35.  How can patient's bicarbonate surge above my

4    level of prescription.

5         I was so concerned about this that I took this case to

6    my colleagues, and I presented it in a conference.  With 20

7    other nephrologists.  Some have more gray hair than me, some

8    have no hair, those are the ones that are really smart.  No one

9    could explain how my patient's bicarb could be above the level

10   of the prescription.  In retrospect, I now understand that

11   that's because of the addition of acetate.

12   Q    So let's talk a little bit about the effects of high

13   bicarbonate levels.  Are you familiar with the term "high

14   metabolic alkalosis"?

15   A    Yes I am.

16   Q    Can you give a definition as a nephrologist of what that

17   terms means to you?

18   A    Yes.  Metabolic alkalosis refers to an elevated pH above

19   the level of norm which is caused by a increase in bicarbonate.

20   Q    Is there bicarbonate level that you as a nephrologist would

21   associate with severe metabolic alkalosis?

22   A    Yes.  I believe that between the levels of 35 and 40 or

23   higher, that patients are likely to experience consequences of

24   acute severe metabolic alkalosis, but I hedge a little bit

25   because every nephrologist knows that it's not just the

Steven Borkan - Direct

257

1    absolute level of bicarbonate but how quickly the alkalosis

2    develops.

3            In other words, I wouldn't want to be held to 35 as an

4    absolute limiter of severe acute metabolic alkalosis because

5    patients who have presentations with very low bicarbs, who are

6    actually acidotic on presentation, can have such a rapid

7    increase in bicarb that they could experience symptoms of

8    acute, severe alkalosis at levels lower than 35.

9    Milliequivalents per liter.

10   Q    And does increasing bicarbonate levels in patient's blood

11   affect that patient's blood potassium levels?

12   A    Yes, it does.

13   Q    How does it?

14   A    It's very well known in virtually every textbook of

15   internal medicine and every textbook of nephrology that a rise

16   in serum bicarb and metabolic alkalosis causes a shift of

17   potassium into cells.  This scenario is referred to as

18   hypokalemia or low blood potassium levels.

19   Q    And does lower blood potassium have any effects on the

20   heart?

21   A    Yes, it does.  A low blood potassium can potentially weaken

22   the strength of the contraction of the heart, which determines

23   how much blood ejects from the heart.  It also determines the

24   blood pressure.  So a loss of contractility of the heart can

25   lead to low blood pressure.  Called hypotension.  A low blood

Steven Borkan - Direct

258

1   potassium can also prolong the repolarization period after a

2   heartbeat and that repolarization period is referred on the

3   electrocardiogram or EKG as the QT interval.

4   Q   Are you aware of any debate in the scientific literature

5   about whether lowered potassium, lowered blood potassium, has

6   the effects on the heart muscle that you just described?

7   A   No, sir, I'm not aware of any controversy.

8   Q   And let's just take the first of the effects.  Weakened

9   heart contraction.  What are the health risks associated with

10  weakened heart contraction?

11  A   As I mentioned, the patients can experience low blood

12  pressure.  They can experience a decrease in the blood flow

13  ejected from the heart.  That is termed cardiac output.  And

14  with a fall in cardiac output, the brain and the heart itself

15  receive less blood flow.  And that in itself can cause ischemic

16  strokes in the brain, myocardial infarction or heart attacks,

17  and the low potassium, because of its effect on the

18  repolarization period --

19  Q   Let me stop you.  So that's the second effect.  Let's take

20  that effect now.

21          What is the effect of this prolonged QT interval that

22  you referred to in terms of health risks?

23  A   The QT interval is the most vulnerable period of time when

24  if a patient should have an irregular heartbeat during the

25  repolarization period, it's far more likely that they'll

Steven Borkan - Direct                          259

1    experience an arrhythmia, which means an irregular heartbeat,

2    and that irregular heartbeat can lead to the type of arrhythmia

3    referred to as ventricular fibrillation or ventricular

4    tachycardia.  This is a potentially lethal arrhythmia that can

5    cause cardiopulmonary arrest.

6            THE COURT:  Are we still talking about GranuFlo now

7    and bicarbonate, or are we into something else?

8            THE WITNESS:  No, sir, we're still talking about the

9    effect of GranuFlo in raising serum bicarbonate, which would

10   then cause alkalosis, which would then cause a shift of

11   potassium, which could then cause cardiopulmonary arrest, which

12   would explain Fresenius' observations that GranuFlo was

13   dangerous.

14           THE COURT:  Okay.

15           But not everybody who has a spike of bicarbonate

16   during or after dialysis has a heart attack, right?

17           THE WITNESS:  That's absolutely correct.  That is that

18   the human body is resilient.  And we differ tremendously in our

19   triggers and our susceptibilities to these untoward events.

20           THE COURT:  In fact, if I understand what you're

21   saying, at least with respect to the so-called tall people, all

22   of them will have spikes, if they get GranuFlo.

23           THE WITNESS:  That's correct.  But depending upon

24   their comorbidities, working in tandem with the excess

25   bicarbonate delivered through exposure to GranuFlo, some would

Steven Borkan - Direct

1    be more or less susceptible to getting untoward effects.

2              THE COURT:  Right.

3              You've heard our discussion earlier about how the

4    plaintiff team here wants to represent a class of some alleged

5    300,000 people who ever got GranuFlo during their dialysis

6    treatments.

7              Do you have any thought at all as to what percentage

8    of that 300,000, if it is the right number, would have had

9    spikes that caused bad effects?

10             THE WITNESS:  Using the only data I really have, is

11   the Fresenius data in their 80,000 plus patients, and about

12   1.1 percent of them experienced arrest in the chair.  So I

13   would assume that if you included heart attacks and ischemic

14   strokes, the number would go up.  But I'm guessing that it

15   would be about 1 or 2 percent.

16             THE COURT:  And if you include, if you include

17   postdialysis problems, it would go up a little more.

18             THE WITNESS:  A little more.

19             THE COURT:  But you're not talking about 10 percent of

20   all the people who got GranuFlo had a stroke or a heart attack.

21             THE WITNESS:  No, sir, I'm not.

22             THE COURT:  It's 1 or 2 or 3 percent, maybe.  Maybe.

23             THE WITNESS:  Yes, sir, and it would be within a

24   defined period when it would be biochemically feasible to

25   ascribe the untoward event to that spike in bicarbonate caused

Steven Borkan - Direct

261

1   by GranuFlo exposure.

2   BY MR. PAYNTER:

3   Q   So focusing again on the effects of high bicarbonate

4   levels, we were talking about fatal arrhythmias, Dr. Borkan.

5   Is the hemodialysis particularly susceptible to fatal

6   arrhythmias?

7   A   Yes, sir, they are, because of the magnitude and the

8   rapidity of the electrolyte shifts, it's known that high

9   bicarbonate itself can cause not only a decrease in the

10  contractile strength of the heart, but also causes the heart to

11  beat irregularly.

12          So that an elevated bicarb through its effect on pH

13  and its effect on potassium can generate arrhythmias, and the

14  reason our patients are so susceptible is that roughly 60 to

15  80 percent of our dialysis population has a thick heart muscle

16  wall.  This syndrome is referred to as left ventricular

17  hypertrophy or LVH; and as the heart muscle thickens, it

18  becomes more dependent on the perfusion of nutrients and during

19  dialysis, in patients with thick heart muscle, they are at risk

20  for fatal arrhythmias.

21          THE COURT:  But at the same time, the whole point of

22  dialysis or one of the points of dialysis is to increase

23  bicarbonate levels.

24          THE WITNESS:  Yes, to a safe level.

25          THE COURT:  To a safe level, so it's a choice of

Steven Borkan - Direct                    262

1  evils, somewhat.  Do you want to increase bicarbonate levels,

2  but if you increase bicarbonate levels, it may increase the

3  risk of other things.

4          THE WITNESS:  Yes, sir, that's true; and that's why

5  that Fresenius document is so critical, because it suggests

6  that a new medical device introduced without physicians like me

7  being aware should be more carefully monitored so that I can

8  identify the short people that might benefit from its use and

9  avoid its use in the tall people.

10          THE COURT:  So when did you learn about this Fresenius

11  study?

12          THE WITNESS:  I learned about it by accidentally

13  finding it on the Internet, myself, after I had been, my

14  services were hired by the plaintiffs' attorneys.

15          THE COURT:  But this study occurred in 2004?

16          THE WITNESS:  I believe the memo was actually 2011.

17  November 4, 2011.  Where they reported this dramatic increase

18  in cardiopulmonary arrest in their GranuFlo-exposed patients.

19          THE COURT:  Okay.  I'm confusing it with something

20  that happened in 2004.

21          But so you didn't learn about it until say, 2014?

22          THE WITNESS:  That's correct, sir.

23          THE COURT:  How is it that you as a practicing

24  nephrologist who deal with this stuff every day weren't aware

25  of this?

Steven Borkan - Direct

263

1        THE WITNESS:  I have always trusted the providers of

2  dialysis care, Fresenius and DaVita, to provide safe equipment,

3  safe devices, and a safe procedure.  There is a separation, so

4  to speak, of church and state, that as the doctor, I write the

5  prescription; but I don't actually run the machine.  I don't

6  mix the dialysate.  I have no control over the products or

7  devices that are purchased.  I only write the prescription.

8  And then adjust that prescription based on predialysis chemical

9  levels, bicarbonate, for example.

10       In this case, the wool was completely over my eyes in

11  a medical device --

12       THE COURT:  Was the information out there to be seen,

13  if you'd opened your eyes, or was it concealed from you and

14  your colleagues?

15       THE WITNESS:  I believe "concealed" is too strong a

16  word.  Now that I've devoted a week of time to investigating

17  this issue, I'm actually surprised how easy it is to identify

18  that some patients would be at risk for being exposed to

19  GranuFlo.  And I would like to promote the education of myself

20  and my colleagues so that we can make better choices for our

21  patients because I took an oath when I became a doctor that

22  said, first do no harm.  And in some of my patients, I've come

23  to the point where I firmly believe that GranuFlo exposure in

24  some patients can cause untoward effects, including death.

25       THE COURT:  So Fresenius didn't actively conceal it,

Steven Borkan - Direct

1    but they didn't go out of their way to inform the nephrology

2    community.

3              THE WITNESS:  I think that's fair, sir.

4              THE COURT:  See, I had an environmental case in here

5    last week -- you see everything eventually -- and one of the

6    issues was whether or not a certain governmental study had been

7    publicized to the public.  And the evidence was that it was

8    available on the 34th floor of a tall building in Denver.  It's

9    just that nobody knew it was there.  It was available for

10   anybody to go see, but they didn't know it was there.

11             Is that what you're saying?

12             THE WITNESS:  Yes, sir.  I think that physicians,

13   including medical directors even of my own DaVita unit, were

14   underinformed that there was no process that I could see for

15   monitoring the population predialysis bicarbonate levels to see

16   what effect GranuFlo was actually having.

17             THE COURT:  So how do you blame DaVita for this?  It

18   sounds like you've got a bone to pick with Fresenius.

19             THE WITNESS:  I think that both companies have a

20   responsibility when they introduce a new medical product that's

21   used broadly or universally in all dialysis patients in a

22   clinic, that the onus is on them to make sure that we're

23   educated about the potential risks of this new product.

24             THE COURT:  Did DaVita even know about it?  Did they

25   know about this Fresenius study back in 2011?

Steven Borkan - Direct                    265

1          MR. PAYNTER:  They did, Your Honor.

2          MR. HOPKINS:  They did.

3          THE COURT:  You say they did.  But he's the witness.

4          THE WITNESS:  I don't actually know the answer to that

5    question, sir.  It's a very important question, but I don't

6    know what they knew and when they knew it.  I only know that as

7    a DaVita physician, I didn't know about it, none of my

8    colleagues knew about it, my medical director didn't know when

9    or if GranuFlo had been introduced to our clinic.

10         And no one could explain in the patients whose

11   bicarbonates levels exceeded the prescription how this could

12   happen.  This information is critical for me to take the best

13   care of my patients.

14         THE COURT:  Okay.

15         Maybe a couple more questions and we'll call it a day.

16         MR. PAYNTER:  Okay, Your Honor, we'll go through the

17   next effect.

18   BY MR. PAYNTER:

19   Q   Dr. Borkan, do, do the high bicarbonate levels, metabolic

20   alkalosis, affect ionized blood calcium levels?

21   A   Yes, they do.

22   Q   And how?

23   A   Ionized calcium level, which is the important physiologic

24   measure of calciums, not total calcium, falls as pH rises and

25   bicarbonate rises.

Steven Borkan - Direct

1   Q   And are you aware of any debate in the medical literature

2   about this effect which you just described?

3   A   No, I'm not.

4   Q   And does lower ionized calcium in the blood have any

5   effects on the heart?

6   A   Yes, they are actually very similar to the effects of low

7   potassium that we discussed.  Specifically, low calcium can

8   decrease the contractile strength of the heart, can lower blood

9   pressure, and it also has very well-established effects on the

10  QT interval and tends to prolong it.

11        So the lower the ionized calcium, the longer the QT

12  interval and the more susceptible a patient would be to fatal

13  arrhythmias.

14  Q   And again, are you aware of any debate in the medical

15  literature about the effects that you just described?

16  A   No, I'm not.

17        MR. PAYNTER:  Your Honor, I'm about to enter a

18  different topic.

19        THE COURT:  Okay.  Let's stop here.  And we'll pick it

20  up at nine o'clock.  I have an eight-thirty hearing, but I'm

21  going to take that in chambers, and so to any extent that any

22  of you wish to leave your stuff here and leave it on the table,

23  that is fine.

24        MR. HOPKINS:  Thank you, Your Honor.

25        THE COURT:  But that's up to you.  You won't have to

1    move it for anyone else.

2              MR. PAYNTER:  Thank you.

3              THE COURT:  All right, folks, have a nice evening.

4              THE WITNESS:  Thank you.

5          (Recess at 5:02 p.m.)

6                      REPORTER'S CERTIFICATE

7              I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9    Dated at Denver, Colorado, this 6th day of May, 2015.

10

11                          s/Kara Spitler_____
                                 Kara Spitler
12   WITNESSES

13      BARBARA YOUNGBERG

14          Direct Examination By Mr. Wojtanowicz        133

15          Cross-Examination By Ms. Ruggiero            161

16          Redirect Examination By Mr. Wojtanowicz      219

17      STEVEN BORKAN

18          Direct Examination By Mr. Paynter            221

19

20

21

22

23

24

25