```
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2

    Civil Action No. 13-cv-00573-RBJ-KMT
 3  Member Cases:  13-cv-00574, 13-cv-00579, 13-cv-00893,

 4  DORIS MORRIS; TONY ARMSTRONG; and MELVIN NUNES, as personal
    representative of the Estate of Stella Nunes,
 5
         Plaintiffs,
 6
    vs.
 7
    DAVITA HEALTHCARE PARTNERS, INC.,
 8
         Defendant.
 9
    _____
10
                        REPORTER'S TRANSCRIPT
11         Class-Certification and Daubert Hearing, Day 2

12  _____

13               Proceedings before the HONORABLE R. BROOKE

14  JACKSON, Judge, United States District Court for the District

15  of Colorado, commencing at 9:15 a.m., on the 30th day of April,

16  2015, in Courtroom A902, Alfred A. Arraj United States

17  Courthouse, Denver, Colorado.

18                            APPEARANCES

19           GARTH WOJTANOWICZ and CRAIG VALENTINE, Hagens Berman

20  Sobol Shapiro, LLP; STUART PAYNTER, for plaintiffs.

21           JOSEPH HOPKINS, JAMES TYRRELL, LISA RUGGIERO, and

22  PATRICK GILMARTIN, Edwards Wildman Palmer, LLP, for defendant.

23

24  Proceeding Reported by Mechanical Stenography, Transcription
             Produced via Computer by Kara Spitler, RMR, CRR,
25        901 19th Street, Denver, CO, 80294, (303) 623-3080
```

Steven Borkan – Direct
269

```
1              P R O C E E D I N G S

2       (Reconvened at 9:15 a.m.)

3              THE COURT:  Okay.

4              Ready to go?

5              MR. PAYNTER:  Yes, Your Honor.

6              Your Honor, we would like to continue with the

7   examination of Dr. Borkan.

8              THE COURT:  Sure.

9              Maybe I better let you do a little of the examination

10  this time.

11             MR. PAYNTER:  I'm going to try to wrap it up as

12  quickly as possible, so.

13             THE COURT:  Good morning.

14             THE WITNESS:  Good morning, sir.

15             THE COURT:  You're still under oath.

16       (Steven Borkan was recalled to the stand.)

17             THE WITNESS:  Yes, sir.

18                  DIRECT EXAMINATION CONTINUED

19  BY MR. PAYNTER:

20  Q    Good morning, Dr. Borkan.

21  A    Good morning.

22  Q    Yesterday when you were explaining to the Court the

23  distribution of predialysis bicarb in the dialysis patient

24  population, you recall you used the analogy of the distribution

25  of height in the general population?
```

Steven Borkan - Direct
270

1    A    Yes, I do.

2    Q    And I believe you analogized folks with low predialysis

3    serum bicarbonate to short people on the end of the bell curve?

4    A    Yes, I did.

5    Q    And I believe you said that GranuFlo would confer some

6    benefits on that population at that short end of the bell

7    curve; is that correct?

8    A    That's correct.

9    Q    And how would it do so?

10   A    The delivery of bicarbonate plus acetate would rapidly

11   increase the bicarbonate level in patients who are short, in

12   your analogy, or who have acidosis.

13          However, the price would be that the rate of rise of

14   bicarbonate could exceed a safe threshold and in the Fresenius

15   memo, they noted that patients with bicarbonate under 19

16   milliequivalents per liter were also at increased risk.

17   Q    So that predialysis bicarbonate increases?

18   A    That's right, the benefit is the acidosis is treated and

19   there is a price.

20   Q    And the price is that there is a increased risk for

21   cardiopulmonary arrest in that population; is that correct?

22   A    That's correct.  Because the rate of rise for bicarbonate

23   is faster when the patient's bicarbonate is low because the

24   gradient is higher.

25   Q    In your medical opinion, are there safer ways to raise the

Steven Borkan – Direct
271

1    predialysis bicarbonate for those patients at the short end of

2    the bell curve, rather than simply switching to GranuFlo?

3    A    Yes, there are safer ways to treat those patients.

4    Q    And what are those methods?

5    A    I would recommend decreasing the bicarbonate content

6    initially in patients who are the most acidemic to avoid very

7    rapid rises, and I would certainly eliminate the GranuFlo

8    component.

9    Q    Let's go back to where we ended yesterday.  We were talking

10   about the effects of metabolic acidosis.  So high bicarbonate

11   levels have any effect on respiration?

12   A    Yes, they do.

13   Q    And what is that effect?

14   A    Almost universally high bicarbonates will suppress

15   respiration or ventilation.  And the consequence of that is

16   that patients' oxygen content in their blood drops.

17   Q    And is there any debate in the scientific literature about

18   whether this effect you just described occurs?

19   A    No, this effect is considered to be universal.

20   Q    And does this effect pose any health risks for the heart

21   and brain?

22   A    It absolutely does pose health risks, because any stimulus

23   such as severe or acute metabolic alkalosis that suppresses

24   respiration and drops oxygen content can also drop oxygen

25   delivery to critical organs such as the brain and heart.

Steven Borkan - Direct
272

1    Q    For the Court's benefit, can you give a brief explanation

2    of how oxygen is delivered to tissue, biochemically?

3    A    Yes.  There's a carrier protein, and that protein is called

4    hemoglobin.  Hemoglobin is the protein that makes the blood

5    red.  When the blood contains adequate oxygen, the color is

6    red.  When the hemoglobin doesn't have oxygen, the blood is

7    blue.

8    Q    And do high bicarbonate levels have any effect on

9    hemoglobin's ability to deliver oxygen to tissue?

10   A    Yes, it does.  That effect is termed the Bohr effect,

11   B-O-H-R.  And the Bohr effect describes the observation that as

12   pH increases, bicarbonate rises.  That the binding between

13   hemoglobin, the carrier protein, and oxygen is very, very

14   tight.  What that means is that when the hemoglobin tries to

15   deliver the oxygen to tissues, the oxygen is not released.  So

16   that this Bohr effect actually aggravates the decrease in

17   oxygen delivery that's caused by metabolic alkalosis.

18   Q    And is there any debate in the scientific literature about

19   whether or not this Bohr effect exists?

20   A    No, there is not.

21   Q    And does the increased bind of oxygen to hemoglobin that

22   you described have any physiological effect of oxygen delivery

23   to the heart or brain?

24   A    Yes, it does.  It would aggravate the first effect of

25   metabolic alkalosis which is to stress respiration.  And then

Steven Borkan – Direct
273

 1    in addition, the Bohr effect would prevent that lower level of

 2    oxygen from actually being released into the tissues so it's a

 3    dual potentially toxic effect in lowering oxygen delivery to

 4    tissues.

 5    Q    And what would be any health risks associated with lowered

 6    oxygen delivery to the heart and brain?

 7    A    Yes, there are.  Those two organs in particular are

 8    dependent upon oxygen, and lower levels of oxygen, particularly

 9    in susceptible patients, even for a matter of minutes, can

10    cause toxicity, specifically ischemic stroke in the brain and

11    myocardial infarction or heart attack.

12    Q    Doctor, can we look at the summary slide real quickly.

13         Dr. Borkan, this slide you see now on your screen, did

14    you prepare this slide?

15    A    Yes, I did.

16    Q    And does this slide represent a summary for the Court's

17    benefit of the effects of excess delivered bicarbonate in

18    dialysis patients?

19    A    Yes, it does.

20    Q    Now, when we're talking about the effects of high

21    bicarbonate that lower oxygen and have other, the effects that

22    were summarized here on the slide, are these effects

23    cumulative?

24    A    Yes, they are.

25    Q    And, Craig, can we look at the next slide.

Steven Borkan – Direct
274

1          And how do these, how do these effects cumulative,

2    Dr. Borkan?

3    A    Although any one of them, specifically the elevated pH,

4    through its effects on the heart, hypoxemia effect on the heart

5    and brain, the Bohr effect reducing tissue delivery, the effect

6    of potassium and lower ionized calcium and decreasing cardiac

7    output, all predispose to arrhythmia.  And in a, what I call a

8    perfect storm, although each one of these events could cause

9    fatal arrhythmias, it's almost certainly likely that the

10   combination of these events leads to a more profound

11   susceptibility to fatal arrhythmia.

12         It could also, in addition to causing cardiopulmonary

13   arrest, abbreviated CPA, cause MI and ischemic stroke that

14   accounts for about 70 percent of the strokes.

15   Q    And just for clarity, when you refer to tissue ischemia,

16   what does that phrase mean?

17   A    That phrase, "ischemia," implies a decrease in blood

18   perfusion or flow to critical organs, and as perfusion goes

19   down, oxygen and substrate delivery, such as sugar and other

20   metabolites, reach a critical level where those tissues can

21   actually become damaged or die.

22   Q    So in your medical opinion, Dr. Borkan, does switching

23   dialysis patients from a dialysate with 4 milliequivalents or

24   less acetate to GranuFlo predictably increase their risk of

25   cardiopulmonary arrest?

Steven Borkan – Direct

1    A    Yes, it does.  By causing one or more of the events

2    outlined in this diagram that ultimately increased the

3    patient's risk for cardiopulmonary arrest, myocardial

4    infarction, or ischemic stroke.

5    Q    And is the opinion you just gave consistent with the

6    statement in the FDA 2012 recall which has been admitted as

7    Plaintiffs' Exhibit 2, that, quote, A significant risk factor

8    associated with low blood pressure, hypokalemia --

9              THE REPORTER:  Slow down and go back, please.

10   BY MR. PAYNTER:

11   Q    So my question was, is the medical opinion that you just

12   gave consistent with the statement in the FDA 2012 recall that

13   has been previously admitted as Plaintiffs' Exhibit 2, where it

14   states that metabolic alkalosis is, quote, A significant risk

15   factor associated with low blood pressure, hypokalemia,

16   hypoxemia, hypercapnia, and cardiac arrhythmia, which if not

17   appropriately treated may culminate in cardiopulmonary arrest?

18   A    Yes.  This diagram is absolutely consistent with that FDA

19   statement, as you just read.

20   Q    And is the testimony you just gave also consistent with the

21   November 4, 2011 Fresenius memo, which has previously been

22   admitted as Joint Exhibit 2, where it states, quote, The

23   current analysis determined that borderline elevated

24   predialysis bicarbonate levels and overt alkalosis are

25   significantly associated with a six- to eightfold greater risk

Steven Borkan – Direct

1    of CP arrest and sudden cardiac death in the dialysis facility?

2    A    Yes.   The diagram that I've outlined here is virtually

3    identical, again, to the Fresenius statement.

4    Q    And in your medical opinion, Dr. Borkan, does switching

5    patients from a dialysate with 4 milliequivalents or less of

6    acetate to GranuFlo predictably increase their risk of

7    myocardial infarction?

8    A    Yes, it does.

9    Q    Dr. Borkan, in your medical opinion, does switching

10   dialysis patients from a dialysate with 4 milliequivalents or

11   less of acetate to GranuFlo predictably increase their risk of

12   ischemic stroke?

13   A    Yes, it does.

14   Q    And in your medical opinion, Dr. Borkan, does exposure of

15   patients to acetate in excess of 4 milliequivalents per liter

16   fall below the standard of acceptable medical practice?

17   A    Yes, it does.

18   Q    Dr. Borkan, is it your opinion as a nephrologist, that

19   patients who are currently being exposed to GranuFlo should be

20   informed of that fact?

21   A    Yes, I believe all patients who are exposed to GranuFlo

22   should be informed.

23   Q    And do you believe that that is an important, that that is

24   important information that should be included in their medical

25   record?

Steven Borkan - Direct

277

1   A    Yes, I do.

2   Q    And why is it your opinion that patients who are currently

3   exposed to GranuFlo should be informed of this fact?

4   A    I believe this is a very important component of safe

5   medical care for each dialysis patient.  For example, in the

6   story that I told yesterday of my patient with crushing chest

7   pain whose dialysis was stopped and then he came to the

8   emergency department with a markedly elevated serum bicarbonate

9   level that exceeded my prescription, which at the time was a

10  mystery.

11           In retrospect, the patient was exposed to an

12  acetate-containing dialysate that caused the surge in

13  bicarbonate above my level of prescription.  It's now known

14  that high levels of bicarbonate, because of the Bohr effect,

15  because of the effect in reducing oxygenation, because of its

16  effect on potassium and potentially on calcium, et cetera, can

17  actually aggravate lactate production in the heart, forcing it

18  to become anaerobic; that is, deprived of oxygen, which in my

19  patient's case probably precipitated the chest pain, rather

20  than undergo a cardiac catheterization, which is what happened

21  to him, if we had known that he had severe metabolic alkalosis,

22  caused by acetate exposure or GranuFlo exposure, we would have

23  worked him up completely differently, changed his dialysis

24  prescription so that he would no longer be at risk for severe

25  life-threatening metabolic alkalosis.

Steven Borkan - Direct

278

1       This is only one case.  But I firmly believe that

2   every nephrologist should know and deserves to know which

3   patients are most susceptible to metabolic alkalosis surges

4   during exposure to GranuFlo, and the only way to do that is to

5   make it obvious to the patients and the prescribing

6   nephrologist that their patients have been or will be exposed

7   to GranuFlo.

8   Q   And in your opinion, Dr. Borkan, as a nephrologist, should

9   patients who were exposed in the past to GranuFlo be informed

10  of this fact?

11  A   Yes, I do believe that patients exposed in the past should

12  be informed.

13  Q   And why is that, Dr. Borkan?

14  A   I believe this could dramatically improve our understanding

15  of the individual patient's physiology.  Because I recall many

16  patients whose bicarbonate level changes I couldn't understand,

17  and I ascribed it to the patient's taking sodium bicarbonate at

18  home, which they denied.  Or a marked change in their diet,

19  which we discussed yesterday can change bicarbonates

20  profoundly.

21      And in retrospect, the change in bicarbonate probably

22  was due to exposure to acetate-containing dialysate.

23      So I believe even retrospective awareness of GranuFlo

24  exposure could improve our physiologic understanding and care

25  of our individual patients.

Steven Borkan - Direct                                         279

1    Q    So would it be accurate, then, to say that as a

2    nephrologist knowing of past GranuFlo exposure might cause you

3    to alter your patient care plan for some patients, potentially?

4    A    Absolutely, and it would potentially improve my dialysis

5    prescription to make it safer.

6    Q    In your medical opinion, Dr. Borkan, had DaVita monitored

7    bicarbonate levels across the entire dialysis population,

8    should it have detected the trend of elevated bicarbonate

9    following exposure to GranuFlo?

10   A    Yes, it would.

11   Q    And why is that?

12   A    As we discussed yesterday, at some length, the predialysis

13   bicarbonate increases in a predictable manner in patients who

14   receive more bicarbonate so that the addition of increased

15   acetate through GranuFlo would almost certainly increase

16   predialysis bicarbonate levels in the entire dialysis

17   population.  And the evidence of that is in the Fresenius

18   document where they show that there was a 1 to 2

19   milliequivalent increase in predialysis bicarbonate levels in

20   patients after switching to GranuFlo.

21            MR. PAYNTER:  No further questions, Your Honor.

22            THE COURT:  All right.  Cross-examination,

23   Mr. Hopkins.

24            MR. HOPKINS:  Yes.

25                        **CROSS-EXAMINATION**

Steven Borkan - Cross

1    BY MR. HOPKINS:

2    Q    Good morning, Dr. Borkan.

3    A    Good morning, sir.

4    Q    A couple of questions on just your initial testimony here

5    and then I had some questions from yesterday to clear up my

6    understanding about a few things.

7              The -- you said that exposure to acetate levels in

8    dialysate above 4 milliequivalents per liter falls below the

9    medical standard of care; is that correct?

10   A    Could you state that again, please.

11   Q    Sure.  I think you just said, maybe minutes ago, that

12   treating a dialysis patient with a dialysate containing acetate

13   at a level greater than 4 milliequivalents per liter falls

14   below the medical standard of care; is that fair?

15   A    That's correct.

16   Q    So, is it the case, then, that treating a patient with a

17   dialysate containing acetate at a level of 4 milliequivalents

18   or below would not fall below the standard of care?

19   A    In general, it turns out that that is the default or

20   average dialysate that patients are exposed to.  That's the

21   background or baseline.  And it's my understanding that there

22   has to be some small acid component in the electrolyte solution

23   of dialysis machines in order to maintain the proper balance of

24   electrolytes.

25   Q    Okay.

Steven Borkan - Cross
281

1            And I just want to make sure we're talking about the

2      same thing.

3            The video that was submitted to the Court that you

4      said you reviewed illustrates a modern human dialysis machine

5      which delivers dialysate through a process called three-stream

6      dialysis?

7      A    That's correct.

8      Q    And the three streams consist of, one, very highly purified

9      water, correct?

10     A    That's correct.

11     Q    And then the acid concentrate, correct?

12     A    That's correct.

13     Q    And then the bicarbonate component?

14     A    That's correct.

15     Q    And they're all combined in the machine at the time of

16     dialysis to make the dialysate solution, correct?

17     A    Yes, that's correct.

18     Q    And the acid concentrate component with the component that

19     contains a lot of these electrolytes that we're talking about,

20     calcium, potassium, magnesium; isn't that right?

21     A    That's correct.

22     Q    And the acid concentrate also contains acetate as one of

23     the ingredients; is that right?

24     A    That's correct.

25     Q    And that's because when you combine the three streams in

Steven Borkan - Cross

282

1  the dialysis machine, to make the dialysate solution, you need

2  to have some acetate so that when the -- you need to have some

3  acid that when it combines with the pure bicarbonate, the

4  electrolytes that are in the acid concentrate don't precipitate

5  out; is that right?

6  A    That's correct, specifically the calcium carbonate.

7  Q    Okay.

8          And the acetate is included in the acid concentrate

9  component so that when it combines with the bicarbonate, it

10 offsets the bicarbonate that gets eaten up by the acid part of

11 the acid concentrate, correct?

12 A    That's fair.

13 Q    So that any bicarbonate-based dialysate, in modern times,

14 since being switched from pure acetate dialysate solution, any

15 bicarbonate-based dialysate, is going to contain some amount of

16 acetate, correct?

17 A    That's not correct. There are alternative solutions that

18 contain citrate, for example.

19 Q    But other than citrate, a conventional bicarbonate-based

20 dialysate is going to contain some amount of acetate, correct?

21 A    Either acetate or citrate, but I believe you're correct

22 that the most common is to contain some level of acetate.

23 Q    And the level -- I think you said it a few minutes ago, and

24 I think you said it yesterday -- the typical amount of acetate

25 contained in a conventional bicarbonate-based dialysate is

Steven Borkan - Cross                283

1    around 4 milliequivalents?

2    A    That's correct.

3    Q    So that when you're talking about -- and I think

4    Mr. Paynter just went through this with you, so I apologize for

5    any repetition -- when you're talking about excess acetate

6    going into a patient's body and then converting into what you

7    call excess bicarbonate, you're talking about the additional

8    4 milliequivalents that GranuFlo has of acetate beyond the

9    typical other dialysate that contains lower levels?

10   A    Yes, that's correct.

11   Q    Now, yesterday you indicated that you treat at a DaVita

12   clinic in Boston; is that right?

13   A    That's correct.

14   Q    Is there more than one clinic, or is it just one clinic

15   that you see patients at?

16   A    There are two.  Both are operated under contract with

17   DaVita.  One is an inpatient dialysis unit, which is a unit

18   inside the medical center itself.  And a second is a

19   free-standing DaVita outpatient dialysis unit.

20   Q    Okay.

21          So the first one that's the acute-care facility.  Is

22   that at Boston Medical Center?

23   A    Yes, sir, it is.

24   Q    I think we talked about that at your deposition.

25          Where is the other facility?

Steven Borkan - Cross

284

1   A    Located, I believe, at 550 Harrison Avenue, which is

2   approximately one and a half blocks from the medical center.

3   Q    Okay.

4        And you have privileges at both those facilities?

5   A    Yes, I do.

6   Q    And how long have you had privileges at each?

7   A    I believe since, at Boston Medical Center, I've had

8   privileges since 1989.

9   Q    Okay.

10  A    And that would include the inpatient dialysis unit.

11       And I've had privileges, I believe, with DaVita since

12  the 1990s, when they built that facility at 550 Harrison

13  Avenue.

14  Q    Okay.

15       And the facility at 550, or on Harrison Avenue, is

16  that an acute-care facility, is that an outpatient chronic-care

17  facility?

18  A    The latter, it's an outpatient chronic facility.

19  Q    Okay.

20       Yesterday you told us that you were concerned to learn

21  there was acetate in dialysate and that you didn't know your

22  patients had been switched to GranuFlo; is that right?

23  A    That's correct.

24  Q    And you said you couldn't explain to your patients that got

25  sick, whose serum bicarbonate levels you said exceeded your

Steven Borkan - Cross                                        285

1    prescription, how that would be possible.  Do you remember

2    giving that testimony?

3    A    Yes, I do.

4    Q    And so you said you'd have patients treated with GranuFlo

5    whose serum bicarbonate levels you had seen in their lab values

6    exceeded their prescription; is that right?

7    A    That's correct.

8    Q    And you indicated that you spoke to your DaVita medical

9    director about that.  Is that right?

10   A    Yes, I did.

11   Q    Which, which facility, what medical director did you speak

12   with?

13   A    His name is Dr. Jesse Bhatia.

14   Q    Could you spell that?

15   A    Yes.  It's the first name is J-E-S-S-E.

16   Q    Uh-huh.

17   A    And the last name, Bhatia, B-H-A-T-I-A.

18   Q    And when was it you spoke with him about this issue?

19   A    I believe the most recent conversation was actually two or

20   three months ago.  When I wondered whether I could look at

21   bicarbonate data that might be available in our outpatient

22   chronic dialysis unit to see what the average bicarbonates

23   were.  And to see whether or not there had been a trend towards

24   higher predialysis bicarbonates.

25   Q    Uh-huh.

Steven Borkan - Cross

286

1          And he is -- you may have just said this, I'm sorry --

2     he's the medical director at the outpatient facility on

3     Harrison Avenue?

4     A    Yes, sir.

5     Q    Okay.

6          When was the first time you spoke with him about your

7     concerns regarding GranuFlo?

8     A    To the best of my recollection, he was part of a conference

9     that I gave where I presented the observation that one of my

10    patients had a post or, a posthemodialysis bicarbonate level

11    that exceeded my prescription, and I asked Dr. Bhatia as well

12    as my colleagues in the room, if anyone could explain that

13    observation.

14    Q    And when was that conference?

15    A    That was approximately two or three years ago.

16    Q    And was that a formal conference, or when you say

17    "conference," do you mean just a sort of a gathering of

18    nephrologists?

19    A    It's a formal renal grand rounds which is held each week at

20    our medical center, attended by all nephrologists and fellows.

21    Q    So when you were speaking with him about that, you weren't

22    aware of the ingredient acetate being present in

23    bicarbonate-based dialysates?

24    A    That's correct.

25    Q    And when you spoke to the medical director, Dr. Bhatia, you

Steven Borkan - Cross

1   said yesterday you spoke to him asking for more information,

2   and he said that he did not have a data analysis of the average

3   bicarb in your unit there on Harrison Avenue either before,

4   during, or after the GranuFlo usage.  Is that right?

5   A    That's correct.

6   Q    Okay.

7           So I suppose it would surprise you to learn that none

8   of these DaVita clinics at which you treat patients use

9   GranuFlo?

10  A    I know that the inpatient unit does not have the equipment

11  to process GranuFlo.  But I did not know that, whether or not

12  patients in the outpatient unit received GranuFlo or not,

13  because the information was not available to me.  Even when I

14  inquired.

15  Q    But you expressed yesterday that you were concerned to

16  learn that your patients were switched to GranuFlo, didn't you?

17  A    Yes, I did.

18  Q    So what patients were switched to GranuFlo when neither of

19  the facilities at which you treat use GranuFlo?

20  A    I don't think it's fair to say that those are the only

21  facilities where GranuFlo -- where my patients were exposed to

22  GranuFlo, because I had privileges over the last ten years at

23  up to eleven different facilities.  So I didn't mean to imply

24  that GranuFlo was the only facility -- that my facility at

25  Boston Medical Center was the only one where GranuFlo might

Steven Borkan - Cross

288

1    have been used.

2    Q    But you didn't become aware of the GranuFlo issue till last

3    year, correct?

4    A    That's correct.

5    Q    So did you go back and research your patients from other

6    clinics and prior years to figure out if any of those other

7    clinics ever used GranuFlo?

8    A    No, sir, I did not.

9    Q    Have you inquired of any of your current patients whether

10   they treat at other facilities, other than these two where you

11   treat, to go and then see if they use GranuFlo?

12   A    No, sir, I did not, because that information is not

13   available in any of the medical records, in any of the tens of

14   thousands of dialysis patients that I've cared for over the

15   past 28 years.

16   Q    Did you ever call the clinic?  Any clinic?

17   A    And ask what, sir?

18   Q    If they use GranuFlo?

19   A    No, sir, I have not.  Other than my own unit in the last

20   two or three months.

21   Q    Now, the Judge asked you yesterday if you told the clinics

22   that where you treat patients, don't use GranuFlo.  And you

23   said, I wish I had that power.  Have you tried.  Not that it

24   makes a difference, because they don't use GranuFlo, but have

25   you tried?

Steven Borkan – Cross

289

1   A    Unfortunately, my understanding is that most outpatient

2   facilities do not offer alternative dialysate solutions.   That

3   one size fits all.   What I'm saying is that my prescription as

4   a physician is limited to the parameters that were presented

5   here.   And nowhere in my prescription, in any of the facilities

6   where I've ever been, have I had the option as a doctor of

7   altering the acetate content.   Or even of switching the acetate

8   to citrate.

9   Q    Have you ever asked to use a citrate-containing dialysate

10  with your patients at any clinic at which you've ever treated?

11  A    I have used citrate solutions under other settings, where

12  patients could not tolerate some of the components that were

13  added to the dialysis solution, such as heparin.   And citrate

14  was an alternative that I've used in occasional cases.

15  Q    So you have been able to get it, when you wanted to use it?

16  A    That was in a different setting, sir, and it was with a

17  continuous form of hemodialysis called CVVH.   And not standard

18  outpatient hemodialysis.   This is a different procedure, a

19  different machine, and the prescribing options for me as a

20  physician are much different than the typical inpatient or

21  outpatient dialysis prescription.

22  Q    Okay.

23       So in a typical circumstance at a typical outpatient

24  clinic at which you currently serve, you've never gone to the

25  medical director or anyone at the facility and said, I don't

1    want to use this kind of dialysate, I want to use something

2    else?

3    A    No, sir, I have not.

4    Q    All right.  Thank you.

5    A    And when the issue has come up, what I've learned is that

6    it's quite inconvenient and expensive to personalize, customize

7    the dialysis prescription in the outpatient setting because

8    each machine has to be taken down and set up again.

9    Q    Now, you say when it's come up.  You've never asked, or how

10   has it come up?

11   A    I have asked recently as to the financial pressures that my

12   dialysis director at DaVita experiences and have asked why

13   there's a difference between the inpatient unit where I have

14   flexibility in customizing the prescription, other than

15   acetate, for each one of my patients, but have less freedom to

16   change the prescription in the outpatient unit.

17          And the answer to my question is that the staffing,

18   the timing, the rapid turnaround of patients in the outpatient

19   unit precludes customization of the prescription and changes as

20   we often do in the inpatient unit.

21   Q    Well, I have other things I want to cover.  But I don't

22   want to leave that hanging.  What customization were you trying

23   to do, what changes are you saying you weren't allowed to make?

24   A    This is just a general comment.

25   Q    Well, I'm afraid I'm still confused.  You said you had a

Steven Borkan - Cross
291

1   conversation with the medical director about pricing pressures

2   and there's a difference between the acute inpatient facility

3   and the chronic outpatient facility, and that in the discussion

4   with the medical director at the outpatient facility, it was

5   explained to you there were certain customizations regarding

6   your prescription that I guess you're saying you weren't going

7   to be allowed to do.  I'm trying to understand what that was

8   that you were trying to do.

9   A   I understand your question now.

10          In the inpatient setting, there are laboratories

11  available predialysis on virtually every inpatient.  So with

12  each treatment, I can change the potassium, the calcium, the

13  bicarbonate, as is necessary to care for the patient that day.

14          No such laboratory data is available typically but

15  once a month in the dialysis population that's chronic in the

16  outpatient facility.

17          If I were to call each dialysis treatment and phone in

18  a different prescription, the outpatient dialysis unit would

19  not be able to honor my request.

20  Q   So there's two pieces there I just want to explore.

21          If you wanted to order more labs for your patients,

22  you could do so, couldn't you?

23  A   Yes, I could.

24  Q   And are you saying that when you call in to change a

25  prescription at the outpatient facility, that they're telling

Steven Borkan - Cross

1    you they can't or won't change it?

2    A    It is very awkward to change the prescription as often as

3    an -- on the outpatient unit as it is in the inpatient unit

4    because of differences in the amount of staffing and

5    differences in the time pressure for each procedure.

6    Q    Okay.

7              Well, awkwardness aside, I'm now concerned about what

8    may be going on, as I know my client is, at the Boston facility

9    you're talking about.  Are they refusing to change the

10   prescription per your directions, when you give it to them?

11   A    I don't recall an episode where that's happened.

12   Q    So when you say it's awkward, you just know how the

13   facility functions and that it makes more work for them, not

14   that I can't get it done, if you want it to be done?

15   A    Yes, sir.

16   Q    When did you first apply for privileges at any DaVita

17   clinic?

18   A    I believe DaVita created the outpatient unit somewhere in

19   the early 1990s, and the whole group of us at Boston Medical

20   Center in the section of nephrology applied for privileges

21   there.

22   Q    Okay.

23             Did you ever have privileges at a different DaVita

24   clinic prior to that one?

25   A    I don't recall so, sir.

Steven Borkan - Cross
293

1    Q    Okay.

2          So for the one in the '90s when you applied for

3    privileges, did you have to provide an email address?  Wasn't

4    that required?

5    A    I don't recall.

6    Q    Okay.

7          Do you currently receive emails from DaVita's office

8    of chief medical officer?

9    A    I believe so, sir.

10   Q    How long has that been the case?

11   A    I'm going to change my answer.  I don't recall having

12   received any information from DaVita's chief medical officer

13   for years.

14   Q    By email or any other form?

15   A    No, sir.

16   Q    Okay.

17         Have you ever heard of Nethlink, N-E-T-H-L-I-N-K?

18   A    I have heard of it.

19   Q    Okay.

20         Have you ever accessed it?

21   A    No, sir, I have not.

22   Q    And so if you've heard of it, are you aware it's a DaVita

23   website available to treating nephrologists where those

24   treaters can see posted notices, get information, look things

25   up, use it as a resource?

Steven Borkan - Cross
294

1    A    I have heard of it, sir.  But I do not use it.

2    Q    Are you aware that it provides the information and services

3    that I just outlined?

4    A    No, sir, I'm not.

5    Q    How have you heard of it?

6    A    Some of my colleagues have mentioned it, and the reason I'm

7    being vague about this is that at some point, about seven or

8    eight years ago, for about a three-year period, I actually took

9    care of a dialysis shift, Monday, Wednesday, Friday, of a group

10   of dialysis patients, approximately 36.  And at that time there

11   was an older form of electronic communication system that I did

12   use often to track my patients.

13        During the transition time from one DaVita computer

14   system to another, I no longer did a shift of dialysis patients

15   and transitioned to care for other dialysis patients in a

16   different setting.  And although I continued my privileges, I

17   had no motivation to continue the computer link.  So I've never

18   accessed the program that you just discussed.

19   Q    Okay.

20        The computer link you were just talking about that you

21   did access, I just forgot what you said, you said that was

22   three or four years ago?

23   A    It might have been seven or eight years ago.  It was called

24   Duck.

25        THE REPORTER:  Duck, D-U-C-K?

1        THE WITNESS:  D-U-C-K.

2   BY MR. HOPKINS:

3   Q    Now, individuals who you indicate you believe have a

4   postdialysis spike in serum bicarbonate that leads to the

5   sequence of events that you talked about to a cardiac event,

6   you said there would be a defined period in which it would be

7   biochemically feasible to ascribe that event to a spike from

8   GranuFlo.  And I'm sorry I missed what you said yesterday.

9   What would that time period be, after the end of dialysis?

10  A    It's actually challenging to put a limit on it for the

11  following reason.  That when Graham *et al.* studied ten or

12  eleven serial bicarbonate measurements, in nine patients, two

13  of them actually did not experience a drop in bicarbonate in

14  the two days between dialysis sessions.  So it's conceivable

15  biochemically that the metabolic alkalosis in some patients

16  could persist from one dialysis session all the way to the next

17  one, two days later.

18        Two days is 48 hours.

19        So there is scientific evidence that the alkalosis can

20  persist for quite a long time.

21  Q    So that means the typical up and down, that's been

22  described in the literature as a sawtooth pattern, just didn't

23  happen to those patients?

24  A    That's correct.

25  Q    So in the defined time period that you're talking about is

Steven Borkan - Cross
296

1    48 hours, or do you think typically it would be something less?

2    A    Typically.  In the other seven of the nine patients, their

3    bicarbonates did follow a sawtooth pattern, and that's likely

4    because they were either more physically active, which

5    generates acid, or they had a healthier diet that included

6    protein which then led to the generation of acid and the

7    consumption of their bicarbonate, leading to the sawtooth

8    pattern.  So.

9    Q    So for those other seven patients, what would the defined

10   time period be for them, after dialysis, when would that end?

11   A    Approximately 12 hours after the dialysis.

12   Q    Okay.

13        And you've said this morning and yesterday that the

14   introduction of GranuFlo as a dialysate was great for short

15   people -- perhaps should say vertically challenged, the

16   acidotic people in the population, but not so great for the

17   tall people, those in the alkalotic end of the scale; is that

18   right?

19   A    The word "great" is an overstatement.

20   Q    Fair.

21   A    That is -- that, to give an accurate answer, the GranuFlo

22   and the increase in delivered bicarbonate that would result

23   from exposure to GranuFlo would increase the serum bicarbonate

24   level to a higher extent, to a greater extent than the

25   dialysate that did not contain GranuFlo.  But the price would

Steven Borkan - Cross

297

1   be that the GranuFlo would more likely than not cause a rapid

2   rise in bicarbonate and Fresenius noted that those patients who

3   were the shorts, the most vertically challenged, the acidotic

4   ones, also experienced a marked increase in the risk of

5   cardiopulmonary arrest when exposed to GranuFlo.

6   Q   But you spoke yesterday of the risks to the people that

7   were on the alkalotic end of the scale, look at the Fresenius

8   data from 2004, these extra 28 people or so who might have

9   predialysis serum bicarbonates greater than 30, the tall

10  people, you're saying the use of GranuFlo with them exposes

11  them to increased risks as well, correct?

12  A   Your statement is incorrect and inaccurate, sir.

13  Q   And what's wrong with it?

14  A   You picked the number 30 milliequivalents per liter, and

15  Fresenius noted that there was at least a doubling of

16  cardiopulmonary arrest risk with bicarbonates that were equal

17  to or exceeded 26.

18  Q   Okay.

19          Other than that language in the November 4, 2011

20  Fresenius internal memo, my reference was to the 2004 Fresenius

21  data talking about the use of GranuFlo with the population

22  4,793 people, and that slide indicated an alkalosis risk of up

23  to 30 milliequivalents; is that right?

24  A   The slide indicated that, but that's scientifically

25  inaccurate.

Steven Borkan - Cross

1    Q    Okay.

2         So let's take it with those people that have a

3    predialysis serum bicarbonate greater than, and I've forgotten

4    the number already, whatever you just said, 26, 27?

5    A    26.

6    Q    26.   Those people with a predialysis serum bicarbonate

7    greater than 26, the use of GranuFlo with them exposes them to

8    the risks you've outlined; is that correct?

9    A    That's correct.

10   Q    So given that treatment is individualized and that treating

11   nephrologists look at labs at least once a month, why doesn't

12   the treating nephrologist just change the bicarbonate

13   prescription?

14   A    That certainly is an option.

15   Q    Okay.

16        In the dialyzer, in the process of dialysis, blood

17   flows on one side of the membrane through the little tube, and

18   the dialysate surrounds it on the other side of the membrane

19   and the dialysate contains the bicarbonate and the acetate that

20   we've talked about, correct?

21   A    That's correct.

22   Q    And bicarbonate moves from the dialysate solution into the

23   blood per the concentration gradient as you described, assuming

24   that the bicarbonate level in the blood is lower than the

25   bicarbonate level in the dialysate, correct?

Steven Borkan - Cross

299

1    A    That's correct.

2    Q    Okay.

3         And acetate, a different substance, also moves from

4    the dialysate, per the concentration gradient, into the blood,

5    goes to the liver in the person's body, where it's then

6    metabolized into bicarbonate, correct?

7    A    That's correct.

8    Q    So if an amount of bicarbonate on the blood side somehow

9    during the process of dialysis got higher or greater than the

10   amount of bicarbonate on the dialysate side, then the

11   bicarbonate on the blood side would move per the concentration

12   gradient back across the membrane into the dialysate, correct?

13   A    In general, that's correct.  But the rate of removal of

14   bicarbonate from the patient's bloodstream may not necessarily

15   equal the amount or the rate of bicarbonate generation from

16   acetate.

17        As in your example, the two processes, bicarbonate

18   delivery downstream from the dialysate into the patient's blood

19   and the conversion of acetate to bicarbonate by the patient's

20   liver, are completely independent processes.  And in patients

21   who rapidly convert acetate to bicarbonate, there can be a

22   transient spike in bicarbonate level that far exceeds the

23   concentration gradient.

24   Q    And that's during dialysis?

25   A    Yes.  For those patients who rapidly metabolize acetate,

Steven Borkan - Cross

1    the spike would occur during the dialysis procedure.

2    Q    I'm sorry, have you finished your answer?

3    A    In contrast, in patients who slowly metabolize acetate to

4    bicarbonate, they might experience the spike after the dialysis

5    procedure is stopped.  And they would not benefit from the

6    potential removal of bicarbonate from their blood because the

7    dialysis procedure is over.

8    Q    Okay.

9         Let's take the first one first.

10        Can you identify for me any article or study that

11   documents a person undergoing dialysis having a blood

12   bicarbonate level higher than the bicarbonate level in the

13   dialysate with which that person is being treated?

14   A    Yes, sir, I just gave you the example yesterday of the

15   patient I had, excuse me, with crushing chest pain, whose

16   bicarbonate level exceeded.

17   Q    Well, that was, first of all, a personal anecdotal example,

18   which is not my question; and second of all, that was a

19   individual who you indicated had a higher bicarbonate level

20   after dialysis.

21        My question was can you identify for me an article or

22   study that demonstrates a person undergoing dialysis having a

23   bicarbonate blood level higher than the bicarbonate level in

24   the dialysate with which they're being treated?

25   A    Unfortunately -- excuse me -- there are very few studies of

Steven Borkan – Cross

301

1   postdialysis bicarbonate levels, since nephrologists have

2   focused predominantly predialysis bicarbonates.  But in the few

3   studies, one including from Pandy *et al.* from Einstein, in

4   which 50 patients were serially examined, after exposure to

5   GranuFlo and bicarbonate dialysate solution of 43; that is,

6   35 milliequivalents per liter bicarbonate and

7   8 milliequivalents per liter acetate, 53 percent of those

8   patients became frankly alkalemic to a serious degree after

9   exposure to GranuFlo, causing Pandy *et al.* to raise concerns

10  about the acute, severe alkalosis that was now occurring in

11  patients exposed to high bicarbonate contents to which GranuFlo

12  was added.

13  Q   Okay.

14       And I'll come back to my question.  So I can still

15  give it a shot.  But just on that Pandy reference you make,

16  that's out of the University of Pennsylvania, correct?

17  A   No, it's not.  It's Albert Einstein University.

18  Q   Okay.

19       That Pandy reference that you're talking about, that's

20  a short abstract, about four or five sentences long?

21  A   I think it's longer than that, but I think it was reported

22  in abstract form, correct.

23  Q   Is it an actual study, or is it only reported in abstract

24  form?

25  A   It's reported in abstract form.

Steven Borkan - Cross

302

1   Q   Okay, let me go back to my question, because that was

2   talking about postdialysis.

3          My question was can you please point me to an article

4   or study that reflects that a dialysis patient undergoing

5   dialysis was demonstrated to have a bicarbonate level in their

6   blood that was greater than the bicarbonate level in the

7   dialysate with which they were being treated.

8   A   There are many studies, including the Fresenius

9   observation, that bicarbonate levels need not exceed the level

10  prescribed in order to cause toxicity.  So it would be

11  inaccurate and incorrect for me to claim that toxicity would

12  require that the patient's bicarbonate level ever exceed the

13  level prescribed by the physician, or exceed any specific

14  number; that is, that a rapid rise in bicarbonate, more likely,

15  when GranuFlo is added to the dialysate, or high bicarbonate

16  contents in the dialysis solution can raise serum bicarbonate

17  rapidly to a level where symptoms can occur.

18         THE COURT:  I don't know that that's his question.

19  His question, I think, is, are there any studies that show that

20  bicarbonate level in the blood and in the dialysis fluid gets

21  out of balance while you're in the middle of dialysis.

22         MR. HOPKINS:  More or less, Your Honor; I'm happy to

23  take that one.

24         THE COURT:  Well, your question is more artful than

25  mine, but I'm not sure he's answering your question.

Steven Borkan - Cross

303

1    MR. HOPKINS:  I agree, Your Honor.  I did not want to

2    belabor the point on the fourth or fifth try.  But I'll give it

3    one other shot and then move along.

4    BY MR. HOPKINS:

5    Q   During dialysis, Doctor, you testified that acetate can be

6    rapidly converted in the liver into bicarbonate, that that can

7    combine the patient's blood with the bicarbonate they're

8    already receiving through the dialysis process from the

9    dialysate, and you've testified can lead to them having, during

10   dialysis, a blood serum bicarbonate level in excess of the

11   bicarbonate level of the dialysate.

12        And thus my question is can you please identify for me

13   any article or study that demonstrates in a dialysis patient

14   undergoing dialysis that that can occur.

15   A   No, sir, I cannot.

16   Q   Thank you.

17        Can you identify for me, other than the Pandy abstract

18   you just referenced, a study that documents a postdialysis

19   spike in a dialysis patient, other than your personal

20   experience, reflecting a serum bicarbonate level that is higher

21   than the bicarbonate level in the dialysate with which they

22   were treated.

23   A   No, I cannot.

24   Q   Thank you.

25        Now, the National Kidney Foundation has a program,

Steven Borkan - Cross                                     304

1    it's an organization, I'll call it a program, called the Kidney

2    Disease Outcomes Quality Initiative or KDOQI, correct?

3    A    That's correct.

4    Q    And that is a program that has a group of experts in the

5    field that meets and discusses and makes consensus

6    recommendations about the care of chronic kidney disease and

7    end-stage renal disease patients, does it not?

8    A    Yes, sir.

9    Q    And you would agree, would you not, that the KDOQI

10   recommendation from 2000 is that a patient's predialysis serum

11   bicarb level should be equal to or greater than 22

12   milliequivalents, correct?

13   A    That's not my recollection, and the data that you're

14   quoting from 2000 is now 15 years old.

15   Q    That's quite right.  2000 is 15 years ago from today.

16        But the KDOQI recommendation for a patient's

17   predialysis serum bicarbonate level which dates back to 2000 is

18   that that patient's serum bicarbonate level should be equal to

19   or greater than 22 milliequivalents, correct?

20   A    That's not considered scientifically reasonable at the

21   current time.  The current recommendation is to maintain

22   bicarbonates between 20 and 22 milliequivalents per liter, and

23   there is no evidence to my knowledge that maintaining

24   bicarbonates predialysis higher than 22 is of any medical

25   benefit.

Steven Borkan - Cross

305

1    Q    Okay.

2         Has KDOQI changed their recommendation since 2000

3    about that?

4    A    Yes.  In fact, the organization has changed and it has a

5    different name.

6    Q    It does?  What's it called now?

7    A    KDIGO.

8    Q    I see.  Do you know what that stands for?

9    A    Kidney Disease Improving Global Outcomes.

10   Q    Okay.

11        Is that focused on international recommendations and

12   analysis, as opposed to KDIGO?

13   A    Yes, sir.

14   Q    As opposed to KDOQI?

15   A    Yes, sir.

16   Q    So other than your KDIGO reference, there is no KDOQI

17   guideline since 2000 when the recommendation was that a

18   patient's predialysis serum bicarbonate levels should be equal

19   to or greater than 22, correct?

20   A    That's not correct.  In a current American Society of

21   Nephrology meeting that I attended in November 2014, there

22   were -- it was a conference at which the optimal predialysis

23   bicarbonate level was debated.

24   Q    Uh-huh?

25   A    And the general consensus of a thousand nephrologists from

Steven Borkan - Cross

1    around the world was that the 20 to 22 level of bicarbonate was

2    the most rational one, given our current scientific

3    understanding of the risks of acute metabolic alkalosis during

4    dialysis versus failing to treat metabolic acidosis because of

5    its potential problems.

6    Q   Okay.

7         And the specific discussion that you're referring to

8    about acid/base balance, was that the controversies in

9    nephrology between Dr. Mehotra and Dr. Tentori?

10   A   Yes, it was.

11   Q   I see.  And was the discussion during that conference

12   between those two researchers, did they have agreement that

13   this standard that you're talking about was the appropriate

14   predialysis serum bicarbonate level to be used as a standard?

15   A   Yes.  Although there was some debate, there was general

16   agreement that the risks of acute metabolic alkalosis which is

17   increasing in severity in the dialysis population needs to be

18   tempered.

19   Q   And there was agreement between whom, Dr. Mehotra and

20   Dr. Tentori, on that topic as to the level of predialysis serum

21   bicarbonate while they were on the dais during that discussion?

22   A   Yes, sir.

23   Q   Okay.

24        And the actual title of that discussion was called

25   Controversies in Nephrology, talking about the difference

Steven Borkan - Cross

1    between whether it's better to have a higher predialysis serum

2    bicarbonate or a lower predialysis serum bicarbonate, wasn't

3    it?

4    A    That's correct.

5    Q    And didn't Dr. Tentori make very clear in her address that

6    she was not taking any position regarding any association

7    between high serum bicarbonate levels and adverse morbidity or

8    mortality and that such associations disappear when the

9    malnutrition inflammation complex is taken into account?

10   A    No, sir, I believe your representation is inaccurate.

11   Because she has published in 2013 that for each

12   4 milliequivalent increase in predialysis bicarbonate, there

13   was a marked increase, a significant increase in morbidity and

14   mortality.

15         The debate in the literature and from Dr. Tentori is

16   not whether or not metabolic alkalosis measured by predialysis

17   bicarbonates is dangerous.  There's general agreement that it

18   is.

19         However, there is debate about how to explain that

20   increase in morbidity and mortality.

21         Furthermore, the Fresenius document suggests that

22   patients who experience metabolic alkalosis in the chair are at

23   six- to eightfold increased risk of death during dialysis.

24   Q    We're going to come to Dr. Tentori's article in a few

25   minutes.

Steven Borkan - Cross

308

1    As people age, Doctor, endogenous acid production

2    decreases, doesn't it?

3    A    That assumes that the patient's muscle mass has decreased.

4    And in general, your statement is true.  But not every older

5    person experiences a decrease in muscle mass.  Therefore, it's

6    generally accepted but not universal.

7    Q    Okay.

8         And during dialysis, isn't it well established that

9    bicarbonate, the administration of bicarbonate, may actually

10   stimulate or boost endogenous acid production?

11   A    Yes, this is a known effect of metabolic alkalosis.  And in

12   some cases, particularly by Burson, *et al.*, it's been noted

13   that patients with underlying coronary artery disease can

14   experience acute angina during bicarbonate administration

15   because of the effect that you just mentioned.  That is, an

16   increase in acid production.

17   Q    And you do agree, don't you, that the determination of the

18   level of bicarbonate in the dialysate with which a dialysis

19   patient is treated is a decision for the treating nephrologist

20   based on his or her clinical judgment for a particular patient,

21   correct?

22   A    Yes.  The bicarbonate concentration is at the purview of

23   the nephrologist.  But the acetate content is not.

24   Q    But the -- unless the nephrologist asks to have a different

25   dialysate used, correct?

Steven Borkan - Cross

1   A    I don't know that that's an option, sir.

2   Q    You also believe that the use of sodium diacetate in

3   GranuFlo uniformly, meaning across all patients, results in a

4   patient's serum bicarbonate level exceeding the level intended

5   by the treating nephrologist in the dialysis prescription,

6   correct?

7   A    Yes.  That makes physiologic sense because the GranuFlo

8   would provide more bicarbonate equivalents than written for by

9   the nephrologist.  And as a result, the patient's delivery of

10  bicarbonate would be from two sources.  One would be from the

11  GranuFlo, and the other would be from the bicarbonate.  And

12  it's only the bicarbonate component that the nephrologist

13  prescribes.

14  Q    But you did say that you agree that the use of sodium

15  diacetate in GranuFlo results in a patient's serum bicarbonate

16  level exceeding the level intended by the treating nephrologist

17  as written in the prescription, correct?

18  A    That is the sole purpose.  My understanding is of the

19  creation of the GranuFlo product is purposefully to increase

20  the bicarbonate delivery to the patient.

21  Q    So that the patient is then receiving, in your opinion,

22  more, the patient's serum bicarbonate level is going to be --

23  let me rephrase that.

24          The patient's serum bicarbonate level is going

25  to . . . you believe that the use of GranuFlo results in a

Steven Borkan - Cross

1    patient receiving more bicarbonate than the treating

2    nephrologist intended in a prescription, correct?

3    A    Yes, I do.

4    Q    But of course you can't know that without knowing what the

5    treating nephrologist intended, correct?

6    A    No, I disagree with that statement.  The bicarbonate level

7    prescribed in the nephrologist's prescription is evidence of

8    intent.  That is, that nephrologists appreciate that the higher

9    the bicarbonate they prescribe, in general, the higher the

10   bicarbonate level will achieve in the patient.  We reviewed

11   that data yesterday.  Data suggested by Dr. Goldfarb which is

12   an article publish by Noh *et al.* in 2007.  And they showed that

13   as the nephrologist increases the bicarbonate in the

14   prescription, the predialysis bicarbonate rises, to a small

15   extent.  But the postdialysis bicarbonate level rises to a far

16   greater extent.

17          So that the price of trying to increase a patient's

18   predialysis bicarbonate is a surge in bicarbonate during or

19   immediately after dialysis.  The addition of GranuFlo would

20   biochemically and predictably increase the height of that surge

21   and the rate at which bicarbonate is delivered to the patient.

22   Q    But my question goes to the statement that a patient is

23   receiving a bicarbonate amount that's greater than what's

24   intended by the treating nephrologist.  And that opinion

25   assumes that there are no treating nephrologists that are aware

Steven Borkan - Cross

1    of the acid concentrate of the dialysate that's going to be

2    used on their patient, correct?

3    A    Unfortunately, this, the current state of affairs is that

4    most nephrologists are not aware of the difference in acetate

5    content of GranuFlo versus NaturaLyte or other brands of

6    acetate-containing dialysate.

7    Q    Okay.

8            A medical director or a facility would know what acid

9    concentrates are being used in their facility, wouldn't they?

10   A    In a perfect world, yes.  But that assumes that the medical

11   directors have been properly educated and have actually read

12   their emails and with all the pressures they have on their

13   heads have focused on this fact.

14           And in fairness to them, unless they had data pre,

15   during, and post changing of one medical product to another,

16   they would have no reason to educate the rest of us at the

17   facility to be on alert for higher than expected predialysis

18   bicarbonates.

19           So the saddest part to me of this story is the clear

20   evidence of lack of communication from the manufacturer of the

21   medical product to the medical director to the clinics to the

22   staff who actually use it and to the prescribing nephrologists

23   who should be aware, should have been made aware of the

24   possibility of a rise in predialysis bicarbonates, a fall in

25   potassium, a fall in ionized calcium, and some of the many

Steven Borkan - Cross                                    312

1   other consequences of acute metabolic alkalosis in

2   GranuFlo-exposed patients.

3   Q    So your answer to the question of whether a medical

4   director in a facility knows what acid concentrates are being

5   used in that facility is, I gather, you don't know?

6   A    I don't know.

7   Q    So you don't know if plaintiff Tony Armstrong's treating

8   nephrologist, Dr. Trina Miller, who is the medical director of

9   the clinic where Mr. Armstrong received dialysis, you don't

10  know if she knows what concentrates are being used in her

11  facility, do you?

12  A    I don't know.

13  Q    In your reply declaration, you indicated that it's the

14  responsibility of the dialysis unit, not the prescribing

15  nephrologist, to ensure that the dialysate formulate delivers

16  the prescribed bicarbonate content.  And the technician does

17  that, doesn't he or she, Doctor, by inputting the bicarbonate

18  prescription into the machine exactly as the doctor gives it,

19  correct?

20  A    That's correct, with regard to the bicarbonate component,

21  but incorrect with regard to the acetate component, since

22  there's no line for acetate in my prescription.

23  Q    Is there a setting for acetate in the machine, Doctor?

24  A    No, I don't believe so.  I believe it's the acetate

25  component is determined by which product is actually infused

Steven Borkan - Cross
313

1    into the machine as that third stream.

2    Q    So when the doctor gives the prescription and gives a

3    number for bicarbonate, that's the number that the dialysis

4    under the technician puts in the machine, correct?

5    A    Yes, and that's independent of the independent component of

6    acetate.

7    Q    Yes, that's quite clear, but the technician inputs the

8    number for bicarbonate into the machine that the treating

9    nephrologists provides, correct?

10   A    That's correct.

11   Q    And when the FDA increased its class one labeling recall

12   related to GranuFlo and NaturaLyte, did the FDA indicate that

13   dialysis unit technicians should be changing bicarbonate

14   prescriptions given by the treating nephrologists?

15   A    No, I don't believe so.

16   Q    And when Fresenius issued its urgent product notification

17   and providing information to its customers in 2012, did

18   Fresenius tell its customers, one of which is DaVita, that it

19   should have its technicians changing the bicarbonate setting on

20   the machine in contravention to the doctors' prescription?

21   A    No, it did not.

22   Q    Has Fresenius ever given such instructions to its

23   customers?

24   A    I'm not sure of your question.

25   Q    Has Fresenius ever told any of the customers that purchase

Steven Borkan - Cross                                    314

1  the GranuFlo product that when they are using that product in

2  their dialysis unit, the technicians in the unit should change

3  the bicarbonate setting on the machine?

4  A   I'm not privy to all of the communications between

5  Fresenius and its employees, so I would have to say I don't

6  know.

7  Q   But you would agree, wouldn't you, that the dialysis

8  technician cannot alter the dialysis prescription given by the

9  treating nephrologist, correct?

10  A   With regard to the bicarbonate component, I agree with you.

11  Q   And when you're referencing a patient's exposure to

12  dialysate in your declarations, and as we talked about at your

13  deposition, you've indicated you're referring to one patient

14  and a single dialysis treatment, correct?

15  A   Which patient are you referring to, sir?  I'm sorry.

16  Q   Any patient.  When you say a patient's exposed to GranuFlo,

17  you mean not that they've gone three times a week for a month

18  or a year, you mean that a patient has undergone one treatment

19  with GranuFlo one time.

20  A   I'm not sure that I understand your question.

21  Q   Okay.

22       In paragraph 9 of your declaration, you make a

23  reference to exposure to dialysis solutions, and your reference

24  there, I've asked you before, is to one patient, one dialysis

25  treatment at one point in time over the course of their entire

Steven Borkan - Cross

315

1   dialysis treatment life.  That qualifies as exposure; is that

2   right?

3   A    Yes, sir.

4   Q    Thank you.

5   A    At any point a patient exposed to GranuFlo could experience

6   toxicity, and it might only be one exposure, that's correct.

7            MR. HOPKINS:  Pat, can you pull up plaintiffs'

8   PowerPoint.

9            Slide 34.

10  BY MR. HOPKINS:

11  Q    Now, this is data from the Noh study; is that correct,

12  Doctor?

13  A    Yes, it is.

14  Q    Did you prepare this slide?

15  A    Yes, it is.  This is a --

16  Q    Well, no, did you prepare the slide?

17  A    Yes, I did.

18  Q    Okay.

19           If you take a look at -- you can leave this on the

20  screen.  But take a look at Exhibit G, which is in your book,

21  please.

22           Do you have that?

23  A    Yes, sir, I do.

24  Q    Okay, the second page, page 96, at the bottom.

25           Of page 96, the left-hand column, the last paragraph.

Steven Borkan - Cross

1          There's an explanation there about the kind of

2   dialysate solutions they use in the study, and it says, quote,

3   Conventional bicarbonate solutions.  Is that right?

4   A   Yes, sir.

5   Q   Okay.

6          Looking at slide 34, it says at the bottom, four-hour

7   dialysis, no dialysate acetate added.

8          Did you put that reference in there?

9   A   Yes, I did.

10  Q   And why was that?

11  A   These patients in the Noh study, I believe, were not

12  exposed to GranuFlo.  So there was no additional acetate beyond

13  the prescribed level of bicarbonate.

14  Q   Well, didn't we talk earlier that every bicarbonate-based

15  dialysate contains some level of acetate, which you said is

16  typically 4 milliequivalents?

17  A   Yes, I did.  But unfortunately, the article did not detail

18  which brand or acetate content, so that's why I put no

19  dialysate acetate added.

20  Q   Oh, okay.

21         Well, let's just go with the typical.  So it's got

22  4 milliequivalents of acetate, 'cause they say they used

23  conventional bicarbonate solution; doesn't sound like it's

24  anything racy or unusual.

25         Therefore, using your approach that bicarbonate and

Steven Borkan - Cross

317

1   acetate is additive to figure out the total buffer, the total

2   amount of bicarbonate against which the patient is being

3   dialyzed, that means as you look across the top here of the

4   chart, when someone was getting 25 bicarbonate, as you

5   calculated, they were actually getting 29.  And when someone

6   was getting a 30 milliequivalent bicarbonate containing

7   dialysate, they were actually getting 34; and then the

8   individuals who were getting a 35 bicarbonate dialysate were

9   actually getting 39 milliequivalents, correct?

10  A   That makes the assumption that their dialysate solution

11  contained 4 milliequivalents units of acetate or contained

12  acetate at all, and we don't know that.

13  Q   Can you identify for me a bicarbonate-based solution that

14  does not contain some element of acetate or citric acid?

15  A   Off the top of my head, no.

16  Q   Okay.

17          And I thought we established that 4 was typical.  But

18  we'll leave that as it be.

19  A   It can range, my understanding is that it can range --

20  Q   There's no question pending, Doctor; thank you.

21  A   Sure.

22  Q   With respect to the Noh study here, these people were

23  dialyzed over five years, correct?

24  A   I believe they were dialyzed for variable periods of time.

25  Do you mean that five years was the average duration of

Steven Borkan - Cross

318

1   dialysis in this population?

2   Q    Yes.

3   A    Yes, sir.

4   Q    And that indicates that for patients that over the

5   five-year period were dialyzed against a 35 milliequivalent

6   level of bicarbonate level containing dialysate -- I'm not

7   going to talk about the 4 milliequivalents of acetate for

8   now -- that those folks, nonetheless coming in two to three

9   times a week, at least, dialyzed against a 35 plus 4 dialysate,

10   had still, had a prehemodialysis serum bicarbonate level of

11   22.9, correct?

12   A    That's correct.

13   Q    Could you please take a look at Exhibit R.

14            And, Pat, if you could pull it up.

15            And look at the third page of that PowerPoint.

16            Doctor, do you understand the difference in these

17   different types of dialysate illustrated by the different

18   ratio --

19            THE REPORTER:  Could you go back to the Xs, please.

20   BY MR. HOPKINS:

21   Q    Doctor, do you understand the different types of dialysate

22   shown here by concentrate proportioning, the 45X, 35X, and

23   36.83X?

24   A    I am aware that, of different proportioning; but since I do

25   not run a dialysis machine, these are not numbers that I'm

Steven Borkan - Cross

319

1    familiar with.

2    Q    Okay.

3         So you're not familiar with these different types of

4    dialysate?

5    A    No, I'm aware -- I should restate that.

6    Q    Sure.

7    A    I'm aware of the difference between dialysate buffers that

8    contain the acetic acid as diacetate as portrayed on this

9    diagram, but not with this specific X concentration of the

10   various components of the dialysate.

11   Q    Thank you.

12        And you've talked in your reply declaration about an

13   apparent association between an increased serum bicarbonate

14   level and an increased risk of death.  There's a difference

15   between an apparent association and causation, correct?

16   A    Yes.  Association does not imply causation.

17   Q    Thank you.

18        And you've indicated in your reply declaration that

19   the studies you've referenced indicate that predialysis

20   bicarbonate levels greater than 27 or 28 milliequivalents

21   increases morbidity and mortality in human dialysis patients.

22   So do you mean that those studies stand for the proposition

23   that having that serum bicarbonate level causes illness and

24   death in human dialysis patients?

25   A    I believe the number that you quoted, if I recall, was 27

Steven Borkan - Cross

320

1   or 28.   The Fresenius data and subsequent studies would suggest

2   26 or 27 is sufficient to characterize the patient as at risk

3   for cardiopulmonary arrest.

4   Q   But those studies and the studies you referenced are

5   talking about an association, correct, they're not talking

6   about causation?

7   A   That's correct.

8   Q   And to support your opinion -- I know you said this

9   yesterday, I apologize -- to support your opinion that there is

10  such an increased risk of death from the use of GranuFlo, you

11  rely on the Fresenius November 4, 2011 internal memo, don't

12  you?

13  A   No, sir, there's extensive data in addition to the

14  Fresenius document which noted that not only was predialysis

15  bicarbonate a risk factor for cardiopulmonary arrest but a

16  predialysis potassium of 4 milliequivalents or less was also an

17  independent risk factor and that when the two of them are

18  considered together, the risk of cardiopulmonary arrest was

19  even greater.

20          That data, in addition to data showing that the more

21  bicarbonate is delivered to a patient, the faster the lowering

22  of potassium, and other studies showing that alkalosis

23  decreases ionized calcium, and other studies showing that

24  bicarbonate aggravates hypoxemia, and other studies indicating

25  that alkalosis through the Bohr effect decreases oxygen

Steven Borkan - Cross
321

1    delivery can all be used independently to establish causation.

2    Q   But my question was, other than the Fresenius internal memo

3    of November 4, 2011, there is no other article or study that

4    you've identified that shows such an increased death risk from

5    the use of GranuFlo.  Specifically.

6    A   Such a study could not be carried out because if I were to

7    propose such a study, my institutional review board, IRB, would

8    refuse to let me do it because of the risks of acute and severe

9    metabolic alkalosis in GranuFlo-exposed patients.

10        So the reason I believe there is no single study other

11   than the Fresenius document is that that is the single largest

12   human experiment that I could think of that could be done

13   without institutional review board permission.  And I firmly

14   believe that that study will not be repeated because I couldn't

15   get my colleagues to agree to allow me to expose patients to

16   that degree of risk.

17   Q   The study that was done, review of data that was done in

18   November 4, 2011 memo, took data from patients being treated

19   with GranuFlo in Fresenius clinics at various level of bicarb

20   prescriptions, correct?

21   A   That's correct.

22   Q   Are people still being treated with GranuFlo today in

23   Fresenius clinics, in DaVita clinics, at those same levels of

24   bicarbonate prescriptions?

25   A   I don't have access to that data, sir, I don't know.

Steven Borkan – Cross

322

1    Q    And the November 4, 2011 memo was an observational

2    analysis, wasn't it?

3    A    Yes, sir.

4    Q    And in observational studies, there can be apparent

5    association which then disappear when other factors are taken

6    into account, correct?

7    A    That is possible.  Although in this study, I can't fathom

8    what those factors would be as a nephrologist.

9    Q    Apart from that study, in observational analyses, apparent

10   associations can disappear when other factors are taken into

11   account, correct?

12   A    That's correct.

13   Q    And that's the nature with multivariate analysis, isn't it?

14   A    Yes, it is.

15   Q    And a multivariate analysis is observation and analysis of

16   more than one statistical outcome variable at the same time,

17   correct?

18   A    That's correct.

19   Q    And you would agree, wouldn't you, that a higher

20   predialysis serum bicarbonate level is a marker in dialysis

21   patients for malnutrition or the inflammation complex?

22   A    It is possible that in some patients, a high bicarbonate

23   could represent malnutrition.

24   Q    Let's take a look at Exhibit II, please.

25          THE COURT:  Mr. Hopkins, would this be an acceptable

Steven Borkan - Cross

323

1    time to take a ten-minute break?

2            MR. HOPKINS:  Absolutely, Your Honor, and I will try

3    to move very expeditiously through the rest of my examination.

4            THE COURT:  Actually, you're doing great.  You're

5    going at a pace that I can follow.

6            MR. HOPKINS:  Okay.

7            THE COURT:  I get your questions, I get the answers,

8    I'm learning a lot.  I'm not quite sure what points you're

9    making on some of this with respect to the issues before me.

10   But at least I'm learning a lot.

11           MR. HOPKINS:  Understood, Your Honor, thank you.

12       (Recess at 10:40 a.m.)

13       (Reconvened at 10:56 a.m.)

14           THE COURT:  I understand that Julie is not trainable.

15   No matter how many times I say, you don't have to say "all

16   rise," she does it.

17           MR. HOPKINS:  I'm from the old school, myself, so I

18   would not be able to not do it.

19           THE COURT:  No, she's right.  She's absolutely right.

20           Onward.

21   BY MR. HOPKINS:

22   Q   I apologized to Dr. Borkan already; I'd like to take a

23   quick look at Exhibit G, before we then turn to Exhibit II.

24           I think you have Exhibit G before you, Doctor?

25   A   Yes, sir, thank you.

Steven Borkan - Cross

1    Q    And the bottom of the first page, 95, and the top of the

2    next page, 96, there's a reference there to the KDOQI guideline

3    I was talking about earlier, which indicates, quote, Recommends

4    predialysis serum bicarbonate, $HCO_3$ concentration greater than

5    or equal to 22 milliequivalents per liter as a target to

6    correct metabolic acidosis, correct?

7    A    Yes, sir.  Those were probably the best guidelines they had

8    at the time when the article was published in 2007.  The study

9    was done a few years earlier.  Those would be the prevailing

10   guidelines at the time.

11   Q    But they're not the prevailing guidelines today?

12   A    No, sir.

13   Q    Then we can look back at Exhibit II, please.

14            Malnutrition and inflammation in chronic human

15   dialysis patients are chronic conditions themselves that can

16   worsen over time, correct?

17   A    That's correct.

18   Q    And they can also lead to morbidity and mortality, correct?

19   A    That's correct.

20   Q    And when studies have adjusted for what this article talks

21   about as the malnutrition inflammation complex syndrome, the

22   apparent association between patients with high predialysis

23   serum bicarb levels and an increased risk of morbidity and

24   mortality disappears; isn't that right?

25   A    It disappears in this particular study in which death is

Steven Borkan - Cross

1  not death in the intra or peri dialysis period.  So this

2  article and its correction of the association with predialysis

3  bicarbonates and a risk of death is not death in the chair.

4  It's not death in the posthemodialysis period, within the 12 to

5  48 hours that we discussed earlier this morning.  It's simply

6  all-cause morbidity and mortality.

7          These are two different forms of death.  And this

8  article in no way, shape, or form bears scientifically on why

9  my patients might die in the dialysis chair.

10          That is only partly related to the predialysis

11  bicarbonate, but more importantly, is more likely than not due

12  to changes in electrolyte and acid/base composition during the

13  procedure itself.  This article does not study the dialysis

14  period or the immediate postdialysis period.  Therefore,

15  correction of the increase in morbidity and mortality that

16  they're describing that occurs not on dialysis has no bearing

17  on the phenomenon of GranuFlo induced toxicity and

18  cardiopulmonary arrest.

19  Q   So this study has no bearing on the issue of high

20  predialysis serum bicarbonate and an increased risk of death

21  for the patients, for death occurring in the clinic or in the

22  defined time period we talked about before; is that your

23  opinion?

24  A   That's correct.  I couldn't have said it more beautifully.

25  Q   Thank you.

Steven Borkan - Cross

326

1          Take a look at page 74.

2          And in the second column, six lines down, the article

3     notes, quote, Moreover, we initially found improved survival

4     rates in the acidotic range of serum $HCO_3$, whereas normal to

5     alkalotic $HCO_3$ levels seemed to be associated with higher

6     all-cause and cardiovascular mortality.  These associations,

7     however, reverse almost entirely after multivariate adjustment

8     to case mix and markers for malnutrition and inflammation

9     together known as MICS.

10         Did I read that correctly?

11    A    That's correct, sir, these are --

12    Q    Thank you.

13    A    These are apples and oranges.

14    Q    You're familiar with the 2013 observational study by

15    Tentori called DOPPS 2?

16    A    Yes, I am.

17    Q    If you turn to Exhibit I.

18         And this is the Tentori study from 2013 that we've

19    talked about before; is that right?

20    A    Yes, sir.

21    Q    Okay.

22         And if you take a look at the second page, under

23    methods, and this was a study that went from, covered data from

24    2002 to 2011, isn't that correct, it's there on the first

25    paragraph under methods?

Steven Borkan - Cross

1    A    That sounds correct.

2    Q    And the patients that were eligible for this analysis were

3    those dialyzing three times per week and having, if you look

4    down at the start of the second paragraph, quote, dialysate and

5    serum bicarbonate values within plausible limits, 20 to 45

6    milliequivalents for dialysate and 10 to 36 milliequivalents

7    for serum.  Were eligible for this analysis.

8           So that's the, those are the patients and the values

9    that they felt were plausible that they looked at in the study;

10   is that correct?

11   A    That's correct.

12   Q    And the study reported that no trends in dialysate

13   bicarbonate concentration were observed, correct?

14   A    That's correct.

15   Q    And the authors indicated that their analysis of the data

16   in this nine-year study did not find an interaction between

17   dialysate bicarbonate concentration and serum and dialysate

18   potassium and calcium levels, correct?

19   A    That's correct.

20   Q    The authors also indicated that their findings are in

21   agreement with results from a recent analysis that reported no

22   association between serum bicarbonate levels greater than 22

23   milliequivalents per liter and mortality after adjustment for

24   nutritional and inflammatory markers, didn't it?

25   A    That's correct, but, again, sir, this study did not bear on

Steven Borkan - Cross

328

1    death that occurred in the dialysis chair or in the immediate

2    dialysis period and only studied predialysis bicarbonates; and

3    Tentori acknowledged in her analysis, she couldn't tell which

4    patients in this, I believe it's Fresenius centers that

5    participated in this study, used GranuFlo and those which did

6    not, since it was not reported and not recorded.

7    Q    Did they talk about GranuFlo specifically in that study?

8    A    In the conference that I mentioned in November 2014, and in

9    a subsequent editorial, I believe published in the *Clinical*

10   *Journal of the American Society of Nephrology* or it could have

11   been the *American Journal of Kidney Disease*, Tentori

12   acknowledged there was no data available to her about which

13   patients were or were not exposed to GranuFlo and which centers

14   did or did not use GranuFlo.  So her analysis was somewhat

15   limited.  And she acknowledged that the data provided in the

16   current study that we're discussing right now, 2013, did not

17   bear on intradialytic changes in serum bicarbonate.

18   Q    Did she speak about GranuFlo at all in her remarks from the

19   dais, in the conference?

20   A    I can't recall whether it was publicly said or whether it

21   was a private conversation between the two of us that occurred

22   after that conference.

23   Q    Was that at the conference that you spoke to her?

24   A    Yes, it was.

25   Q    After that presentation?

Steven Borkan – Cross

329

1    A    Yes.

2    Q    Was there anyone else present during that discussion?

3    A    No, sir.

4    Q    How long did that last?

5    A    About five minutes.

6    Q    What did you talk about?

7    A    I had stood up in front of a thousand of my colleagues and

8    I had presented my concerns based on my reading of the

9    literature about the potential relationship between sudden and

10   severe metabolic alkalosis in GranuFlo-exposed patients and the

11   increased risk of sudden death.

12          And when I stood up at the microphone and presented,

13   what you refer to as my theory or my hypothesis, not a single

14   person stood up to disagree with me.  And even Dr. Mehotra, who

15   was charged with presenting the component of the controversy

16   that metabolic alkalosis was desirable, acknowledged that we

17   really don't have sufficient information to know at what level

18   metabolic alkalosis during the dialysis period is dangerous.

19   But acknowledged that we should be cautious.

20          So there was not a single person of a thousand of my

21   colleagues that disagreed with the basic observation that

22   acute, severe metabolic alkalosis can cause cardiopulmonary

23   arrest through the very mechanics that I said here.

24   Q    That was an open Q and A session?

25   A    Yes, it was an open microphone Q and A.

Steven Borkan - Cross

1    Q    Did anyone get up and speak?

2    A    There was quite a bit of controversy because this is

3    currently on the cutting edge of nephrology.

4    Q    Was there anyone in the audience that reacted to anyone

5    asking the question expressing disagreement and arguing with

6    them in the middle of the Q and A session?

7    A    Absolutely.  That's what people do.

8    Q    So someone got up to ask a question and someone else got up

9    and disagreed with them and argued with them during the Q and A

10   session?

11   A    Absolutely.

12   Q    That's not what I saw when I was there.

13         With respect to the November 4, 2011 memo --

14         THE COURT:  Now, you'll not do that at trial.

15         MR. HOPKINS:  I apologize, Your Honor.  I'm sorry.

16   BY MR. HOPKINS:

17   Q    After the November 4, 2011 memo, the Fresenius medical

18   office later issued a further communication on the data that

19   was discussed in the November 4 memo; isn't that correct?

20   A    Can you specifically refer me to, refresh my memory as to

21   which memo you're mentioning.

22   Q    Sure.  Turn to Exhibit E.

23         I'm sorry, are you at Exhibit E?

24   A    Yes, I am.

25   Q    Okay.

Steven Borkan - Cross

331

1        This is a further analysis of the data that was looked

2    at in the November 4, 2011 memo that was issued subsequently,

3    in about July 2012; isn't that right?

4    A    Yes, sir.

5    Q    And if you look on the first page, down to the first -- end

6    of the last paragraph on the first page, it reflects that the

7    rate of cardiopulmonary arrest at Fresenius remained stable

8    between .4 and .6 events per 10,000 treatments over the past

9    decade.  Doesn't it indicate that?

10   A    Yes, it does say that.

11   Q    So it was not increasing; the rate of CPA events per 10,000

12   treatments was stable, correct?

13   A    According to their report, yes.

14   Q    Okay.

15        And if you look to the second page, there's a

16   reference that, in the middle of the page, the mortality rate

17   of the overall population of human dialysis patients had been

18   gradually declining over the period reflected there from 2007

19   to 2011; isn't that right?

20   A    That's correct.  But again, this does not bear on

21   cardiopulmonary arrest.  This was simply mortality trends in

22   general, and mortality can occur for a variety of natural and

23   unnatural causes.

24   Q    Okay.

25        If you turn to Plaintiffs' Exhibit 22, Pat.

Steven Borkan - Cross

332

1    It's missing.  Look in one of plaintiffs' books.

2    If you look in plaintiffs' exhibits, one of those

3    books?

4    A   I have volume 1 and volume 2.

5    Q   Okay.

6    Let's try volume 2.  Looking for Exhibit 22.

7    A   Yes, I have it.

8    Q   Now, that first email, Dr. Borkan, is an email from an

9    individual at Fresenius to individuals at DaVita sending along

10   an urgent product notification for naturalized liquid and

11   GranuFlo acid concentrate dated March 30 of 2012; is that

12   right?

13   A   Yes.

14   Q   Now, since March 30 of 2012, has the manufacturer of

15   GranuFlo, Fresenius, provided further instructions and guidance

16   regarding the concept or idea of total buffer?

17   A   I'm not sure.

18   Q   Okay.

19   Let's take a look at Defendant's Exhibit F.  So you

20   can put that binder away and go back to the big one you were

21   looking at.

22   A   I'm with you at F.

23   Q   Okay.  And you see this is a Fresenius medical office

24   communication dated November 3, 2014?

25   A   Yes.

Steven Borkan - Cross

1    Q    Okay.

2              If Fresenius provided an important update and guidance

3    to treating physicians regarding prescribing of dialysate made

4    with GranuFlo, would that be relevant regarding your opinions

5    in this case?

6    A    It might be.

7    Q    And if Fresenius had issued an important update and had

8    advised treating physicians, all of them with privileges at

9    Fresenius clinics, that the concept of total buffer was being

10   used incorrectly in medical and product literature to suggest

11   that, one, hemodialysis patients might be dialyzed against a

12   dialysate containing a bicarbonate concentration higher than

13   the physicians' prescribed bicarbonate dose; or, two, that

14   hemodialysis patients' serum bicarbonate levels might rise to a

15   level exceeding the bicarbonate doses and that both of those

16   uses of total buffer are inaccurate and might lead physicians

17   to reduce the prescribed bicarbonate dose they might otherwise

18   order for patients, that would be information that you would

19   want to know regarding your opinions, wouldn't it?

20   A    To be honest, it wouldn't change my opinion, because I

21   still believe there's substantial scientific evidence that the

22   amount of bicarbonate delivered is greater than I prescribed

23   when the dialysate contains GranuFlo, and that amount could

24   exceed even the 4 milliequivalent difference between the

25   typical solution and the GranuFlo.

Steven Borkan - Cross

334

1    Q    So if Fresenius, the manufacturer of GranuFlo, had

2    indicated to all of its medical directors and the treating

3    physicians, 5,000 or more that treated at its clinics, that

4    treating physicians must provide a bicarbonate dialysis dose

5    prescription that will be the bicarbonate setting on the

6    machine, that wouldn't be information that would be relevant to

7    you?

8    A    I'm not sure scientifically that that's an accurate

9    statement, and I would regard it with skepticism.

10   Q    Okay.

11        If Fresenius had had discussions with the FDA and the

12   FDA had agreed that Fresenius could delete references to total

13   buffer from Fresenius documentation and GranuFlo and NaturaLyte

14   products' labels and literature, that wouldn't have been

15   information relevant to your opinions?

16   A    No, I'd still have similar concerns.  Because if you just

17   give me a little liberty, since you asked me to review this

18   document --

19   Q    I didn't ask you to review the document, I asked you to

20   turn to it, Doctor, so I don't think your answer is really

21   responsive.

22        It's your opinion, isn't it, that a change in pH will

23   change serum potassium and change ionized calcium every time a

24   patient is treated with GranuFlo but those changes will not

25   necessarily be outside the range of normal, correct?

Steven Borkan - Cross

335

1    A    No, I would not agree with your statement at all.

2    Q    Okay.

3              You gave a deposition in this case?

4    A    Yes, sir, I did.

5    Q    And you took an oath to swear the truth?

6    A    Yes.

7    Q    And you told the truth at your deposition, correct?

8    A    Yes.

9    Q    There's a binder there that says deposition transcripts.

10   If you could take a look at that.

11             Referring to page 146, line 8.

12             Do you have that, Doctor?

13             I'm sorry.

14   A    You said, sir, 146.

15   Q    Yes, sir, page 146, line 8.

16             And were you not asked and did you not answer, quote,

17   Okay, is it possible to have an elevated serum bicarbonate

18   level and increased pH and have a reduction in potassium but

19   not a reduction in calcium or vice versa.

20             And you answered, You can easily change both ionized

21   calcium and potassium levels without altering pH, but a change

22   in pH is one of the most basic and cardinal physiologic

23   changes, and changes in pH will change serum potassium and will

24   change ionized calcium.

25             And then I asked, But not necessarily in every case

Steven Borkan - Cross

1    outside the normal range.

2              And then you answered, That's correct.

3              Isn't that right?

4    A    Yes, sir.

5    Q    Now, you agree that not every patient treated with GranuFlo

6    will experience negative consequences, correct?

7    A    I would hope not, sir.

8    Q    And a dialysis patient being treated with GranuFlo might

9    even be acidotic, correct?

10   A    That's correct.  And in that case, if the bicarbonate was

11   less than 19, Fresenius reported that that patient would also

12   be at increased risk for cardiopulmonary arrest.

13   Q    But a patient could be being treated with GranuFlo and

14   nonetheless still have their predialysis serum bicarbonate

15   levels in the acidotic range?

16   A    That's correct.

17   Q    So the effect of GranuFlo really depends on the individual

18   patient's biochemistries prior to dialysis, doesn't it?

19   A    No, sir, it's not that simple.  It also relates to how

20   their body processes the GranuFlo, which as we discussed,

21   contains acetate.  And in the memo that you recently referred

22   to, Fresenius acknowledged in one of the paragraphs that they

23   were deeply concerned about the variability between patients in

24   acetate metabolism and uncertainty about when bicarbonate would

25   rise in each individual patient, which is precisely my concern.

Steven Borkan - Cross

337

1  Q   And it's your opinion, is it not, that regular monitoring

2  of key laboratory values by the dialysis center more likely

3  than not would have detected a trend towards elevated blood

4  bicarbonate levels as well as lower potassium levels in

5  patients treated with a dialysate containing sodium diacetate?

6  A   That's correct.

7  Q   A trend is more than one value, right?

8  A   Yes, sir, it is.

9  Q   And an upward trend would be a number of values over time

10  that are increasing, correct?

11  A   Yes, it would.

12  Q   And it's also your opinion that elevated bicarbonate values

13  would be immediately evident, like flipping a switch?

14  A   That's correct.

15  Q   And I believe it's also your opinion that switching a flip

16  to a higher acetate content would immediately --

17         And it is also your opinion that flipping a switch to

18  the higher acetate content would immediately increase

19  predialysis bicarbonate levels?

20  A   Yes, as reported by Noh.

21  Q   That would be detected at the first month's drawing

22  thereafter?

23  A   I apologize.  Yes.

24  Q   And you've acknowledged that the postdialysis data that you

25  call the primary importance to your opinion generally does not

Steven Borkan - Cross

338

1    exist for a typical dialysis patient, correct?

2    A    That's correct.

3    Q    You don't believe that treatment with GranuFlo can lead to

4    a blockage of the heart, do you?

5    A    I'm not sure what is meant by your statement.

6    Q    Well, as opposed to an electrical disruption of the heart,

7    a heart attack caused by a blockage of the heart would not be

8    caused by GranuFlo, correct?

9    A    No, I don't believe the mechanism by which GranuFlo causes

10   heart attacks is related to a mechanical or structural blockage

11   of the heart.  I believe that patients who have preexisting

12   structural problems with the heart are susceptible to ischemia

13   when exposed to GranuFlo through a variety of mechanisms that

14   we discussed earlier.

15   Q    When you see chronic hemodialysis patients in your practice

16   that you have not seen before, do you ask whether they've had

17   dialysis with GranuFlo recently, or previously, rather?

18   A    No, I do not.

19   Q    Do you ask where they had dialysis so that you can

20   investigate where they previously were dialyzed to see if they

21   received a dialysate containing GranuFlo?

22   A    No.  My investigation would be limited to getting what's

23   called a rounding report.  Which is a standard document shared

24   between dialysis units in which the patient's biochemical

25   parameters are measured, their dialysis prescription is

Steven Borkan – Cross

1    detailed, and their response to dialysis with regard to their

2    vital signs and body weights is documented.  And I would review

3    that document, searching, among other things, for evidence of

4    an elevated predialysis bicarbonate or low dialysis

5    bicarbonate.

6  Q   Have you changed your dialysis prescriptions for your

7    patients at all to account for the level of acetate that's in

8    the dialysate being used?

9  A   I now pay more attention to the predialysis bicarbonate

10   level and potassium level to pick up patients who may be at

11   risk for cardiopulmonary arrest during the procedure because of

12   the development of alkalosis, which occurs almost universally

13   in patients and is the price that we pay and they pay for

14   attempting to increase their predialysis bicarbonate levels to

15   the target range of 20 to 22 milliequivalents per liter.

16        So I do my best to balance the benefit of treating

17   chronic acidosis with the danger of producing acute, severe

18   metabolic alkalosis, since both are accepted to be dangerous.

19  Q   So you change your patient's prescriptions based on their

20   land values?

21  A   Of course.

22  Q   Not based on the brand of dialysate that's being used?

23  A   No.

24  Q   Do you have privileges at any clinics owned or operated by

25   Fresenius?

Steven Borkan - Cross

1    A    No, I do not.

2    Q    Have you ever?

3    A    No.

4    Q    And your opinion regarding the specific sequence of events

5    that you've discussed in your declarations and under

6    examination by plaintiffs' counsel, that happens after a

7    patient is treated with GranuFlo, starting with elevated serum

8    bicarbonate levels and ending in an increased risk of death or

9    sudden death, that theory is a hypothesis, correct?

10   A    That's correct, supported by substantial data.

11   Q    You did research on PubMed to prepare your opinions in this

12   matter; is that correct?

13   A    Yes, I did.

14   Q    And you did research to determine the path of physiologic

15   link between low oxygen content hypoxia and to establish

16   whether or not there was a link between hypoxia and injury to

17   the heart or the heart cell referred to as the cardiac myosite,

18   correct?

19   A    That's correct.

20   Q    But when you did that PubMed search, you didn't review any

21   of the articles that came up as a result of those searches, did

22   you?

23   A    I'm not sure if I understand what you mean by "review."

24   Q    Did you read them?

25   A    Yes, sir, I did.

Steven Borkan - Cross                                    341

1    Q    Would you look at your deposition, the deposition

2    transcript, please, tab 2, page 78.

3         And line 24.  And at your deposition, I asked you

4    regarding this topic, quote, Now, did you review the articles

5    that came up as a result of the searches.

6         And you answered, No, sir, I did not.

7         Isn't that correct?

8    A    That's correct.  That's why I asked you today to be more

9    specific.  In the medical profession, review has two different

10   meanings.  If I read an article and I'm asked if I've read it,

11   the answer would be yes or no.  To review an article has a

12   completely different meaning.  As a reviewer, it would mean

13   that the primary publication would be sent to me for review.

14        So I must have misunderstood your question, which is

15   why you're getting a different answer.

16   Q    So you didn't understand when I asked you, at the

17   deposition, did you review the articles, that I meant, had you

18   read any of them.  You thought I was asking you whether you had

19   formally as a reviewer reviewed them and submitted comments?

20   A    Yes.  Either that or I misunderstood whether you were

21   expecting me to say that I had read every one.  And admittedly,

22   in some of the articles, since there were, in the case of

23   myocardial ischemia, my recollection is something like 7,000

24   PubMed hits, I did not read and certainly did not review 7,000

25   manuscripts.

Steven Borkan - Cross                    342

1    Q   Well, you were certainly free to answer to me, I didn't

2    review all of them, I didn't read all of them, I only read

3    eight, correct?

4    A   That's correct.

5            MR. HOPKINS:  I have nothing further, Your Honor.

6            MR. PAYNTER:  Very short redirect, Your Honor.

7                      **REDIRECT EXAMINATION**

8    BY MR. PAYNTER:

9    Q   Dr. Borkan, do you recall being asked whether you ask your

10   patients if they've received GranuFlo by Mr. Hopkins?

11   A   Yes, I do.

12   Q   Do you have an understanding of whether your patients know

13   whether they have received GranuFlo?

14   A   Yes, I do have an understanding.

15   Q   And what is that understanding?

16   A   My understanding is that the patient would not be able to

17   answer my question.  Therefore, I wouldn't ask it.

18           MR. PAYNTER:  No further questions, Your Honor.

19           MR. HOPKINS:  I have nothing further, Your Honor.

20           THE COURT:  I have a couple of questions.

21                         **EXAMINATION**

22   BY THE COURT:

23   Q   Many times you have referred to the one patient that had

24   crushing chest pains and so forth, and you couldn't figure out

25   why.  His bicarbonate levels exceeded what you prescribe.  And

Steven Borkan - Examination

343

1   then my impression was that you were saying, well, I ultimately

2   figured out, it must have been from GranuFlo.  Is that what

3   you're saying?

4   A    No, sir, not exactly.  At the time that I took care of the

5   patient, I didn't realize, to be honest, that there was an

6   acetate component of the typical dialysis solution.  And even

7   though GranuFlo contains 8 milliequivalents of that acetate,

8   the solution that my patient had probably contained

9   4 milliequivalents of acetate.  So it's technically possible

10  that the high bicarbonate my patient was due to acetate at the

11  lower level than would be provided by GranuFlo.

12          But I didn't mean to imply that GranuFlo was the only

13  explanation for the patient's bicarbonate exceeding my level of

14  prescription.

15  Q    If I recall, you said that the staff clinician observing

16  the dialysis became concerned right during the dialysis or

17  toward the end that this fellow's chest pains were getting

18  worse.  And as a result, that person was brought over to the

19  inpatient facility.

20  A    Yes, sir.

21  Q    The impression I got from that testimony was that he would

22  have been brought over from the 550 Harrison Street facility.

23  A    That's exactly correct.

24  Q    Mr. Hopkins was suggesting, probably because his client has

25  told him, that that facility didn't use GranuFlo.  If that is

Steven Borkan – Examination

1    correct, then it would follow that GranuFlo was not the culprit

2    in that particular instance?

3    A    No, sir.  The purpose of my story was partly to illustrate

4    that because nephrologists like me don't often have bicarbonate

5    levels during dialysis or immediately after, in fact, I was

6    taught as a renal fellow not to obtain those chemical values

7    until four to six hours or more after dialysis, because the

8    numbers would be abnormally out of whack, so to speak, and

9    reflect the dialysate more than they did the patient's baseline

10   chemical values.

11          So this patient illustrated to me, for the first time,

12   how high bicarbonates could rise and not only could they rise

13   to a high level, but that the acetate component would

14   contribute additional bicarbonate above the level that I had

15   prescribed.

16          So the surprise to me was that the bicarbonate level

17   during dialysis is much, much higher than I realized, in part

18   due to the addition of acetate.  And scientifically speaking,

19   there's substantial evidence that GranuFlo, which contains more

20   acetate, would elevate the bicarbonate even further and faster.

21   Q    Now, you just said in response to my question, you said

22   earlier today, and you said it yesterday, that you didn't

23   realize that there was an acetate in these solutions for a long

24   time?

25   A    That's correct.

Steven Borkan - Examination                345

1   Q    And I can't remember if you told us when you first became

2   aware that there was acetate in any of them.

3   A    I believe it was within the last year as preparation for

4   this hearing.

5   Q    I know nothing about nephrologists.  I know more today than

6   I did two days ago.

7   A    Yes, sir, you do.

8   Q    But do you think that would be a common experience, that

9   nephrologists in general didn't realize until a year ago that

10  there was actually acetate in these solutions?

11  A    I think it's -- there is a general ignorance in my field

12  among my colleagues about the technical aspects of the

13  dialysate.

14          For example, when I've asked my colleagues to explain

15  the fact that there are three components of dialysis

16  solution -- and this is at an academic institution where I

17  respect my colleagues greatly -- very, very few of them can

18  accurately explain the three components.  The purified water,

19  the acid component, and the bicarbonate component.

20          And the reason is that although nephrologists are very

21  savvy with the prescription and the physiology and kidney

22  disease in general, we're not nearly as savvy with a highly

23  technical procedure of dialysis, which is done by a separate

24  professional person.

25  Q    The last question really relates to the very last question

Steven Borkan – Examination

346

1   that Mr. Hopkins asked you.  But in the bigger context, it

2   relates to the whole challenge to your testimony.  The

3   defendants have challenged your testimony on the basis that it

4   is nothing more than a hypothesis.  I might be overstating

5   their case a bit.  But that's at least part of their attack.

6   And they have cited law in their papers where courts have said,

7   well, hypothesis is not knowledge.

8            So Mr. Hopkins asked you, isn't your theory of how

9   these plaintiffs' bad outcomes happened a hypothesis, and you

10  said, yes, but it is supported by substantial data.

11           Did I get that right?

12  A    Yes, sir.

13  Q    And you spent the last two days telling us what data you

14  think supports your hypotheses, right?

15  A    That's correct.

16  Q    Many times the plaintiff lawyer asked you, after getting an

17  answer to one of his questions, is that controversial in your

18  field, and each time you would say no.

19           Is your hypothesis as to what happened to these three

20  plaintiffs a matter of controversy among your professional

21  colleagues?

22  A    I don't believe so, no.  And the reason I say that is that

23  even in Dr. Goldfarb's report, which is a -- takes the opposite

24  tack, it would be difficult to find a nephrologist who would

25  disagree about the potential toxicities of metabolic alkalosis.

Steven Borkan – Examination

1    Every textbook on metabolic alkalosis contains the same

2    untoward effects on potassium, on calcium, the Bohr effect, on

3    oxygenation, on contractility of the heart and arrhythmia

4    production or susceptibility.  These are universally accepted

5    toxicities of metabolic alkalosis.

6    Q   Right.

7        But is there controversy with respect to your theory

8    as to how these people got to there?  Let's say everybody

9    realizes and agrees that if you have metabolic alkalosis, it's

10   a bad thing and can be a risky business.

11       But your theory as to how these people got there has

12   to do with elevated bicarbonate levels contributed to by the

13   double dose of acetate in this one particular dialysate which

14   put them into the, ultimately the metabolic alkalosis and they

15   ended up being, three of the minority of patients that have

16   terrible outcomes; is that right?

17   A   That's correct.

18   Q   Is that controversial, in your opinion?

19   A   The outcome is not controversial.  What is controversial is

20   which one or ones of the untoward effect was responsible for

21   their death.  So the outcome is not controversial.

22   Q   But how they got there might be?

23   A   But how they got there, and the reason there is no specific

24   study is it would be very difficult to get anyone to agree to

25   allowing to do the study.  It would be not considered safe or

Steven Borkan - Examination

1    practical or moral.

2    Q   Of course, I haven't heard from Dr. Goldfarb.  I met him

3    this morning, but I haven't heard from him yet.  I take it he's

4    going to disagree with you on how these three people got there.

5    Or is he?

6    A   I don't know, to be honest.

7    Q   Okay.

8         Okay.

9         This will be a softball, but I would like to hear your

10   answer nonetheless because I know I'm going to hear a lot from

11   the defendants to the contrary.

12        Your hypothesis on what happened to these plaintiffs,

13   in your opinion, are you out in left field, are you one voice

14   crying in the wilderness, to use the motto of my undergraduate

15   college, or do you think your hypothesis is one that is shared

16   by many others?

17   A   I think my hypothesis is shared by many others.

18   Q   And why do you say that?

19   A   The opinion that others will raise who might consider it

20   controversial would say that so many chronic illnesses, some of

21   which you've heard about here today, malnutrition,

22   inflammation, high blood pressure, diabetes, coronary artery

23   disease, obesity, hyperlipidemia, high cholesterol, on and on,

24   they would say how do you know, Dr. Borkan, that the patient

25   had, these three patients had untoward events related to

Steven Borkan – Examination

349

1   GranuFlo exposure.  How do you know.  When they have all this

2   burden of disease and they're on dialysis.  Certainly they are

3   fragile and susceptible to untoward consequences.  How do you

4   know that it was the GranuFlo that caused the toxicity.

5        And I would know best because during the finite period

6   of dialysis, that patient's burden of disease didn't change.

7   They came to the procedure and left from the procedure with the

8   same burden of chronic illness.  The one thing I know for sure

9   is that certain biochemical parameters placed them at risk for

10  GranuFlo exposure.

11       So by narrowing the window and concentrating on

12  patients who are otherwise medically stable, albeit with a high

13  burden of disease, I believe we can simply and clearly separate

14  those patients who suffered from GranuFlo toxicity from those

15  who more likely than not did not.

16  Q   I do have one more question.

17       Yesterday I asked you, and I can't remember exactly,

18  because I asked a lot of questions yesterday, but I asked you,

19  basically, isn't GranuFlo good for some patients.

20       And I thought you said yes, for many patients,

21  GranuFlo is fine.

22       Am I wrong?

23  A   No, sir, I did say that.  But I omitted the fact that a

24  consequence of trying to fix one parameter, their metabolic

25  acidosis, inevitably leads to a potential risk of metabolic

Steven Borkan – Examination                          350

1    alkalosis during dialysis, and that we have to achieve what I

2    refer to as the Goldilocks effect, the porridge not being too

3    hot, too much alkalosis, or too cold, too much acidosis.

4    Q    Right, and I do appreciate your including these colorful

5    little analogies because it helps the layperson like me

6    understand.

7            And one that we talked about at length both days is

8    the short versus tall people analogy.

9            And the impression I had yesterday was that for the

10   short people, meaning the people whose bicarbonate levels

11   naturally are low, GranuFlo can be a good thing, and the extra

12   dose of acetate could be a good thing for them.  But today when

13   you came in this morning, you seemed to be saying GranuFlo is

14   dangerous even for those people.

15           And if I'm right so far, my question is, what changed

16   overnight, was it these lawyers telling you, hey, you got to

17   fix this up, or what?

18   A    No, sir, your question is a fair one, and I appreciate it.

19           There are two principles in nephrology that it's not

20   simply how high the bicarbonate level rises or falls but how

21   fast it changes.  So what I omitted in my analogy yesterday

22   with regard to the short people who might benefit is that I was

23   referring only to the effect of the GranuFlo on metabolic

24   acidosis correction.  Their acidosis would likely correct with

25   GranuFlo.  But the risk is that in the patients who have the

Steven Borkan – Examination

351

1    lowest bicarbonate, because of the principle of diffusion, the

2    rate of rise in bicarbonate would be very fast.

3    Q   They need to get there, but they don't need to get there

4    that fast?

5    A   That's correct, sir, and those are two general principles

6    in nephrology that it's not only the absolute level of an

7    electrolyte that's important, but how fast it changes, and when

8    it changes rapidly, those patients generally have symptoms and

9    toxicity at lower levels simply because the body's not able to

10   deal with the rapidity of the change.  And I mentioned

11   yesterday the dialysis is unprecedented in its ability to

12   rapidly produce acute and severe metabolic alkalosis.

13   Q   Last question, promise.

14        Is it your opinion that GranuFlo ought to be taken off

15   the market totally?

16   A   No, sir.  I believe that in some patients it may be of

17   value.  But I'm more concerned than ever that I don't know and

18   the company doesn't really know in whom it would be most

19   beneficial versus toxic.  And that needs to be assessed before

20   that product is widely applied to the general population.

21        So if you pushed me and you said in the absence of

22   data, would you remove the product from the market, my opinion

23   would be, yes.  Because I would be trying to protect the

24   patients at risk for death in the dialysis chair or thereafter.

25   Versus trying to help the subpopulation that I haven't

Steven Borkan – Examination                      352

1    characterized that might benefit from GranuFlo.

2              THE COURT:  All right.  Follow-up questions, start

3    with plaintiff counsel.

4              MR. PAYNTER:  No, Your Honor.

5              THE COURT:  Mr. Hopkins.

6              MR. HOPKINS:  Just one.

7              Ask it from here if that's all right, Your Honor.

8                      **RECROSS-EXAMINATION**

9    BY MR. HOPKINS:

10   Q    Did you examine the medical records of any of the three

11   plaintiffs, Dr. Borkan?

12   A    The only medical records that I reviewed, I believe, is a

13   Mr. Dial.

14   Q    Who is not a plaintiff in this action.

15   A    I don't believe so.

16   Q    Okay.

17              So you reviewed none of -- make sure the record is

18   clear -- you reviewed none of the medical records regarding any

19   of the three remaining named plaintiffs, Mr. Armstrong,

20   Ms. Morris or Ms. Nunes?

21   A    No, I did not.

22   Q    And you come to no opinions regarding their specific cases?

23   A    Not yet, no.

24              THE COURT:  All right.

25              Done?

1          MR. HOPKINS:  Yes, Your Honor.

2          THE COURT:  Okay.

3          I'll warn you, Mr. Hopkins, you received a gold star

4    from the court reporter, but there's a little tarnish on it now

5    because you didn't go back to the lectern.

6          MR. HOPKINS:  I apologize.  I will try to clean that

7    up.

8          THE COURT:  All right.  Thank you, Doctor; you're

9    excused and free to go.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  Now, did you have another witness?

12          MR. VALENTINE:  I'm coming to the lectern before I

13    speak.

14          No, I have two things that I need to do.  One, I need

15    to review some documentary evidence with you; and then, two, I

16    need to address the questions that you raised about class

17    certification.  And so with your guidance, I could review the

18    documentary evidence now before lunch quickly, cognizant of the

19    time constraints that we have and save the class discussion for

20    the end of the hearing.  I'm leaving it up to you.  But

21    cognizant of the time constraints that we have.

22          THE COURT:  Well, for one thing, we have two experts

23    charging by the hour; and if they were thinking of leaving as

24    soon as they could, I would rather hear their testimony so they

25    can.

354

```
 1            Well, let me ask you gentlemen.  Where are we
 2   schedule-wise?  How much more time are we going to need today,
 3   all day?
 4            MR. HOPKINS:  I don't believe so.  Your Honor, I have
 5   to do the, we have to do the direct and cross of Dr. Goldfarb,
 6   and I would endeavor to be as absolutely brief as possible; and
 7   then we may have a very limited examination of Miss Goykhman,
 8   who is here.
 9            But I would just note my objection for the record to
10   Mr. Valentine's review of documentary evidence with the Court.
11   I don't know what that is or what --
12            THE COURT:  I don't know what it is, either, but
13   that's going to have to wait.
14            Let's go ahead and start with Dr. Goldfarb.
15            MR. HOPKINS:  Very good, Your Honor.
16            THE COURT:  Good morning, sir.  Again.
17            THE WITNESS:  Good morning.
18            THE COURT:  You noticed, did you, that when your
19   lawyer there said he had one question, he asked four.  You did
20   see that.
21            THE WITNESS:  Yes, sir.
22            THE COURT:  That's lawyers and judges do that.
23            Okay.
24            **(STANLEY GOLDFARB, DEFENDANT'S WITNESS, SWORN)**
25            THE COURT:  Thank you.  Have a seat.
```

```
1              Go ahead.

2              MR. HOPKINS:  Thank you, Your Honor.

3                      DIRECT EXAMINATION

4     BY MR. HOPKINS:

5     Q    Dr. Goldfarb, could you please describe your educational

6     background for the Court?

7     A    Yes.

8     Q    When you're ready.

9     A    Yes.  I'm a, I'm a physician.  I am graduating from

10    University of Rochester School of Medicine.  I trained at the

11    University of Pennsylvania for both internal medicine and

12    fellowship in nephrology of which I'm both board-certified and

13    I've been a practicing nephrologist, academician, researcher

14    for the past 45 years.

15    Q    And just to round out our record, where did you get your

16    undergraduate degree?

17    A    From Princeton University.

18    Q    And where do you currently work?

19    A    I work at the University of Pennsylvania School of Medicine

20    and at the hospital of the University of Pennsylvania and

21    Presbyterian Medical Center.  In Philadelphia, which is a part

22    of the Penn Health system.

23    Q    And do you work at the Perelman School of Medicine?

24    A    Yes, that is the new name of our school over the past two

25    years.
```

Stanley Goldfarb – Direct                356

1    Q    And how long have you been a professor there?

2    A    I've been a professor since 1987.

3    Q    How is your time presently divided among your various

4    responsibilities?

5    A    I spend about, depending on the year, 20 to 30 percent of

6    my time as a clinical nephrologist caring for patients with

7    acute kidney problems, most of whom were on dialysis.  And I

8    spend the remainder of my time either in scholarly activities

9    or administrative work as an associate dean of the medical

10   school.

11   Q    And what has been the focus of your research over your

12   career?

13   A    It's had various foci, but it's predominantly aimed at

14   understanding the kidney's role in fluid and electrolyte

15   metabolism and specifically in how the kidney is damaged during

16   diabetes.

17   Q    And have you written on the subject of acid-based

18   metabolism, electrolytes?

19   A    Yes, I have.

20   Q    How many articles, in general, roughly?

21   A    Oh, several.  I would say probably close to a dozen and

22   some book chapters as well.

23   Q    And do you lecture on these topics as well?

24   A    Yes, I do.

25   Q    Can you please describe your involvement in any

1    professional organizations?

2    A    Well, yes.  I've been involved with the American Society of

3    Nephrology as a member of various committees, including

4    editorship of one of their journals.  And I am currently also

5    on the editorial board of a few organizations.  The *Journal of*

6    *Clinical Nephrology*, the journal of the, the *Journal of the*

7    *American Society of Nephrology*, and also on the editorial board

8    of the organization called UpToDate, which is an on-line

9    medical textbook.

10   Q    And are you one of the editors in chief of UpToDate?

11   A    Yes, I am.

12   Q    How many patients do you presently see in an average day

13   when you're on the clinical service?

14   A    Anywhere from 25 to 30 patients.

15   Q    And how many of those would be on dialysis?

16   A    Usually about two-thirds to three-quarters of them are

17   receiving some form of dialysis treatment.

18   Q    And are there particular standards of care or

19   recommendations you look to in or follow in the treatment of

20   your dialysis patients?

21   A    Yes.

22   Q    What would those be?

23   A    Well, one is the KDOQI guidelines which are in fact that

24   the serum bicarbonate level be greater than, equal or greater

25   than 22 milliequivalents per liter; and then there are other,

Stanley Goldfarb - Direct

358

1    there's a whole series of other guidelines that we follow, but

2    often based on the individual issues with a given patient.

3    Q   And have you had any role in the past in developing any

4    KDOQI or KDIGO recommendations?

5    A   Well, I did have the role as the chairman of the committee

6    that reviewed the KDIGO recommendations regarding calcium and

7    phosphorous metabolism which is an important issue as we've

8    heard here and occurs in patients with kidney disease.  I was

9    on a committee from the National Kidney Foundation that

10   reviewed those guidelines that were produced by the

11   international body to see how relevant they were for American

12   nephrologists.

13   Q   And were you asked to provide any opinions in this action?

14   A   Today?

15   Q   In this case?

16   A   Yes, I was.

17   Q   And what is you were asked to do?

18   A   Well, I was asked to both consider the general issue of the

19   importance of bicarbonate and its relationship to dialysis and

20   the potential impact of varying bicarbonate levels on patients

21   who undergo dialysis, and I was also asked to review a series

22   of individual cases that were part of this legal proceeding.

23   Q   And did you provide your opinions on those questions,

24   issues?

25   A   Yes, I did.

Stanley Goldfarb - Direct

1    Q   And where are those opinions articulated?

2    A   Well, there's a declaration that was produced.  I think it

3    was called my declaration, that describes my views, both the

4    general issue and some of those comments regarded my views of

5    Dr. Borkan's declaration, and then my comments on specific

6    patients as well.

7    Q   And what did you do to develop your opinions in this case?

8    A   Well, I called upon my own personal experience.  I think

9    that was the main source of information, and then I did a

10   review of the medical literature to identify real data, not

11   anecdotes, that speak to the interaction between levels of

12   bicarbonate and some of the issues that have been raised in the

13   proceedings.

14   Q   And if you could turn to Exhibit W.  Defendant's Exhibit W.

15   So you can put that book away.  The one underneath that, I

16   think, is the one to look at.

17   A   Yes.

18   Q   And if you could take a moment to look at that.  Is that a

19   copy of your declaration, Doctor?

20   A   Yes.

21   Q   And it has your curriculum *vitae* attached?

22   A   Yes, it does.

23   Q   And on page 62 -- not page 62 -- page 13 of the document,

24   is that your signature?

25   A   Yes, it is.

Stanley Goldfarb - Direct

1    Q   And did you type up this declaration, yourself?

2    A   I did not type it up, no.

3    Q   How was that prepared?

4    A   Well, this declaration was the result of an ongoing

5    process.  I discussed with you and with your colleagues my

6    views of this, of the issues and of the individual cases, and

7    then that led to a, a manuscript that was basically a dictation

8    almost, but not specifically a dictation, but rather a

9    enumeration of my thoughts.  A copy was then sent to me.  I

10   made multiple changes when I thought that it didn't accurately

11   reflect my opinions, and then there were several iterations of

12   that process until I was satisfied that the document did

13   reflect my opinions.

14   Q   And does it reflect your opinions and your opinions alone?

15   A   Yes.

16   Q   And have you also kept track of the materials that you've

17   reviewed in developing your opinions in this case?

18   A   Yes, I have.

19   Q   Let's take a look at Exhibit X.

20            And is that the current list of materials that you've

21   reviewed in arriving at the -- relating to your opinions in

22   this case?

23   A   Yes, it is.

24   Q   And there's been some back and forth with the lawyers and

25   certainly there was a prior list that you had; this is the most

Stanley Goldfarb - Direct                361

1    up-to-date list.  As a result of your review of additional

2    materials since the filing of your declaration, have any of

3    your conclusions or opinions changed?

4    A   No.

5    Q   Okay.

6             Now, trying to --

7             THE COURT:  Find a good place to break, and we'll take

8    a lunch break.

9             MR. HOPKINS:  Okay.  This is probably a good place to

10   break, then, Your Honor.

11            THE COURT:  Okay.

12            MR. HOPKINS:  I'll have him address other things.

13            THE COURT:  That was a little mean of me because I

14   wanted to give myself a minute to ask a question.

15            MR. HOPKINS:  No problem.

16            THE COURT:  I understand that you and Dr. Borkan don't

17   agree on some things in this case.  But my question is, just in

18   terms of background and experience and credentials, education,

19   experience, and so forth, do you consider yours, your set of

20   credentials, to be materially different from or better than

21   his?

22            THE WITNESS:  You know, I think Dr. Borkan sounds like

23   a qualified nephrologist.  He sounds like someone who's dealt

24   with patients with kidney disease.  He works in a academic

25   medical center similar to my experience, so in that sense, Your

Stanley Goldfarb - Direct

1   Honor, I would have no quarrel with that.

2          THE COURT:  Okay.

3          So what we've got here, and it's what I would have

4   expected, is two qualified guys with similar training and

5   experience over the years who just have a different opinion on

6   certain issues.

7          True?

8          THE WITNESS:  Well, I think we have -- we're coming at

9   it with a different data set as well, sir.  And I think

10  that's -- I hope I can sort of portray that accurately, that I

11  think there is a body of literature that speaks to many of the

12  issues that were discussed and were not dealt with and were

13  rather dealt with in an anecdotal fashion.

14         Now, I have anecdotes and he has anecdotes, but I

15  think I can also show on medical literature, what careful

16  experiments were doing, taking the measurements that we're

17  speaking about here, to show that the hypothesis that he has is

18  not valid; and in fact, you know, in fact, part of the approach

19  to a hypothesis, the real scientific approach, is to try to

20  disprove your hypothesis, and that really hasn't happened.

21  It's been marshaling information that it's I think in some

22  cases has been misrepresented and in some cases has been

23  incomplete.

24         So what I think I'm going to be able to do is I think

25  show that the medical literature that addressed many of these

Stanley Goldfarb - Direct

1    issues and that the information is different from what he

2    portrays.

3              THE COURT:  Okay.

4              I appreciate that.

5              All right.  Let's take an hour.

6              MR. HOPKINS:  Thank you, Your Honor.

7        (Recess as 12:03 p.m.)

8        (Reconvened at 1 p.m.)

9              THE COURT:  Did you fellows get lost?

10             MR. HOPKINS:  No, Your Honor, we thought we broke a

11   little bit after twelve.

12             THE COURT:  Maybe just on New Jersey time, is that it?

13             MR. HOPKINS:  I have no excuse.

14             THE COURT:  And what happened to your witness?

15             MR. HOPKINS:  I will go find him, too.

16             THE COURT:  Maybe he and Borkan went out for lunch

17   together and resolved that whole thing.

18             MR. HOPKINS:  That would be a great relief to

19   everyone, Your Honor.

20             THE COURT:  Well, I'm only half joking; it might be a

21   good idea.

22             THE WITNESS:  Sorry to keep you waiting.

23             THE COURT:  No, you didn't.

24   BY MR. HOPKINS:

25   Q   Good afternoon, Dr. Goldfarb.  From your review of Dr.

Stanley Goldfarb - Direct

364

1   Borkan's declaration and then hearing his testimony over

2   yesterday and this morning, you've heard him express a number

3   of opinions regarding his theory related to this case.  Do you

4   agree with Dr. Borkan's analysis and his theory?

5   A   I have many, many areas, most the areas I disagree with

6   him.

7   Q   Could you describe for us the ways in which you disagree

8   with Dr. Borkan's theories and analysis?

9   A   Yeah.  So I would first --

10          MR. PAYNTER:  Your Honor, can I have -- the witness

11  appears to be reading something.  We would request that be

12  introduced into evidence, if that's the case.

13          MR. HOPKINS:  I have no objection.  It's his

14  self-created notes from thoughts about his opinions.  In

15  opposition to Dr. Borkan.

16          THE COURT:  It doesn't have to be in evidence.

17          Would you want a copy?

18          MR. PAYNTER:  Yes, we would like a copy of that.

19          THE COURT:  All right.  Let's make a copy.

20          Do you folks want a copy, too?

21          MR. HOPKINS:  Sure, Your Honor, thank you very much.

22          THE WITNESS:  So I can start.  Should I, or should we

23  wait?

24          THE COURT:  Go ahead.

25          THE WITNESS:  So the first point I would make, point

Stanley Goldfarb - Direct

365

1  no. 1, is the idea that there has been an increased death rate

2  and an increase in cardiopulmonary arrest in patients on

3  dialysis since the introduction of higher bicarbonate levels,

4  and that's not the case.

5      So even though he points out the issue that

6  cardiovascular death rate in these large studies, for example,

7  in the, the Tentori study or the Calenter situs study which was

8  one of those large epidemiological studies that was mentioned,

9  cardiopulmonary arrest would be captured in those studies.

10 It's not while there are patients dying while on dialysis are

11 irrelevant to those observations.

12     And number two, is Fresenius' own data are that

13 patients who have, the rate of cardiopulmonary arrest is not

14 changed over the decade during which GranuFlo was introduced or

15 during that decade when patients were routinely dialyzed

16 against high bicarbonate levels.  So that's point no. 1.

17     Point no. 2 is that in many studies that have been

18 looked at to ask the question of what are the characteristics

19 of a patient who undergoes high bicarbonate dialysis, and I

20 must reiterate that you cannot do dialysis without acetate or

21 citrate.  Both of which accomplish the same thing.  I think

22 there was an implication, although not stated, that citrate

23 would be different in that it would not generate bicarbonate

24 production, but of course it does.  Both substances, acetate

25 and citrate, are metabolized in the body to bicarbonate.

                                    366
                    Stanley Goldfarb - Direct

1           And it's been studied on many, many occasions, at

2    least four times now, looking, that I can identify, and I think

3    there are more, as well as mentioned in many reviews that

4    during dialysis, against high bicarbonate plus acetate, that

5    patients have an initial rise in their serum bicarbonate, and

6    then it levels off and it starts to decline immediately after

7    dialysis.  And the level that it reaches is substantially below

8    the level of bicarbonate that's in the dialysis machine.

9           Anywhere from 3 to 7 milliequivalents.

10          Now, Dr., the study by Noh, which is from Korea, was

11   mentioned; and in that study, sure enough, like the others,

12   that I can cite, Semring is one, Heglan is another, the

13   patients' bicarbonate level never achieves the level that's in,

14   of the bicarbonate that's in the dialysis, much less adding in

15   the extra acetate as a potential bicarbonate source.

16          Now, the reason that doesn't happen is that when

17   bicarbonate is introduced into the patient -- and he did

18   mention this in his testimony -- there is a response by the

19   body to produce acid.  Now, why this occurs isn't totally

20   clear, but there are many enzymatic pathways in metabolism that

21   are sensitive to changes in pH, changes in the amount of acid

22   in the body.  And it turns out that patients generate acid

23   during the dialysis that neutralizes some of the bicarbonate

24   that they're exposed to.

25          So even though bicarbonate very easily traverses the

Stanley Goldfarb - Direct

367

1    dialysis membrane, it doesn't ever achieve the level that he

2    talked about when it's looked at in an organized fashion.

3           Now, you know, could there be an occasional patient in

4    who we can't explain a value, and that certainly occurs.  We

5    see that in medicine all the time.  Things that we normally do

6    and complete in a consistent manner, we'll occasionally see

7    patients that don't respond in the way that the average, the

8    typical, patient responds.  But when, again, when you go to the

9    medical literature and ask this, what is the bicarbonate value

10   during dialysis, it doesn't achieve the level of the dialysate

11   bicarbonate, it's substantially finding, and it's a very

12   consistent finding.

13          The next point I would say I disagree with is his

14   statement, which I think is a very important statement on his

15   part, from his perspective is when patients are exposed to

16   bicarbonate dialysis, they slow their rate of ventilation.  He

17   mentions that as part of the mechanism where a low oxygen level

18   would be generated by the exposure to a bicarbonate dialysis.

19          Again, that's been looked at very carefully.  And in

20   fact, that's not what happens.  What happens to patients is

21   that they ventilate more rapidly.  That's an interesting and

22   somewhat surprising finding.  Because as he mentions, his

23   concept was that all patients whose bicarbonate level would

24   rise would slow their rate of ventilation.  But he also pointed

25   out that dialysis is the one situation in which the bicarbonate

                                  368
                   Stanley Goldfarb - Direct

1    levels can rise very, very rapidly, and that's generally true.

2    There are a couple of exceptions to that, but that's generally

3    true.

4           So when patients with a rapidly rising bicarbonate

5    have been tested, in fact, they don't slow their rate of

6    ventilation, they increase their rate of ventilation; and the

7    reason is that increased acid production that I mentioned

8    neutralizes the bicarbonate, forms carbon dioxide, and our

9    bodies are designed to get rid of it.

10          Their oxygen levels -- and there are two kinds of

11   oxygen levels in the blood.  There's the kind that he was

12   talking about, the oxygen binding to hemoglobin, which is the

13   main constituent of oxygen in the blood, far outweighs the

14   amount of oxygen in the blood that's dissolved.  Most of the

15   oxygen in our blood is carried on hemoglobin.  It gets to the

16   tissues, hemoglobin releases it, and that's where oxygen comes

17   from to the tissue.

18          The hemoglobin, the oxygen hemoglobin disassociation

19   that he talked about, the Bohr effect that he mentioned, when

20   that's been looked at, the binding of hemoglobin to oxygen in

21   patients on dialysis during and right after dialysis does not

22   diminish.  It does not change.  It does not increase.  It

23   doesn't change.  And the reason it doesn't change is because he

24   implied that the Bohr effect, this relationship between pH and

25   binding of hemoglobin to oxygen, was a linear relationship.  A

Stanley Goldfarb - Direct

1   fall in -- a rise in the binding would occur immediately on a

2   change in pH.  But that's not the relationship.   The

3   relationship is the so-called sigmoidal one, and what that

4   means is that it's very flat over a very wide range, and then

5   it plummets over a range that's almost incompatible with

6   existence.

7         So the Bohr effect is important in, in the laboratory

8   assessment of what the oxygen content of hemoglobin is, but in

9   patients, on dialysis, it's an irrelevancy because during the

10  phase, the level of oxygen and the level of hemoglobin that

11  they have, there's no significant change in the binding of

12  oxygen to hemoglobin.  So that's very much in dispute.

13        And that undermines two of the observations I've just

14  mentioned.  Substantially undermined his hypothesis about

15  decreased oxygen delivery.  One is they don't slow their

16  ventilation, and secondly, they don't have a change in oxygen

17  binding to hemoglobin over the range that occurs in the real

18  world.  It does occur in the test tube, under an unphysiologic

19  or unnatural range, a range incompatible with life, but it

20  doesn't occur in any important way, in any significant way in a

21  patient that's undergoing dialysis.

22        The next thing that I would say is that his

23  observation, his discussion is that the ionized calcium levels

24  fall.  Now, calcium is important in the contractility of the

25  heart.  How effectively the heart contracts.  What he failed to

Stanley Goldfarb - Direct                    370

1   mention is that there are two studies that I was able to find

2   that actually measured the ionized calcium association with

3   dialysis in which the bicarbonate levels were at 37

4   milliequivalents per liter and the acetate level was

5   4 milliequivalents per liter.  Under those circumstances -- and

6   again, we've said that patients never get higher than those

7   values during dialysis.  So that represents really a maximum

8   sort of level.  During, under those circumstances, the ionized

9   calcium level is not reduced during dialysis.

10          Now, again, if you take a test tube of blood and

11  alkalanize it outside the patient, yes, you will see a change

12  in the calcium binding; but in the patient that doesn't happen,

13  for two reasons.  One is during dialysis, patients are getting

14  calcium.  It's part of the prescription, we've seen each time

15  that calcium was listed as one of the ingredients and the

16  system, a parathyroid hormone system, in which there's a

17  release of this hormone in response to any change in calcium,

18  even a slight, unmeasurable change, it's an extraordinarily

19  sensitive system, this hormone is released, acts on bone,

20  mobilizes calcium on bone and restores it back to normal.

21          The idea that the ionized calcium falls and that that

22  fall is an important contributor to decreased heart function

23  has not been observed.  Theoretically it happened.  Could

24  happen in a test tube, but it doesn't happen in the patients.

25          And then he talked about this fall in potassium that

1    would occur as a result of high bicarbonate dialysis.  We are

2    trying to have the potassium fall in virtually every patient in

3    whom we perform dialysis.  The reason for this is that in the,

4    in the, in the course of eating a normal diet and patient eats

5    any sort of protein, there's going to be a large potassium

6    intake.  The only way potassium can leave the body when it's

7    taken in through diet is through the kidney.  If you don't have

8    any kidneys, the only way the potassium can leave the body is

9    through dialysis.

10         Since patients -- we want patients to eat, they're

11   going to get large potassium loads during their meals.  And the

12   only way we can remove that potassium is to perform dialysis.

13   This is a risk of dialysis.  The fact that potassium levels

14   fall during dialysis is a risk.  We're concerned about it, it's

15   one of the parts of the dialysis prescription, how much

16   potassium should be in the dialysate.  We don't make it zero

17   because we don't want the value to fall too rapidly.  The goal

18   we have for the patient's blood is between 3 and a half and

19   4 milliequivalents.

20         When this has been measured -- and it was measured in

21   a very careful study by Heglan and his colleagues, and this was

22   done in South America but published in the nephrology

23   literature -- the potassium fall that occurs during dialysis

24   between a high bicarbonate, a lower bicarbonate, there's a

25   slightly greater fall with a high bicarbonate, but the fall was

Stanley Goldfarb - Direct                              372

1   not out of the normal range; and at the end of dialysis, there

2   was a snap-back of the potassium back to the same level in the

3   high-bicarbonate dialysis as there was in the low-bicarbonate

4   dialysis, when the bicarbonate was 25 milliequivalents.

5           What that meant was what was happening in a

6   higher-bicarbonate dialysis is that a bit more potassium was

7   entering the cells, but as soon as the dialysis was over, it

8   was coming back out of cells, and we know that this occurs

9   because most potassiums within the body resides in cells.

10          So there's no slow rate of breathing, there's no

11  decrease in oxygen binding to hemoglobin.  There's no --

12  increased oxygen binding to hemoglobin, there's no reduction in

13  ionized calcium, and there's no untoward reduction in potassium

14  above and beyond the reduction in potassium that we've been --

15  that we aim to achieve during dialysis in patients that receive

16  higher bicarbonate.  And when I say "higher bicarbonate," I'm

17  talking about between 35 and 37 milliequivalents and some

18  additional acetate.  Typically 4 milliequivalents of acetate.

19  If citrate is used, by the way, it, too, is metabolized by the

20  body.  So there's no real difference between citrate and

21  acetate.

22          Let me see what else is on my list.

23          THE COURT:  Did Borkan get anything right at all?

24          THE WITNESS:  Well, you know, I think he -- what I

25  would say is that, you know, there were, there was statements

Stanley Goldfarb - Direct

373

1    that -- can there be a trend towards lower potassium, yes,

2    there's a trend, the question is does it really go to a level

3    that's more dangerous than the levels seen in various other

4    levels of bicarbonate, no.  The ionized calcium rate I think he

5    really gets wrong.  The reduced rate of breathing, he

6    absolutely gets wrong.

7          I think he also makes mistake about the, the

8    consequences of acetate dialysis.  So his idea is that acetate

9    is, is being generated, is being infused into the patient

10   through dialysis, correct.  That does happen.

11         However, again, and I think this has been a theme of

12   this whole discussion here, is that there's a great deal of

13   variability.  So, for example, in the early days of dialysis,

14   back, you know, 30 and 40 years ago, as we mentioned, acetate

15   was the ingredient that was in dialysis in order to provide

16   buffer to the patient.  It was in a time before bicarbonate was

17   used.

18         That changed.  But during that era, there were very

19   careful studies of acetate metabolism because people were

20   really interested in this acetate, how quickly is it

21   metabolized, how much bicarbonate is it going to generate.  One

22   hour after the end of dialysis, all of the acetate was gone

23   from the patient's blood, and that was at a time when the

24   amount of acetate was anywhere from eight to ten times the

25   amount of acetate that we now see in a standard dialysis

Stanley Goldfarb - Direct

1   situation.  Or five to four times the amount of acetate that a

2   patient who receives GranuFlo might receive.

3            So by one hour, it's all gone, totally gone, and

4   that's from a much higher baseline than we see.  So this idea

5   that this acetate is going to be sitting there someplace and

6   stewing and producing bicarbonate for many hours after the

7   dialysis, the dialysis treatment is over, is just not correct.

8   That's not what happens.  The metabolism of it is quite quick.

9            THE COURT:  I thought what he said was, in some

10  people, the metabolism of acetate is much slower than others.

11           THE WITNESS:  Well, that might happen.  But that

12  person would have terrible liver disease.  Because the notion

13  that the synthetic function of the liver, which this would fall

14  under, is impaired doesn't happen in patients that have, you

15  know, mild congestive heart failure or patients that have

16  hypertension or renal failure.  They would have to have severe

17  liver disease.

18           And again, I think that's part of his approach.  You

19  could come up with a patient, a very unusual patient, that

20  might show a slow acetate metabolism.  But if you talk about

21  typical patients and how they're going to respond, that's the

22  typical response.  The typical response is that the acetate is

23  gone completely by the end of dialysis treatment, certainly by

24  one hour after dialysis is concluded.

25           THE COURT:  We might want to have a question at some

Stanley Goldfarb - Direct

375

 1    point.

 2              THE WITNESS:  Well, if I could --

 3              MR. HOPKINS:  Certainly, Your Honor; trying to

 4    facilitate the dialogue.

 5              THE COURT:  If your question is, do you have any other

 6    things to say about Borkan that you want to disagree with,

 7    then, that's okay.

 8    BY MR. HOPKINS:

 9    Q    Are there any other items on your list that you wanted to

10    cover regarding your disagreement?

11    A    Yes.  He said on at least a couple of occasions here that

12    bicarbonate and metabolic alkalosis depresses cardiac

13    contractility, beating, function, that's just not true.  That's

14    not what happens.  Bicarbonate actually stimulates it and

15    Clancy did a study in the *American Journal of Physiology* many

16    years ago to show this.  This is an old observation, it may

17    have been 40 years ago, 50 years, doesn't matter, the effect of

18    bicarbonate on the heart is quite clear.  It doesn't depress

19    contractility; I don't know why he says that.  There is no data

20    that shows that.

21              And finally, he says that low potassium depresses

22    cardiac contractility.  As I mentioned before, low potassium is

23    a potential problem.  When people have looked very closely at

24    the correlates on patients with sudden death, potassium plays a

25    important role.  Sudden death is a problem, but not a growing

Stanley Goldfarb - Direct

376

1    problem.

2          However, low potassium does not depress the

3    contractility of the heart.  What it does is it depresses, it

4    increases the heart's susceptibility to arrhythmias, and he's

5    certainly correct in that.  But, again, as I mentioned, that's

6    an issue that we have to deal with all the time in dialysis

7    patients.  There's some dialysis patients that eat a terrific

8    diet and come in with high potassium levels.  With those

9    patients, we'll dialyze them against the zero potassium bath.

10   That's done in a very frequent manner.  Other patients have

11   very poor nutrition and are eating much less potassium and

12   their potassium levels are low to begin with, and we dialyze

13   them against a three potassium bath because we're afraid that

14   the change would be too severe.  So this is something that

15   nephrologists take into account and it's an important part of

16   the dialysis prescription.

17          THE COURT:  Just slow down a little bit.

18          THE REPORTER:  A lot, not a little bit.

19          THE WITNESS:  I'm almost done.

20          THE COURT:  We're not trying to get you to stop.

21   We're trying to get you to speak a little slower.

22          THE WITNESS:  I get passionate.

23          I think the only last thing I would say is his notion

24   of what data mean, and his notion of how you deal with a

25   hypothesis, and I think I tried to say that before, if he wants

Stanley Goldfarb - Direct

377

1   to form a hypothesis about the risks of, of bicarbonate, his

2   job as a scientist is to disprove his hypothesis.  If he cannot

3   disprove his hypothesis, then the hypothesis can stand.

4          But he's supplied none of the data that undermine his

5   hypothesis.  He's avoided mentioning those data, and I think

6   the absence of that turns his hypothesis into almost a unique

7   one in this land; and I think I would also say that the, that

8   discussion at the nephrology meeting, if you say, should I

9   worry about a very high metabolic alkalosis, sure, I would

10  worry about it, because we want our patients to approach the

11  normal situation.

12         But it's a different thing to say that I know this

13  causes this outcome.  We have absolutely no data to support

14  that, and all the data we have is that the outcome that he

15  proposes does not occur.  It hasn't occurred since GranuFlo was

16  introduced.  It hasn't occurred since high bicarbonate was

17  introduced, and when we observe the constituents, the

18  components of this hypothesis, they don't hold up, patients

19  don't underbreathe, patients don't have decreased oxygen.

20  Patients don't develop reduced ionized calcium, and finally

21  patients don't have potassium levels also that look any

22  different than the potassium levels when the dialysis

23  bicarbonate is at a lower level.

24  BY MR. HOPKINS:

25  Q   Dr. Goldfarb, were you present at the November 2014

Stanley Goldfarb - Direct

1    American Society of Nephrology kidney week conference that

2    Dr. Borkan mentioned and specifically at the particular meeting

3    and the discussion between Dr. Mehotra and Dr. Tentori?

4    A    Yes, I was.

5    Q    And in your experience, is it correct that you can't change

6    a prescription that an outpatient clinic will honor, that

7    there's some sort of preventive action that happens in the

8    clinic that doesn't allow you as the treating doctor to do

9    that?

10   A    No.  Understand that what happens in outpatient clinics is

11   once a month, sometimes more frequently if there's a clinical

12   issue, bloods are drawn, and bloods are drawn typically before

13   dialysis, 'cause we know what happens during dialysis, there's

14   no point in drawing bloods during dialysis, and bloods are

15   drawn to see what the patient's clinical condition is.

16          Subsequently the nephrologist will get the report of

17   those, of that data, either from the nurse or from their visit

18   to the dialysis clinic that week, and will decide whether they

19   need to change the prescription.  Whether they need to add

20   potassium to the dialysate.  Whether they want to reduce the

21   bicarbonate.  Certainly they have the capacity to do that.

22   Whether they want to change sodium modeling that occurs, how

23   much fluid removal they want the patients to have during a

24   dialysis treatment.  That's all something that is decided as a

25   result of how the patient does on dialysis and what those

Stanley Goldfarb – Direct

1    laboratory studies are.

2    Q    And that's regardless of the brand of the dialysate that

3    might be being used?

4    A    Sure.

5              THE COURT:  So I must have missed something, because I

6    thought what Borkan was saying was the technician won't change

7    the prescribed level, not that the doctor can't.  I mean, the

8    doctor can always change his preparation.

9              MR. HOPKINS:  I understood during that segment of

10   Dr. Borkan's testimony that he said he had encountered

11   resistance if he wanted to change a patient's prescription on a

12   daily or more frequent basis, that the clinic had resisted

13   that.  I believe he talked about it being awkward.  I think he

14   ultimately acknowledged that it could be done, but I think he

15   said his ability to give the clinic a new prescription and get

16   them to change it was awkward, I think was his phrase.

17             THE COURT:  People hear different things differently.

18             MR. HOPKINS:  Yes.

19             THE COURT:  I thought he was talking in that instance

20   about how difficult it would be to change dialysates on a daily

21   basis or patient-to-patient basis.

22             MR. HOPKINS:  Yeah, I think there was a discussion of

23   you need to swap out and clean out machines as part of that,

24   that was part of the back-and-forth, yes, Your Honor.

25             THE COURT:  Certainly it seems obvious to me that the

Stanley Goldfarb - Direct

1   doctor can change his prescription if he needs to.

2           MR. HOPKINS:  I would agree.

3           THE COURT:  He would be a idiot not to, if the lab

4   test came back and said you need to change something.

5           MR. HOPKINS:  And my examination earlier just that the

6   clinic would do that.  That the clinic is not standing in the

7   way of the implementation of the doctor's change in

8   prescription.

9           THE COURT:  I should hope not.

10          MR. HOPKINS:  I should hope not as well, Your Honor.

11  BY MR. HOPKINS:

12  Q   Dr. Goldfarb, if a patient was treated with GranuFlo in the

13  past, how, if at all, in your opinion, would that impact them

14  in the future?

15  A   So one time or multiple times?

16  Q   Any way you want to look at it.

17  A   Well, one time, you know, they would have a response to it.

18  Their bicarbonate level would be whatever it wants to be.  It

19  would decline, and that was another point that I'm not sure I

20  totally made, but it would start to decline during dialysis,

21  and it would continue to decline, typically over the next 24 to

22  48 hours until their next dialysis treatment.  So that whatever

23  level of bicarbonate that they achieved after one dialysis

24  treatment, there's no memory of that.  There's no residue of

25  that.

Stanley Goldfarb - Direct

381

1      And then if one received a higher bicarbonate bath and

2   a higher acetate content over a sustained period of time, we've

3   seen in the Noh study that patients who were dialyzed under a

4   higher bicarbonate bath achieve a higher baseline bicarbonate

5   level.  That was the goal.  The only patients in the Noh study

6   that achieved the guideline of greater than 22 milliequivalents

7   per liter of bicarbonate at the entry into a dialysis treatment

8   were the patients who received the higher bicarbonate level.

9      So there will be an effect, but the effect will be,

10  hopefully, to allow the patient to hit the targets that we

11  have; and that way there will be residual of a higher

12  bicarbonate administration to the extent that the extra acetate

13  might be, in that particular case, generated into a higher

14  bicarbonate level.

15  Q   As a treating nephrologist, is it relevant to you at all if

16  a patient in the past had ever been dialyzed against GranuFlo?

17  A   No.

18  Q   In your declaration, you also address your analysis of the

19  medical records of the three remaining individual plaintiffs

20  that we have in this case.  Is that correct?

21  A   Yes, it is.

22  Q   And what records did you review to reach your opinions

23  about, that are set forth in your declaration that we'll hear

24  about today?

25  A   I reviewed some dialysis records.  I reviewed medical

Stanley Goldfarb - Direct                      382

1    records, particularly over certain events that were said to be

2    key medical events that occurred in each of those patients.

3    Q    But did you review all the medical records that were sent

4    to you?

5    A    Yes.

6    Q    And was it important to your opinions in this case to

7    review the named plaintiffs' medical records?

8    A    Well, I thought so.

9    Q    Why is that?

10   A    Well, I thought the issue was that these were patients that

11   it was, it was proposed that some aspect of their dialysis

12   treatment had contributed to their medical condition.  And

13   therefore that it was important to understand what exactly had

14   happened to those patients.

15   Q    And what did your review of the medical records reveal

16   regarding whether there was support for Dr. Borkan's theories

17   and suppositions?

18   A    Well, there were three patients that are now still, you

19   know, at issue here, I guess.

20        One patient is a lady named Mrs. Nunes, and Mrs. Nunes

21   was a lady that in the five minutes into a dialysis treatment

22   had sudden cardiac arrest.  Clearly this was a patient whose

23   bicarbonate level was irrelevant.  No one would propose that

24   over five minutes, there's a substantial change of her

25   bicarbonate level from baseline.  She had this cardiac arrest

Stanley Goldfarb - Direct                    383

1   or at least a severe episode of hypotension, was transported

2   to -- the treatment was stopped, she was transported to a

3   hospital, and at that time her serum bicarbonate level was

4   measured in the emergency room after this event, and her serum

5   bicarbonate level was 27 at that time.  Which is a level that,

6   you know, is consistent with goals, certainly it's above 22.

7          And that, again -- and one can actually do some

8   back-calculations of what her bicarbonate level might have been

9   at the time of the arrest because there's a signature left in

10  the blood if bicarbonate has been consumed by acid.  When

11  patients have a cardiac arrest, they may produce lactic acid,

12  and then the lactate that's left from the lactic acid is

13  present in their blood, and there's 1 milliequivalent of

14  lactate produced per every -- there's 1 milliequivalent of

15  bicarbonate that's consumed for every milliequivalent of lactic

16  acid that's generated when a patient has a cardiac arrest.

17         So we can look at the lactate levels of the blood.  If

18  the lactate level of the blood is high, then we can

19  back-calculate what the bicarbonate level was when the lactate

20  production first began.  And in her case, there was no evidence

21  that she had lactate at the time that she reached the emergency

22  room; and therefore, any bicarbonate that was there at 27

23  represented the bicarbonate that there was right at the time

24  she had her cardiac arrest.

25         So that was the lady that had a bicarbonate level of

Stanley Goldfarb – Direct                    384

1    27.  And there was no way to attribute her episode in the, in

2    the dialysis unit to anything really related to dialysis other

3    than the fact that dialysis itself is a very stressful

4    procedure and patients do have complications associated with

5    dialysis because, you know, they're being hooked up to a

6    machine, blood is flowing out of the patient; and this is very

7    stressful to the patient and it's not uncommon to see patients

8    have untoward events, low blood pressure and sometimes cardiac

9    arrest, even, in part because of the stress of the dialysis

10   treatment itself.

11             THE COURT:  Was this her very first dialysis?

12             THE WITNESS:  No, she was a dialysis patient who had

13   been dialyzed for a long period of time.

14             THE COURT:  So why would she be suddenly stressed by

15   this process?

16             THE WITNESS:  You know, that's a very interesting

17   question, and why something happens at one particular time

18   compared to another is not clear.  When we had a cardiac

19   catheterization done as part of the attempt to treat her after

20   this event, she had severe coronary artery disease.  Now,

21   coronary artery disease is an accumulating process and she may

22   have had just one more plaque that's deposited inside the

23   coronary arteries.  The coronary arteries that feed our hearts

24   are thinner than this pen.  So it doesn't take much to obstruct

25   them.  And unfortunately it's a major health problem still

Stanley Goldfarb – Direct

1    today in America.

2            So she may very well have had a plaque that ruptured,

3    a plaque of atherosclerosis on the side of one of those

4    coronary vessels and just obstructed her blood vessel down the

5    stream.  So we see this all the time.  Why today, what did the

6    patient have a heart attack today, why not tomorrow, unrelated

7    to any dialysis, and it's a series of events that lead to that.

8            THE COURT:  But you don't literally mean we see this

9    all the time.  People aren't just dropping like flies from

10   dialysis, are they?

11           THE WITNESS:  No, no, no, but what I'm saying is heart

12   attack is a very common event in the United States in general,

13   and your question was why did she have her heart attack at that

14   moment.

15           THE COURT:  You're saying it might have been just

16   coincidental that she happened to be in dialysis.

17           THE WITNESS:  Coincidental.  Dialysis is stressful.

18           So that was an example of someone where it was at

19   least, you know, two or three days after her previous dialysis

20   treatment when this event occurred.  So there's no way to

21   attribute her cardiac arrest and her acute event to a high

22   bicarbonate level when it occurred five minutes into a dialysis

23   treatment.

24   BY MR. HOPKINS:

25   Q    Did you consider the lab values for Ms. Nunes that were in

Stanley Goldfarb - Direct                386

1    the medical records that you reviewed?

2    A    Yes, I did.

3    Q    If you could turn to Exhibit Z, please.

4    A    You said Z.

5    Q    Z.  As in Z.

6              Just take a moment to look at that document.

7              And did you have a chart or a table of relevant lab

8    values prepared about Ms. Nunes?

9    A    I did.

10   Q    Did you have a chart or table of relevant lab values

11   prepared regarding Ms. Nunes?

12   A    Yes, it is a table like this.

13   Q    Okay.

14             And what did your review of Ms. Nunes' lab values

15   indicate to you, if anything, regarding pattern or trend?

16   A    I don't think there's a real pattern.  Occasionally she had

17   values there are here that are higher than 30.  I'm not sure of

18   the circumstances that underlie those observations.  But there

19   was no observation within a month of this episode that she had

20   which was a dialysis, a predialysis or after this particular

21   event, a value that was abnormal.  These were all in the normal

22   range, and they were not values associated with metabolic

23   alkalosis.

24             THE COURT:  How can you tell bicarbonate levels from

25   this chart?  This chart means nothing to me but numbers.

Stanley Goldfarb - Direct

1    THE WITNESS:  Well, the $CO_2$ column, which is the

2  column E, that's another way of notating bicarbonate levels.

3  That equals bicarbonate levels.

4    THE COURT:  Carbon dioxide is the same thing as

5  bicarbonate?

6    THE WITNESS:  Well, this is what happens.  Bicarbonate

7  and carbon dioxide are in equilibrium with each other.  In

8  nature, when you just put carbon dioxide into a bottle of

9  water, we do that with soda all the time.  That equilibrium

10  occurs, half of it is as bicarbonate, half of it as carbonic

11  acid which equals the dissolved carbon dioxide and they're in

12  equilibrium.

13    What the kidney does is alter that equilibrium.  The

14  kidney gives 24 milliequivalents to 29 milliequivalents of

15  bicarbonate to every 1 milliequivalent of carbon dioxide.  And

16  that raises our pH from the equilibrium pH which occurs in,

17  with the carbon dioxide system from 6.1 up to 7.4.

18    So now the question is how do we measure bicarbonate.

19  What we do is take a tube of blood and we drop acid into it.

20  That changes all the bicarbonate into carbon dioxide and then

21  the carbon dioxide that's generated is what's measured in this

22  $CO_2$ term.  So the carbon dioxide that we measure in the blood

23  after acidification of the blood in the laboratory is equal,

24  almost perfectly, to the bicarbonate that's present in the

25  blood.  And that's the notation is $CO_2$, but what's actually

Stanley Goldfarb - Direct

388

1   being measured in this column is the bicarbonate content of the

2   blood.

3                THE COURT:  And how do you explain no. 7?

4                THE WITNESS:  That's a mistake.  That should be the

5   sodium.  They transposed the bicarbonate.  The sodium level is

6   28.  That would be incompatible with life, and the bicarbonate

7   level is 141, which would be incompatible.  So they really have

8   been flipped.

9                And then if you just scan --

10  BY MR. HOPKINS:

11  Q   Well, Doctor, let me just ask the next question; the column

12  C, the reference to CA, that reflects calcium lab value; is

13  that correct?

14  A   Yes.

15  Q   And then column D, the reference to K, does that reflect

16  the potassium measured in the lab value?

17  A   Yes.

18  Q   And then we just talked about column E where it says the

19  $CO_2$ is the serum bicarbonate level.  Column F, referenced to

20  NA, is that the measured sodium lab value?

21  A   Correct.

22  Q   I believe you said before in your review of the lab values,

23  you did not see any pattern or trend regarding her serum

24  bicarbonate levels; is that right?

25  A   That's correct.

Stanley Goldfarb - Direct

389

1   Q   How about for the calcium levels, did you see any pattern

2   or trend in her calcium levels?

3   A   No, I think they tended to be lower earlier on in her

4   treatment history, and the more recent values were higher.  And

5   this reflects the fact that we do treatments that patients take

6   in order to raise our calcium value in the time between

7   dialysis treatments as well as administering calcium during

8   dialysis is a way of enhancing the amount of calcium that's in

9   their body.  It is deficient in many patients with chronic

10  kidney disease.

11          THE COURT:  What was the date of her cardiac arrest?

12          THE WITNESS:  That was the 12-26.

13          THE COURT:  Of?

14          THE WITNESS:  Of 2011.

15          MR. HOPKINS:  She passed away, Your Honor.

16          THE COURT:  12-26, 2011.

17          And so what you're saying, and that's on the very last

18  page here, what you're saying is there's nothing unusual there.

19          THE WITNESS:  Correct.

20  BY MR. HOPKINS:

21  Q   And with respect to column D, the potassium levels, did you

22  see any pattern or trend in her potassium lab values?

23  A   No, most of them have an H after the value, if you look

24  back on previous pages, and again, that's typical of dialysis

25  patients.  We see values that are elevated.  Again, it was

Stanley Goldfarb - Direct

1    elevated on the 26th, when she had her arrest, that part of

2    that elevation could have been attributable to the arrest.  But

3    we certainly don't see a low potassium at any point here as

4    strange for her cardiac event.

5    Q    Now, you also --

6         THE COURT:  It's the highest calcium or the highest,

7    yeah, calcium, isn't it?

8         THE WITNESS:  It's the high potassium.  And calcium,

9    too, well, it is, it is higher.  I don't know that she had

10   another value quite that -- but, again, we tend to see values

11   like that.  It's a function of calcium that's administered and

12   more specifically vitamin D that's administered to patients in

13   pretty high amounts as associated with dialysis treatments.

14        THE COURT:  Well, it's not the highest potassium, but

15   it is the highest calcium.

16        THE WITNESS:  Yeah.  That's within the, the normal

17   range for serum calcium.

18        THE COURT:  Take your word for it.  I wouldn't have a

19   clue.

20        THE WITNESS:  Yeah.

21   BY MR. HOPKINS:

22   Q    Dr. Goldfarb, what did your review of Mr. Armstrong's

23   medical records reveal to you?

24   A    Yes, again, I reviewed his medical record, several episodes

25   where he was in emergency rooms, admitted to the hospital.  And

Stanley Goldfarb - Direct

391

1  then one event that was attributed -- I wish I could remember

2  the date of that event -- that was felt to be a specific event

3  which was . . . I don't try to recall that.

4  Q    I believe there's an allegation in the complaint that he

5  had a cardiac event somewhere around September 11 of 2010.

6  Does that sound familiar to you?

7  A    Yeah, I'm sorry, I'm blocking on that.  But September 2010.

8  Yes.

9  Q    September, well, clear it up.  Let's call it September 11

10  of 2010.

11  A    Yeah.  And what Mr. Armstrong had, when he came into the

12  hospital, I think 24 hours after a dialysis treatment, and the

13  problem was that he had fluid overload.  And he confessed, if

14  you will, and this is not atypical of patients, that he

15  ingested extra fluid that day.  I think he said he drank 1

16  liter of Coca-Cola, which I'm sure is an underestimate, and he

17  came in with fluid overload, congestive heart failure, and this

18  was not associated acutely with his dialysis treatment, but

19  this was an event that occurred at least 24 hours after his

20  dialysis treatment.

21       He had been admitted many, many times in the past.

22  During those admissions, he admitted to not being adherent to

23  his dialysis treatments, missing treatments, and he also

24  admitted to other things like, like illicit drug use which can

25  impair cardiac functions.

Stanley Goldfarb – Direct

392

1      So his presentation was not one of ischemia, it was

2   one of fluid overload.  And fluid overflow is a very, very

3   common event in dialysis patients.  We see it all the time.

4   Our patients, it's a great struggle for them to be able to

5   maintain their fluid balance; they're often thirsty between

6   dialysis treatments.  If they eat any salty foods, their thirst

7   is intense.  If they drink fluid, there's no real means to

8   eliminate that fluid, and this becomes a reason to do dialysis

9   treatments is to manage the fluid.  If they're thirsty and take

10  in too much fluid, they become fluid overloaded, and he

11  presented with that syndrome.

12      And that's all I can say is it was not, that's not a

13  ischemic event.  That's an event associated with fluid

14  overload.  And that was the event there.  And again, he had

15  many other admissions to the hospital over the, the period of

16  time that he was observed that were associated with fluid

17  overload.

18  Q   Did he have any history of cardiac disease?

19  A   Yes, he had a history of hypertension.  He had a history of

20  congestive heart failure, so this was not atypical event for

21  him.

22  Q   And if you can turn to the Exhibit AA, please.

23  A   AA.

24  Q   It's right after Z.

25  A   Uh-huh.

Stanley Goldfarb - Direct

1    Q   Okay.

2          And did you have a chart of relevant lab values for

3    Mr. Armstrong prepared as well?

4    A   Yes, I did.

5    Q   And is this the chart here?

6    A   Yes, it is.

7    Q   And it shows similar, the same type of lab values that we

8    just saw on the chart for Ms. Nunes, correct?

9    A   Yes, it does.

10   Q   And with respect to the $CO_2$.  The predialysis serum bicarb,

11   did you observe any trend or pattern in Mr. Armstrong's serum

12   bicarb levels with the data you had?

13   A    Well, it went, it certainly went up and down.  I think when

14   he was admitted to the hospital on that day, as I recall, his

15   bicarbonate levels were 27.  That is his predialysis

16   bicarbonate levels associated with that admission to the

17   hospital, as I recall.

18   Q   But did you see any pattern or trend in his bicarbonate

19   levels?

20   A   No, he had some levels that were high, he had some

21   subsequent levels that were lower.  I think, you know, his, his

22   values tend to be on the, on the higher side.  But that's all I

23   think one can say.

24   Q   What about for the calcium values reflected here, any trend

25   or pattern?

Stanley Goldfarb - Direct

394

1   A   No, not really.

2   Q   And what about potassium?

3   A   No.  No particular trend.

4   Q   And the last plaintiff that we'll talk about is Ms. Morris.

5           And what did your review of Ms. Morris' records

6   indicate to you, if anything?

7   A   So, Miss Morris is a lady that was having cardiovascular

8   problems, specifically recurrent episodes of chest pain.  She

9   was brought into the hospital for a stress test.  She had a

10  background of being on dialysis for a period of time.  Had

11  hypertension, had diabetes, had coronary artery disease.

12          At the time that she was brought into the hospital

13  because of the stress test, she was found to have a very

14  positive stress test, which was indicative of severe coronary

15  artery disease.

16          48 hours after her dialysis treatment, 48 hours, she

17  experienced severe chest pain, which precipitated her entering

18  the hospital and undergoing a cardiac catheterization which

19  showed that she had severe obstruction of her coronary vessels.

20  Again, this was not in any proximity to her dialysis treatment.

21  And she then underwent a percutaneous treatment of her coronary

22  artery disease.

23  Q   And was her medical history notable for any particular

24  comorbid conditions or anything else?

25  A   I said she had hypertension, diabetes.  You know, it

Stanley Goldfarb - Direct          395

1   sounded like a fairly typical, unfortunately typical dialysis

2   patient who has a number of comorbid conditions.

3   Q    And turn to Exhibit A -- I'm sorry, Exhibit Y, please.

4          And as with the other two plaintiffs that we, that we

5   spoke about, did you have a chart prepared regarding relevant

6   lab values for Ms. Morris?

7   A    Yes, I did.

8   Q    Is that the chart we're seeing here as Exhibit Y?

9   A    Correct.

10  Q    And with regards to her serum bicarbonate levels reflected

11  here, could you see any pattern or trend in the predialysis

12  serum bicarbonate levels that she had?

13  A    You know, I didn't see a trend.  But what was interesting

14  about her case was that her bicarbonate levels were in fact

15  higher at the time that she came in with her episode of chest

16  pain than they had been before.  And I was perplexed by that

17  because in fact, it was not in proximity to her dialysis

18  treatment.

19         And then it turns out that there was a notation in the

20  medical record that she had vomited on the way into the

21  hospital with her episode of severe chest pain.  And upon

22  further questioning of her by a dietitian, which was further on

23  in the medical record, it turns out that she had been vomiting

24  for the past week or so.  She said everything that I ate came

25  back up.

Stanley Goldfarb – Direct

396

1      Now, whenever a patient vomits, they generate

2  bicarbonate into their blood.  Dialysis patients will raise

3  their serum bicarbonate level if they vomit.  Normally people

4  that have kidney function are then able to eat following the

5  episode of vomiting, will excrete that extra bicarbonate out

6  through the urine; but dialysis patients have no kidneys, so

7  therefore it can't be excreted.  A dialysis patient that vomits

8  will start to raise their bicarbonate level.

9      So it's almost certain that we see the rise from 25,

10  26, 27, 27, in the four measurements that are preceding, that

11  suddenly it's 33, almost certainly reflected the fact that she

12  had undergone episodes of vomiting at the time and associated

13  with her severe chest pain, which that's one of the

14  manifestations of acute coronary syndrome is that patients will

15  start to have episodes of vomiting.

16  Q   With respect to her lab values for potassium, did you see

17  any trend or pattern?

18  A   When she was in the hospital for her acute event, potassium

19  was 4.8.  A week before, it was 3.6, but there's no real

20  pattern.  There are many higher potassium values.  And again,

21  this is fairly typical because the potassium level is going to

22  really be a function of what diet is preceding their dialysis

23  treatment.

24  Q   And how about her lab values for calcium, did you see any

25  pattern or trend?

Stanley Goldfarb - Direct

397

1    A    No.

2    Q    With regards to all three plaintiffs, what did your review

3    of the individual plaintiffs' medical records reveal about the

4    nature of their respective cardiac events with perhaps the

5    exception of Mr. Armstrong, who I gather you don't feel had a

6    cardiac event, but was there anything about the nature of those

7    cardiac events that was apparent to you?

8    A    Well, I mean, something clearly didn't happen, and that was

9    that this was a result of the hours into dialysis treatment or

10   the immediate postdialysis period.  Events were distant, except

11   for Mrs. Nunes in whom it happened in the first five minutes of

12   the dialysis treatment.

13        The second thing is they sound like many of our

14   patients.  People in our unit that I've seen who were treated

15   with dialysis who come in with various complaints that are not

16   different from this and their serum bicarbonate levels when

17   admitted to the hospital are perfectly normal.

18        So you cannot attribute the problems that these three

19   patients faced to metabolic alkalosis or to really anything

20   associated with acute dialysis treatment because their

21   difficulties arose distant from that event or in the absence of

22   metabolic alkalosis attributing to dialysis.

23   Q    And are the conclusions of your review from the medical

24   records and from your review of the lab values dependent at all

25   as to whether the dialysate that was used was GranuFlo or not?

Stanley Goldfarb - Direct

398

1    A    No, to me the question was what were their values, not what

2    dialysis prescription led to those values.

3    Q    As a treating physician, if you wanted or one of your

4    patients wanted to know what kind of acid concentrate was being

5    used in your unit where you see patients, could you or the

6    patient find out?

7    A    Yes.

8    Q    How would you do that?

9    A    I did it this past weekend.  I just looked at the base of

10   the dialysis machine and asked the technician what acetate were

11   we using.  And it was 37 milliequivalents of bicarbonate.

12   4 milliequivalents of acetate.

13   Q    Do you know what brand of acid concentrate it was?

14   A    I don't know the brand, no.  I don't know.

15           MR. HOPKINS:  I have nothing further at this time,

16   Your Honor.

17           THE COURT:  Cross-examination.

18                       **CROSS-EXAMINATION**

19   BY MR. PAYNTER:

20   Q    Good afternoon.

21   A    Hello.

22   Q    Good afternoon, Dr. Goldfarb.

23           Let me just see, I don't want to put words in your

24   mouth; but is it accurate that you, your opinion, your medical

25   opinion, is that there has not been any peer-reviewed study

Stanley Goldfarb - Cross

1   conducted that tests whether GranuFlo, the additional acetate

2   in GranuFlo, causes an increased risk of cardiopulmonary

3   arrest?

4   A   I'm unaware of such a study.

5   Q   And do you think that such a study should have been

6   conducted by Fresenius before GranuFlo was introduced?

7   A   You know, I don't think so.  I think, I think for a number

8   of reasons.  First of all, cardiopulmonary arrest is still a

9   very uncommon event.  In order to study uncommon events, you

10  have to study large numbers of patients for long periods of

11  time and hope that a very uncommon event occurs.

12          And unfortunately, that requires a long time and lots

13  of patients.  So the typical way that one would ask that

14  question is to do a retrospective study, to look at what

15  happens when you introduce the new event and to see whether a

16  very uncommon event produces a signal.

17          Now, you would, you would do a prospective study to

18  test it, if you thought that there was a high likelihood of a

19  complication.  Because that's the only way that you could

20  really identify it, and if you thought there was a high

21  likelihood, that's something that you'd be able to see in a

22  manageable number of patients.

23          So I don't -- I think that given the fact that we knew

24  that bicarbonate levels didn't rise to the level of bicarbonate

25  in the dialysate, since it was known that metabolic acidosis

Stanley Goldfarb - Cross                              400

1    was the complication that we needed to avoid, since there

2    hadn't been a signal of an increased rate of cardiopulmonary

3    arrest in the, in the period where bicarbonate, high

4    bicarbonate levels started to be used as the dialysate, I think

5    that it was reasonable and more likely than not to be that the

6    best way to ask that question is to do a retrospective analysis

7    rather than a prospective one.

8    Q   And do you know how long GranuFlo has been on the market?

9    A   You know, I just know from the discussion that went on

10   here, there was that presentation in 2004.  I assume it was

11   probably around that time, but I don't know, myself, for sure.

12   Q   In that entire time, are you aware of either DaVita or

13   Fresenius conducting a retrospective study to which you just

14   referred?

15   A   Well, I think the Fresenius follow-up memo in 2012

16   suggested that they had those data, and they knew that there

17   was not an increased incidence of cardiopulmonary arrest, but I

18   don't know how long, when they had actually identified those

19   data.

20   Q   And which you refer to a 2012 study.  Can you refer me to

21   what the name of that study was, or if you know the exhibit?

22   A   Fresenius sent out a memo in which they evaluated a further

23   follow-up of their initial memo that led to all of this

24   speculation about the risks of GranuFlo.  There was a follow-up

25   memo that went through a more careful analysis of other

Stanley Goldfarb - Cross

1    potential correlates between cardiopulmonary arrest and

2    bicarbonate to sort of ask the question of whether in fact the

3    notion that there's an extraordinarily high risk of

4    cardiopulmonary risk with their current dialysis formulations

5    was in fact correct.

6    Q   Is it possible, Dr. Goldfarb, that what you're thinking of

7    is the December 3, 2014 memorandum that is, if you wish to

8    refresh your memory, Defense Exhibit F?

9    A   No, I don't think so.  I think this was in 2012, if I'm not

10   mistaken.

11   Q   Could you -- sorry, Defense Exhibit E.  Could you take a

12   look at Defense Exhibit E.

13           Is this the study to which you refer?

14   A   Yes.

15   Q   And your belief is this took place in 2012?

16   A   I thought so.

17   Q   Okay.

18           And so in that period from whenever GranuFlo was

19   introduced to 2012, are you aware of any other retrospective

20   study of the type you described should have been conducted?

21   A   That, I'm sorry, that it should have been conducted?

22   Q   Well, I thought that was your testimony.  I don't want to

23   put words in your mouth.  So I'll just say in that period from

24   when GranuFlo was introduced to 2012, are you aware of any

25   retrospective study, as you've used that term, being conducted

Stanley Goldfarb - Cross                                    402

1    by either Fresenius or DaVita?

2    A    I'm not aware of such a study.

3    Q    Now, do you -- you do agree that high bicarbonate levels

4    can lead to the process of metabolic alkalosis, correct?

5    A    That's definitional.

6    Q    Right.

7         And so if you take a look at Plaintiffs' Exhibit

8    No. 2, this is the March 29, 2012 recall.  And this would be in

9    the plaintiffs' binder.

10        And let me direct your attention to the second page.

11   And do you see the sentence where it refers to high serum

12   bicarbonate level, and then it says, I'm quoting, This may

13   contribute to metabolic alkalosis which is a significant risk

14   factor associated with low blood pressure, hypokalemia,

15   hypoxemia, hypercapnia and cardiac arrhythmia.  Do you see

16   that?

17   A    I'm sorry, the second page?

18   Q    Yes.  This is plaintiffs' binder Exhibit No. 2.

19        THE COURTROOM DEPUTY:  I think you have the defense

20   binder.

21        THE WITNESS:  I'm sorry, I'm looking at the wrong

22   binder.

23        MR. PAYNTER:  We will drown you in paper before the

24   case is over.

25        THE COURT:  Is it in your slide document?

Stanley Goldfarb – Cross                          403

1          MR. PAYNTER:  It is not, Your Honor.

2          THE COURT:  I say that 'cause I don't have your

3    exhibits.

4          THE COURTROOM DEPUTY:  They're behind you, Judge.

5          THE WITNESS:  Okay, I'm with you.

6          THE COURT:  Oh.

7          MR. PAYNTER:  Shall we wait a second, Your Honor.  Do

8    you want to --

9          THE COURT:  No.

10   BY MR. PAYNTER:

11   Q   So do you see the second page where there's a reference to

12   high serum bicarbonate levels and then it says, quote, This may

13   contribute to metabolic alkalosis which is a significant risk

14   factor associated with low blood pressure, hypokalemia,

15   hypoxemia, hypercapnia and cardiac arrhythmia.  Do you see

16   that?

17   A   Yes.

18   Q   Do you agree with that statement?

19   A   Well, I think my testimony so far is the nature of my

20   disagreement, but the relevance of that to typical dialysis

21   patients.  Now, there's a difference between -- there's not

22   enough detail in this statement to really relate it to any

23   given patient.

24   Q   I'm not asking you to relate it to any given patient.  I'm

25   asking you whether it relates to the dialysis patient

Stanley Goldfarb – Cross                         404

1  population as a whole?

2  A   Well, you know, again, you cannot separate out electrolyte

3  disorder from its quantitative value; and I think that's the

4  difficulty here, that's the problem we've been talking through

5  this whole trial.  We're making believe that metabolic

6  alkalosis is dangerous, and that's not true.  It's what degree.

7  That's not stated here, so in that sense, I don't agree with

8  it.

9  Q   Is there a level of metabolic alkalosis that you do agree

10 is a significant risk factor associated with the effects listed

11 there?

12 A   You know, it's hard to really find that in the literature,

13 which is quite interesting.  If one tries to find, show me the

14 basis for metabolic alkalosis producing those effects, it turns

15 out that has actually been generated in patients that don't

16 have kidney failure, that have developed metabolic alkalosis,

17 typically of vomiting or of diuretic use, and have associated

18 hyperkalemia which is a response to their vomiting, and not

19 directly of the metabolic alkalosis.  So this statement is

20 correct in a textbook of medicine, but it's not correct in

21 dialysis patients.

22 Q   But the FDA sent this out to only dialysis clinics,

23 correct?

24 A   I don't know who they sent it out to, but I assume what

25 you're saying is correct.

Stanley Goldfarb - Cross                405

1   Q   Well, it's a recall for a dialysate, right.

2          Do you have any reason to believe that the FDA meant

3   this statement that I just read you, about the effects of

4   metabolic alkalosis, to apply to any other population other

5   than the dialysis population to which this memorandum was

6   directed?

7   A   I don't know exactly what their intent was, but this is

8   about this product, so obviously it's about this product.

9   Q   Dr. Goldfarb, the FDA did not say that metabolic alkalosis

10  may be a significant risk factor associated with those low

11  blood pressure, et cetera; it said it is a significant risk

12  factor, correct?

13  A   That's correct.  Without a reference.

14  Q   And the effects that it outlined, the FDA believed, quote,

15  If not appropriately treated, may culminate in cardiopulmonary

16  arrest.  Do you see that?

17  A   Yes.

18  Q   And do you disagree with that statement from the FDA?

19  A   I think I've characterized my view of this statement.  That

20  this statement is a theoretical, another hypothesis without

21  data to back it up, concern that was raised and they're

22  transmitting a concern.  But I do not believe in the typical

23  dialysis patient that undergoes dialysis against a bicarbonate

24  bath designed to raise their serum bicarbonate level, that this

25  sequence of events, some it doesn't occur, actually, it's a

Stanley Goldfarb - Cross                            406

1   mistake, and some, and risk of this culmination in

2   cardiopulmonary arrest is an extraordinarily rare event and not

3   associated with the typical hemodialysis treatment.

4   Q   So it's your understanding that the FDA may issue a class

5   one recall based on nothing more than a hypothesis without

6   sufficient data?

7   A   Correct.

8           THE COURT:  I don't want to overstate this, so correct

9   me, but are you saying that you disagree both with Borkan and

10  with the FDA's recall?

11          THE WITNESS:  I think this FDA's recall is not based

12  on the data that are in the literature regarding the

13  interaction between bicarb and dialysis patients.  I suspect

14  that there was a fear created by the original Fresenius memo

15  and the FDA wanted to make sure that there may not be reality

16  associated with it.  Well, it turns out that there wasn't.  But

17  at the time that they issued this recall, I suspect that they

18  were concerned and therefore they issued a recall.

19          THE COURT:  Would this FDA document be a hypothesis?

20          THE WITNESS:  Well, it is a hypothesis, yes.

21  BY MR. PAYNTER:

22  Q   Dr. Goldfarb, do you agree that -- strike that.

23          Assume that Dr. Borkan is correct, that there is a

24  spike in bicarbonate levels with the administration of

25  GranuFlo, either during or in the hours after dialysis, I'd

Stanley Goldfarb - Cross                              407

1   like you to just assume that fact.

2            Do you agree that the magnitude of that spike would

3   not be detected by predialysis bicarbonate blood serum draws?

4   A   What do you mean, you mean the magnitude of the spike?

5   Q   Correct.  My question is could it be detected by looking at

6   predialysis blood bicarbonate?

7   A   Well, you know, again, what's been shown in the literature

8   is that higher bicarbonate dialysate is associated with higher

9   predialysis bicarbonate levels.  So if your question is would I

10  be able to detect the fact that patients were getting

11  bicarbonate levels that were higher than they were before, yes,

12  their bicarbonate levels would typically be higher if I, if all

13  other things being equal in the predialysis measurement.

14  Q   So that wasn't the question.

15           The question was whether, by looking at a patient's

16  predialysis bicarbonate, you would be able to detect the

17  magnitude of the spike that Dr. Borkan testified about,

18  assuming, of course, that that spike exists?

19  A   Well, the bicarbonate level will rise.  There's no

20  question.  That's the point of dialysis.  The level will

21  rise --

22  Q   Let me stop you doctor, I'm not asking you if their level

23  will rise, I'm not.

24           What I'm asking you is using predialysis, predialysis

25  blood bicarbonate test, could you detect, as a nephrologist, a

Stanley Goldfarb - Cross                          408

1    magnitude of such a spike?

2    A    The magnitude, no.

3              THE COURT:  Okay.  Now, I need to ask you a question.

4    'Cause now I'm confused about something.

5              MR. PAYNTER:  Sure.

6              THE COURT:  I thought that your other expert,

7    Youngberg's criticism, or one of her major criticism of DaVita

8    is that they weren't keeping track of predialysis bicarbonate

9    levels.

10             MR. PAYNTER:  Yes.

11             THE COURT:  Now, your question is to me suggesting

12   that those levels that she holds so dear aren't that big a

13   deal.

14             MR. PAYNTER:  That's a perfect question, Your Honor.

15   And my question was directed towards the magnitude of the

16   spike.  And as Dr. Borkan testified, and you would detect an

17   increase in predialysis bicarbonate, and that's what

18   Dr. Goldfarb was saying.  My question was a little more

19   specific, which is based on that, would you be able to detect

20   the magnitude of the spike, 'cause you'll recall there's some

21   dispute among the parties as to whether that spike could

22   actually impede a doctor's prescription.  So it goes to the

23   magnitude of the spike, not the existence of it.

24             THE COURT:  Okay.

25   BY MR. PAYNTER:

Stanley Goldfarb – Cross                    409

1   Q   Dr. Goldfarb, let's talk a little bit about the issue that

2   we were just discussing with the Court.  Is it your opinion

3   that a patient dialyzed on GranuFlo, their blood serum

4   bicarbonate could never exceed a doctor's prescription?

5   A   I would say that it's highly improbable and to the best

6   medical evidence that it would be an extraordinarily uncommon

7   event to see the value exceed the prescriptive value.

8   Q   But even you would admit that it's possible given your

9   understanding of dialysis patients' biochemistry?

10  A   Well, you know, possible is a, you know, is a very

11  all-inclusive term.  For example, it's possible that the

12  patient could vomit during a dialysis treatment.  Then they

13  certainly would achieve a higher bicarbonate level, and that

14  had nothing to do with the dialysis treatment.  So under some

15  circumstances, it's possible.

16          But from the medical literature, the typical response,

17  the overwhelmingly typical response in multiple studies in

18  multiple countries under multiple different bicarbonate levels,

19  the answer is no, they did not achieve a level greater than the

20  prescribed bicarbonate level.

21  Q   And do any of those studies that you are relying upon use

22  high flux, modern high flux dialysis machines with acetate

23  levels of 8 milliequivalents per liter or greater?

24  A   I don't know that anyone's ever used 8 or greater except in

25  the days of acetate dialysis.  It was done, the most recent one

Stanley Goldfarb - Cross

1    was in the, was in this century, and almost certainly -- I

2    can't recall specifically the machines that were used, but they

3    were used, but it was a, a study done recently.

4    Q   Well, was it using GranuFlo or some other dialysate?

5    A   It was using 4 milliequivalents.

6    Q   So not 8 milliequivalents?

7    A   Correct.

8    Q   So it doesn't tell you whether that additional 4 could

9    cause the patient's bicarbonate to exceed the doctor's

10   prescription?

11   A   That study can't speak to 8 milliequivalents.

12   Q   Let me talk a little bit about your analysis of the

13   plaintiffs' individual medical records.

14       At the time that I deposed you, you were unaware of

15   when or even whether our individual patients had received

16   GranuFlo, correct?

17   A   That's correct.

18   Q   And at your deposition, you admitted, I believe -- well,

19   strike that.

20       Do you then agree that without knowing when or even

21   whether a patient is on GranuFlo, that you cannot opine from a

22   scientific perspective about the effects of GranuFlo on that

23   individual patient?

24   A   Well, I thought I was asked to opine about the effect, the

25   interaction between dialysis treatment and the patients'

Stanley Goldfarb - Cross

1   specific cardiac event.  That's what I was asked --

2   Q   I'm not asking you what you were or were not asked to opine

3   about.  I'm asking you to simply state as a nephrologist, as an

4   expert in this case, you believe that you could reach a

5   scientific opinion about the effects of GranuFlo on an

6   individual patient without knowing when or even whether that

7   patient was given GranuFlo?

8   A   Yes.  So what I thought I could do is to say whether or not

9   the event was related to dialysis.  Now, since GranuFlo is an

10  intrinsic part of the dialysis treatment, if there was no

11  relationship to a dialysis treatment, then I can say that there

12  was no relationship to whatever composition of dialysate the

13  patient received during dialysis.  So that was the logical

14  chain that I went through in this.

15  Q   But that logic failed with respect to Mr. Thornton,

16  correct, because GranuFlo was not an integral part of

17  Thornton's dialysis, correct?

18          MR. HOPKINS:  I'd object, Your Honor, with the wording

19  I read yesterday regarding Dr. Goldfarb's declaration, his

20  reference is to any dialysate.  His analysis did not fail

21  because Mr. Thornton was on some other dialysate.  As

22  Dr. Goldfarb has just explained, I believe it's an improper,

23  argumentative objection.

24          THE COURT:  Now, that's a talking objection.  I want

25  to hear what section of the Federal Rules of Evidence you are

Stanley Goldfarb - Cross                      412

1    invoking.

2                MR. HOPKINS:  There is none, Your Honor, there is

3    none.  I apologize.  Argumentative.

4                THE COURT:  Overruled.

5    BY MR. PAYNTER:

6    Q    You may answer the question.

7    A    Please repeat the question.

8                MR. PAYNTER:  Could the reporter read back the

9    question.

10        (The last question was read.)

11               THE WITNESS:  I may be missing something.  I think

12   that the logic here is consistent.

13   BY MR. PAYNTER:

14   Q    I believe I just heard you say that GranuFlo is an integral

15   part of the dialysis?

16   A    No, no.  I just said whether or not -- what I said is

17   whether GranuFlo, if I didn't say it, I apologize, if

18   GranuFlo -- if the hypothesis is that I don't know if that is a

19   problem, the only way it's a problem must be in association

20   with dialysis.  Since the patients' problems were unassociated

21   with the dialysis treatment, whether or not GranuFlo was

22   present was irrelevant to my conclusion.  That's what I meant

23   to say.  I think that logic is intact.

24   Q    I got you.  But you would agree, then, that your analysis

25   of the individual plaintiffs' medical records did not tell you

Stanley Goldfarb - Cross

1   anything about the effect of GranuFlo on predialysis

2   bicarbonate.

3   A   I couldn't speak to the effect of GranuFlo on predialysis

4   bicarbonate, no.

5   Q   All right.  Thank you.

6            MR. PAYNTER:  That's all I have, Your Honor.

7            THE COURT:  Redirect.

8            MR. HOPKINS:  No, Your Honor.

9            THE COURT:  All right.  Thank you, sir.

10           THE WITNESS:  Thank you.

11           THE COURT:  You're excused, free to go.

12           All right.  Those are your witnesses, both sides,

13   right?

14           MR. HOPKINS:  Yes, Your Honor.

15           THE COURT:  All right.  Now, you had something you

16   wanted to say about exhibits.

17           MR. VALENTINE:  Your Honor, it was more in the lines

18   of some rebuttal exhibit that had not been admitted yet that I

19   wanted to bring to your attention.

20           THE COURT:  What's that?

21           MR. VALENTINE:  They are emails that were produced

22   from DaVita that showed that the office of the chief medical

23   examiner -- or excuse me, office of the chief medical officer

24   at DaVita received the Fresenius memo on November 4.  They

25   formulated a --

414

```
 1                THE COURT:  November 4 of what year?

 2                MR. VALENTINE:  2011.  The day it was released.  That

 3     one of the -- excuse me -- doctors in the OCMO asked the

 4     question of how they wanted to proceed with this memo, and sent

 5     it to Dr. Nissenson and other members of DaVita.  Just as a

 6     rebuttal to the assertion that was raised yesterday that DaVita

 7     did not know about this memo, did not get this memo.  That was

 8     all that the documents were going to be used to show.

 9                MR. HOPKINS:  I would just object as to notice, Your

10     Honor, but if they are documents that are produced by DaVita, I

11     certainly don't stand in the way of them being admissible.

12                THE COURT:  Are you guys saying that you didn't know

13     about this memo?

14                MR. HOPKINS:  I think there was an indication that it

15     was not received from Fresenius.  I'm not sure exactly which

16     emails Mr. Valentine is speaking about.  But certainly our

17     assertions all along have been that DaVita was not on notice of

18     these issues prior to the memo, did not receive anything

19     related to the memo prior to its issuance, and I'm not exactly

20     sure which the emails are how DaVita received it after the memo

21     was issued.

22                THE COURT:  Well, I don't have that level of recall.

23     But I will have a transcript, I can check it out.

24                My question is did DaVita in any way, shape, or form

25     suggest that they did not get the Fresenius memo if there are
```

1    in fact emails that said they did.

2         MR. HOPKINS:  I don't believe that we made any

3    arguments that we did not receive the memo at some point from

4    some source after it was issued by Fresenius.

5         THE COURT:  And you're saying they did.

6         MR. VALENTINE:  Yes, Your Honor.  And Mr. Tyrrell's

7    opening, again, during, during Mr. Paynter's questioning,

8    again, you're going to look at the record, to the extent that

9    it does show that what I'm saying, they did not get the memo on

10   November 4, 2011, I would like to have these emails with their

11   attachments introduced for that purpose.

12        THE COURT:  Mr. Tyrrell, this is your chance to rebut

13   him or to correct the record if you wish.

14        MR. TYRRELL:  I'm not sure that I'm even addressing it

15   properly.  But what we think happened is that we did not

16   receive directly from Fresenius this memo.  We do not doubt, we

17   do not deny that in or about the same time we got it.  And if

18   these emails shed light on that, and it's our documents, we

19   have no objection to their coming into the record.

20        THE COURT:  Well, now, I wouldn't want you to be

21   saying we didn't get it from Fresenius and trying to create the

22   impression you didn't get it, if you got it some other way.

23        MR. TYRRELL:  We're not trying to create the

24   impression we didn't get it.

25        THE COURT:  Your documents are admitted.  I'll

416

1    compare, myself.

2              MR. VALENTINE:  Your Honor, may I grab, I left them in

3    my bag.  May I grab them and bring them to you.  I have a copy

4    for the other side.

5              THE COURT:  Well, yes, I don't have enough up here

6    already.

7              Now, do you gentlemen wish to make some sort of a

8    closing argument?

9              MR. VALENTINE:  Yes, Your Honor.

10             THE COURT:  Will you confine it to a little bit in

11   time.

12             MR. VALENTINE:  I will go as quickly as I can while

13   being respectful of the court reporter.

14             THE COURT:  Let's take a little bathroom break first

15   and then we'll pick it up around 25 to three.

16        (Recess at 2:27 p.m.)

17        (Reconvened at 2:36 p.m.)

18             THE COURT:  All right.

19             Closing, and this is Mr.

20             MR. VALENTINE:  Valentine.

21             THE COURT:  A Colorado Springs local.

22             MR. VALENTINE:  That's right.

23        As an initial housekeeping matter, Your Honor, the two

24   emails that I handed you before the break, we discussed with

25   defendant.  The email with the Bates no. 24595 will be

1    Exhibit 36.  And the email and attachments with Bates no. 24603

2    will be Exhibit 37.

3                THE COURT:  Okay.

4                            **CLOSING ARGUMENT**

5                MR. VALENTINE:  Your Honor, as an initial matter, one

6    of the arguments that DaVita has been making is that they are

7    stuck with the physician's prescription, that they have no

8    discretion, that they have to execute the prescription as it's

9    written.

10               In reality --

11               THE COURT:  Regardless, that's the merits here.

12               MR. VALENTINE:  Okay.

13               THE COURT:  Let's just talk about what I've got to

14   decide now.  That is, do I knock Youngberg out, Borkan, do I

15   knock part of Goldfarb out, and most important of all, do I

16   certify a class.

17               MR. VALENTINE:  Your Honor, with regards to the expert

18   witnesses, the Tenth Circuit law is fairly clear, that if an

19   expert witness is essential to the class-certification

20   decision, you must make a Daubert decision before deciding on

21   class certification.  What we have here are not experts who are

22   essential to the class-certification decision.  They are

23   presented here to help us demonstrate how we would prove our

24   case using common elements, using common proof at class

25   certification.

1          If, for whatever reason, you are to exclude

2    Miss Youngberg, Dr. Borkan, or part of Dr. Goldfarb's opinion,

3    we could, or defendant could, in the merits phase, supplement

4    again and bring in a similar witness to provide similar

5    testimony, assuming they had a similar opinion; but a dismissal

6    of any one, on any one of those motions would result in no

7    material change to the decision that you're facing on class

8    certification.  I don't think that that's really something

9    that's in dispute.

10         And so the expert testimony that you heard over the

11   last couple of days should help you understand how plaintiffs

12   would prove the elements that they would prove at trial through

13   common evidence.  As you heard Dr. Goldfarb describe, he spent

14   time talking about the individual plaintiffs.  But he also

15   discussed the common proof, contested the common proof that we

16   would present at trial to prove the elements of our claims.

17         And so you have a situation where there are claims

18   that you can certify to, again, going to our (c)(4) class where

19   on certain issues, we can come in, have a trial on those, on

20   the merits of those issues, resolve those issues, and then the

21   class members going forward can take that, that proof and use

22   it however they would choose to use it, whether that is a CCPA

23   claim, whether that is the, the plaintiffs who would have

24   catastrophic injuries.

25         THE COURT:  Okay.  I really don't need a lecture on

1    how to do my job.  I need to have you tell me, let's start with

2    no. 1, the class certification.  What class do you want?  The

3    same one that's in your papers?

4              MR. VALENTINE:  Your Honor, we spent a lot of time

5    thinking about that.  Yes.  That is the class that we want.

6              THE COURT:  Everyone that got GranuFlo.

7              MR. VALENTINE:  Everyone that got GranuFlo.  What I

8    would say to you --

9              THE COURT:  Between what dates, or is it ever?

10             MR. VALENTINE:  I believe that's in our brief.  I

11   believe it's ever at a DaVita clinic.

12             THE COURT:  And you're not going too fast.

13             And defendants have suggested, but you really haven't

14   said one way or the other that that might be 300,000 people.

15             MR. VALENTINE:  Correct.

16             THE COURT:  Do you have any idea that they're wrong?

17             MR. VALENTINE:  That's the best estimate based on the

18   evidence that they have given us so far.

19             THE COURT:  All right.

20             What questions do you want certified?  You at one

21   point suggested three.  At another point you suggested 13.

22             MR. VALENTINE:  Your Honor, on three remaining causes

23   of action that we have, we would, we would like the question

24   certified that can be proven with the general liability.  So if

25   you go to negligence.

420

1          THE COURT:  Well, are you going to refer me now to

2     questions you've already posed in the past, or are you going to

3     give me new ones?

4          MR. VALENTINE:  Your Honor, the, they are the same

5     questions that were posed in the past that go to the elements

6     of each one of those claims.

7          THE COURT:  All right.  I'm looking at page 32 of

8     document 99.  It says, Plaintiffs seek class treatment of the

9     following issues, each of which is based on the same DaVita

10    conduct and the same legal and factual questions and will

11    determine on a class-wide basis the validity of the class'

12    negligence claims, and there you list nos. 1, 2, 3, 4, 5, 6,

13    and 13.

14         And then over at page 42 and 43, with respect to the

15    fraud claims, you list questions 7, 9, and 13.

16         And at pages 99, with respect to the CCPA claims, you

17    list 8, 9, 10, 11, 12, 13.

18         So are you saying that you want 13 questions, as you

19    stated them, certified?

20         MR. VALENTINE:  Yes, Your Honor, we're not backing

21    around from those questions.  At the same time we're cognizant

22    of your request for us to consider subclasses, for us to

23    consider --

24         THE COURT:  I didn't say anything about subclasses.

25    All I said was think about what questions you want.

1          MR. VALENTINE:  Fair enough.

2          Your Honor, the questions that we would like are

3    questions that go to the general causation for all of the

4    elements of these claims.  We believe that those 13 questions

5    outline what those are.  If there are problems with those 13

6    questions, if there are terms that don't belong in them, we

7    will adjust those questions.  But we believe that those 13

8    questions go to the general causation for the claims that we

9    have remaining that we can prove through DaVita's common

10   conduct.

11         THE COURT:  All right.

12         What's your position on if the Court were to certify

13   any question, how the class is ascertained and who pays for the

14   cost of that, how the notice is given, and who pays for the

15   cost of that?

16         MR. VALENTINE:  In terms of ascertaining the class,

17   Your Honor, the class definition, as we've provided it, every

18   patient who was given GranuFlo at a DaVita clinic, can be

19   determined through reference to DaVita's own records.

20         THE COURT:  I know that.  Ms. Ruggiero told us that.

21         MR. VALENTINE:  Okay.  So we can ascertain the class.

22         We would maintain that it is DaVita's responsibility

23   to pay for those costs because this is information that they

24   should have kept from the beginning for each patient.  In terms

25   of notice to the class.  In every class action we did, we

```
 1    provide notice to the class members.  It's not a problem for us

 2    to provide notice to the class members, to pay for the notice

 3    that goes to class members.

 4               THE COURT:  Okay.

 5               What kind of notice, how much do you think it's going

 6    to cost, and where do you get the money?

 7               MR. VALENTINE:  Your Honor, this is something that our

 8    firm does all the time, we have money set aside.

 9               THE COURT:  You have pots of money.  No, let's talk

10    cold turkey here.  300,000.  How much does it cost to send

11    notice?  What kind of notice are you going to send?

12               MR. VALENTINE:  Typically the way that we do this is

13    that we have class administrators.  These are companies that

14    professionally provide notice to the class.  They find the

15    class members.  If they've moved from the time that they were

16    treated at DaVita with the address that they have, they will

17    find the patient.  They will provide them notice.  They will

18    provide a follow-up notice if we do not find them on the first

19    try.  These administrators are typically how we do this to find

20    and notify class members.

21               THE COURT:  Okay.

22               MR. VALENTINE:  In that case, we hire the class

23    action, the class administrator.

24               THE COURT:  Okay.  And how do they give notice, is it

25    first class mail, certified mail, how do you do it?
```

1    MR. VALENTINE:  They'll do it through certified mail,

2    any means necessary to find the people.  They'll do the best

3    job possible to find these people and give them notice.  If

4    that's certified mail, if that's phone calls, whatever that is,

5    they'll do the best possible notice for every class member.

6    THE COURT:  How much is that going to cost?  You must

7    have made an estimate of it.

8    MR. VALENTINE:  You know, it has -- we haven't, and

9    again, to be perfectly frank, it's something that we do, it's

10   something that Steve Berman, who unfortunately is not here, has

11   a much better idea of the finances of the firm, but maintains a

12   war chest, for every class action we do, we have significant

13   expenditures and we have the money set aside.

14   THE COURT:  It's the named plaintiffs that are

15   providing the notice, right?

16   MR. VALENTINE:  We are providing the money for it.

17   These named plaintiffs are poor people.  We foot the bill.

18   THE COURT:  You don't expect them to pay you back

19   ever.

20   MR. VALENTINE:  The named plaintiffs, no, sir.

21   THE COURT:  All right.  And I asked some questions

22   right at the very beginning.  You give out these notices to

23   300,000 people.

24   MR. VALENTINE:  Correct.

25   THE COURT:  And you must believe, then, that you've

1    got a case that you can prove and win for 300,000 people.

2    Otherwise, you wouldn't be giving notice to them, right?

3              MR. VALENTINE:  Correct.

4              THE COURT:  What if you prove and win the case?

5              MR. VALENTINE:  On general causation.

6              THE COURT:  Yes.

7              MR. VALENTINE:  As I've been stating?

8              THE COURT:  How do you envision it's going to work

9    after that, unless, of course, DaVita just cuts you a huge, big

10   check, how is it going to work?

11             MR. VALENTINE:  The way that it works is typically,

12   once we have identified these class members and talked to them,

13   we figure out what these claims actually, which of these people

14   have, as Dr. Borkan and Dr. Goldfarb have agreed, not

15   everyone -- I'll start with Dr. Borkan who said that everyone

16   who got GranuFlo was given more delivered bicarbonate than they

17   were prescribed, and so everyone has the injury.  But not

18   everybody has a cardiopulmonary arrest, an MI, an ischemia

19   event, so we need to differentiate how many of those people

20   are.  Right now what we have are estimates.  We have guesses.

21   And that could be a small number of people.  It could be a

22   large number of people.

23             THE COURT:  Well, Dr. Borkan said he thought maybe 1

24   to 2 percent, something like that.

25             MR. VALENTINE:  Which is three to --

425

1          THE COURT:  What difference does that make, if you're

2    representing 300,000 people?

3          MR. VALENTINE:  If somebody has a small claim, we can

4    prove an injury to a legally protected fact, we can prove that

5    through DaVita's actions that they made a mistake and so all of

6    the elements of a CCPA claim, except for the individual

7    damages, which for most people are going to be smaller than the

8    $500 statutory award, allows them to come into court and say

9    they get the $500 and go on their way.  That's the majority.

10          For those that remain, the three to 6,000, typically

11    what we do in this situation is we would start trying

12    bellwethers and we will try a bellwether, see what happens.

13    If, as has happened in the past, the defendant says, come hell

14    or high water, I refuse to settle any case, try every single

15    one of these, we try them.  It's happened in, it's happening

16    right now --

17          THE COURT:  You're going to try 6,000 cases if it

18    turns out to be 2 percent.

19          MR. VALENTINE:  They're going to be short trials, yes,

20    I understand if we have to get a special master.

21          THE COURT:  Short jury trials.

22          MR. VALENTINE:  Short jury trials.  Or come to an

23    agreement.  But part of this situation is that under the CCPA a

24    successful plaintiff is entitled to their costs and their

25    attorneys' fees.  And so for each one of these trials, both

1   sides are going to have the incentive to not continue to try

2   these cases because it will increase the attorneys' fees and

3   the costs that an unsuccessful defendant is going to pay or a

4   unsuccessful plaintiff is going to eat.

5          THE COURT:  Okay.  What else would you like to say in

6   your closing argument?

7          MR. VALENTINE:  On that point, Your Honor, if I can

8   just direct you, as you've said, to some Tenth Circuit

9   decisions, I would cite the Esplin vs. Hirschi case,

10  402 F.2d 94, which the Tenth Circuit said -- granted, I'm going

11  to read the quote, and I will grant that it's a different type

12  of class case, but the quote is, It cannot be denied that the

13  resolution of the class-action issue in suits of this type

14  places an onerous burden on the trial court.  But if there is

15  to be an error made, let it be in favor and not against the

16  maintenance of the class action.  For it is always subject to

17  modification should later developments during the course of the

18  trial so require.

19         And so I would say to you --

20         THE COURT:  Kind of easy for those guys to say that.

21         MR. VALENTINE:  I'm glad they did.

22         My point in that, Your Honor, is if you certify this

23  and our worst fears come true and we're looking at the

24  Armageddon morass that was described in the opening statements

25  and you choose at that point to decertify the class or you

427

1    choose to create subclasses because we lose our choice of law

2    or our Shady Grove arguments, if in the future it just becomes

3    completely untenable to continue this case as a class action,

4    that's an option.  The decision that you make now is not, is

5    not set in stone; if you certify the class, it's not set in

6    stone and you're stuck with it going forward.

7            THE COURT:  Well, it's set in stone at least to some

8    extent, isn't it.  Mr. Tyrrell made the point that as soon as

9    you send out notices to 300,000 people, you're potentially

10   going to scare the bejeebies out of all these patients.

11           MR. VALENTINE:  And that is, that --

12           THE COURT:  Even though for many of them, there's been

13   no cardiac arrest, there's been no stroke, there's been no

14   nothing.

15           MR. VALENTINE:  But we don't know who that is.  What

16   we're doing is what was done during that hearing by the DaVita

17   counsel when they were talking about it was just 28 people.  It

18   was just 28 people that Fresenius told us that we needed to pay

19   attention to.  And didn't -- and they didn't pay attention to

20   anybody.

21           That brings me to the other point that I wanted to

22   make, Your Honor; having heard what you said about the (b)(2)

23   class, notice to these people so that those who are injured is

24   the single most important part of this class from our

25   perspective.  The single most important part, however this

1    class is framed, whether it is a (b)(2) class, declaring that

2    DaVita must conduct a compliant look-back program to figure out

3    who got GranuFlo and tell those people that they got GranuFlo

4    so that they can correct their medical records and get the

5    medical attention they need, if they're one of those people.

6    If they're not, oh, well.  But that is the single most

7    important part of this case, is notification to the class

8    members so that they can decide how they want to proceed.

9         THE COURT:  Now tell me one more time, why is it that

10   you can't accomplish what you want to accomplish with a trial

11   for your three plaintiffs, other than the fact that if

12   Dr. Goldfarb is right, you've got three losers on your hands.

13   But you're assuming that Goldfarb is wrong.  You're assuming

14   that these three are good representatives, that they were

15   injured by GranuFlo, that their cardiac arrest was related to

16   the GranuFlo.  You're not only assuming that, you've got to

17   assume that because they're not typical or adequate

18   representatives otherwise.

19        If you are right and you win, why aren't you

20   accomplishing virtually the same thing as if you launched this

21   massive class process?

22        MR. VALENTINE:  There are a couple of things that I

23   will say to that.  The most important is, as I said before,

24   from our perspective, the most important part of this is

25   notification.  We try these cases, three cases, win or lose,

429

1    the 297,000 -- or 299,999 -- 97 other people will never know

2    whether they got GranuFlo.  Seriously injured people, they

3    can't go down to the DaVita clinic and find out if they got

4    GranuFlo.  They can't get their medical records and determine

5    if they got GranuFlo.  They can't take it to their doctor who

6    may be treating them for a stroke, for an MI, or a CPA that

7    they had before and say, hey, remember this, it wasn't just my

8    coronary artery disease, I also got GranuFlo, does that affect

9    my medical history, does that affect the treatment that we have

10    going forward, that Dr. Borkan said was important.  That's one

11    reason that it doesn't do us any good.

12          The second reason, you talked about collateral

13    estoppel at the beginning of this.  You heard Mr. Tyrrell say

14    we will contest collateral estoppel every single time.  You

15    brush it off.  I've been in that situation where we've tried to

16    use that and we've had to brief and fight on every single one

17    of these arguing collateral estoppel.

18          THE COURT:  Well, I sure don't know how they could

19    avoid it.

20          MR. VALENTINE:  Well.  They always find a way.

21          THE COURT:  Yes, I guess they can contest everything.

22    They have so far in this case.

23          MR. VALENTINE:  Correct.

24          The third issue that I'd like to address in response

25    to your question is the adequacy.  And it's very tangential to

1    the way that you asked the question, but the assertion has been

2    raised that our three plaintiffs are not adequate class

3    representatives because they have potentially huge damages.

4    But from our perspective, we have to consider also that what if

5    Dr. Goldfarb is right.  We can show that each one of those

6    plaintiffs got GranuFlo.  We can show that each one of those

7    plaintiffs got GranuFlo delivering excess bicarbonate from what

8    the intent of their physician was.  And so, but if the jury

9    believes Dr. Goldfarb and says, no, no, we're not going to do

10   that, we're not going to say that this particular MI or event

11   was related to GranuFlo, these individuals still are going to

12   pursue the CCPA claims where they would get their $500 and they

13   would get their attorneys' fees and costs.

14          THE COURT:  What is in it for your representatives in

15   this case to launch this enormous class action?  Why wouldn't

16   it be much better for your clients to simply give them their

17   day in court, if you can prove that GranuFlo caused these

18   horrendous damages, you get actual damages, you might get

19   punitive damages, what's in it for them?

20          MR. VALENTINE:  Your Honor, our class representatives

21   understand at the beginning, we explain to them what the rigors

22   of being a class representative entails and that they are

23   obligated to pursue the best interests of the class, pending

24   class certification, absent the ruling of the class

25   certification.  So up through this point, they are obligated to

1    do their best to represent the interests of the class and not

2    their own interests.

3                  THE COURT:  Okay.  Fine.  So what?

4                  Now answer my question.

5                  MR. VALENTINE:  What's in it for them.  They, frankly,

6    they believe like we do, that people should know that GranuFlo

7    was used on them.  They, they believe in the case.  They

8    believe that people should know.  They believe that DaVita

9    should tell people.

10                 THE COURT:  It would be a lot cheaper just to do a

11   massive advertising campaign than what you're launching into.

12   If you really want people to know.

13                 MR. VALENTINE:  I understand that, Your Honor.  But

14   that doesn't guarantee that people get the information.

15                 THE COURT:  And why are they only concerned about the

16   people who got GranuFlo at DaVita.  They should be equally

17   concerned about people who got GranuFlo at Fresenius.

18                 MR. VALENTINE:  They are.

19                 THE COURT:  They're really altruistic in their motive.

20                 MR. VALENTINE:  They are also involved in the

21   Fresenius case.

22                 THE COURT:  The same three.

23                 MR. VALENTINE:  Yeah, they filed lawsuit against

24   Fresenius.  Fresenius, in this case, you said DaVita is not a

25   manufacturer.  Good, Fresenius is no doubtedly, undoubtedly the

432

1    manufacturer, they have claims against the manufacturer.

2            THE COURT:  All right.

3            Anything else?

4            MR. VALENTINE:  No, Your Honor.  I would save the rest

5    for rebuttal, which would be very short, if at all.

6            THE COURT:  All right.  Who's the argument man?

7    That's Mr. Tyrrell, I guess.

8                    **CLOSING ARGUMENT**

9            MR. TYRRELL:  I'd like to focus on what we have

10   learned in the course of this evidentiary hearing that bears on

11   the question before the Court today.  Of whether to certify the

12   issue classes and the injunctive class that plaintiffs seek.  I

13   do it in the context of observing the obvious, that the burden

14   of proof that a class-action device is superior and meets all

15   of the qualifications falls on the plaintiff.  They had this

16   hearing and this opportunity to meet that burden.  We do not

17   believe they've done so.

18           What have we learned.  First, we've learned that

19   plaintiffs are going to stick to their guns.  They want a class

20   of 300,000 people.  We've learned that they take this position

21   despite some very interesting testimony from their own expert,

22   Dr. Borkan.  What does Dr. Borkan tell us, in response to Your

23   Honor's question.  I'm going to give it the broadest scope

24   possible.  That maybe there's 3 percent of these people who are

25   injured.  Maybe.  And he bases that on the Fresenius study and

433

1    an extrapolation from that.

2          That means that we have a class of 270,000 people who

3    were not injured, unless you accept their definition,

4    unsupported by the law, that simply being exposed to GranuFlo,

5    with no impact on you, is an injury.  That's just not the law.

6          What did we learn also from Dr. Borkan?  We learned

7    some important things.  Dr. Borkan said that he, that -- excuse

8    me, he attributes all of these deaths, this, this large number,

9    3 percent, 1 percent, to GranuFlo.  He said he's focusing on

10   deaths in the chair.  But he doesn't provide any evidence

11   whatsoever as to what is the statistical difference between the

12   number of deaths in the chair before GranuFlo existed and the

13   number of deaths in the chair afterward.  This is not the first

14   time these fragile patients have died in the chair.  We know

15   nothing, there is no evidence whatsoever to give us a true

16   indication as to injured people, how they can --

17         THE COURT:  That's the merits of the case.  He has his

18   opinions.  Goldfarb has his opinions.

19         MR. TYRRELL:  I'm going to numerosity, Your Honor.  We

20   have no idea how big this group is, that's my only point.

21         THE COURT:  Of course we know how big the group is.

22   We know it's 300,000 if we buy their definition.

23         MR. TYRRELL:  Right.

24         THE COURT:  But if we say it's just the people -- I'm

25   not going to use the word "die in the chair."  I don't like the

434

1   ring of it.  If we just talk about the people who had serious

2   cardiac event during or shortly after dialysis, he's talking,

3   as I understand it -- and I'll have to review the record,

4   too -- at 1 or 2 or 3 percent.  Even there, you're talking

5   about 3,000, 6,000, 9,000 people.  Easily enough for

6   numerosity.

7           You don't have to prove that you're going to win the

8   case to show numerosity.

9           MR. TYRRELL:  Your Honor, my point is, his number is

10  not correlated to GranuFlo.  It is simply the number of people

11  who died during the process.

12          In any event, let me move on.

13          THE COURT:  I think his opinion is it is correlated.

14          MR. TYRRELL:  His opinion without, respectfully, any

15  studies to support it is that he believes there is that

16  correlation.

17          THE COURT:  Right, it's a hypothesis just like the

18  FDA.

19          MR. TYRRELL:  Right.

20          THE COURT:  They're all hypothesis.

21          MR. TYRRELL:  I'm now addressing the issue of Daubert,

22  I'm going to stick to class, if I may.

23          Dr. Borkan has also told us it is a very narrow time

24  window that we're talking about that could be affected, and

25  that's useful to know in terms of people who really had a

1    cardiac event that might be attributable to GranuFlo.

2         THE COURT:  You don't seriously think that numerosity

3    is your best argument.

4         MR. TYRRELL:  No, I don't; the best argument is the

5    one that I gave before is manageability, but I want to save it

6    for last 'cause I've got to finish strong.

7         THE COURT:  Do me a favor, just start strong and

8    finish strong because I'd like to finish up here, when you've

9    had your say.

10        MR. TYRRELL:  I do want to touch predominance because

11   we think one of the reasons that this case is not manageable is

12   because there are so many individualized questions.  And I'm

13   not going to tick through all the issues that my associates

14   gave me.  Occasionally I find one of my own.  But the bottom

15   line is that we know choice of law is going to require the

16   application of 46 or more state laws.  We know that every

17   prominent --

18        THE COURT:  You know that that's what you hope I

19   decide.

20        MR. TYRRELL:  Yes, but we believe that's controlling

21   precedent in this district, and that's what's been done before.

22   So, yes, I don't know that Your Honor will decide that, but we

23   think that's the case.

24        But suppose we take the alternative that Your Honor

25   suggested to me and say maybe it's the headquarters of DaVita.

436

1    Maybe I mentioned that DaVita changed headquarters in the

2    middle of this.  On March 1 of 2010, it moved from California

3    to Colorado.  So even if we took Your Honor's example, we'd

4    have to apply the laws of Colorado to one time period and the

5    laws of California to another time period.  And I'm not even

6    getting to the issue that every one of the DaVita clinics is

7    separately incorporated.  So without going there, the

8    choice-of-law issue is real.  The substantive differences

9    between the law and the two things Your Honor said are left,

10   negligence and fraud are real.  I'm not going to belabor the

11   individual issues here in the brief.

12        But Your Honor did come to me and you said,

13   Mr. Tyrrell, if it's the case that they really knew it and they

14   really hid it, are you telling me that the law would be

15   materially different in any state, and the answer I think that

16   I gave you is yes.

17        Because in all of those states it comes down to it's

18   two types of fraud, affirmative misrepresentation and

19   affirmative admission.  They say looking at those touting ads

20   that we put out.  They'd have to correlate each ad to what

21   people relied upon.  It would be impossible on a class basis.

22   Moreover, how do people really select the clinics.  Certainly

23   they select it based on quality, but more based on interviewing

24   people and finding out what they have to say and getting the

25   comfortability level on that clinic.  How do you determine that

1    on other than a individual basis.  What was told to them at

2    these face-to-face meetings.

3         THE COURT:  I'm not following you at all.  I thought

4    the fraud was relatively simple to understand at least, and

5    that is if DaVita knew that these spikes were occurring and

6    associated it with GranuFlo but did not do anything, did not

7    inform the physicians or the patients, then they're guilty of

8    fraud.

9         MR. TYRRELL:  Your Honor, that's the fraud of omission

10   that I'm coming to.  But their papers argued two types of

11   fraud.  They say we touted our great services and therefore we

12   misrepresented ourselves.  Now, we haven't talked about that

13   very much, but that's what they're arguing, and I'm saying

14   that's nuts.

15        So now I go to the type of fraud that Your Honor is

16   saying.  We knew about it and we didn't disclose it.  That is

17   still going to be subject to the laws of informed consent of

18   the individual state, and my friend here from Texas gave me the

19   example to give Your Honor.

20        There's a Texas statute that says, in medical

21   malpractice cases, the only thing you're allowed to do is to

22   charge, not fraud, not negligence, not anything else, you are

23   only allowed to charge whether or not the medical facility

24   breached its requisite standard of care.  So in short, for the

25   people in Texas, we would argue to Your Honor, you've got to

438

1    apply the Texas standard and there's a pretty far one out there

2    that says even to the kind of fraud Your Honor is saying,

3    that's not what can be presented by statute in Texas to the

4    jury.  I don't want to belabor that anymore.

5         With respect to facts, okay, one thing I gleaned from

6    Dr. Borkan's testimony is each individual case is enormously

7    different.

8         THE COURT:  You know, for somebody you think shouldn't

9    even be heard, you're sure quoting him a lot.

10        MR. TYRRELL:  Your Honor, I'd like to come back, you

11   said to me, in a damages case, do you basically say there are

12   no damages or do you argue in the alternative.  I want to quote

13   him a lot and say you shouldn't pay any attention, so I want to

14   argue in the alternative.

15        From both experts, we've learned a lot about

16   nephrology.  Most of it goes to merits.  But to the extent that

17   we can draw to the issue that goes to the class, I think

18   everything that was said focuses very clear attention on the

19   unique nature of each patient, the unique nature of their

20   prescriptions and how you're going to frame a common liability

21   or causation question that somehow simplifies the case,

22   particularly when we're mindful of our responsibilities under

23   the Seventh Amendment of not presenting questions that are

24   inextricably intertwined.  Inextricably intertwined to two

25   different juries makes no sense whatsoever.

1        So now I come to my central point.  This is just not

2   manageable.  You asked the question of where are we if they

3   win.  We send out all of this notice.  Okay, we scared the

4   Dickens out of 300,000 people, 270,000 of which had nothing

5   happen to them.

6        Then, we get a class determination that there's some

7   general question --

8        THE COURT:  Where do you get the 270?

9        MR. TYRRELL:  270,000 people did not have a cardiac

10  episode, they simply were exposed to GranuFlo, and they're

11  seeking $500 each under the Colorado Consumer Protection Act.

12       THE COURT:  You're saying 30,000 out of your 300,000

13  had cardiac incidents.

14       MR. TYRRELL:  I did my math wrong.  291,000.  I was

15  trying to go the other way.  291,000.  That's why I became a

16  lawyer, I was never good at numbers.  291,000 had no impact.

17       So what happens.  When you answer Your Honor's

18  question.  Are they going to come back in here as to all of

19  those people and do the documentation to find out, I guess, if

20  they're entitled, assuming Colorado law applies, to 500 bucks

21  apiece?  We're going to have to set up some administrative

22  system for that.  Then we're going to have 9,000 cases,

23  starting with bellwether trials that people are going to have

24  to prove all of the details of their case.  Why would we do

25  this?  Is this a superior --

440

 1          THE COURT:  Well, they're hoping that that won't

 2   actually happen.

 3          MR. TYRRELL:  Right.  But we all know that settlements

 4   occur, for lots of reasons, including the *in terrorem* effect of

 5   certifying a class of 300,000 people, and I think that's what

 6   this is all about.

 7          THE COURT:  Might be.

 8          MR. TYRRELL:  But the reality is you have to assume

 9   the case is going to go forward and if it goes forward, you're

10   going to have not mini trials, you're going to have full-blown

11   trials.  Even if you can find some question and I look at the

12   questions they frame and that Dr. Borkan discussed; namely,

13   what did the physician intend.  Dear lord, how can we do that

14   on any kind of a common basis.

15          In short, your point, the lack of manageability of

16   this case, means that the class-action device is not superior.

17   They have not offered proof, I respectfully suggest, as to how

18   they're going to handle this.  All they've said is we have the

19   financial resources to spend a lot of money on mailings.  That

20   is not an answer to the manageability question.

21          THE COURT:  Well, and even that, I harken back to my

22   question, maybe the Court should appoint a third nephrologist

23   and have the parties pay and the comment was, well, that would

24   be expensive or something like that.  I can't remember the

25   words.

1          MR. TYRRELL:  My comment was let's do it if they're

2     really qualified.

3          THE COURT:  Your comment was, but their comment to the

4     implication was that would be a financial burden.

5          I don't think they even have a clue as to how much of

6     a financial burden this case could turn out to be.

7          On the other hand, I could say that's their problem,

8     not mine.

9          MR. TYRRELL:  So I wrap up now with the other half of

10    my argument of who you shouldn't pay any attention to, *i.e.*

11    Daubert.  Respectfully to Miss Youngberg, what has she told us.

12    She told us that DaVita admits that DaVita had a lot of

13    policies, and I'm sorry that my partner Miss Ruggiero had to

14    keep going through because at bottom we probably could have

15    stipulated that there were a lot of policies.

16         The relevant thing that Miss Youngberg tried to say is

17    that DaVita didn't enforce its policies.  That's what she's

18    really saying.  The problem is she doesn't know that.  She

19    admits that she doesn't know it, okay, counsel just stood up

20    here and said, you know what --

21         THE COURT:  But she based a lot of it on her

22    interpretation of the one deposition that the young lady who

23    was back in the back making a ruckus during the trial.

24         MR. TYRRELL:  She's been fairly calm, Your Honor, but

25    in any event, she probably didn't like hearing about her

1    deposition.

2         THE COURT:  I'm not talking about this one, I'm

3    talking about the one sitting in the far back.

4         MR. TYRRELL:  She was the lady had we decided to rebut

5    Miss Youngberg.

6         THE COURT:  Miss Goykhman.

7         MR. TYRRELL:  But don't take my word for the fact that

8    Miss Youngberg is to be discarded because she has nothing

9    substantive to add.  Take Mr. Valentine's word in his closing

10   argument.  He said his witnesses could be ignored.  He said he

11   could go forward with his case without that.  So I think the

12   issue is that Miss Youngberg has nothing material to offer and

13   if in reaching the conclusion that Your Honor reaches with

14   respect to we hope beyond certification, it is possible for you

15   to buttress your opinion by saying Miss Youngberg does not meet

16   the Daubert standards.

17        It's tougher with regard to Dr. Borkan.

18        THE COURT:  Yes, I would suggest that it is.

19        MR. TYRRELL:  I acknowledge that.  He's clearly

20   qualified.  What we think, though, is that you've listened to

21   what his, and I don't mean to demean hypotheses, okay,

22   hypotheses are good things.

23        THE COURT:  Of course you mean to demean them; you did

24   in your brief.

25        MR. TYRRELL:  I don't mean to demean a hypothesis as

1    Dr. Goldfarb has said is appropriately vetted, challenged,

2    supported or not supported with documentation.  But a naked

3    hypothesis, which is where we stand with Dr. Borkan, I suggest

4    does give grounds for Daubert nonrecognition of his testimony.

5            THE COURT:  Well, you described it as naked, and

6    Dr. Goldfarb describes it as naked.  But Dr. Borkan says his

7    hypothesis is backed up by many studies and a lot of data.

8    They just disagree on that.  And how is a judge supposed to

9    really know?

10           MR. TYRRELL:  Parse Mr. Hopkins' cross-examination,

11   and you'll see if it really, really is backed up by enough to

12   get him over the Daubert threshold.

13           THE COURT:  Okay.

14           MR. TYRRELL:  So in conclusion, Your Honor, we thank

15   you for all of your time.  I'm glad we are going to make our

16   airplanes tomorrow morning, not that we don't like being here

17   in Denver.  We appreciate your hospitality.  We urge the court

18   respectfully not to certify this as a class, not to send notice

19   to 300,000 sick people and make their lives any worse.

20           THE COURT:  Trust me when I tell you, this Court isn't

21   going to send notice to anyone.  That's these guys over here.

22           All right.

23           Mr. Valentine.

24                        **REBUTTAL ARGUMENT**

25           MR. VALENTINE:  Let me address what I think are some

444

1    misconception or maybe I misspoke.  First, I said that none of

2    the expert testimony is material to the decision on class

3    certification.  I did not say ignore my witnesses.  If I said

4    ignore my witnesses, I apologize, I misspoke.

5         If you go and look at the Tenth Circuit case law on

6    Daubert and class-certification hearings, it discusses whether

7    or not an expert's testimony is material to the class

8    certification.  That was what I meant by that.

9         The question that you raised about the money that we

10   had for an expert witness, a third witness, money is not the

11   issue.  We like Dr. Borkan.  We like the way that he presents

12   on the stand.  We like his opinions.  Paying for an expert is

13   not the issue.  Paying the money is not the issue on any of

14   this.

15        THE COURT:  Okay.

16        MR. VALENTINE:  On sending notice to 291,000 people

17   that we assume were not injured by GranuFlo.  The notification

18   that goes out, that we will pay for --

19        THE COURT:  Might be 297 if you take his 1 percent low

20   end.

21        MR. VALENTINE:  Fine.  297, 299,000.

22        THE COURT:  It's a lot more if you use Mr. Tyrrell's

23   numbers.

24        MR. VALENTINE:  Sure.

25        THE COURT:  I'm trying to tease him a little bit.

445

1          MR. VALENTINE:  That notification is not something

2     that we draft and say, you got GranuFlo, your life is over,

3     call somebody immediately so that you are not dead, we are not

4     going to terrify these people.

5          THE COURT:  The Court probably wouldn't approve that

6     particular form of notice.

7          MR. VALENTINE:  Exactly.  We would negotiate the

8     notice.  You would approve the notice.  We would include

9     language saying, where --

10         THE COURT:  So let me ask you a question.

11         MR. VALENTINE:  Please.

12         THE COURT:  Way back at the beginning, seems like

13    weeks ago, but it was yesterday, Tyrrell was saying one thing

14    you can't do, Judge, and then he corrected it and he said one

15    thing you shouldn't do, is redefine the class, your way.

16         And I suppose he would say the same thing with respect

17    to the questions if I were inclined to certify any questions.

18    It's baseball arbitration, is it, here?  It's your way or the

19    highway on the class, it's your way or the highway on the

20    questions?  You're the only one who gave me any.  I asked him

21    if he would give me any, and he didn't, but.

22         MR. VALENTINE:  Your Honor, what I would propose and I

23    think the best way of handling this, because as I said before,

24    the most important thing is that we notify these people, is to

25    certify a (b)(2) class, give the notice to these people, a

1    declaration that DaVita must conduct a compliant look-back

2    program with sufficient checks in place so that we can make

3    sure that it happened because if you look in the Tenth Circuit

4    case law like in the Clark case, defendants often say they

5    performed a look-back program and they don't actually do it.

6            They perform the look-back program, we look at the

7    results that we get, what is actual instead of theorizing about

8    270 to 297,000 people, we can look at the people, we can make a

9    determination at that point.

10           I'm not saying my way or the highway.  I'm saying the

11   most important thing to us is notification of the people.  If

12   that requires that we have to go through the 23(c)(4) class and

13   have issues certified so that we can notify the class members,

14   we are promoting that.  If we go through the (b)(2) route so

15   that you declare that DaVita must conduct a compliant look-back

16   program so that they get notice, great.

17           For us it's notice.  If you wanted us to consider more

18   ways, you said it felt like a week, it's felt like a week to

19   us, too.

20           THE COURT:  Yeah.

21           MR. VALENTINE:  You asked us for questions yesterday

22   morning.  The two attorneys who have been heading up this case,

23   have been unable to come here.  We did consult with them.

24   We're looking through ascertainability, manageability

25   questions, we're looking at it.  So if you would like, give us

447

1    a week to come up with more and we'll submit you a list of new

2    questions.  I don't want to prolong the briefing in this case

3    forever, but quite simply, the issue that's important is

4    notification of these people.  They can't find out any other

5    way.

6            THE COURT:  So let me ask you a different question.

7            You have suggested that you take a preliminary step,

8    in your case you would like it to be the (b)(2) class, but then

9    based on what we find out, we can adjust.

10           MR. VALENTINE:  Yes.

11           THE COURT:  Does it work both ways?  If we tried the

12   three and found out, by golly, you won, can we then certify a

13   class, or is it too late?

14           MR. VALENTINE:  Your Honor, what I would do, excuse

15   me, is cite you to the Futz [phonetic] decision that came down

16   from the Tenth Circuit yesterday, and I only know about it

17   because it's one of our cases, where, and I don't even remember

18   who the judge was, here, denied class certification, made us go

19   forward and try the case for our individual plaintiff.  We won

20   that trial.  We went up to the Tenth Circuit to appeal the

21   class-certification denial and lost.  And so we're stuck.  They

22   affirmed the decision and dismissed the case.

23           And so there are factual differences --

24           THE COURT:  Just think, what a wonderful result that

25   was in a sense.  You saved all that money.

1          MR. VALENTINE:  Your Honor --

2          THE COURT:  I'm teasing you now.

3          MR. VALENTINE:  I know, but it still stinks.  It was

4  just yesterday on a case that we filed back in 2004 or so.

5  It's a case that's been going on for a while.  I think it was

6  Judge Krieger.

7          THE COURT:  It's tough to be a plaintiff lawyer.  It's

8  kind of like spikes, if there are such things, of bicarbonate.

9  You have these very great highs and these very low lows

10  sometimes.

11          MR. VALENTINE:  The lawyers who were better than me

12  that couldn't show win more than they lose, so we're on a good

13  team.

14          Your Honor, I just conclude here, like I said, the

15  most important thing is not the 291,000 people who didn't get

16  hurt.  It's the 9,000 people who have no other way of finding

17  out whether or not they got GranuFlo and it was responsible for

18  their catastrophic, life-changing injuries.  Thank you.

19          Thank you.

20          All right.  Thank you all.

21          Yes, Mr. Hopkins.

22          MR. HOPKINS:  One housekeeping issue.

23          THE COURT:  You find it irresistible to make the last

24  point.

25          MR. HOPKINS:  I prefer not to as I know I stand

449

```
 1    between the cessation of this hearing and the rest of the day

 2    for everyone else.

 3              THE COURT:  Go the lectern, then; we got to train you.

 4              MR. HOPKINS:  Yes, Your Honor.

 5              THE COURT:  This should be a doozy because they're

 6    entitled to the last word.

 7              MR. HOPKINS:  Of course.

 8              During Mr., Dr. Goldfarb's examination, his notes were

 9    marked, and I was going to just mark them as Defendant's

10    Exhibit LL since they were marked.

11              THE COURT:  That's fine.

12              MR. HOPKINS:  I only have this one copy.  If it's

13    permissible to the Court, we can get copies with and

14    appropriately label it and submit it to the Court, if it's all

15    right.

16              THE COURT:  You can do that before you leave.

17              MR. HOPKINS:  And the second issue was Mr. Paynter and

18    I had discussed yesterday -- I'm not sure where he stands at

19    the moment -- making a request for a posthearing submission,

20    very brief.  I would propose two weeks after receipt of the

21    final transcript.  I'm not sure how Mr. Paynter feels on that.

22              MR. PAYNTER:  I think, Your Honor, whatever Your Honor

23    wants.

24              THE COURT:  Posthearing submission on what?

25              MR. HOPKINS:  Summarizing and pulling together the
```

1    testimony and the evidentiary things that we've heard over the

2    last few days.

3              THE COURT:  You both want that?

4              MR. PAYNTER:  To be honest, Your Honor, we had

5    originally discussed that as a possibility given that we just

6    found out that other lead attorney wasn't there and he might be

7    able to have some input.

8              THE COURT:  I don't want to sit on this forever.

9              MR. HOPKINS:  No, Your Honor.  I propose ten pages

10   that's due two weeks after receipt of the final transcript.

11             THE COURT:  All right.  Ten pages between the two

12   sides.  Five each.

13             MR. HOPKINS:  Thank you, Your Honor.

14             THE COURT:  And I'm taking it under advisement.  In

15   part 'cause it's complicated and I want to really read some of

16   this.  But I've also learned from the Tenth Circuit that

17   they're not happy when I certify a class without writing

18   something.

19             MR. HOPKINS:  Understood, Your Honor.

20             THE COURT:  I once ruled from the bench on a class

21   certification, and they spanked me.  They affirmed, but they

22   spanked me.  Next time, write it up.  I will do so.

23             Thank you all.

24        (Recess at 3:32 p.m.)

25                       REPORTER'S CERTIFICATE

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3     Dated at Denver, Colorado, this 8th day of May, 2015.

4

5                              s/Kara Spitler_____
                                  Kara Spitler
6     WITNESSES

7        Steven Borkan

8            Direct Examination Continued By Mr. Paynter      269

9            Cross-Examination By Mr. Hopkins                 280

10           Redirect Examination By Mr. Paynter              342

11           Examination By The Court                         342

12           Recross-examination By Mr. Hopkins               352

13       STANLEY GOLDFARB

14           Direct Examination By Mr. Hopkins                355

15           Cross-Examination By Mr. Paynter                 398

16    CLOSING ARGUMENT

17       By Mr. Valentine                                     417

18       By Mr. Tyrrell                                       432

19       Rebuttal Argument By Mr. Valentine                   443

20

21

22

23

24

25