IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No 13-cv-00573-RBJ-KMT
(*Consolidated with* 13-cv-00574-RBJ-KMT, 13-cv-00576-RBJ-KMT,
13-cv-00579-RBJ-KMT, 13-cv-00892-RBJ-KMT and 13-cv-00893-RBJ-KMT)

DORIS MORRIS, an individual; TONY ARMSTRONG, an individual; and, MELVIN
NUNES, individually and as personal representative of the ESTATE OF STELLA NUNES,
and on behalf of all others similarly situated,

      Plaintiffs,

v.

DAVITA HEALTHCARE PARTNERS, INC.,

      Defendant.

---

## ORDER

---

Presently before the Court is Plaintiffs' Motion to Certify Class and Appoint Class
Counsel [ECF No. 99/100]. For the reasons set forth below, the motion is denied.

### I. Facts

The plaintiffs or their loved ones are all former DaVita patients who suffered heart
attacks during or soon after dialysis treatments at DaVita clinics. As relevant here, dialysis is a
process that reproduces about 10 to 15 percent of kidney function in patients with End Stage
Renal Disease; it is typically performed three times per week for about three hours at a time.
ECF No. 151 (Transcript of April 29, 2015 hearing (Day One Tr.)) at 229. One important
purpose of dialysis is controlling the pH level of a patient's blood, which would otherwise
become too acidic in the absence of properly-functioning kidneys. *Id.* at 231–32. Dialysis
accomplishes this through the use of a dialysate, a substance that, when placed in a machine

1

through which the patient's blood circulates during the course of a treatment, allows electrolytes to diffuse into the blood. *Id.* at 229.

One such electrolyte, bicarbonate, counteracts the buildup of acid that occurs naturally from physical activity and the ingestion of food. *Id.* at 232. After bicarbonate enters a patient's blood during a dialysis treatment, the patient's bicarbonate level peaks; it then begins to drop over the next few days as the patient moves and eats, before peaking again during or soon after the next dialysis treatment. *Id.* at 233. Determining the amount of bicarbonate that a patient should receive during dialysis is an important part of the role performed by the patient's nephrologist. *Id.* at 235–36. Thus, when a nephrologist writes a dialysis prescription, he or she includes a specific level of bicarbonate as part of the prescription. *Id.* That level tends to be between 30 and 40 milliequivalents per liter, with an average of 37. *Id.* at 238.

A patient, however, does not receive bicarbonate only in direct form from the dialysate. *Id.* at 237–38. All dialysates also contain some amount of acetate, an acid-like substance that is very efficiently converted into bicarbonate by the patient's liver and thus provides an additional source of bicarbonate during dialysis. *Id.* at 238. A typical dialysate contains 4 milliequivalents of acetate. *Id.* at 237. In contrast, the dialysate that DaVita used when treating the plaintiffs— GranuFlo or NaturaLyte[1]—contain 8 milliequivalents. *Id.*; ECF No. 90 at ¶12. Plaintiffs contend that DaVita failed to account for this extra acetate when treating patients with GranuFlo and thus delivered more bicarbonate to patients than they should have received according to their nephrologists' prescriptions.

On plaintiffs' theory, this extra bicarbonate increased the risk of serious negative health

---

[1] GranuFlo and NaturaLyte appear to be different trade names for what is essentially the same product. *See* ECF No. 90 at ¶2. For convenience, the Court refers to them throughout this Order collectively as "GranuFlo."

consequences in some patients treated with GranuFlo.  According to the plaintiffs' expert witness, Dr. Borkan, excess bicarbonate is problematic for patients with high predialysis bicarbonate levels.  Day One Tr. at 239.  For these patients, the additional bicarbonate they receive during dialysis can cause their bicarbonate levels to spike to dangerous levels, resulting in metabolic alkalosis, a condition in which a patient's pH level is too high.  *Id.* at 239–40. Metabolic alkalosis is associated with an increased risk of ischemic strokes, heart attacks, myocardial infraction, and fatal arrhythmias.  *Id.* at 257–59, 266.  On the other hand, patients with low predialysis bicarbonate levels—who are at risk for metabolic acidosis, a condition characterized by low pH levels—may benefit from the extra bicarbonate they receive as a result of the higher acetate content of GranuFlo.  *Id.* at 248.  Dr. Borkan also noted that a rapid increase in bicarbonate can cause metabolic alkalosis in some patients with very low predialysis bicarbonate levels.  *Id.* at 257; ECF No. 153 (Transcript of April 30, 2015 hearing (Day Two Tr.)) at 269–71.

The plaintiffs believe that they (or in the case of Mr. Nunes, his wife) experienced heart attacks as a result of their exposure to GranuFlo, either during or soon after undergoing a dialysis treatment at a DaVita clinic.  Ms. Morris, a resident of Minnesota, suffered a heart attack approximately 24 hours after completing such a treatment in April of 2012.  ECF No. 90 at ¶25. Stella Nunes, the late wife of Melvin Nunes, suffered a heart attack while undergoing a dialysis treatment in California in December of 2012.  *Id.* at ¶26.  She passed away the next morning at the hospital.  *Id.*  Finally, Mr. Armstrong, also a resident of California, had a heart attack during a dialysis treatment in April of 2011.  *Id.* at ¶23.  Overall, Dr. Borkan estimated, a little over one to two percent of the patient population that received GranuFlo experienced a negative health outcome like a heart attack or stroke.  Day One Tr. at 260.

Indeed, in March of 2012, the U.S. Food and Drug Administration ("FDA") issued a Class 1 recall for GranuFlo and NaturaLyte that cautioned physicians to "be aware of the concentration of acetate or sodium diacetate" contained in the products.  ECF No. 99-6, Recall Notice, at 2–3.  The FDA's recall notice explained that

> inappropriate prescription of these products can lead to a high serum bicarbonate level in patients undergoing hemodialysis.  This may contribute to metabolic alkalosis, which is a significant risk factor associated with low blood pressure, hypokalemia, hypoxemia, hypercapnia and cardiac arrhythmia, which, if not appropriately treated, may culminate in cardiopulmonary arrest.  This product may cause serious adverse health consequences, including death.

*Id.* at 3.  Thus the recall warned physicians to take the acetate content of GranuFlo into account when writing prescriptions, but it did not remove the product form the market.

Plaintiffs have brought claims for negligence, fraudulent concealment, and violations of the Colorado Consumer Protection Act ("CCPA").[2]  The motion presently before the Court seeks class certification for purposes of all three claims.  The Court held a two-day evidentiary hearing in connection with the motion on April 29 and 30, 2015.

## II.  Discussion

It is axiomatic that a class action is an exception to the general rule that "litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (internal citation and quotations omitted).  Federal Rule of Civil Procedure 23 sets out the parameters governing class actions in federal courts.  First, the proposed class must satisfy the prerequisites laid out in Rule 23(a): numerosity, commonality, typicality, and adequacy.  Second, the putative class must fall into one of the categories listed in Rule 23(b).  Plaintiffs here rely on both the second and third categories.  Under the second, the Court may certify the putative class if "the party opposing the class has acted or refused to act on

---

[2] Plaintiff Nunes has also alleged wrongful death and loss of consortium claims.  ECF No. 90 at 36.

grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The third permits certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A plaintiff seeking certification may also employ Rule 23(c)(4), which allows "an action [to] be brought or maintained as a class action with respect to particular issues."

The U.S. Supreme Court emphasized that Rule 23 imposes weighty obligations on plaintiffs and certifying courts in its 2011 *Dukes* decision. 131 S.Ct. at 2551 ("certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied"). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Id.* Put another way, "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* Nevertheless, a peek at the merits is not an invitation to "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012). On the contrary, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1194–95 (2013) (emphasizing that an evaluation of the probable outcome on the merits is not properly part of the certification decision). Some of the evidence presented by the parties at the class certification hearing, and

discussed in this Order, is relevant to the merits.  However, I cite it only to the extent I have found it necessary in deciding class issues and without expressing any opinion on the ultimate merits of the claims or defenses.

In the present case, plaintiffs seek to certify various classes under Rule 23(b)(2), (b)(3), and (c)(4).  First, they seek injunctive relief under Rule 23(b)(2) requiring DaVita to "(i) track the dialysate received by each patient and record that information in the patient's medical records; (ii) conduct a valid "look-back" program to determine which patients were exposed to GranuFlo in the past; and, (iii) notify GranuFlo-exposed patients that if they suffered cardiopulmonary arrest, myocardial infarctions, or ischemic strokes during or after GranuFlo dialysis, those events might be related to DaVita's administration of GranuFlo and may give rise to legal claims against DaVita."[3]  ECF No. 161 at 2.  As for the 23(b)(3) class, plaintiffs have listed 13 issues on which they seek certification under 23(c)(4) in their original motion and two alternative issues in their post-hearing brief, each related to DaVita's actions surrounding its use of GranuFlo.  ECF No. 99 at 32–38; ECF No. 161 at 5.

Turning to the proposed class definitions, plaintiffs originally sought to certify a class of all patients who were treated with GranuFlo (or NaturaLyte) at DaVita clinics for purposes of all three claims (negligence, fraudulent concealment, and violations of the CCPA).  ECF No. 90 at ¶69.  DaVita estimates that this proposed class includes approximately 300,000 people, dispersed throughout the United States.[4]  Day One Tr. at 17.  In their post-hearing brief, however, plaintiffs state that they have reconsidered their proposed class definition and instead seek certification of the following classes: (1) under Rule 23(b)(2), "[a]ll individuals dialyzed at a DaVita clinic

---

[3] This proposed injunctive relief laid out in plaintiffs' post-hearing brief appears to replace the request contained in the complaint.  In any event, the Court would not certify either 23(b)(2) class for the reasons explained below.

[4] DaVita represents that the class would include people residing in 46 states.  ECF No. 112 at 2.

following the introduction of GranuFlo," ECF No. 161 at 2; (2) for purposes of the CCPA claim under Rule 23(b)(3), "[a]ll DaVita patients dialyzed with GranuFlo since March 1, 2010 [the date on which DaVita moved its corporate headquarters to Colorado]," *id.* at 3; (3) for purposes of the fraudulent concealment claim under Rule 23(b)(3), the original class of all DaVita patients dialyzed with GranuFlo, *id.* at 4; and (4) an issue class under Rule 23(c)(4), for all three claims, consisting of "[a]ll [presumably DaVita] patients exposed to GranuFlo who suffered cardiopulmonary arrest, myocardial infarction or ischemic stroke either during dialysis with GranuFlo or within forty-eight hours after GranuFlo exposure," *id.* at 5.[5]  It appears that plaintiffs intend to stand by the original proposed class definition for purposes of the negligence claim under Rule 23(b)(3).

Defendant opposes any certification and challenges the plaintiffs' standing for all of the proposed classes.  The Court thus addresses the standing arguments first, then turns to the relevant Rule 23 analysis.

## A. <u>Standing</u>

DaVita sets forth two standing arguments in its response: (1) the majority of the putative class members were not injured and thus lack standing, and (2) for purposes of 23(b)(2) certification, the named plaintiffs are not suffering from a continuing injury, and they therefore lack standing to seek injunctive relief.  The Court will address each in turn.

---

[5] The plaintiffs' post-trial brief appears to contemplate a Rule 23(b)(3) class that is not also a 23(c)(4) issue class for all three of plaintiffs' claims. *See* ECF No. 161 at 3–5.  Prior to and at the hearing, plaintiffs requested only a 23(b)(3) class under 23(c)(4).  To the extent they now intend to seek a stand-alone 23(b)(3) class, the Court denies that request for the same reasons it declines to certify the 23(b)(3) class under 23(c)(4) below; indeed, such a class would additionally fail to satisfy the commonality, typicality, and predominance requirements.  The Court thus takes plaintiffs' new proposed 23(c)(4) class definition ("[a]ll patients exposed to GranuFlo who suffered cardiopulmonary arrest, myocardial infarction or ischemic stroke either during dialysis with GranuFlo or within forty-eight hours after GranuFlo exposure") as an alternative class definition for their negligence, fraud, and CCPA claims under Rule 23(b)(3) and (c)(4).

**1.  Non-named Plaintiffs' Standing**

Beginning with the first argument, the Tenth Circuit has made clear that that "Rule 23's requirements must be interpreted in keeping with Article III constraints." *Vallario v. Vandehey*, 554 F.3d 1259, 1269 n.7 (10th Cir. 2009) (internal citation omitted).  "Article III . . . restricts the federal courts to the adjudication of 'Cases' and 'Controversies.'  The standing inquiry ensures that a plaintiff has a sufficient personal stake in a dispute to ensure the existence of a live case or controversy which renders judicial resolution appropriate." *Tandy v. City of Wichita*, 380 F.3d 1277, 1283 (10th Cir. 2004) (internal citations omitted).  In order to have standing to bring a claim, a plaintiff must have suffered an "injury in fact." *Id.*  The defendant argues that the majority of the putative class members in the present case were not injured because, although everyone treated with GranuFlo may have experienced elevated bicarbonate levels, most did not suffer a cardiac event or other adverse health outcome.  Thus, on DaVita's theory, most putative class members lack standing and the class cannot be certified.[6]

However, DaVita's argument assumes that all members of the proposed class must demonstrate standing in order to proceed as a class.  In fact, courts are split on whether the standing analysis at the certification stage looks only to the named plaintiffs or to the proposed class as a whole.  *See In re Deepwater Horizon*, 739 F.3d 790, 800–01 (5th Cir. 2014) *cert. denied sub nom. BP Exploration & Prod. Inc. v. Lake Eugenie Land & Dev., Inc.*, 135 S. Ct. 754 (2014).  The Tenth Circuit has made clear that "only named plaintiffs in a class action seeking prospective injunctive relief must demonstrate standing by establishing they are suffering a

---

[6] This argument was made in response to plaintiffs' original proposed class definition of all DaVita patients who were treated with GranuFlo.  However, it applies equally to all of plaintiffs' newly proposed classes, except for the alternative 23(b)(3)/23(c)(4) class consisting only of people who did in fact suffer a heart attack, stroke, or similar outcome.  Indeed, I assume defendant would argue the point even more vigorously in light of the new 23(b)(2) putative class, which includes patients who did not even receive GranuFlo.  However, regardless of the class definition in play, defendant's argument fails as a matter of law.

continuing injury or are under an imminent threat of being injured in the future." *DG ex rel.*

*Stricklin v. Devaughn*, 594 F.3d 1188, 1197 (10th Cir. 2010).  Thus, for purposes of 23(b)(2)

certification, only the named plaintiffs must demonstrate that they have been injured, and

DaVita's argument that many putative class members were not injured is immaterial to the

standing analysis.

Whether the Tenth Circuit has adopted this same approach in the 23(b)(3) context is less

clear, but it appears that it has.  The *Stricklin* opinion cites a Seventh Circuit case for the

proposition that "[a] class will often include persons who have not been injured by the

defendant's conduct. . . . Such a possibility or indeed inevitability does not preclude class

certification."  *Id.* at 1198 (quoting *Kohen v. Pacific Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th

Cir.2009)).  Thus this circuit has suggested that—in any context—plaintiffs need not show that

the every member of a proposed class has been injured at the class certification stage.  Moreover,

in describing what appears to be the emerging majority approach, the Fifth Circuit concluded

that the Tenth Circuit has "arguably" adopted this approach in the 23(b)(3) context:

> In attempting to answer this question [of how courts are to evaluate standing for
> the purposes of class certification under Rule 23], courts have followed two
> analytical approaches.  According to one approach, which has been endorsed by
> three Justices concurring in *Lewis*, several circuits, and an influential treatise, the
> inquiry hinges exclusively on the Article III standing of the "named plaintiffs" or
> "class representatives."  This test requires courts to ignore the absent class
> members entirely . . . [T]his approach to the standing inquiry during class
> certification has been followed by the Seventh, Ninth, and Third Circuits.
> Additionally, the Tenth Circuit has adopted this test at least in "class action[s]
> seeking prospective injunctive relief" and arguably also in class actions for
> damages as well.

*In re Deepwater Horizon*, 739 F.3d at 800–01 (citing *Stricklin*).  The First Circuit also recently

cited *Stricklin*—in a 23(b)(3) case—in support of the position that "[only] at least one named

plaintiff must satisfy the actual injury component of standing in order to seek relief on behalf of

himself or the class." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 32 (1st Cir. 2015).

In light of this case law, the Court finds that only the named plaintiffs must demonstrate an injury in fact at this stage. DaVita's first standing argument does not assert that the named plaintiffs have not been injured (indeed, they all have been), but rather that "the vast majority of all putative class members" suffered no cognizable injury. ECF No. 112 at 7. Thus the defendant's argument fails as a matter of law.

### 2. <u>Standing under Rule 23(b)(2)</u>

DaVita also argues that the named plaintiffs themselves lack standing for purposes of the 23(b)(2) class. As noted above, "[the] named plaintiffs in a class action seeking prospective injunctive relief must demonstrate standing by establishing they are suffering a continuing injury or are under an imminent threat of being injured in the future." *DG ex rel. Stricklin*, 594 F.3d at 1197. It is not clear to the Court that the named plaintiffs are currently suffering or may soon suffer any injury. While the plaintiffs or their loved ones were undoubtedly injured in the past, there is no evidence suggesting that they are currently at risk of any negative health consequences associated with their prior treatment with GranuFlo. Plaintiffs' motion does not argue as much, but rather focuses on the fact that DaVita "denied . . . class members full knowledge about their own medical records." ECF No. 99 at 45.

On plaintiffs' theory, the injury that forms the basis for the proposed injunctive relief class is the denial of "complete and accurate information about [putative members'] medical history, treatments, and course of care." *Id.* However, the named plaintiffs have all learned through discovery that they were treated with GranuFlo at DaVita clinics.[7] Day One Tr. at 16–

---

[7] Moreover, DaVita determined which of the original plaintiffs in this action received treatment with GranuFlo by looking at the purchasing records of its clinics and comparing the time periods during which the clinic used GranuFlo with the time periods of the plaintiffs' treatments. Day One Tr. at 52–54. Thus it appears that the plaintiffs are aware of the time periods during which they were treated with GranuFlo,

17, 77–78.  For this reason, even assuming that the lack of knowledge that a patient was treated with GranuFlo at some point in the past is a cognizable injury, the named plaintiffs are not suffering this injury.  They therefore lack standing for purposes of injunctive relief and cannot represent a class under Rule 23(b)(2).

Indeed, the Southern District of New York recently denied a motion for class certification on similar grounds in *Vaccariello v. XM Satellite Radio, Inc.*, 295 F.R.D. 62 (S.D.N.Y. 2013).  In that case, the plaintiff brought suit against a company that provides subscription-based satellite radio service, alleging that the company's practice of automatically renewing subscriptions violated consumer protection laws.  *Id.* at 66.  The plaintiff sought injunctive relief under Rule 23(b)(2) requiring the defendant to provide notice of its automatic renewal practices to its customers.  *Id.*  The Court declined to certify a 23(b)(2) class because the named plaintiff was not presently suffering the complained-of injury:

> The crux of plaintiffs' complaint is that [defendant] XM's customers unwittingly pay extra fees because they are unaware that their service automatically renews. As a result of his billing dispute with defendant, [the plaintiff] is now clearly aware of XM's billing practices.  Given this knowledge, plaintiff is not likely to unwittingly face automatic renewal and its accompanying fees. Accordingly, there is insufficient evidence that [he] is likely to suffer future harm from XM's policies.

*Id.* at 72.  *See also Cattie v. Wal-Mart Stores*, 504 F. Supp. 2d 939, 951 (S.D. Cal. 2007) (declining to grant injunctive relief where plaintiff lacked standing because she was—at the time of the suit—fully aware of defendant's alleged false advertising and "if [a plaintiff] may not seek injunctive relief, the standing of unnamed class members will not suffice to give the Court

---

or at least that they could easily obtain this information during discovery.  Additionally, DaVita's post-trial brief represents that "DaVita has never refused [a request for information about whether a patient was treated with GranuFlo] from a patient, doctor, or litigant.  With a patient's name, DaVita can determine if he was administered GranuFlo, as it has done for the named Plaintiffs and numerous individuals (putative class members here) who filed individual claims in the Fresenius MDL."  ECF No. 162 at 1–2 n.1.

jurisdiction to grant it").  Similarly in the present case, the named plaintiffs cannot seek injunctive relief where the alleged injury is the concealment of information that they now possess.  Even assuming a class of DaVita patients who are unaware that they were treated with GranuFlo could be certified under 23(b)(2) on the basis of this alleged injury, the named plaintiffs in the present case could not represent that class.  Thus the Court denies the plaintiffs' motion for certification as to the 23(b)(2) class,[8] and I proceed to analyze only the proposed 23(b)(3) class under Rule 23's requirements.

## B.  The Rule 23(a) Requirements

As noted above, a plaintiff seeking to certify any class under Rule 23 must satisfy the prerequisites laid out in Rule 23(a).  This provision requires that

---

[8] Moreover, independent of the plaintiffs' lack of standing to bring a claim for injunctive relief, the proposed 23(b)(2) class cannot satisfy Rule 23(a)'s typicality requirement.  "[T]ypicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."  *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1199 (10th Cir. 2010).  The *Stricklin* court found typicality where, although only 1.2% of the proposed class suffered the harm complained of, all class members were subject to a "common risk of harm."  *Id.*  Here, all putative class members were not subject to a common risk of harm.  According to the plaintiffs' own expert, "GranuFlo would have one medical advantage" for a subset set of patients, and the fact that it raises the average bicarbonate level in the population of dialysis patients is "a good thing" for some portion of that population.  Day One Tr. at 248, 250.  Although it is unclear what portion of DaVita patients were at risk of serious negative health outcomes like those experienced by the plaintiffs, Dr. Borkan estimated that only one to two percent of patients treated with GranuFlo (or perhaps "a little more" than that number) actually experienced such outcomes.  *Id.* at 260.  He added that the rapid rise of a patient's bicarbonate level itself can trigger metabolic alkalosis even in patients with relatively low predialysis bicarbonate levels, *id.* at 257, although again it is unclear what percentage of patients were at risk of experiencing such an outcome (apparently this risk is associated with very low predialysis bicarbonate levels, *see* Day Two Tr. at 269–71).  In any event, it is clear to the Court that, even on plaintiffs' theory, not all of the over 300,000 people in plaintiffs' proposed 23(b)(2) class were at risk of being harmed by DaVita's use of GranuFlo, and, moreover, some subset likely benefited from receiving treatment with GranuFlo.  Thus a seemingly significant portion of the putative class has no basis to claim harm at the hands of DaVita.  In such circumstances, plaintiffs cannot satisfy Rule 23(a)'s typicality requirement.  For similar reasons, the Court is also skeptical of the putative class's ability to satisfy Rule 23(a)'s commonality requirement and Rule 23(b)(2)'s requirement that "the party opposing the class has acted or refused to act on grounds that apply generally to the class."  *Cf. Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 824 (7th Cir. 2012) ("If . . . a class is defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification.").

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). As an initial matter, plaintiffs argue that for purposes of the proposed 23(b)(3) class they need only satisfy the 23(a) requirements with respect to the issues on which they seek 23(c)(4) certification, not for the class as a whole. While the numerosity and adequacy analyses here are not impacted by the fact that plaintiffs seek certification pursuant to 23(c)(4), the Court agrees that the commonality and typicality requirements should be examined only with respect to the 23(c)(4) issues. *See Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 241 (S.D.N.Y. 2010) ("[W]hen a Court chooses to limit class certification only to certain common issues under Rule 24(c)(4) . . . [it] goes almost without saying that the related requirements of commonality and typicality are . . . met."); *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 29 (E.D.N.Y. 2001) (Rule 23(c)(4) "accords district judges the discretion to certify a class action as to particular issues in a manner that treats common things in common and distinguishes the distinguishable, thereby satisfying Rule 23(a)'s requirements of commonality and typicality."). Accordingly, in the following analysis, the Court considers commonality and typicality only with respect to the issues on which plaintiffs seek 23(c)(4) certification. As laid out below, the Court finds that plaintiffs have satisfied the 23(a) prerequisites for certification.

### 1. Numerosity

To satisfy numerosity, plaintiffs first must show that the putative class is ascertainable. *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 638–39 (D. Colo. 1986). While the class does not have to be "so ascertainable that every potential member can be specifically identified at the commencement of the action, the description of the class must be sufficiently definite so that it is administratively feasible for the court to ascertain whether a particular individual is a member."

*Id.* (internal citations omitted).  In other words, "the class must be defined with reference to objective criteria [and] there must be a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition."  *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 355 (3d Cir. 2013).  Moreover, if a court must undertake extensive individualized inquiries into whether a putative member falls within the class definition, certification is not appropriate.  *See Davoll v. Webb*, 160 F.R.D. 142, 146 (D. Colo. 1995) *aff'd*, 194 F.3d 1116 (10th Cir. 1999) ("Various factors would have to be considered in determining whether each named Plaintiff and each member of the putative class has or will have a 'disability' for the purposes of an ADA claim. Such necessarily individualized inquiries are best suited to a case-by-case determination.").

In the present case, the putative class includes every DaVita patient who was treated with GranuFlo at any point in time (or, for the CCPA claim, after March 1, 2010) or, alternatively, just those who experienced a serious negative health outcome.  DaVita apparently did not record in patients' medical records which dialysate was administered to them.  However, it is possible to determine whether a patient probably was or was not treated with GranuFlo.  If individual clinics used only one dialysate product at a time, then one can determine from purchasing records when GranuFlo was being used at the clinic and compare that data to the patient's records, resulting in a reasonable inference that the patient was or was not treated with GranuFlo, and if so, during what period of time.  *See* Day One Tr. at 53–54.  The present case illustrates this process.  The original Complaints in these consolidated cases named 13 individuals who allegedly suffered serious adverse health effects from the use of GranuFlo in their dialysis treatments.  However, partly as a result of the process described above, the number of plaintiffs was reduced to the present three.

Whether that process is administratively feasible when applied to 300,000 patients is debatable.  And that is only one step in the process, because the records of those who are found to have received GranuFlo must be examined to identify the smaller number, estimated by Dr. Borkan to be in the range of one to two percent of the total (so roughly between 3,000 and 6,000 patients) who experienced serious adverse health effects during or shortly after a treatment with a GranuFlo dialysate.  Thus, if the question is whether it is possible to identify the members of the class, the answer is "yes."  If the question is whether it is administrative feasible to do this, the answer might be different, depending upon who is asking the question.  DaVita would answer "no," since it would be the one to do the work.  For purposes of the numerosity requirement, I will answer the question with a weak "yes."  But, this administrative problem is still part of the mix when I later get to the question of whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy" per Rule 23(b)(3).

In order to be certified, the proposed class also must be so numerous that joinder is impracticable.  Fed. R. Civ. P. 23(a); *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006). Defendant concedes that "the class proposed would be immense."  ECF No. 112 at 35.  Indeed, the parties estimate that the putative class of all DaVita patients treated with GranuFlo consists of nearly 300,000 individuals.  The proposed CCPA class consists of some portion of that number, and a conservative estimate of the number of individuals in the alternative class of just those patients who were seriously injured is in the range of 3,000 to 6,000 people.  In any case, joinder is clearly impractical.  Thus plaintiffs have shown that the proposed class is ascertainable and sufficiently numerous, and the Court finds that they have satisfied Rule 23(a)'s numerosity requirement.

## 2. <u>Commonality</u>

In order to satisfy the prerequisite of commonality, a putative class must raise a common contention that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. at 2551 (finding that plaintiffs failed to demonstrate commonality because it was "quite unbelievable" that thousands of Wal-Mart managers across different regions of the country "would exercise their discretion in a common way without some common direction"). "What matters to class certification is not the raising of common questions—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (internal citation, quotations, and alterations omitted).

Here, as noted above, the fact plaintiffs seek certification only on particular issues under 23(c)(4) strongly weighs in favor of finding commonality. *See Charron*, 269 F.R.D. at 241; *Simon*, 200 F.R.D. at 29. *See also In re Tetracycline Cases*, 107 F.R.D. 719, 729 (W.D. Mo. 1985) (finding that "[i]n an abstract sense, at least, [the commonality] requirement is clearly met" where plaintiffs employ Rule 23(c)(4) to isolate common issues of law and fact). Although the Supreme Court clarified in *Dukes* that commonality requires not just common questions— which are by definition present under 23(c)(4)—but also common answers, it seems likely that well-framed issues raised under 23(c)(4) will satisfy the commonality requirement.

In the present case plaintiffs have laid out common issues central to their claims, the answers to which can be decided on a classwide basis. *See* ECF No. 99 at 32–38 (listing 13 common issues on which plaintiffs seek certification); ECF No. 161 at 5 (listing an additional two issues). Not all 15 issues are appropriate for certification. The first—whether GranuFlo,

when administered according to DaVita policies and procedures leads to elevated bicarbonate levels and alkalosis—is not capable of classwide resolution on a "yes" or "no" basis; even on plaintiffs' theory of the facts, not all patients treated with GranuFlo will experience alkalosis. *See* Day One Tr. at 239–40.  The first alternative issue listed in plaintiffs' post-hearing brief is problematic for the same reason.  *See* ECF No. 161 at 5.  The third issue from plaintiffs' motion—whether DaVita adequately investigated GranuFlo before it began using it—should not be included in light of this Court's Orders on DaVita's two motions to dismiss [ECF Nos. 69 and 126].  Finally, the last issue (labeled number 13) is not relevant in light of the Court's decision not to certify a class for injunctive relief.  The remaining 11 issues (10 from the motion and one from the post-trial brief) concern GranuFlo's effect on bicarbonate levels, DaVita's monitoring of patient data, DaVita's company-wide practices and procedures, DaVita's knowledge about problems associated with the use of GranuFlo, whether DaVita concealed information from its patient population, DaVita's duties as a corporation, and whether DaVita committed an unfair or deceptive trade practice.  ECF No. 99 at 32–38.  These all raise questions that can be answered on a classwide basis in a single stroke, and thus the Court finds that commonality exists as to these 11 questions.

### 3.  <u>Typicality</u>

In general, "typicality exists where . . . all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances." *Stricklin*, 594 F.3d at 1199.  In other words, "[t]he test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal citations

and quotations omitted). However, as noted above, the use of Rule 23(c)(4) narrows the typicality analysis to the issues on which certification is sought. *See Charron*, 269 F.R.D. at 241. The typicality inquiry is closely related to that of commonality: "The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart Stores*, 131 S. Ct. at 2549 n.5 (internal citation and quotations omitted). Moreover, as noted above, when plaintiffs seek certification under Rule 23(c)(4) to isolate issues common to the proposed class, typicality is satisfied almost by definition. *See Charron*, 269 F.R.D. at 241; *Simon*, 200 F.R.D. at 29 (E.D.N.Y. 2001).

Here, for purposes of 23(b)(3) certification under 23(c)(4), the Court is satisfied that the plaintiffs have demonstrated typicality.[9] The issues on which they seek certification all turn on DaVita's conduct with respect to its use of GranuFlo and its policies and practices surrounding the monitoring of patient data. DaVita's conduct, as relevant to the 11 issues on which commonality exists, was not unique to any particular plaintiff; to the extent that members of the proposed class were injured by this conduct, the same course of conduct on DaVita's part caused those injuries. For these reasons, the proposed 23(b)(3) class satisfies Rule 23(a)'s typicality requirement.

## 4. **Adequacy**

Finally, Rule 23(a) requires that the plaintiffs and plaintiffs' counsel adequately represent the class. This analysis involves many of the same factors analyzed above in the commonality and typicality sections. *See Wal-Mart Stores*, 131 S. Ct. at 2549 n.5. However, it also requires consideration of (1) whether there are any conflicts between members of the class or class counsel and (2) whether the named class members and their counsel will vigorously prosecute

---

[9] Note that this analysis differs significantly from that laid out in note 8, *supra*, because plaintiffs seek certification for the proposed 23(b)(3) class pursuant to Rule 23(c)(4). Were it not for the proposed use of 23(c)(4), the typicality analysis here would mirror that for the 23(b)(2) class.

the case.  *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187–88 (10th Cir. 2002) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997)).

The Court finds that both the named plaintiffs and their counsel would adequately represent the class.  In the context of the 11 questions for which the Court found commonality above, the interests of all putative class members are aligned (for example, all would benefit from an affirmative answer to the question of whether DaVita failed to adequately monitor patient data and outcomes).  Although the majority of putative members have only a consumer protection claim (under the broadest proposed class definition), while the three named plaintiffs also seek damages for severe injuries or death, there is no indication in the record of conflict among class members or between class members and counsel.  These different types of claims are complementary, not contradictory.  Moreover, the Court has no reason to believe that the plaintiffs and their well-qualified counsel will not vigorously prosecute the case, as they have done to date.

DaVita argues that the plaintiffs' attorneys cannot adequately represent the putative class because of their involvement in litigation against Fresenius, the manufacturer of GranuFlo.  ECF No. 112 at 39–40.  Specifically, defendant contends, the plaintiffs here have not joined Fresenius in the present action, and plaintiffs' counsel have taken factual and legal positions in the Fresenius litigation that are adverse to their clients' interests in the present case.  *Id.* at 40.  The Court is not persuaded by either of these arguments.  Plaintiffs are entitled to make strategic decisions about the joinder of other parties, and defendant has not pointed to any inconsistency between positions taken in the two cases that the Court finds problematic.  In its response, DaVita highlights only the fact that plaintiffs in the Fresenius litigation contend that Fresenius had exclusive control over non-public information about the nature of GranuFlo, ECF No. 99 at

38; here the heart of plaintiffs' case is that DaVita should have or did discover this information on its own. Although there is some evidence suggesting that DaVita may have received certain documents from Fresenius regarding the dangers associated with GranuFlo, the Court does not find this small inconsistency fatal to counsel's ability to represent the plaintiffs in this case. In sum, DaVita's arguments do not convince the Court that plaintiffs or their counsel will not adequately represent the class, and the Court finds that plaintiffs have satisfied the adequacy requirement.

### C.  The Rule 23(b)(3) and 23(c)(4) Requirements

Having found that plaintiffs have satisfied the prerequisites of Rule 23(a), the Court now turns to an analysis of the requirements for certification under 23(b)(3) and 23(c)(4). Plaintiffs have set forth 15 issues related to DaVita's actions or lack thereof, 11 of which the Court found appropriate for certification under the 23(a) analysis above. In order to certify a 23(b)(3) class on these issues, the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Furthermore, "[t]he matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action."

*Id.* Thus the Court examines (1) predominance and (2) superiority in determining whether certification is appropriate pursuant to 23(b)(3). Lastly, the Court considers whether certification under 23(c)(4) will materially advance the litigation. *See In re Motor Fuel Temperature Sales*

*Practices Litig.*, 279 F.R.D. 598, 609 (D. Kan. 2012).

### 1. <u>Predominance</u>

As an initial matter, the parties disagree about how Rule 23(c)(4) affects the 23(b)(3)

predominance analysis.  Courts are split on whether a plaintiff's entire claim or only the specific

issues on which he seeks certification must satisfy the predominance requirement.  *See, e.g.*, *In*

*re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 227 (2d Cir. 2006) ("[A] court may employ

subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole

satisfies Rule 23(b)(3)'s predominance requirement."); *Castano v. Am. Tobacco Co.*, 84 F.3d

734, 745 (5th Cir. 1996) ("A district court cannot manufacture predominance through the nimble

use of subdivision (c)(4). . . . [A] cause of action, as a whole, must satisfy the predominance

requirement of (b)(3) . . . [even where c(4)] allows courts to sever the common issues for a class

trial.").  While it does not appear that the Tenth Circuit has adopted either approach, the District

of Kansas recently held that courts need only consider the specific issues on which a plaintiff

seeks certification: "Although the Tenth Circuit has not addressed the question, this Court has

generally followed the approach of the Second, Seventh and Ninth Circuits, and has used Rule

23(c)(4) to certify parts of claims where doing so would materially advance the disposition of the

litigation of the whole."  *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. at

664–65 (internal citations and quotations omitted).  This appears to be the majority approach.[10]

*See id.*  This Court will therefore follow the approach embraced by the District of Kansas and

consider only the issues on which plaintiffs seek 23(c)(4) certification in analyzing whether

questions of law or fact common to class members predominate over any questions affecting

---

[10] DaVita cites only to Fifth Circuit cases in arguing for the other approach.  *See* ECF No. 112 at 10–11.
Moreover, in addition to the Second, Seventh, and Ninth Circuits, the First and Fourth Circuits appear to
have adopted the specific-issues approach as well.  *See Tardiff v. Knox Cnty.*, 365 F.3d 1 (1st Cir. 2004);
*Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 439 (4th Cir. 2003).

only individual members.

Despite DaVita's thorough attempt to show otherwise, it seems clear that—considering only the (c)(4) issues for which the Court found commonality above—common questions predominate.  Taking note of the factors relevant to the 23(b)(3) analysis, the Court finds that (A) the putative class members do not have a strong interest in controlling the litigation with respect to the issues on which plaintiffs seek certification; on the contrary, given the need for extensive expert testimony, resolving these issues in a single proceeding would seem to benefit the class members; (B) no other class action against DaVita regarding its use of GranuFlo has been requested, *see* Day One Tr. at 92; and (C) DaVita's principal place of business is Denver, Colorado, and thus this Court is an appropriate forum in which to resolve this dispute, ECF No. 90 at ¶28.

The fourth consideration—the likely difficulties in managing a class action—cuts against certification, as discussed below, even when considered only with respect to the particular issues on which plaintiffs seek certification.  However, the Court believes that these concerns about the manageability of plaintiffs' proposed class are best addressed under the superiority analysis below.  *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 194 (3d Cir. 2001) ("It is within [the superiority] requirement that the court should address the difficulties likely to be encountered in the management of a class action.").

Moreover, an important focus of the predominance inquiry is whether plaintiffs can establish that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Nassau Cnty. Strip Search Cases*, 461 F.3d at 227 (internal citation omitted).  The 11 issues for which the Court found commonality above—involving GranuFlo's

effect on bicarbonate levels, DaVita's monitoring of patient data, DaVita's company-wide

practices and procedures, DaVita's knowledge about problems associated with the use of

GranuFlo, whether DaVita concealed information from its patient population, DaVita's duties as

a corporation, and whether DaVita committed an unfair or deceptive trade practice—all turn on

generalized proof about the nature of GranuFlo and DaVita's actions as a corporation.  Although

DaVita highlights a host of issues requiring individualized proof that are relevant to plaintiffs'

claims, these individual issues are of limited relevance here, where Court has determined it will

look only to whether predominance is satisfied as to the particular issues on which plaintiffs seek

certification.[11]

Thus the most relevant considerations weigh in favor of finding predominance here.

Courts have recognized that Rule 23(c)(4) effectively operates to isolate just those issues that

predominate: "Even if the common questions do not predominate over the individual questions

so that class certification of the entire action is warranted, Rule 23 authorizes the district court in

appropriate cases to isolate the common issues under [Rule 23(c)(4)] and proceed with class

treatment of these particular issues."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th

Cir. 1996).  *See also Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 29–30 (E.D.N.Y. 2001) ("The

framers of [Rule 23(c)(4)] considered class actions brought under Rule 23(b)(3)—

characteristically disputes that involve numerous individual proofs of causation and injury—

---

[11] Indeed, all of the cases DaVita cites to emphasize that certification should be denied where the trial would be consumed by individual issues and no operative set of facts establishes liability, *see* ECF No. 112 at 11, either do not address predominance in relation to 23(c)(4) certification or do not follow the approach taken by this Court of considering only the issues on which plaintiffs seek certification in analyzing predominance.  *See Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 619 (S.D. Ohio 1996) (considering predominance for the case as a whole, not only in relation to 23(c)(4) issues); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005) (same); *Spence v. Glock, Ges.m.b.H.*, 227 F.3d 308 (5th Cir. 2000) (analyzing certification under 23(b)(3), but not 23(c)(4)); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1084 (6th Cir. 1996) (same); *Cole v. Gen. Motors Corp.*, 484 F.3d 717 (5th Cir. 2007) (same); *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1219 (10th Cir. 2013) (same).

particularly well suited for certification of fewer than all issues.  Their conclusion follows from the fact that [Rule 23(c)(4)] assists in satisfying Rule 23(b)(3)'s additional class certification requirements of predominance and superiority.").  In sum, plaintiffs have employed Rule 23(c)(4) to isolate those issues that predominate over individual ones and can be resolved with reference to generalized proof.  The Court accordingly concludes that plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement.

### 2. **Superiority**

Rule 23(b)(3) also requires that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy."  The Tenth Circuit has noted that "class treatment is superior [when] it will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."  *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997)).  *See also Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.) *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) ("If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'").  Furthermore, "a class action is the superior method for managing litigation if no realistic alternative exists."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234–35 (9th Cir. 1996).

In the present case, although the first three 23(b)(3) factors weigh in favor of certification, several manageability concerns present here overwhelm the superiority analysis.  *See Johnston*, 265 F.3d at 194 (noting that manageability concerns are particularly relevant to superiority).  Setting aside the claim asserted under the Colorado Consumer Protection Act for a

minute, the core claims in this case are that DaVita was either negligent in monitoring patient data and thus failed to recognize the risks associated with its use of GranuFlo, or that DaVita did properly monitor the relevant data and understand its significance but concealed it from its patients and their physicians.  On either theory, although the general issues on which plaintiffs seek certification are relevant to each putative member's potential claims, a myriad of individual causation issues would need to be resolved with respect to each plaintiff.

Even in the discussion of the three named plaintiffs at the class certification hearing, the defendant put forth expert testimony that (1) Mrs. Nunes' bicarbonate level was not elevated to a dangerous level when she suffered cardiac arrest, and, even if it had been, that could not have been caused by GranuFlo because she was only five minutes into her dialysis treatment that day, Day Two Tr. at 382–85; (2) Mr. Armstrong had been admitted to the hospital several times because he "was not adherent to his dialysis treatments," he had engaged in illicit drug use, he had a history of hypertension and congestive heart failure, and, on the day of his cardiac arrest, he experienced "fluid overload" after drinking one liter of Coca-Cola and did not have a dangerously high bicarbonate level, *id.* at 390–94; and, lastly, (3) Ms. Morris had a history of cardiovascular problems, and, although her bicarbonate level was unusually high at the time she was admitted to the hospital, this was caused by her vomiting on the way to the hospital, not her dialysis treatment, *id.* at 394–97.  If the Court were to certify the plaintiffs' proposed 23(b)(3) class, it would potentially need to hold several thousand mini-trials to resolve individual causation issues for the putative members who suffered a negative health outcome.[12]

---

[12] The plaintiffs correctly point out that the size of a proposed class in and of itself does not impact manageability: "The size of a proposed class, on its own, does not affect manageability; increasing the size of a proposed class only hurts manageability if it introduces new proposed class members with individual issues." *Anderson Living Trust v. WPX Energy Prod., LLC*, No. CIV 12-0040 JB/LFG, 2015 WL 1321479, at *92 (D.N.M. Mar. 19, 2015) (citing *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 66061 (7th Cir.2004) (Posner, J.)).  However, this is just the type of case in which each additional class

In sum, this is a case in which individual issues are so central to plaintiffs' claims that classwide treatment of even the issues on which plaintiffs seek certification would not achieve significant economies of time, effort, and expense.[13]

Furthermore, the different laws that govern putative members' claims and the significant individual causation issues involved make class treatment unworkable. As this Court has already made clear in its Orders on DaVita's motions to dismiss [ECF Nos. 69 and 126], each putative class member's claims are governed by the laws of the state in which he or she received treatment at a DaVita clinic.[14] Thus, under plaintiffs' plan, after the initial phase of litigation, the Court and the parties would be faced with the task of sorting out how to proceed under dozens of states' laws, which are far from uniform in the medical malpractice context.[15] In light

---

member's claims involve a host of individual issues.

[13] The Court is not unaware that the sheer difficulty and expense of trying this number of cases, and the potential exposure to damages for that number of plaintiffs, might lead to a settlement. But the Court cannot assume that a settlement will occur. On the contrary, the notion that the in terrorem effect might lead to a settlement suggests to this Court that a class action is not superior to individual actions.

[14] The law governing the plaintiffs' negligence and fraudulent concealment claims is determined by Colorado choice-of-law rules. The Colorado Supreme Court has held that the choice-of-law standard used to determine what state law applies in a multi-state tort action is "the most significant relationship to the occurrence and parties test expressed in Restatement (Second) of the Conflicts of Laws §§ 145, 171 (1971)." *AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 508 (Colo.2007) (en banc). Taking into account the relevant considerations laid out in § 145, the Court finds that (a) plaintiffs' alleged injuries occurred in their home states; (b) the conduct causing the alleged injuries occurred primarily in California (where DaVita was formerly located) and Colorado; (c) DaVita is incorporated in Delaware and headquartered in Colorado, while the plaintiffs reside in 46 different states; and (d) the relationship of the parties is centered in each plaintiff's home state, where he or she established a relationship with DaVita and regularly visited a DaVita clinic. Weighing these considerations, the Court finds that each plaintiff's home state has the most significant relationship to the occurrences at the center of this litigation and to the parties under the guidelines set out in the Restatement. Moreover, "[w]hen, as here, the case involves claims of personal injury, the location of the injury presumptively provides the controlling law unless some other state has a more significant relationship." *Elvig v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1210 (D. Colo. 2010). For these reasons, the law of each putative class member's home state would govern his or her tort claims in the present action.

[15] By way of example, this Court has already dismissed one plaintiff's claims for failure to comply with an Arizona statue requiring that an expert affidavit be filed with the Court in medical malpractice cases, ECF No. 126 at 7, and another plaintiff's negligence claim because, under North Carolina law, the discovery rule is inapplicable to wrongful death actions even when based on underlying allegations of

of the individual causation issues and the variety of state laws involved in plaintiffs' claims, the Court concludes that class treatment is not a superior method for resolving plaintiffs' negligence and fraudulent concealment claims.[16]

Turning to the consumer protection claims, the Court here too finds that plaintiffs' proposed class is unmanageable. The complaint sets out a claim under the Colorado Consumer Protection Act. ECF No. 90 at 37. However, it is not clear to the Court that out-of-state plaintiffs who received treatment from DaVita clinics in their home states and presumably also saw any advertising (or did not receive any information that should have been disclosed) in their homes states can bring suit under Colorado's consumer protection statute. Indeed, the choice-of-law analysis for consumer protection claims takes into account the same considerations as that for plaintiffs' negligence and fraud claims, and thus the Court concludes that the relevant law of each plaintiff's home state governs any consumer protection claim he or she might bring. *See* note 14, *supra*. *See also Elvig v. Nintendo of Am., Inc.*, 696 F. Supp. 2d 1207, 1215 (D. Colo. 2010) ("It is reasonable to assume that most consumers expect to be protected by the laws applicable in the state where they live, purchase a product and use it."); *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 83 (D. Mass. 2005) (finding that the consumer protection law of each plaintiff's home state applied where "class members purchased physician-administered drugs in reliance on [publications] in states where they were receiving treatments

---

medical malpractice, ECF No. 69 at 12. Such differences between different states' laws abound in the medical malpractice context.

[16] The Court's concerns about the variety of state laws and myriad individual issues involved in these claims are present regardless of whether the Court considers the proposed class of the 300,000 individuals treated with GranuFlo at DaVita clinics or the alternative class of the approximately 3,000 to 6,000 people who received GranuFlo and experienced a negative health outcome like a heart attack or stroke. Indeed, under any class definition, only those who actually experienced such an outcome will have negligence and fraudulent concealment claims. As plaintiffs' counsel made clear at the class certification hearing, the vast majority of individuals in the proposed class of 300,000 have only consumer protection claims. *See* Day One Tr. at 73, 260.

from their physicians, typically their places of residence"). Again here, the Court and the parties would be forced to sort out putative class members' claims under dozens of state consumer protection laws, which vary widely.[17] Such an approach is not superior.

Moreover, at least portions of plaintiffs' alleged consumer protection claims would require a consideration of individualized proof. Even assuming that Colorado law applied, "to maintain a private claim for relief [under the CCPA], a plaintiff must demonstrate an injury in fact to a legally protected interest caused by the challenged deceptive trade practice." *Crowe v. Tull*, 126 P.3d 196, 209 (Colo. 2006). The Colorado Supreme Court addressed the issue of whether plaintiffs can establish the causation element of a CCPA claim on a classwide basis, without consideration of individual evidence, in *Garcia v. Medved Chevrolet, Inc.*, 263 P.3d 92 (Colo. 2011). In that case, the court noted that "[r]eliance often provides a key causal link between a consumer's injury and a defendant's deceptive practice." *Id.* at 98. Although "reliance may be inferred from circumstantial evidence common to a class," frequently "proof of reliance varies from individual to individual." *Id.* at 98–99. Indeed, "courts have . . . refused to certify class actions where an individual assessment is required to determine whether a class member relied on a defendant's deceptive practice and whether that practice caused injury." *Id.* at 99. Trial courts must, therefore, "rigorously analyze the evidence presented to determine whether the evidence supports a class-wide inference of causation. As part of this analysis, the

---

[17] As the Central District of California has recently noted, "there are material differences among the states' consumer protection laws. . . . [A]t least seven states require a pre-filing notice to the defendant in order to file a claim, including Alabama, Georgia, Indiana, Massachusetts, Texas, and Wyoming. Moreover, statutes of limitations vary among the states from one to ten years . . . Several states do not permit class actions under their consumer protection laws including Montana, South Carolina, Tennessee, Alabama, and Virginia. Some states generally restrict class actions brought under their respective consumer protection laws to state residents, while at least one state does not recognize a private right of action. Finally, there are also material differences in the remedies given by the state laws." *Gustafson v. BAC Home Loans Servicing*, LP, 294 F.R.D. 529, 538–39 (C.D. Cal. 2013) (internal citations and quotations omitted).

trial court must consider not only whether the circumstantial evidence common to the class supports an inference of causation, but also whether any individual evidence refutes such an inference." *Id.* at 100.

In the present case, plaintiffs allege that DaVita violated the CCPA by (1) failing to disclose "true and material facts concerning NaturaLyte and GranuFlo and its use of those products in administering dialysis treatments," and (2) making false statements about the high quality of care it provided to patients. ECF No. 90 at ¶¶42–44, 107. To the extent plaintiffs' CCPA claim is based on DaVita's failure to disclose particular information, it is likely susceptible to proof on a classwide basis; plaintiffs can argue that no reasonable class member would have sought treatment from DaVita had the alleged risks associated with its use of GranuFlo been disclosed. *See Garcia*, 263 P.3d at 99 (citing *Negrete v. Allianz Life Insurance of North America*, 238 F.R.D. 482, 484 (C.D. Cal. 2006) (plaintiffs could establish reliance on a classwide basis with the "common sense inference that no rational class member would purchase the annuities in questions [sic] upon adequate disclosure of the facts")).

However, to the extent the claim is grounded in DaVita's affirmative statements about its quality of care and high regard for patient safety, plaintiffs will likely be required to present individualized proof of reliance. At this stage, plaintiffs have failed to present evidence common to the proposed class that supports an inference of causation, and, moreover, DaVita intends to present evidence refuting reliance on an individual basis (indeed, as far as the Court is aware, it is possible if not probable that putative class members were directed to DaVita clinics by their nephrologists and investigated DaVita no further). For these reasons, at least a portion of plaintiffs' CCPA claim is not amenable to classwide treatment. Thus resolution of the issues on which plaintiffs seek certification would do little to secure economies of time, effort, and

expense; the nature of plaintiffs' consumer protection claim underscores the above finding that class treatment is not superior.[18]

The Court also notes that a realistic alternative to class treatment exists here for all of plaintiffs' claims. The three plaintiffs presently before the Court allege that they have suffered serious injuries; they thus have every incentive to pursue their claims against DaVita. Moreover, the Court thinks it likely that other potential plaintiffs will be able to rely on collateral estoppel to avoid relitigating the general causation issues on which plaintiffs seek certification in the event that the initial plaintiffs are successful (indeed, this set-up benefits plaintiffs at the expense of the defendant, which cannot rely on collateral estoppel even after successfully litigating against one or more plaintiffs). *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 427 (4th Cir. 2003) (noting that plaintiffs can rely on collateral estoppel against a defendant when another plaintiff has prevailed on an issue that the defendant has had a full and fair opportunity to litigate). *See also Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 631 (D.N.M. 2007) (finding class treatment not superior in part because plaintiffs in later individual cases could rely on collateral estoppel to prevent defendants from raising the same issues in subsequent litigations). Thus, in the present action, individual cases provide a realistic alternative to a class action.

Lastly, other expenses and undesirable results would result from class certification in the present case. As mentioned in the ascertainability analysis above, the process the parties have outlined for determining who is a member of the putative class—on any of the plaintiffs' proposed definitions— would be complex, costly, and not necessarily entirely accurate.

---

[18] Again, these manageability concerns are fatal regardless of whether the Court considers a proposed class of DaVita patients treated with GranuFlo after March 1, 2010 (presumably consisting of some significant portion of the 300,000 people in the original proposed class) or the more limited group of those who experienced a negative health outcome. In either case, the necessity of sorting out thousands of plaintiffs' claims under dozens' of states varied consumer protection laws makes class treatment an inferior method for resolving this dispute.

Moreover, any notice sent to the proposed class of 300,000 individuals would potentially alarm many of them and lead them to question their confidence in DaVita, when in fact that vast majority of these people did not experience any adverse health effects as a result of DaVita's use of GranuFlo. *See* note 8, *supra*. Thus the expense associated with attempting to identify class members and the undesirable result of unnecessarily alarming many thousands of sick people further underscore the conclusion that class treatment is not superior here.

To sum up, plaintiffs' claims require the application of dozens of states' negligence, fraud, and consumer protection laws and involve a host of issues necessitating individualized proof. In light of these considerations, the Court finds that class treatment in the present case will not achieve economies of time, effort, and expense and a class action is therefore not a superior method for resolving this dispute. For this reason, I decline to certify plaintiffs' proposed 23(b)(3) class.

### 3. **Materially Advancing the Litigation**

Finally, "[c]ourts should use Rule 23(c)(4) . . . only where resolution of the particular common issues would materially advance the disposition of the litigation as a whole." *In re Motor Fuel Temperature Sales Practices Litig.*, 292 F.R.D. at 665 (internal citation and quotations omitted). *See also In re Paxil Litig.*, 212 F.R.D. 539, 543 (C.D. Cal. 2003) ("Since the purpose of Rule 23(c)(4) is to give courts the discretion necessary to advance judicial economy, courts have refused to apply Rule 23(c)(4) when such application would not significantly advance the litigation."). For much the same reasons that class treatment is not superior in the present circumstances, the Court also finds that certification under Rule 23(c)(4) would do relatively little to advance the disposition of this litigation. As explained above, the necessity of applying the law of each plaintiff's home state and the extent to which plaintiffs'

claims turn on individual issues make class treatment unworkable.  For these same reasons, resolution of the issues on which plaintiffs seek certification would play only a limited role in the resolution of their claims on the whole.  Even considering just the smaller, alternative proposed class of the 3,000 to 6,000 individuals who suffered a cardiac event or stroke, this case is one that necessarily involves highly individualized inquiries about the chain of causation leading to a significant negative health event; such inquiries are best conducted in individual trials, not a class action involving thousands of plaintiffs.  Thus, in addition to the fact that class treatment is not superior, 23(c)(4) certification would not materially advance the disposition of this litigation as a whole.

### III.  <u>Conclusion</u>

For the reasons set forth above, Plaintiffs' Motion to Certify Class and Appoint Class Counsel [ECF No. 99/100] is DENIED.

DATED this 18th day of June, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge